## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, TEXAS PRESS ASSOCIATION, and JOSEPH PAPPALARDO, | § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO.: |
| *v.* | § § | 1:19-cv-00946 |
| STEVEN MCCRAW, in his official capacity as Director of Texas Department of Public Safety, RON JOY, in his official capacity as Chief of the Texas Highway Patrol, and WES MAU, in his official capacity as District Attorney of Hays County, Texas, | § § § § § § § | |
| Defendants. | § | |

## PLAINTIFFS' COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

TO THE HONORABLE JUDGE OF THIS COURT:

1.      This is a civil rights action challenging the constitutionality of certain sections of Texas Government Code Chapter 423 ("Chapter 423"), which regulates the use of unmanned aerial vehicles ("UAVs" or "drones") by imposing civil and criminal penalties on newsgathering and speech protected by the First Amendment.

2.      Plaintiffs are a Texas journalist and organizations that represent the interests of visual journalists in Texas and nationwide.  Plaintiffs and their members have used and wish to continue to use UAVs to record newsworthy events for public dissemination.  However, certain sections of Chapter 423 have chilled plaintiffs and their members from using UAVs for a number of newsgathering activities, in direct violation of their rights under the First and Fourteenth Amendments to the United States Constitution.

3.     Chapter 423 contains two sets of provisions that place unconstitutional limitations on the right to operate UAVs for the purpose of gathering the news:  First, Sections 423.002, 423.003, 423.004, and 423.006 (collectively, the "Surveillance Provisions") impose criminal and civil penalties on speech and newsgathering activity by declaring it unlawful to use a UAV to capture and/or publish an image of an individual or privately owned property with the "intent to conduct surveillance."   Second, Sections 423.0045 and 423.0046 (collectively, the "No-Fly Provisions") unconstitutionally impose criminal penalties on newsgathering activities by making it unlawful to fly UAVs over a broad range of facilities at less than 400 feet, including over sports arenas, correctional facilities, animal feedlots, oil and gas drilling sites and pipelines, and petroleum and alumina refineries.  When read in conjunction with the FAA regulations, which require UAVs to fly below 400 feet, the No-Fly Provisions function as a near absolute ban on the use of UAVs in these locations. These restrictions chill and criminalize speech and newsgathering activity protected by the First and Fourteenth Amendments.

4.     The Surveillance Provisions' ban on the use of a drone to capture an image of an individual or privately owned real property "with the intent to conduct surveillance," Tex. Gov't Code § 423.003(a), imposes content and speaker based restrictions on protected speech and newsgathering activity.  Section 423.002 provides over 21 content and speaker based exemptions from the criminal and civil liability otherwise imposed, but notably *does not* exempt the use of UAVs to capture images for the purpose of visual journalism or newsgathering.  This content and speaker based statutory scheme violates the constitutional rights of plaintiffs and their members.

5.     The Surveillance Provisions are also unconstitutionally vague and overbroad. Section 423.003 prohibits the use of drones with the intent to conduct "surveillance," but provides no definition for the "surveillance" conduct it proscribes.  The lack of any statutory

definition leaves journalists, citizens, and law enforcement unable to distinguish legal from illegal conduct, thus exposing those using drones for First Amendment-protected activity to potential prosecution and self-censorship.

6.     The No-Fly Provisions are also unconstitutionally vague and overbroad.  These provisions exempt nine classes of UAV users from the statute's general prohibitions and criminal penalties, including individuals using UAVs for a "commercial purpose."  However, the term "commercial purpose" is undefined in the statute, leaving visual journalists unable to determine if their UAV use is permitted and law enforcement unable to differentiate legal from illegal conduct.

7.     The No-Fly Provisions separately serve to restrict newsgathering activities in violation of the First and Fourteenth Amendments.  By restricting the use of UAVs for newsgathering purposes, while permitting the use of UAVs for commercial purposes, the No-Fly Provisions single out photojournalists for disfavored treatment and impose upstream restraints on protected speech, in violation of the First and Fourteenth Amendments.

8.     Finally, the No-Fly Provisions also violate the Supremacy Clause of the United States Constitution, U.S. Const. Art. VI, cl. 2, because they impinge on the federal government's sole and exclusive authority to regulate the national airspace and aviation safety.

9.     Plaintiffs seek a judgment (a) declaring that the Surveillance Provisions (Sections 423.002, 423.003, 423.004, and 423.006) and the No-Fly Provisions (Sections 423.0045 and 423.0046) violate the First and Fourteenth Amendments in multiple respects; (b) declaring that the No-Fly Provisions violate the Supremacy Clause; and (c) enjoining the Director of the Texas Department of Public Safety, the Chief of the Texas Highway Patrol, and the District Attorney of Hays County from enforcing these provisions of Chapter 423.

## JURISDICTION AND VENUE

10.     This case arises under the United States Constitution and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331 and § 1343(a)(3).  This action is brought pursuant to 42 U.S.C. § 1983.

11.     This Court has authority to grant declaratory relief pursuant to 28 U.S.C. § 2201(a), § 2202, and injunctive relief pursuant to Federal Rule of Civil Procedure 65.

12.     Venue is proper under 28 U.S.C. § 1391(b).  All defendants reside within the Western District of Texas.

## PARTIES

13.     Plaintiff National Press Photographers Association ("NPPA") is the nation's leading professional organization for visual journalists.  Its membership includes news photographers from print, television, and electronic media.  NPPA has approximately 300 members in the State of Texas.  NPPA promotes the role of visual journalism as a public service, including by training and advocating for the work of its visual journalist members.  NPPA, as well as several NPPA members, testified against the passage of Chapter 423 at hearings of the Texas legislature.

14.     Plaintiff Texas Press Association ("TPA") is one of the nation's oldest and largest newspaper trade organizations.  Its members include the *San Antonio Express-News*, the *Dallas Morning News*, the *Austin American-Statesman*, the *Fort Worth Star-Telegram*, and over 400 other newspapers across the State.  The Texas Press Association testified against the passage of Chapter 423.

15.     Plaintiff Joe Pappalardo, a Texas resident, is an award-winning freelance reporter who has worked for Texas newspapers including the *Dallas Observer* and *Corpus Christi Caller-Times* and is currently a contributing editor for *Popular Mechanics*.  Mr. Pappalardo was

certified to operate a UAV in the national airspace by the Federal Aviation Administration ("FAA") until he allowed his certification to expire due to the inability to legally fly UAVs for newsgathering purposes in Texas.

16.     Defendant Steve McCraw is the Director of the Texas Department of Public Safety.  He is sued in his official capacity, in light of his responsibility for the conduct of the peace officers who enforce the criminal provisions of Chapter 423.

17.     Defendant Ron Joy is the Chief of the Texas Highway Patrol.  He is sued in his official capacity, in light of his responsibility as a peace officer to enforce the criminal provisions of Chapter 423 and his responsibility for the conduct of the peace officers who enforce the criminal provisions of Chapter 423.

18.     Defendant Wes Mau is the District Attorney of Hays County.  He is sued in his official capacity, in light of his responsibility for the enforcement of the criminal provisions of Chapter 423 in Hays County and the past threat of San Marcos police officers to bring such a prosecution.

**FACTUAL BACKGROUND**

**Statutory Overview**

19.     The Texas Legislature passed Chapter 423 in 2013 over forceful opposition from visual journalists across the State, who advised the Legislature of the unconstitutional restrictions the proposed law would impose and the chilling effect it would have on newsgathering activities and speech.

20.     As originally enacted, Chapter 423 banned the use of drones for "surveillance" of individuals and private property.  The law exempted some groups and subject matters from this ban, but did not exempt journalists or newsgathering activities.

21.     The Texas Legislature amended Chapter 423 in 2015, 2017, and 2019.   The amendments added additional exemptions from the law's surveillance provisions and added provisions that ban the use of UAVs over any location classified as "a correctional facility, detention facility, or critical infrastructure facility" or over a "sports venue."

*The Surveillance Provisions*

22.     Section 423.003 prohibits using a UAV to "capture an image of an individual or privately owned real property in this state with the intent to conduct surveillance on the individual or property contained in the image."  Tex. Gov't Code § 423.003(a).

23.     Chapter 423 defines the act of capturing an "image" as "any capturing of sound waves, thermal, infrared, ultraviolet, visible light, or other electromagnetic waves, odor, or other conditions existing on or about real property in this state or an individual located on that property."  Tex. Gov't Code § 423.001.

24.     Chapter 423 provides no definition of "surveillance."  As generally understood, "surveillance" can include the act of gathering news.  *See Black's Law Dictionary* (10th ed. 2014) (defining surveillance as "[c]lose observation or listening of a person or place in the hope of gathering evidence"); *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) (defining surveillance as "close watch kept over someone or something (as by a detective)").

25.     A violation of Section 423.003 is a Class C misdemeanor punishable by up to a $500 fine.  Tex. Penal Code § 12.23; Tex. Gov't Code § 423.003(b).

26.     Section 423.004 criminalizes the possession, disclosure, display, distribution, or other use of images by a person who captured those images in violation of Section 423.003.  *Id.* § 423.004(a).

27.     Under Section 423.004, a person who captures an image in violation of Section 423.003 commits an additional Class C misdemeanor for the possession of the image and

commits a Class B misdemeanor for any subsequent disclosure, display, distribution, or other use of the image. *Id.* § 423.004(b). A Class B misdemeanor is punishable by up to 180 days in jail and a fine of up to $2,000. Tex. Penal Code § 12.22. Each image constitutes a separate offense. *Id.* § 423.004(c).

28. Under Section 423.006, a landowner or tenant may bring a civil action against a person who violates Section 423.003 or 423.004. *Id.* § 423.006(a). That landowner or tenant may seek an injunction, a civil penalty of statutory damages, or actual damages if the photographer acted with specific intent to cause substantial injury or harm, as well as mandatory attorneys' fees in addition to any civil penalty awarded.

29. Chapter 423 exempts twenty-one specific uses of UAVs from criminal and civil liability under the Surveillance Provisions. *Id.* § 423.002(a). These exemptions permit a wide variety of individuals and organizations to use drones for information-gathering purposes—including individuals in industries such as telecommunications, real estate, surveying, engineering, and insurance, among others. This section does *not* exempt visual journalists or those engaged in gathering and disseminating information on matters of public concern.

30. The exemptions in Section 423.002 are content and speaker based. They impose civil and criminal penalties based upon the purpose for which the UAV image was captured; the identity or affiliation of the person capturing or directing the capture of the UAV image; or the content of the image captured:

    a. The application of nine exemptions in Section 423.002 turns on the purpose for which an image is captured with a UAV. *Id.* § 423.002(a)(1) (academic purposes); (a)(2) ("purpose of integrating [UAVs] into the national airspace"); (a)(4) ("purposes of mapping"); (a)(5) (various telecommunications-related purposes); (a)(8) (various law

enforcement purposes); (a)(9) (same); (a)(11) ("purpose of fire suppression"); (a)(12) ("purpose of rescuing a person whose life or well-being is in imminent danger"); (a)(16) ("purpose of inspecting, maintaining, or repairing pipelines or other related facilities").

b.   The application of nine exemptions in Section 423.002 turns on the identity or affiliation of the person capturing an image with a UAV or the person who directed the capture of the image. *Id*. § 423.002(a)(1) (professors, employees, students, or those acting under the direction or on behalf of institutions of higher education); (a)(5) (electric or natural gas utility or telecommunications providers); (a)(8) (law enforcement authorities and those acting under their direction or on their behalf); (a)(9) (same); (13) (real estate brokers); (a)(16) (owners or operators of pipelines); (a)(19) (professional land surveyors); (a)(20) (professional engineers); (a)(21) (employees of insurance companies or affiliates of insurance companies).

c.   The application of four exemptions in Section 423.002 turns on the content of an image captured with a UAV. *Id.* § 423.002(a)(8) (certain private property normally open to the public and real property or persons on real property within 25 miles of the border); (a)(9) ("the scene of a catastrophe or other damage"); (a)(10) (hazardous material spills); (a)(15) ("public real property or a person on that property").

31.   None of the twenty-one exemptions in Section 423.002 applies to visual journalists or other newsgathering individuals or entities.

*The No-Fly Provisions*

32.   The Texas Legislature amended Chapter 423 in 2015 to make it an offense to fly UAVs within certain distances of a "critical infrastructure facility." *See* Tex. Gov't Code § 423.0045; 2017 Tex. Sess. Law Serv. Ch. 824 (H.B. 1643) (Vernon's); 2017 Tex. Sess. Law

Serv. Ch. 1010 (H.B. 1424) (Vernon's); 2015 Tex. Sess. Law Serv. Ch. 1033 (H.B. 1481) (Vernon's).

33.     These No-Fly Provisions prohibit intentionally or knowingly flying a UAV in the airspace over a critical infrastructure facility at less than 400 feet above ground level.  *See* Tex. Gov't Code § 423.0045(b).

34.     Chapter 423 defines "critical infrastructure facility" to include facilities such as oil and gas pipelines, petroleum and alumina refineries, water treatment facilities, and natural gas fractionation and chemical manufacturing plants.  *Id.* § 423.0045(a).  As further amended in 2017, the term also includes animal feeding operations, oil and gas drilling sites, and chemical production facilities, among others.  *Id.* § 423.0045(a).

35.     The 2017 amendments also extended the No-Fly Provisions beyond critical infrastructure facilities to the use of drones over a "correctional facility, detention facility," and "sports venue," which includes any arena, stadium, automobile racetrack, coliseum, or any other facility that has seating capacity of more than 30,000 and is "primarily used" for one or more professional or amateur sport or athletics events.  *Id.* § 423.0045, § 423.0046; 2017 Tex. Sess. Law Serv. Ch. 1010 (H.B. 1424) (Vernon's).

36.     Violation of the No-Fly provisions is a Class B misdemeanor, or a Class A misdemeanor if the actor was previously convicted under either Section 423.0045 or Section 423.0046.  A Class A misdemeanor is punishable by up to one year confinement in jail and a fine of up to $4,000. Tex. Penal Code § 12.21.

37.     The No-Fly Provisions contain nine exemptions from the prohibition against UAV use over designated facilities.  These include use by a government entity or one under contract with a government entity, use by law enforcement, use with the written consent of the

property owner, and use "for a commercial purpose" done in compliance with FAA regulations. *Id.* §§ 423.0045(c), 423.0046(c).

38.     Chapter 423 contains no definition of "a commercial purpose," but some common definitions of "commercial," including the definition of "commercial" commonly understood in the photography industry, do not encompass activities undertaken for the purpose of gathering the news.   The vague No-Fly provisions can thus be construed to prohibit drone use for newsgathering purposes within the designated airspace below 400 feet.   When read in conjunction with federal law's requirement that UAVs not fly above 400 feet, *see* 14 C.F.R. § 107.51(b), the No-Fly Provisions operate as a near-complete ban for visual journalists in the locations covered by the No-Fly Provisions. Meanwhile, those who are not visual journalists, but instead gathering information for other commercial purposes, may freely use UAVs.

39.     The FAA Modernization and Reform Act directed the FAA to "develop a comprehensive plan to safely accelerate the integration of civil unmanned aircraft systems into the national airspace system."  Pub. L. No. 112–95 § 332, 126 Stat. 11, 73 (2012) (codified at 49 U.S.C. § 40101 note).

40.     Under this directive, the FAA promulgated 14 C.F.R. Part 107 ("Part 107"), which sets forth the operating, registration, and certification requirements "to allow small unmanned aircraft systems (small UAS) to operate for non-hobby and non-recreational purposes." 81 Fed. Reg. 42064, 4206 (June 28, 2016); 14 C.F.R. § 107.1(a).  Part 107 requires, *inter alia*, that anyone controlling a small unmanned aircraft system register with the FAA, keep the aircraft within a visual line of sight, and fly below an altitude of 400 feet above ground level or within a 400 foot radius of a structure.  14 C.F.R. §§ 107.13, 107.3, 107.31, 107.51(b).

41.     Newsgathering is a non-recreational activity and therefore subject to Part 107. *See* 14 C.F.R. §§ 101.1, 107.1; U.S. Fed. Aviation Admin., AC No. 107-2, Small Unmanned Aircraft Systems ¶ 4.1 (2016).  Part 107 thus prohibits newsgathering drone use above 400 feet from the ground or radius of a structure, 14 C.F.R. § 107.51 (2017), but does not restrict newsgathering drone use below 400 feet or within a 400 foot radius of a structure.

42.     Part 107 regulates the areas in which UAVs may fly in order to protect national security and public safety.  It requires anyone controlling a small unmanned aircraft system to get permission before operating a UAV in a prohibited or restricted area.  14 C.F.R. § 107.45. Part 107 also requires anyone controlling a small unmanned aircraft system to comply with temporary flight restrictions declared by the FAA.  14 C.F.R. § 107.47.  The FAA declares temporary flight restrictions near disaster and hazard areas, public figures, space flight operations, sports events, and aerial demonstrations.  14 C.F.R. §§ 91.137, 91.138, 91.141, 91.143, 91.145.  Even when a temporary flight restriction is in place, however, the FAA permits aircraft carrying news representatives to fly within the restricted zone if a flight plan is filed with the FAA.  14 C.F.R. § 91.137(c).  Finally, Part 107 requires anyone controlling a small unmanned aircraft system to comply with FAA special security instructions in areas where national security requires FAA control of aircraft.  14 C.F.R. §§ 99.3, 99.7, 107.47.

43.     Since the enactment of Part 107, visual journalists throughout the country—including Plaintiff Pappalardo, many of NPPA's members, and employees of the members of TPA—have obtained Part 107 certifications to enable them to operate drones throughout the country safely and lawfully for newsgathering purposes.

44.     Section 2209 of the FAA Extension, Safety, and Security Act of 2016 directed the Secretary of Transportation to establish a process by which certain fixed site facilities may

petition the FAA to prohibit or restrict the operation of unmanned aircrafts in close proximity to the facility.  Pub. L. No. 114–190 § 2209, 130 Stat. 615, 634 (2016) (codified at 49 U.S.C. § 40101 note).  The category of fixed site facilities includes "critical infrastructure," "[o]il refineries and chemical facilties," "[a]musement parks," and "[o]ther locations that warrant such restrictions."  Pub. L. No. 114–190 § 2209(b)(C).

**Harm to Plaintiffs**

45.    Since Chapter 423 was enacted, visual journalists have faced great uncertainty about their permitted use of drones to gather the news in Texas.  In response to this uncertainty, some visual journalists avoid the use of drones altogether for fear of violating Chapter 423; some use drones in newsgathering in a manner that appears to be prohibited under Chapter 423 but is clearly authorized under FAA regulations; and others attempt to operate in compliance with both Chapter 423 and FAA regulations, but find it nearly impossible to do so.

*Plaintiffs National Press Photographers Association and Texas Press Association*

46.    Members of plaintiff National Press Photographers Association regularly use UAVs in connection with their newsgathering activities as visual journalists across the country. Many of NPPA's Texas members, as well as NPPA's members who don't live in Texas but travel to Texas on assignment, are chilled by the challenged provisions of Chapter 423.  Aerial imagery adds significant information and depth to a news story and conveys content in a manner that photography from the ground cannot.

47.    NPPA's members, as well as the visual journalists employed or under contract by the members of the TPA, use compelling, unique images to inform their audiences.  Strong aerial visuals allow them to tell newsworthy stories on matters of public concern, and to add a level of understanding and information to stories that could not otherwise be conveyed.

48.     UAVs are the most feasible, least expensive, and safest way to engage in aerial news photography.  UAVs can fly at low altitudes, are easily maneuverable, and typically have technology to stabilize their cameras and capture smooth video and high definition still images. UAVs allow visual journalists to capture more informative, more timely, and higher quality images.

49.     Alternatives to UAVs, such as helicopters, can cost several hundred dollars per hour to operate, often cannot get close enough to the newsworthy activity, and are loud and disruptive to a news scene.  Capturing high-quality, stabilized images from a helicopter or airplane also requires additional equipment, which can be prohibitively expensive.

50.     Helicopters are also inherently risky, which creates another impediment to their use by visual journalists.  At least eight journalists have died in helicopter crashes since 2007, and if they crash, helicopters pose a far greater threat to bystanders on the ground than do UAVs.

51.     Because of their expense, risk, and inherent limitations, the use of helicopters by large news organizations is typically only permitted for major news events.  Even so, many such organizations have reduced their use of helicopters in recent years due to budgetary restrictions. Smaller news organizations and individual journalists don't have the budget to use helicopters for news coverage.

52.     Many news organizations have also reduced their staff due to budgetary concerns. As a result, visual newsgathering increasingly depends on independent visual journalists, who generally cannot afford to use helicopters or airplanes for newsgathering.  Many independent visual journalists, understanding the importance of the impact that aerial images have on storytelling, have invested time and money to purchase UAVs and obtain their Part 107 certification.

53.     As such, an ever-increasing number of visual journalists rely on the use of UAVs to capture newsworthy images.

*National Press Photographers Association*

54.     NPPA's attorneys focus their legal efforts on advising the association's leadership and assisting the organization in its mission to support and advocate for visual journalists and promote excellence in the profession.  To that end, they promote ethical journalism and work to advocate for and improve the legal landscape for visual journalists, particularly in the areas of First Amendment and copyright protection.  They provide general information on legal issues that face a broad cross-section of NPPA's membership nationwide.

55.     Since the passage of Chapter 423, many of NPPA's members, including photographers, editors, newsroom leaders, and photographers' clients seeking to use drones, have contacted the organization with specific legal questions about the risks of Chapter 423 and how to properly navigate this law.

56.     In response to the passage of Chapter 423, NPPA has had to go out of its way to counteract the negative effects of the law, including, but not limited to: researching the ongoing impact of the law; researching First Amendment protections in case a member is charged criminally or sued civilly based on a violation of Chapter 423; meeting with lawmakers in an attempt to revise the law; monitoring amendments to the law; and spending hours counseling the heads of photography departments and news organizations as well as individual photographers and members about Chapter 423 compliance. These actions have diverted resources from NPPA's core activities described in paragraph 85. Chapter 423 has thus prevented NPPA's attorneys from spending time on efforts that further the broader mission and vision of NPPA.

*NPPA Member Guillermo Calzada*

57.     Guillermo Calzada, a Texas resident, is a visual journalist with over 30 years of experience who has covered a wide range of news stories in Texas, including breaking news, natural disasters, and sports.  Mr. Calzada is a longtime member of the NPPA and is currently employed by the *San Antonio Express-News*.  The *San Antonio Express-News* is a member of the Texas Press Association, and its parent company, the Hearst Corporation, is an associate member of the Texas Press Association.

58.     Mr. Calzada has an FAA Part 107 Remote Pilot Certificate, which qualifies him to operate UAVs in the national airspace.  He owns a GoPro Karma drone that is properly registered with the FAA.

59.     Mr. Calzada used this UAV on July 24, 2018, to report on the aftermath of a deadly arson fire at the Village Apartments in San Marcos that caused numerous fatalities, an important matter of public concern.  As he was finishing his work near the scene, ATF agents stopped Mr. Calzada and called San Marcos police.  Two San Marcos police officers then approached Mr. Calzada and one of the officers informed him of the criminal penalties under Chapter 423 if he continued to use his UAV to report on the fire or if he published any of the images he had already captured.

60.     Mr. Calzada reasonably fears that operating his UAV for the purpose of capturing photographs of newsworthy events, as he is authorized to do by the FAA, will subject him to criminal penalties under Chapter 423.

61.     In particular, Mr. Calzada is aware that Chapter 423 prohibits photography of an individual or privately owned real property with the intent to conduct surveillance.  He is also

aware that Chapter 423 does not define "surveillance," but that the dictionary definition of surveillance is broad enough to apply to his work as a visual journalist.

62.     Chapter 423's "surveillance" provisions are particularly detrimental to his ability to use the UAV to take photos of neighborhood fires or accidents, because he fears that he could be civilly and criminally liable under those provisions for photographing homes that are adjacent to the incident without the permission of the homeowners.

63.     Mr. Calzada also reasonably fears that he could face civil liabilities under Chapter 423 should he or his newspaper publish his drone photography.

64.     Additionally, Chapter 423 has directly chilled Mr. Calzada's speech by causing him to fear prosecution for photographing the locations enumerated in the "No-Fly" provisions, and Chapter 423 will continue to do so.

65.     Chapter 423 infringes Mr. Calzada's rights to gather, record, and disseminate newsworthy information under the First Amendment.

66.     Chapter 423's impact on Mr. Calzada's ability to report newsworthy events of public interest using his UAV also infringes on the First Amendment right of TPA members and the public generally to receive information.  Both the members of TPA and the public have been harmed by the curtailed reporting caused by Chapter 423.

*NPPA Member Brandon Wade*

67.     Brandon Wade, a Texas resident, is a member of the NPPA and an experienced freelance news photographer who has covered sports, natural disasters, and other news events for *The Dallas Morning News*, *The Fort Worth Star-Telegram*, The Associated Press, and Getty Images.  Mr. Wade has both an FAA private pilot's license and an FAA Part 107 Remote Pilot

Certificate with a small unmanned aircraft system rating, which qualifies him to operate airplanes and UAVs, respectively, in the national airspace.

68.     Mr. Wade owns a state-of-the-art UAV with obstacle-avoidance sensors.  He has conducted aerial photography from an airplane, a helicopter, and a UAV, but nearly always finds UAVs to be more dynamic, less expensive, and significantly more flexible than airplanes or helicopters.  For example, Mr. Wade was able to capture newsworthy images of the 2016 flooding in Granbury, Texas that he would not have been able to capture with a helicopter or airplane, by flying his UAV just above the tree line.

69.     On August 14, 2017, Mr. Wade used a UAV to capture aerial photographs of a water treatment plant that was not operating properly.  These aerial photographs showed how the plant bordered a residential neighborhood, a green space, and a golf course.  The plant appeared to Mr. Wade to be surrounded by a fence.  Out of fear of violating Chapter 423, Mr. Wade had to limit where he flew his drone, which hampered his ability to capture newsworthy images.

70.     On March 20, 2018, Mr. Wade used a UAV to capture aerial photographs of a community garden for the *Dallas Morning News*, which is a member of the TPA.  After he told the *Dallas Morning News* that he had used a UAV to capture the photos, the *News* declined to publish the photos.

71.     In May 2018, the *Fort Worth Star-Telegram*, a member of TPA, offered Mr. Wade an assignment documenting the construction of the Texas Rangers' new ballpark, Globe Life Field, by conducting regularly scheduled aerial photography sessions to permit readers to view the progress of the publicly-funded project.  Mr. Wade asked a representative from the Rangers organization for permission to use a UAV to capture images of the construction project for the newspaper, as required by Chapter 423, but the Rangers denied his request.  Mr. Wade

estimates that he has lost at least $7,200 in income because of his inability to photograph the Globe Life Field construction project with a UAV for his newspaper client.  Additionally, TPA member *Star-Telegram* was harmed because the law prevented it from documenting the ongoing progress of a project of public interest.

72.     The Rangers, however, were willing to grant Mr. Wade permission to photograph the construction of the field for the team's own use.  The Rangers hired Mr. Wade under a contract that allows them to selectively release to the press a small portion of Mr. Wade's photography and videography that they alone choose, while Mr. Wade is contractually prohibited from licensing unapproved portions of the photography to members of the news media.

73.     In another incident, the Center for Investigative Reporting (CIR) hired Mr. Wade to photograph a facility housing immigrant children where CIR reported children had been mistreated.  Because of the restrictions and vagueness of Chapter 423, Mr. Wade had to limit where he flew his UAV, which hampered his efforts to capture newsworthy images of the facility.  As such, Chapter 423 prevented him from reporting fully and most effectively on this story.

74.     Mr. Wade is aware that Chapter 423 of the Texas Government Code prohibits UAV photography of an individual or privately owned real property with the intent to conduct surveillance.  He is also aware that Chapter 423 does not define "surveillance" but that the dictionary definitions of surveillance are broad enough to apply to his work as a visual journalist.

75.     Mr. Wade is also aware that Chapter 423 of the Texas Government Code restricts UAV overflight of certain "critical infrastructure facilities."

76.     Mr. Wade reasonably fears that operating his UAV, as he is authorized to do by the FAA, for the purpose of capturing photographs of newsworthy events could subject him to criminal penalties under Chapter 423.

77.     Mr. Wade also reasonably fears that he could face civil liabilities under Chapter 423 for capturing or publishing his drone-captured images.

78.     The uncertainty created by Chapter 423 has chilled Mr. Wade's speech by causing him to fear criminal and civil penalties should he use his UAV to capture newsworthy images on matters of public concern.  Indeed, the uncertainty created by Chapter 423 caused Mr. Wade to lose a valuable long-term assignment, thereby harming his livelihood.

79.     Chapter 423 infringes Mr. Wade's rights to gather, record, and disseminate newsworthy information under the First Amendment.

80.     Additionally,  Chapter 423's impact on Mr. Wade's ability to report newsworthy events of public interest using his UAV infringes on the First Amendment right of TPA members and the public generally to receive information.  Both the members of TPA and the public have been harmed by the restrictions on newsgathering caused by Chapter 423.

*Plaintiff Joseph Pappalardo*

81.     Plaintiff Joseph Pappalardo is a Texas resident and freelance journalist who has worked for newspapers in Texas including the *Dallas Observer* and the *Corpus Christi Caller-Times*.  He has an FAA Part 107 Remote Pilot's Certificate, which, when properly renewed and valid, qualifies him to operate UAVs in the national airspace.  He owns a UAV registered with the FAA.  He is aware that that Chapter 423 does not define "surveillance" but that the dictionary definition of surveillance is broad enough to apply to his work as a visual journalist.

82.     Mr. Pappalardo reasonably fears that operating his UAV for the purpose of capturing photographs of newsworthy events would subject him to criminal penalties under Chapter 423.

83.     Mr. Pappalardo also reasonably fears that he could face civil liabilities under Chapter 423 for capturing images with his drone and for publishing such images.

84.     Chapter 423 has chilled Mr. Pappalardo's speech.   Mr. Pappalardo has done research on Chapter 423 and wrote an article for the *Dallas Observer* about Chapter 423's effect on journalists in Texas, which won a first place award for Innovation in Aerospace Journalism and Publishing at the 2018 Aerospace Media Awards.   After conducting this research, Mr. Pappalardo became concerned that he would risk liability for criminal and civil penalties if he continued to use his drone for journalistic purposes.   Mr. Pappalardo also became concerned after officials at Voice Media Group, which owns the *Dallas Observer*, spoke to him and indicated that they would not be able to support him in any legal action alleging that he captured images with his UAV in violation of Chapter 423.   After this conversation, in December 2017, Mr. Pappalardo used his UAV to capture images in compliance with Chapter 423 only once. Since that time, Mr. Pappalardo has refrained from using his UAV in Texas for any image capturing for newsgathering purposes, and he has not bothered to renew his Part 107 Remote Pilot's Certificate since he is no longer using his UAV for newsgathering purposes.

85.     Chapter 423 continues to chill Mr. Pappalardo's speech.  Based on his reasonable fear of liability under Chapter 423, Mr. Pappalardo has refrained from using his drone in Texas to take photographs of newsworthy events.   Mr. Pappalardo has found that using his drone in compliance with Chapter 423 does not allow him to gain insights and information important to his role as a journalist, or to capture newsworthy images.   But for Chapter 423, he would have

used his UAV to take aerial photographs to aid in coverage of newsworthy topics like Hurricane Harvey (including a panic at the gasoline pumps that the storm caused); flood and wind damage in other storms; house fires; construction projects; urban sprawl; the removal of homeless encampments; the route a proposed toll road would take; dumping sites for dead and abandoned animals; and the removal of a Confederate statute from a public park.  He would also like to cover other, future topics but has refrained and will refrain from doing so because of Chapter 423.  These topics include construction of major infrastructure projects, air quality at various altitudes, illegal poaching in urban areas, and gridlock in the North Texas metroplex

86.     While Mr. Pappalardo could take images of such events from a helicopter without violating Chapter 423, rather than using his drone, this is not a viable option because the cost would be prohibitive for both Mr. Pappalardo and the news outlets for which he works.

87.     Mr. Pappalardo's inability to photograph newsworthy events in the most compelling fashion harms his professional standing and his livelihood.

88.     Chapter 423 infringes Mr. Pappalardo's rights to gather, record, and disseminate newsworthy information under the First Amendment.

89.     Additionally,  Chapter 423's burdensome impact on Mr. Pappalardo's ability to report newsworthy events of public interest using his UAV infringes on the First Amendment right of public generally to receive information; the public has been harmed by the curtailed reporting caused by Chapter 423.

* * * * *

90.     An actual and immediate controversy over the constitutionality of Chapter 423 exists between plaintiffs and defendants.

21

91.     Plaintiffs are entitled to a declaration of rights with respect to this controversy, including to declaratory relief in the form of a ruling from this Court that the Surveillance and No-Fly Provisions are unconstitutional.  Without such a declaration, plaintiffs and plaintiffs' members will be uncertain of their rights and responsibilities under the law.

92.     Plaintiffs are entitled to prospective relief permanently enjoining defendants from enforcing the Surveillance and No-Fly Provisions.  Injunctive relief is proper because defendants have the ability to act, are acting, and are threatening to act under color of state law to deprive Plaintiffs of their constitutional rights.   Plaintiffs and plaintiffs' members are suffering irreparable injury and will continue to suffer a real and immediate threat of irreparable injury as a result of the existence, operation, enforcement, and threat of enforcement of the challenged statute.  Plaintiffs have no plain, adequate, or speedy remedy at law.  Plaintiffs are refraining from constitutionally protected activities solely out of fear of prosecution and civil liability under the statute.

## FIRST CLAIM

### (Surveillance Provisions: First Amendment Violation)

93.     Plaintiffs repeat and incorporate by reference herein the allegations of paragraphs 1 through 92 of this Complaint as if fully set forth herein.

94.     The First Amendment to the U.S. Constitution, incorporated and made applicable to the states by the Fourteenth Amendment to the U.S. Constitution, protects plaintiffs' and plaintiffs' members' rights to gather, record, and disseminate newsworthy information, which includes the right to capture and disseminate images and videos.

95.     The acts of capturing, disclosing, displaying, and distributing an image as defined in Chapter 423 are protected under the First Amendment.

96.    Plaintiffs and plaintiffs' members are engaged in capturing, disclosing, displaying, and distributing "images" under the meaning of the statute, and are chilled from doing so using UAVs or face statutory liability if they do so using UAVs.

97.    The First Amendment prohibits states from regulating speech based on its content, including its purpose or subject matter, unless the state can demonstrate a compelling governmental need for the regulation and that the regulation is narrowly tailored to fulfill that need. Content-based restrictions are presumptively unconstitutional.

98.    By its own terms, Chapter 423 suppresses First Amendment-protected activities on the basis of content.

99.    The First Amendment also prohibits states from regulating speech based on the identity of a speaker unless the state can demonstrate a compelling governmental need for the regulation and that the regulation is narrowly tailored to fulfill that need.  Speaker-based restrictions are presumptively unconstitutional.

100.    By its own terms, Chapter 423 suppresses First Amendment-protected activities on the basis of speaker.

101.    Chapter 423 is neither justified by any compelling government interest nor narrowly tailored to accomplish that interest.

102.    Chapter 423 thus violates plaintiffs and plaintiffs' members First Amendment rights.

103.    Additionally, the First Amendment prohibits statutes that punish a substantial amount of protected free speech in the course of legitimately regulating unprotected conduct. Such statutes are unconstitutionally overbroad in violation of the First Amendment.

104.    The  Surveillance  Provisions  prohibit  "image  capture"  for  purposes  of "surveillance,"  a  term  that  is  not  defined  in  the  statute  but  is  broad  enough  to  encompass newsgathering activities and other forms of protected expression.

105.    Even if the state could lawfully limit the capture of certain images using a UAV, Chapter 423 regulates substantially more speech than the First Amendment permits.

106.    Thus,  the  Surveillance  Provision's  significant  overbreadth  unconstitutionally chills plaintiffs and plaintiffs' members from engaging in protected expressive activity.

## SECOND CLAIM

## (Surveillance Provisions: Vagueness)

107.    Plaintiffs repeat and incorporate by reference herein the allegations of paragraphs 1 through 106 of this Complaint as if fully set forth herein.

108.    The  Due  Process  Clause  of  the  Fourteenth  Amendment  to  the  United  States Constitution prohibits statutes that are so impermissibly vague that an ordinary person would not understand  what  conduct  the  statute  prohibited  or  that  are  so  standardless  as  to  invite  arbitrary enforcement.

109.    A more stringent vagueness test applies where a law "interferes with the right of free speech."  *Hoffman Estates v. Flipside*, 455 U.S. 489, 499 (1982).  This test demands that statutes affecting speech explain precisely what conduct they are proscribing.  *See Edwards v. South Carolina*, 372 U.S. 229, 236 (1963).   In other words, the government may regulate conduct that affects speech "only with narrow specificity."  *NAACP v. Button*, 371 U.S. 415, 433 (1963).

110.    Section 423.003 does not define the term "surveillance" when it criminalizes the use of UAVs to "capture an image of an individual or privately owned real property in this state with the intent to conduct surveillance on the individual or property contained in the image."

111.    There is no limiting principle or definition articulated by a state court to determine what "surveillance" means in this context.

112.    An ordinary person could not determine how "surveillance" is defined and therefore is not given notice as to when their activity is prohibited.  Plaintiffs and plaintiffs' members are chilled from capturing, disclosing, displaying, and distributing "images" using UAVs because of the vague threat of statutory liability.

113.    Law enforcement has no authoritative guidance as to when to arrest individuals— and prosecutors and judges have no authoritative guidance as to when to prosecute individuals— for capturing images with the intent to conduct "surveillance," which allows arbitrary and discriminatory enforcement of Section 423.003.

114.    Potential plaintiffs and judges enforcing civil provisions have no authoritative guidance as to when to enforce Section 423.006's civil provisions, leading to arbitrary and discriminatory enforcement of Section 423.006.

115.    Thus, Section 423.003 is unconstitutionally vague.

**THIRD CLAIM**

**(No-Fly Provisions: First Amendment Violation)**

116.    Plaintiffs repeat and incorporate by reference herein the allegations of paragraphs 1 through 115 of this Complaint as if fully set forth herein.

117.    Laws that regulate conduct implicate the First Amendment when the conduct has a significant expressive element.  Using a UAV to record images for newsgathering purposes has

a significant expressive element because aerial photography is an essential forerunner to disseminating news and thus implicates the First Amendment.

118.     Laws that regulate protected expressive conduct violate the First Amendment if they inevitably single out those engaging in protected speech or impose incidental restraints on protected speech without sufficient justification.

119.     The No-Fly Provisions inevitably single out journalists for disfavored treatment by prohibiting the use of drones for newsgathering purposes over facilities of public interest, while broadly excepting governmental and commercial uses of UAVs in these same zones.  The threat of criminal sanction for engaging in this protected conduct effectively censors critical comment by the press.

120.     This discriminatory treatment of the press burdens newsgathering activities protected by the First Amendment, and thus can only be justied by a compelling governmental interest.  Texas has no such compelling interest here.

121.     The No-Fly Provisions also impose an incidental restraint on protected expressive conduct by prohibiting plaintiffs and their members from flying UAVs as a component of their newsgathering activities near critical infrastructure facilities and sports venues.

122.     A statute that imposes incidental restraints on expressive conduct is only valid if it is within the constitutional power of the government to enact and:  (1) it furthers a substantial governmental interest; (2) the governmental interest is unrelated to suppressing free expression; and (3) the incidental restriction on the alleged First Amendment activity is no greater than is essential to furthering that legitimate governmental interest.

123.    The No-Fly Provisions do not further a substantial governmental interest.  The alleged interest in preventing the harm from UAVs flying over critical infrastructure facilities and causing damage to such facilities is not real nor has it ever occurred.

124.    The government's alleged interest in preventing harm to critical infrastructure facilities is instead directly related to the Texas Legislature's desire to suppress news coverage of potentially dangerous or embarrassing conditions at these sites of public interest, including, for example, the conditions animals are kept in at concentrated feed lots, the deteriorating condition of hydo-electric dams, and the negative environmental impacts of oil, gas, and chemical manufacturing facilities.

125.    Lastly, the incidental restraints imposed by the No-Fly Provisions are greater than essential to furthering the alleged governmental interest because extant Texas Code provisions already prohibit destruction of property and protect the safety of critical infrastructure and sports venues.  As such, the No-Fly Provisions burden far more protected expressive conduct than is necessary to accomplish the alleged government interest.

126.    Additionally, the First Amendment prohibits statutes that punish a substantial amount of protected free speech in the course of legitimately regulating unprotected conduct.  Such statutes are unconstitutionally overbroad in violation of the First Amendment.

127.    Chapter 423 does not define "commercial purpose" in its exemption from the No-Fly Provisions' general prohibitions.  The term is susceptible to narrow definitions that exclude newsgathering activities.

128.    By exempting a large portion of UAV photography with a "commercial purpose" while not exempting newsgathering activities, the No-Fly Provisions sweep a substantial amount

of constitutionally protected conduct within the scope of their otherwise legitimate criminal prohibition.

129.     Because of the No-Fly Provisions' expansive application, plaintiffs and their members have been chilled from engaging in constitutionally protected expressive activity.

130.     The No-Fly Provisions violate the First Amendment as an unconstitutional restraint on speech and as unconstitutionally overbroad.

## FOURTH CLAIM

### (No-Fly Provisions: Vagueness)

131.     Plaintiffs repeat and incorporate by reference herein the allegations of paragraphs 1 through 130 of this Complaint as if fully set forth herein.

132.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits statutes that are so impermissibly vague that an ordinary person would not understand what conduct the statute prohibited, or so standardless as to invite arbitrary enforcement.

133.     The No-Fly Provisions exempt UAV users acting with a "commercial purpose" from its criminal prohibitions, but it does not define "commercial purpose" in the statute.

134.     There is no limiting principle or definition articulated by a state court to determine what "commercial purpose" means in this context.

135.     An ordinary person could not determine how "commercial purpose" is defined and therefore they could not be put on notice as to whether their activity is prohibited.

136.     Law enforcement has no guidance as to when to apply the "commercial purpose" exception, which will lead to arbitrary and discriminatory enforcement of the No-Fly Provisions.

137.     Prosecutors and judges enforcing the No-Fly Provisions have no authoritative guidance as to when to enforce Section 423.003's criminal provisions, leading to arbitrary and discriminatory enforcement.

138.     The No-Fly Provisions are unconstitutionally vague.

## FIFTH CLAIM

## (No-Fly Provisions: Supremacy Clause)

139.     Plaintiffs repeat and incorporate by reference herein the allegations of paragraphs 1 through 138 of this Complaint as if fully set forth herein.

140.     The Supremacy Clause of the U.S. Constitution, U.S. Const. art. IV, cl. 2, provides that federal law is supreme and displaces state law.

141.     Field preemption arises when Congress legislates in an area of law so comprehensively that it occupies the entire field of law on that issue, and thereby displaces any state or local law on that issue whether it conflicts with the federal law or not.

142.     It is well established that the federal government has exclusive authority over regulating the national airspace and aviation safety, which includes protecting the safety of aircraft as well as people and property on the ground. *Burbank v. Lockheed Air Terminal Inc.* 411 U.S. 624 (1973); *Singer v. City of Newton*, 2017 WL 4176477 (D. Mass. 2017); 49 U.S.C. § 40103 (2019).   The federal government exercises its exclusive authority by, for example, establishing flight restrictions over prohibited areas.   Indeed, the federal government has already identified categories of critical infrastructure and directed the FAA to establish processes to prohibit or restrict the operation of drones over such infrastructure.

143.     While a state may promulgate drone regulations consistent with its traditional police powers, such as to protect privacy or prevent trespass or voyeurism, state drone

regulations promulgated to protect aviation safety impermissibly infringe upon a field of exclusive federal regulation.

144.    By banning drone use within the airspace around critical infrastructure and other facilities, Texas is attempting to regulate aviation safety through its No-Fly Provisions.  The No-Fly Provisions are thus preempted by the federal government's exclusive authority to regulate aviation safety.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs respectfully request that the Court enter judgment in their favor and:

(a)    Issue a declaratory judgment that Chapter 423 violates plaintiffs' rights under the First and Fourteenth Amendments;

(b)    Permanently enjoin defendants, as well as their officers, agents, employees, attorneys, and all persons in active concert or participation with them, from enforcing the challenged statute;

(c)    Strike down Sections 423.002, 423.003, 423.004, 423.0045, 423.0046, and 423.006 of Chapter 423;

(d)    Award plaintiffs reasonable attorneys' fees, and all other costs allowed pursuant to 42 U.S.C. § 1988(b); and

(e)    Grant plaintiffs such other and further relief as the Court deems just and proper.


Dated:  September 26, 2019

Respectfully submitted,

David A. Schulz (*pro hac vice motion pending*)
NY State Bar No. 1514751
Jennifer Pinsof (*pro hac vice motion pending*)
IL State Bar No. 6327449
Francesca L. Procaccini (*pro hac vice motion pending*)
NY State Bar No. 5458575
Joe Burson (law student)
Timur Ackman-Duffy (law student)
Media Freedom And Information Access Clinic
Yale Law School[1]
127 Wall Street
New Haven, CT 06511
Tel: (212) 850-6103
Fax: (212) 223-1942
david.schulz@yale.edu

/s/ *James A. Hemphill*
James A. Hemphill
Texas State Bar No. 00787674
(512) 480-5762 direct phone
(512) 536-9907 direct fax
jhemphill@gdhm.com
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Ave., Suite 2200
Austin, Texas 78701
(512) 480-5600 phone

Leslie A. Brueckner (*pro hac vice motion pending*)
CA Bar No. 14098
Public Justice P.C.
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150
lbrueckner@publicjustice.net

Leah M. Nicholls (*pro hac vice motion pending*)
DC Bar No. 982730
Public Justice P.C.
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
lnicholls@publicjustice.net

---

[1]  This complaint has been prepared in part by a clinic associated with the Abrams Institute for Freedom of Expression and the Information Society Project at Yale Law School, but does not purport to present the school's institutional views, if any.