**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, TEXAS PRESS ASSOCIATION, and JOSEPH PAPPALARDO, | § § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | CIVIL ACTION No. 1:19-cv-00946-RP |
| STEVEN MCCRAW, in his official capacity as Director of Texas Department of Public Safety, RON JOY, in his official capacity as Chief of the Texas Highway Patrol, and WES MAU, in his official capacity as District Attorney of Hays County, Texas, | § § § § § § § | |
| *Defendants.* | § § | |

---

## DEFENDANTS' MOTION TO DISMISS

---

Plaintiffs ask the Court to rule that drone technology may be used to capture video or images of any private property or citizen, and at any time or place, across the entire State of Texas. They claim a right to conduct surveillance of any subject they deem sufficiently newsworthy, no matter who or what that might be, thereby ushering in an era of unrestricted aerial spying that would subject every Texan to prying eyes from above. The First Amendment does not demand such an Orwellian result. As a threshold matter, the Court lacks jurisdiction over Plaintiffs' claims because they have not sufficiently alleged a factual basis for standing. However, even if Plaintiffs had standing, their claims would still fail because the laws that they challenge are constitutional. Accordingly, Defendants move to dismiss all of Plaintiffs' claims pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

1

# BACKGROUND

## I.        The Texas Privacy Act

Plaintiffs challenge certain portions of the Texas Privacy Act and later amendments to it, enacted into law as Chapter 423 of the Texas Government Code, titled "Use of Unmanned Aircraft," which is located within a section of the Code dealing with "Law Enforcement and Public Protection." *See* Tex. Gov't Code tit. 4, subtit. B; *see also* "Texas Privacy Act," 2013 Tex. Sess. Law Serv. Ch. 1390 (H.B. 912). This chapter regulates the use of unmanned aircraft (or "UAVs" or "drones"). Among other provisions, Chapter 423 regulates the types of surveillance that may be conducted with drones, regulates the use of such aircraft by law enforcement agencies, and permits political subdivisions of the State to adopt and enforce ordinances regarding the use of drones during special events. As described in the legislative history materials of the Texas Privacy Act, the privacy and public safety concerns specific to drones are unique and particularly challenging as compared to conventional aircraft:

> Drones can fly low, are quiet, and can be nearly impossible to see unless a person was looking for them. Helicopters and airplanes are noisy and difficult to miss, so a person over whom a helicopter flies would hear it and would be on notice that there could be someone surveilling or photographing them.

Texas Bill Analysis, 2013 Regular Session, House Bill 912, Texas House Research Organization, TX B. An., H.B. 912 (May 7, 2013).

Plaintiffs challenge certain portions of the Texas Privacy Act that they have categorized into two different groups: the "Surveillance Provisions" consisting of §§ 423.002-.004 and 423.006, *see* Pls.' Compl. for Declaratory and Injunctive Relief ¶ 3 [ECF No. 1]; and the "No-Fly Provisions" consisting of §§ 423.0045 and 423.0046, *see* Compl. ¶ 3.[1] Plaintiffs have not

---

[1] Solely for the sake of uniformity and the Court's convenience, Defendants sometimes use

challenged the regulatory and reporting provisions applicable to law enforcement agencies, *see* Tex. Gov't Code §§ 423.007-.008; or the grant of authority to political subdivisions of the State allowing them to regulate drone use regarding special events, *see id.* § 423.009. Particularly noteworthy is Plaintiffs' failure to challenge § 423.009, which allows counties, municipalities, and other local government entities **plenary** authority to regulate drone use during special events if certain conditions are met.[2] Given that one of the Defendants, District Attorney Mau, is a county official, Plaintiffs' challenge is particularly inadequate to state a claim for injunctive relief.

### A.    The Surveillance Provisions

Section 423.003 makes it an offense to "use[] an unmanned aircraft to capture an image of an individual or privately owned real property in this state with the intent to conduct surveillance on the individual or property captured in the image." Tex. Gov't Code § 423.003. It is also an offense to capture such an image and possess, disclose, display, distribute, or otherwise use it. *Id.* § 423.004(a). It is a defense to the inadvertent violation of these provisions if the person destroys and stops using the offending image as soon as it is discovered that it was captured in violation of law. *See id.* §§ 423.003(c), 423.004(d)-(e). Violators of these provisions are also subject to a civil action by "[a]n owner or tenant of privately owned real property located in this state . . . against a person who . . . captured an image of the property or the owner or tenant while on the property." *Id.* § 423.006(a).

Excepted from these prohibitions are certain kinds of image capturing for particular purposes specified by statute. *See id.* § 423.002. For example, it is entirely lawful to use a drone

---

Plaintiffs' descriptions of the challenged statutes, without waiving and expressly reserving all rights and arguments.

[2] Plaintiffs have also failed to challenge a provision that prohibits certain disclosures of any images obtained in violation of the one of the Surveillance Provisions. *See* Tex. Gov't Code § 423.005.

to capture images "of public real property or a person on that property." *Id.* § 423.002(a)(15). Additionally, among many other examples, it is legal to use a drone to capture images with the consent of the subject, *id.* § 423.002(a)(6); for law enforcement to use drones for surveillance "pursuant to a valid search or arrest warrant," *id.* § 423.002(a)(7); or from a flying height of up to eight feet, provided no image amplification is used, *id.* § 423.002(a)(14). There are also a number of exemptions for certain business or public safety purposes, such as "oil pipeline safety," *id.* § 423.002(a)(17); search-and-rescue operations, *see id.* § 423.002(a)(12); and academic purposes, *id.* § 423.002(a)(1).

### B.    The No-Fly Provisions

Chapter 423 also prohibits the operation of drones over certain important buildings and infrastructure where it could pose a particularly significant threat to public safety. As reflected in the legislative history materials: "[I]ncreasing use of [drones] poses a significant safety and security risk for critical state infrastructure and [] establishing state guidelines, enforceable by law, will reduce the risk of accidents and prevent intentional harm." Texas Committee Report, 2015 TX H.B. 1481 (NS) (May 8, 2015).

Section 423.0045 makes it an offense to "operate[] an unmanned aircraft over a correctional facility, detention facility, or critical infrastructure facility" less than "400 feet above ground level," or to "allow[] an unmanned aircraft to make contact" with such a facility, or to "allow[] an unmanned aircraft to come within a district . . . that is close enough to interfere with the operations of or cause a disturbance to the facility." Tex. Gov't Code § 423.005(b). Certain law enforcement and other governmental entities, and individuals with permission from the owner of the facility, are exempted from this prohibition. *See id.* § 423.005(c). Similarly, § 423.0046 makes it an offense to "intentionally or knowingly operate[] an unmanned aircraft over a sports

venue and the unmanned aircraft is not higher than 400 feet above ground level." *Id.* § 423.0046(b). A "sports venue" is defined as a facility that "has a seating capacity of 30,000 or more people" and "is primarily used for one or more professional or amateur sports or athletics events." *Id.* § 423.0046(a). Similar exemptions apply. *See id.* § 423.0046(c).

## II.     Plaintiffs' Allegations.

Plaintiffs are two trade organizations comprised of photojournalists, the National Press Photographers Association ("NPPA") and the Texas Press Association ("TPA"), and one freelance reporter, Joe Pappalardo. *See* Compl. ¶¶ 13-15. None of the Plaintiffs allege that they have ever been charged with any of these offenses, or that they have even been threatened with such a prosecution. *See* Compl. ¶¶ 45-89. Instead, NPPA alleges that it has had to divert resources from its other activities and "[i]n response to the passage of Chapter 423, NPPA has had to go out of its way to counteract the negative effects of the law." Compl. ¶ 56. Pappalardo alleges that "Chapter 423 has chilled [his] speech" and that he "reasonably fears" prosecution for using a drone in the course of his business, though he admits he is no longer licensed to use his drone. Compl. ¶¶ 82-84. TPA does not specifically allege how it has been affected by Chapter 423. *Cf.* Compl. ¶ 14.

Plaintiffs have brought five claims for relief. First, they contend that the Surveillance Provisions violate the First Amendment because they are impermissible content-based and speaker-regulations, which are also unconstitutionally overbroad because of the use of the term "surveillance." Compl. ¶¶ 93-106. Second, Plaintiffs allege that the Surveillance Provisions are unconstitutionally vague under the 14th Amendment, again because of the use of the term "surveillance." Compl. ¶¶ 107-115. Third, Plaintiffs allege that the No-Fly Provisions violate the First Amendment because they impose unconstitutional incidental restraints on protected conduct, and they are unconstitutionally overbroad due to the use of the term "commercial purpose." Compl.

5

¶¶ 116-130. Fourth, Plaintiffs allege that the No-Fly Provisions are unconstitutionally vague under the Fourteenth Amendment, again because of the use of the term "commercial purpose." Compl. ¶¶ 131-138. Fifth, Plaintiffs allege that the No-Fly Provisions are in violation of the Supremacy Clause, U.S. Const. art IV, cl. 2, because the federal government has preempted all state laws in the entire field of aviation safety. Compl. ¶¶ 139-144.

For the following reasons, all of Plaintiffs' claims should be dismissed.

## STANDARD OF LAW

When the court lacks the statutory or constitutional power to adjudicate a case, the case is properly dismissed for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). *Hooks v. Landmark Indus., Inc.*, 797 F.3d 309, 312 (5th Cir. 2015). The party asserting jurisdiction bears the burden of proving jurisdiction exists. *Exelon Wind 1, L.L.C. v. Nelson*, 766 F.3d 380, 388 (5th Cir. 2014). A court can find that subject-matter jurisdiction is lacking based on "(1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Johnson v. United States*, 502 F. App'x 412, 414 (5th Cir. 2012). "[T]he court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (internal quotation marks omitted).

Dismissal under Federal Rule of Procedure 12(b)(6) is proper when a plaintiff's complaint fails to state a claim upon which relief can be granted. "To survive a Rule 12(b)(6) motion, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds

of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations, quotation marks, and alterations omitted). Although a court accepts all well-pleaded facts as true, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

### I.      The Court Lacks Jurisdiction Over Plaintiffs' Claims.

As a threshold matter, the Court has no jurisdiction over Plaintiffs' claims because they cannot establish that they have standing to bring them. Article III limits federal courts' jurisdiction to actual "cases" and "controversies." U.S. Const. art. III, § 2; *see also Breaux v. U.S. Postal Serv.*, 202 F.3d 820, 820 (5th Cir. 2000). Courts developed the standing doctrine to "give meaning to Article III's case-or-controversy requirement." *Sample v. Morrison*, 406 F.3d 310, 312 (5th Cir. 2005). To satisfy Article III standing, a plaintiff must show: (1) an injury-in-fact; (2) that is traceable to the defendant's challenged conduct (causation); and (3) that is likely to be redressed by a favorable decision in the district court (redressability). *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *see also Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 585-86 (5th Cir. 2006). These elements are "an indispensable part of the plaintiff's case." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The party seeking to invoke federal jurisdiction bears the burden of establishing all three elements. *Id*. If a party lacks standing to bring a claim, the court lacks subject matter jurisdiction over that claim. *See Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015); *Bell v. Redflex Traffic Sys., Inc.*, 374 F. App'x 518, 522 (5th Cir. 2010).  None of the three Plaintiffs has standing to proceed.

### A.      Pappalardo Lacks Standing.

Pappalardo fails to establish each element of the standing inquiry. First, Pappalardo has suffered no injury. He has never been investigated, indicted, convicted, or otherwise punished for any conduct related to his use of drones in connection with his journalism. Instead, Pappalardo bases his claim to an injury on the theory that he "reasonably fears that operating his UAV for the purpose of capturing photographs of newsworthy events would subject him to criminal penalties under Chapter 423." Compl. ¶ 82. Defendants dispute that Pappalardo's alleged injuries have any constitutional character at all, as discussed below. But even if they did, Pappalardo does not meet the requirements for this kind of standing.

"[S]tanding is not created by a declaration in court pleadings." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008). "[T]his type of self-censorship must arise from a fear of prosecution that is not 'imaginary or wholly speculative.'" *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979)). There is a "core requirement that to bring a preenforcement challenge, a plaintiff must 'produce evidence of an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute,' as well as a 'credible threat of prosecution.'" *Zimmerman v. City of Austin*, 881 F.3d 378, 391 (5th Cir. 2018) (citations omitted). "[A] credible threat of enforcement is critical; without one, a putative plaintiff can establish neither a realistic threat of legal sanction if he engages in the speech in question, nor an objectively good reason for refraining from speaking and 'self-censoring' instead." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018); *see also Speech First, Inc. v. Fenves*, 384 F. Supp. 3d 732, 738-41 (W.D. Tex. 2019).

Other than his own conclusory declaration in his pleading, Pappalardo has not alleged any

facts to show that he faces a credible threat of prosecution. Pappalardo himself *admits* that he is capable of complying with the law, noting that he has captured images with his drone on at least one occasion "in compliance with Chapter 423." *See* Compl. ¶ 84. Pappalardo also alleges that he is well informed regarding the legal issues surrounding Chapter 423, Compl. ¶ 84, but simply being informed about a criminal law does not make one's fear of prosecution any more or less objectively reasonable. Additionally, Pappalardo also provides examples of newsworthy events that he would have used his drone to cover but for Chapter 423. Compl. ¶ 85. But Pappalardo has not alleged any facts to show that such activities would have run afoul of the law. For example, in professing an inability to photograph "the removal of homeless encampments" or "the removal of a Confederate statue [sic] from a public park," Compl. ¶ 85, Pappalardo does not explain why the exemption for aerial drone photography "of public real property or a person on that property" would not entirely cover these activities. *See* Tex. Gov't Code § 423.002(a)(15). Pappalardo simply alleges no facts at all regarding his alleged examples of missed journalistic opportunities. Thus, Pappalardo's claim that he fears prosecution rings hollow, and he cannot satisfy the injury-in-fact requirement

Even if Pappalardo had suffered a cognizable injury, it would not be fairly traceable to Defendants. The State Defendants are law enforcement officers, with no prosecution authority themselves. District Attorney Mau has prosecution authority, but Plaintiffs have not alleged that he has used or even threatened to use such authority with regard to Chapter 423. Moreover, Pappalardo has not alleged any facts to suggest that Defendants would ever investigate him for any alleged violations of Chapter 423, or even interact with him in any way. The Court can only guess that Pappalardo seems to have chosen Defendants because of their hypothetical law enforcement authority over him at some point in the future. Pappalardo also admits that he is not currently licensed under federal law to operate his drone, meaning that he is unable to engage in

his preferred activities for reasons wholly independent from the statutes he challenges—namely, federal law and his own apathy at maintaining his license. *See* Compl. ¶ 84 ("[Papplardo] has not bothered to renew his Part 107 Remote Pilot's Certificate since he is no longer using his UAV for newsgathering purposes."). Indeed, other than naming Defendants as parties, *see* Compl. ¶¶ 16-17, there is no mention whatsoever of Director McCraw, Chief Joy, or District Attorney Mau anywhere in the complaint. Thus, any alleged injury could not be fairly traced to their actions.

Finally, Pappalardo has also failed to establish that his injury could be redressed by an injunction against Defendants. There are no facts whatsoever to suggest that any injunction against Director McCraw, Chief Joy, or District Attorney Mau would affect Pappalardo's journalism practices at all. Because Defendants have nothing to do with Pappalardo's alleged injuries in the first place, an injunction that limits their actions will have no appreciable effect on Pappalardo.

Because Pappalardo has failed to allege facts that establish any of the three requirements of standing, this Court lacks jurisdiction and all of his claims should be dismissed.

## B.   The Organizational Plaintiffs Also Lack Standing.

Just as the sole individual Plaintiff lacks standing, so too do the organizational plaintiffs.[3] They lack standing for the same reasons as Pappalardo: they have not alleged an objectively reasonable fear of prosecution of them or their members, any alleged injury is not traceable to any conduct by Defendants because no conduct by Director McCraw, Chief Joy, or District Attorney Mau is even alleged, and an injunction against Defendants would not redress the purported harms. But in addition to these fundamental jurisdictional deficiencies, the organizational plaintiffs' assertions of standing also suffer from other fatal shortcomings.

---

[3] To the extent that any of the Plaintiffs purport to seek to vindicate the rights of "the public" with their claims, *see, e.g.*, Compl. ¶ 89, such assertions of generalized third party standing are equally insufficient to confer standing, for similar reasons as the Organization Plaintiffs lack standing.

1.      There Is No Third-Party Standing.

The organizational plaintiffs cannot assert claims on behalf of Guillermo Calzada or Brandon Wade. A plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). A party seeking to assert the rights of others must make two additional showings. "First, we have asked whether the party asserting the right has a 'close' relationship with the person who possess the right." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). "Second, we have considered whether there is a 'hindrance' to the possessor's ability to protect his own interests." *Id.*; *see also Powers v. Ohio*, 499 U.S. 400, 411 (1991). To the extent that Plaintiffs are attempting to bring either Calzada's or Wade's claims on their behalf, Plaintiffs fail to make both of these showings.

First, Plaintiffs have not alleged any "close" relationship with Calzada and Wade. At most it can be said that Calzada and Wade are NPPA members, and that Wade has interacted with TPA members. *See* Compl. ¶¶ 57, 67, 70-71. The scant factual allegations regarding Calzada's and Wade's relationship to Plaintiffs fall well short of the closeness inherent to the other relationships that have survived the Supreme Court's test, such as the doctor-patient relationship, *see Singleton v. Wulff*, 428 U.S. 106 (1976), the attorney-client relationship, *see Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989), or some familial relationships, *see Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017); *but see Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 & n.7 (2004).

Second, Plaintiffs have not alleged any "hindrance" to Calzada and Wade bringing their claims in their own right. Their failure to join this litigation as parties is unexplained, and the Court can only guess as to why they have not sought to vindicate their own rights but rather allowed

unrelated third parties make allegations about them. In the absence of any allegations whatsoever, Plaintiffs cannot bring claims on behalf of third parties not before the Court.

2. There Is No Associational Standing.

To the extent that Plaintiffs have alleged associational or organizational standing on behalf of NPPA and TPA, they fall short again. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)). Plaintiffs fail at all three of these elements.

First, NPPA's members do not have standing in their own right. (Nothing is alleged about TPA's members' standing to sue, so TPA can be disregarded at the outset.) As discussed above, Pappalardo does not have standing, and for similar reasons, neither do alleged NPPA members Calzada and Wade. Calzada is alleged to have had one conversation with federal and local law enforcement officers, none of whom work at the direction of any of the Defendants, after he was done photographing a crime scene. *See* Compl. ¶ 59. Calzada is not alleged to have stopped using his drone for photography, and Plaintiffs do not allege that he cannot comply with the provisions of Chapter 423. *See* Compl. ¶¶ 57-66. Accordingly, as with Pappalardo, Calzada is not alleged to have an objectively reasonable fear of prosecution that is anything other than speculative, and any alleged injury is neither traceable to any conduct by Defendants or redressable by an injunction against them.

With respect to Wade, Plaintiffs allege that he has successfully used his drone to capture

images in compliance with Chapter 423—at most, he was inconvenienced on two such occasions. *See* Compl. ¶¶ 68-69, 73. On another occasion, Plaintiffs allege that Wade got a job with the Texas Rangers baseball organization.[4] *See* Compl. ¶¶ 71-72. Finally, Plaintiffs allege that on one occasion Wade could not sell his drone-captured photographs to a third party, but they do not allege that Chapter 423 had anything to do with that publication's decision. *See* Compl. ¶ 70. Accordingly, as with Pappalardo and Calzada, Plaintiffs have not alleged that Wade has suffered a cognizable threat-of-prosecution injury, and they have utterly failed to overcome the traceability and redressability problems. Because Plaintiffs cannot show that any of NPPA's or TPA's members have standing—they have not sufficiently alleged any cognizable injury, and they did not attempt to allege facts to show traceability or redressability—Plaintiffs fail the first prong of the associational standing inquiry.

Second, Plaintiffs have not sufficiently alleged that the interests at stake are germane to the organizational plaintiffs' purposes, particularly with respect to TPA. Plaintiffs allege virtually no facts about TPA's organization, its mission, or its members. Although a few of the entities discussed in the complaint are alleged to be TPA members, there are scant allegations regarding the purpose, activities, structure, or nature of TPA, or the reasons why it is a proper plaintiff in this lawsuit. Accordingly, the complaint does not sufficiently allege facts sufficient to meet this second prong of the associational standing test.

Third, Plaintiffs cannot establish that resolving these claims would not require the involvement of the individual members themselves. As discussed, whether anyone has actually

---

[4] Plaintiffs allege that Wade lost $7,200 in income because he was unable to sell photographs to the *Fort Worth Star-Telegram*, but they do not allege how much money he made from his subsequent employment by the Texas Rangers. *See* Compl. ¶¶ 71-72. Thus it is unclear from the complaint whether Wade was economically injured at all—and there is certainly no suggestion that this incident caused Wade to feel a fear of prosecution.

been injured by Chapter 423 is a fact-intensive question, and Plaintiffs have failed to produce allegations of a single individual who has standing to proceed on these claims before this Court. Should the litigation proceed, Defendants will require the participation of any individual who is alleged to be injured in order to examine these questions. Accordingly, the organizational plaintiffs cannot satisfy the third prong of the associational standing inquiry because the resolution of Plaintiffs' claims will require the participation of the allegedly aggrieved organization members.

> 3.   The Organizational Plaintiffs Cannot Avail Themselves of a Diversion-of-Resources Theory.

The organizational plaintiffs cannot bring their claims on their own behalf. "An organization has standing to sue on its own behalf if it meets the same standing test that applies to individuals." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999). As an initial matter, the organizational plaintiffs cannot establish traceability or redressability against Defendants, for the reasons discussed above. But the organizational plaintiffs also fail to establish any injury based on a diversion-of-resources theory.

"[A]n organization may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct." *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010). "Not every diversion of resources to counteract the defendant's conduct, however, establishes an injury in fact." *Id.* The Fifth Circuit has "explained that '[t]he mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.'" *Id.* (quoting *La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000)). Activities "which basically boil down to examining and communicating about developments" in the law and do not "differ from . . . routine lobbying activities" do not confer standing. *Id.* at 238. Rather, there must be "concrete and demonstrable injury to the organization's activities—with the consequent drain on

14

the organization's resources—constitut[ing] far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Plaintiffs cannot satisfy these requirements. As discussed above, there are virtually no factual allegations in the complaint related to TPA's organization, mission, or activities. The sole activity they allegedly undertook with respect to the Texas Privacy Act was that they "testified against [its] passage," and it is also alleged that the TPA "is one of the nation's oldest and largest newspaper trade organizations." Compl. ¶ 14. But the remaining allegations concerning TPA are conclusory at best, and the Court can only guess at what resources they employ or how they employ them. Without more, TPA cannot establish that merely testifying regarding a bill they disagreed with constitutes anything other than "a setback to the organization's abstract social interests." *Havens Realty*, 455 U.S. at 379. Thus, TPA has not established any injury in its own right.

Plaintiffs include more detail about NPPA and its activities, but its assertion of an injury fares no better. Regarding NPPA's activities, Plaintiffs allege that it "promotes the role of visual journalism as a public service, including by training and advocating for the work of its visual journalist members," and that it and its members "testified against the passage of Chapter 423 at hearings of the Texas legislature." Compl. ¶ 13. NPPA also apparently employs attorneys that carry out NPPA's "mission to support and advocate for visual journalists and promote excellence in the profession." Compl. ¶ 54. "[T]hey promote ethical journalism and work to advocate for and improve the legal landscape for visual journalists, particularly in the areas of First Amendment and copyright protection. They provide general information on legal issues that face a broad cross-section of NPPA's membership nationwide." Compl. ¶ 54.

In response to the passage of the Texas Privacy Act, NPPA has been contacted by its members with legal questions. Compl. ¶ 55. Additionally, Plaintiffs allege that

> NPPA has had to go out of its way to counteract the negative effects of the law, including, but not limited to: researching the ongoing impact of the law; researching First Amendment protections in case a member is charged criminally or sued civilly based on a violation of Chapter 423; meeting with lawmakers in an attempt to revise the law; monitoring amendments to the law; and spending hours counseling the heads of photography departments and news organizations as well as individual photographers and members about Chapter 423 compliance. These actions have diverted resources from NPPA's core activities described in paragraph 85.

Compl. ¶ 56. Paragraph 85 contains no allegations related to NPPA. *See* Compl. ¶ 85.

These allegations are not sufficient to show that NPPA has suffered an organizational injury. The activities that NPPA undertook in response to the Texas Privacy Act are the very activities that NPPA describes as its "mission." Compl. ¶ 54. Plaintiffs do not allege that they have had to do or undertake anything other than their core activities, "which basically boil down to examining and communicating about developments" in the law in a way that does not apparently "differ from [NPPA's] routine lobbying activities." *NAACP*, 626 F.3d at 238. NPPA does not describe any economic costs, the number of man-hours expended, the activities which it had to forgo, and any negative impact to its core mission, instead offering on conclusory allegations that they "diverted resources" and took time from NPPA's attorneys. *See* Compl. ¶ 56. Without any factual allegations to support these bare legal conclusions, Plaintiffs cannot carry their burden of establishing that NPPA suffered a "concrete and demonstrable injury to [its] activities," as opposed to "simply a setback to the organization's abstract social interests." *Havens*, 455 U.S. at 379. The mere provision of legal advice, without any additional supporting factual allegations, does not constitute an organizational injury-in-fact. *See ACORN*, 211 F.3d at 305. Accordingly, NPPA cannot demonstrate standing to bring these claims in its own right, and the Court lacks jurisdiction to adjudicate Plaintiffs' claims.

II.     **Plaintiffs Have Failed to State a Claim Upon Which Relief May Be Granted.**

     A.     **The Surveillance Provisions Are Constitutional (First Claim).**

        1.     The First Amendment Is Not Implicated by Sections 423.002, 423.003, and 423.006 of the Texas Government Code.

Most of the Surveillance Provisions do not significantly implicate the First Amendment. They only prohibit the use of drones to conduct surveillance on private property for purposes other than those specified in the twenty-one safe harbor provisions. *See* Tex. Gov't Code § 423.002; *see also id.* § 423.002(a)(15) (permitting the use of drones to capture images "of public real property or a person on that property"). The relevant question, then, is whether the State must allow individuals both to fly drones on or near private property, and to use those drones to conduct surveillance of private property or citizens without authorization, because such activities are expressive conduct that is protected by the First Amendment. The answer is no.

"The First Amendment literally forbids the abridgment only of 'speech,' but we have long recognized that its protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). "In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Id.* (quoting *Spence v. Washington*, 418 U.S. 405, 410-11 (1974)) (alterations in original). But "[t]he protection of the First Amendment depends not only on whether the conduct is expressive, but also on the context in which that expression takes place." *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 283 (5th Cir. 2001).

"[T]he party invoking the First Amendment's protection [has] the burden to prove that it applies." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013) (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984)). "[O]nly conduct that is 'inherently

expressive' is entitled to First Amendment protection." *Id.* (quoting *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006)). "In evaluating whether particular conduct possesses 'sufficient communicative elements' to implicate First Amendment protections, courts must ask whether '[a]n intent to convey a particularized message was present, and . . . [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 283 (5th Cir. 2001) (quoting *Johnson*, 491 U.S. at 404); *see also Spence v. Washington*, 418 U.S. 405, 410-11 (1974).

Because the Surveillance Provisions do not prohibit the use of drones to capture images "of public real property or a person on that property," Tex. Gov't Code § 423.002(a)(15), the line of cases which have held that there is a First Amendment "right to record" the activities of government officials—such as recording a police officer conducting his duties in public—have no application to Plaintiffs' claims. *Cf., e.g.*, *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 379 (S.D.N.Y. 2015) (citing cases from the First, Seventh, Ninth, and Eleventh Circuits). Likewise, cases which suggest that the act of photography carry with it some element of expression have no application to the Surveillance Provisions, which prohibit only using drones to conduct "surveillance." *See* Tex. Gov't Code § 423.003(a); *cf. ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012). Moreover, the fact that Plaintiffs are members of the press does not provide them with an exception. *See Branzburg v. Hayes*, 408 U.S. 665, 682 (1972) ("It is clear that the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability."). The Supreme Court has long held that "[t]he right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). But Plaintiffs seek nothing less than unrestricted information gathering on any private citizen, anywhere, at any time, by anyone.

Conducting surveillance of private citizens with a drone does not constitute conduct that is protected by the First Amendment. Piloting a drone "with the intent to conduct surveillance" of "an individual or privately owned real property," Tex. Gov't Code § 423.003(a), is not inherently expressive conduct. There is no "intent to convey a particularized message" when someone flies a drone for the purpose of surreptitious information gathering. *See Little*, 268 F.3d at 283. And even if someone does intend to convey a message, it would not be understood by anyone who happened to view it. *Id.* Indeed, one of the benefits of drones that Plaintiffs allege is that they are not "loud and disruptive to a news scene," like a helicopter. Compl. ¶ 49. Thus, even Plaintiffs apparently would agree that the conduct prohibited by the Surveillance Provisions—the piloting of a drone— cannot itself be inherently expressive, as one of its main benefits is secrecy. *See also* Texas Bill Analysis, 2013 Regular Session, House Bill 912, Texas House Research Organization, TX B. An., H.B. 912 (May 7, 2013) ("Drones can fly low, are quiet, and can be nearly impossible to see unless a person was looking for them."). Accordingly, because § 423.003 does not prohibit expressive conduct, the First Amendment is not implicated.

Two of the other challenged provisions also do not implicate the First Amendment. Section 423.002 provides the exceptions of types of conduct that are ***not*** prohibited. *See* Tex. Gov't Code § 423.002. Plaintiffs do not explain how a statute which lays out conduct ***that is not illegal*** could possibly abridge their First Amendment rights. Likewise, § 423.006 provides only for a private cause of action for individuals who are illegally photographed under § 423.003. *See* Tex. Gov't Code § 423.006. This ***private*** cause of action does not represent a ***governmental*** restriction on speech or any other conduct, and it is contingent on Plaintiffs' other challenges to the other remaining Surveillance Provisions.

Because three of the four Surveillance Provisions do not regulate conduct that is protected

19

by the First Amendment, Plaintiffs' First Amendment claims against these statutes must fail.

2.       The Surveillance Provisions Are Constitutional.

Even if the Surveillance Provisions implicated the First Amendment at all—which they mostly do not—they are still constitutional. Where conduct that is not inherently expressive, but nonetheless may have "some expressive content" is at issue, courts "apply the intermediate scrutiny test articulated by the Supreme Court in *United States v. O'Brien*." *Kleinman v. City of San Marcos*, 597 F.3d 323, 328 (5th Cir. 2010) (citing *United States v. O'Brien*, 391 U.S. 367 (1968)). "*O'Brien* rests on the principle that when 'speech' and 'non-speech' elements are united in a course of conduct, a valid governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.* (citing *O'Brien*, 391 U.S. at 376). "Under *O'Brien*, a regulation is constitutional if it is within the constitutional power of the government; it furthers an important or substantial governmental interest; the government interest is unrelated to the suppression of free expression; and the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* (citing *O'Brien*, 391 U.S. at 376). The Surveillance Provisions easily meet this standard.

First, regulation of drone operators is within the traditional police powers of the State. Second, the governmental interests at stake are of the utmost importance. If Plaintiffs prevail, any individual's right or expectation of privacy will be completely eviscerated. There would be nothing to stop drones from flying into anyone's backyard to conduct surveillance on private citizens and their families. Likewise, private property rights would be significantly impugned. Without the Texas Privacy Act, any privately owned land or building would be subject to surveillance by anyone with a drone. Moreover, significant public safety and security risks also motivate and justify governmental restrictions. Allowing malicious actors to conduct unlimited, unrestrained,

covert drone surveillance on private property and citizens puts them at risk of in a way that cannot be matched by more conventional technologies, putting Texans at greater risk of theft or violent crime. These are just some of the important interests protected by the Texas Privacy Act. As drone technology matures, it could pose new threats that cannot yet be imagined. As Plaintiffs themselves recognize, "a state may promulgate drone regulations consistent with its traditional police powers, such as to protect privacy or prevent trespass or voyeurism." Compl. ¶ 143. And yet Plaintiffs would have the State stand idly by and have this Court create a constitutional right to record anything from virtually anywhere.

Third, the Surveillance Provisions are unrelated to the suppression of free expression. The purpose of the Texas Privacy Act is not to discriminate against journalists, drone operators, or anybody else conveying any particular kind of message. As Plaintiffs rightly point out, there are alternatives to using drones to cover newsworthy events, such as helicopters, that the Surveillance Provisions would not prohibit and that Plaintiffs could use to capture the same images that they could from a drone. *See* Compl. ¶ 49. Rather, these statutes are necessary to protect other rights and compelling interests, and they are unrelated to the suppression of speech.

Fourth, to the extent that the Surveillance Provisions present any "incidental restriction on alleged First Amendment freedoms," such restrictions are "no greater than is essential to the furtherance of that interest." *Kleinman*, 597 F.3d at 328. As explained, the Surveillance Provisions permit the use of drones to capture images of public places and, for certain purposes, of private property, which minimizes to the greatest extent possible any incidental restrictions. *See* Tex. Gov't Code § 423.002; *see also id.* § 423.002(a)(15) (permitting the use of drones to capture images "of public real property or a person on that property"). Furthermore, the Surveillance Provisions allow for alternatives such as helicopters, as Plaintiffs themselves recognize. *See*

Compl. ¶ 49. Accordingly, the Surveillance Provisions pass the *O'Brien* test.

To the extent that the Court construes the Surveillance Provisions to directly regulate expression,[5] these statutes are content-neutral and constitutional under that test as well. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 125 S. Ct. 2218, 2227 (2015). "This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id.* (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 562-64 (2011)). In other words, "[t]he principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

"The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* (citing *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48 (1986)). "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Id.* (quoting *Clark*, 468 U.S. at 293).

All of the Surveillance Provisions readily meet this standard, as the content of any of the drone-captured surveillance is irrelevant to whether the images have been illegally captured. It does not matter ***what*** is depicted in the drone-captured image, so long as the statutory prerequisites

---

[5] Only one of the challenged Surveillance Provisions purports to prohibit speech: it is a misdemeanor to disclose or display an image that someone has captured illegally in violation of § 423.003. *See* Tex. Gov't Code § 423.004(a).

of drone surveillance are satisfied. *See* Tex. Gov't Code § 423.003 (prohibiting the capture of ***any*** image of individuals or privately owned real property); *see also* § 423.002 (exempting any type of image that is captured pursuant to certain authorizations). The Surveillance Provisions are entirely agnostic as to who or what is being surveilled. Drone operators are prohibited from targeting ***any*** private individual or private real property and disseminating their ill-gotten surveillance.

There is no suggestion in the Texas Privacy Act of a governmental objection to the content any message presented in any image captured by drone operators, and that the Surveillance Provisions have "an incidental effect on some speakers or messages but not others" does not make them impermissible under the First Amendment. *Ward*, 491 U.S. at 791. The Surveillance Provisions are content neutral, narrowly tailored, and leave open myriad alternatives for Plaintiffs. *See id.* Accordingly, all of the Surveillance Provisions are constitutional.

3. The Surveillance Provisions Are Not Overbroad.

Plaintiffs also challenge the Surveillance Provisions by alleging that "Chapter 423 regulates substantially more speech than the First Amendment permits." Compl. ¶ 105. According to Plaintiffs, "the Surveillance Provision's significant overbreadth unconstitutionally chills plaintiffs and plaintiffs' members from engaging in protected expressive activity." Compl. ¶ 106. Plaintiffs' assertion of overbreadth is meritless.

"The traditional rule is that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *New York v. Ferber*, 458 U.S. 747, 768 (1982). "This general rule reflects two 'cardinal principles' of our constitutional order: the personal nature of constitutional rights and the prudential limitations on constitutional adjudication." *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999) (quoting *Ferber*, 458 U.S.

23

at 767). "By focusing on the factual situation before us, and similar cases necessary for development of a constitutional rule, we face flesh and blood legal problems with data relevant and adequate to an informed judgment." *Id.* (internal quotation marks omitted). Accordingly, invalidation for overbreadth is "strong medicine" that the Supreme Court has "employed . . . with hesitation, and then only as a last resort." *Id.* (internal quotation marks omitted).

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). Courts then consider "whether the statute . . . criminalizes a substantial amount of protected expressive activity." *Id.* at 297. "The 'mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.'" *Id.* at 303 (quoting *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)).

Plaintiffs do not detail the specific ways in which they contend the Surveillance Provisions are overbroad, but their claims are nonetheless meritless. The Surveillance Provisions prohibit only the use of drones to conduct surveillance private real property and individuals on private property without authorization and outside of the nearly two-dozen other exceptions provided by statute. As explained above, very little protected expressive activity is even implicated by the Surveillance Provisions, much less criminalized. No person is restrained by the Surveillance Provisions from saying whatever they wish or photographing whatever they wish using any other lawful means. The Court need not brainstorm hypothetical scenarios where expressive activity may be at issue because there is not a "substantial amount" of First Amendment protected activity that is implicated by the Surveillance Provisions. Accordingly, Plaintiffs' overbreadth challenge must fail.

Because Plaintiffs' First Amendment challenge to the Surveillance Provisions is without merit, their first claim for relief should be dismissed.

### B.     The Surveillance Provisions Are Not Vague.

In Plaintiffs' second claim for relief, they assert that the Surveillance Provisions are so vague as to deprive them of due process because "[s]ection 423.003 does not define the term 'surveillance' when it criminalizes the use of UAVs to 'capture an image of an individual or privately owned real property in this state with the intent to conduct surveillance on the individual or property contained in the image.'" Compl. ¶ 110 (quoting Tex. Gov't Code § 423.003(a)). Plaintiffs' assertion of vagueness is meritless.

"The Fourteenth Amendment's guarantee of Due Process proscribes laws so vague that persons 'of common intelligence must necessarily guess at [their] meaning and differ as to [their] application.'" *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001) (alterations in original) (quoting *Smith v. Goguen*, 415 U.S. 566, 572 n.8 (1974)). "A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Id.* (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).

The Fifth Circuit has "rejected that a law 'must delineate the exact actions a [person] would have to take to avoid liability.'" *Doe I v. Landry*, 909 F.3d 99, 118 (5th Cir. 2018) (quoting *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008)). "'[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1891 (2018) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)) (alteration in original). "No policy can be so specific as to cover every

conceivable situation and to disallow all discretion or interpretation in its application." *Ne. Penn. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 327 F. Supp. 3d 767, 784 (M.D. Penn. 2018). "'[O]nly a reasonable degree of certainty is required.'" *Roark & Hardee*, 522 F.3d 552-53 (quoting *United States v. Tansley*, 986 F.2d 880, 885 (5th Cir. 1993)) (emphasis and internal quotation marks omitted).

Plaintiffs' assertion that the word "surveillance" renders the Texas Privacy Act unconstitutionally vague is completely meritless. Plaintiffs' position is undermined by their own allegations: they allege a generally understood definitely of the word "surveillance," Compl. ¶ 24 (citing Black's Law Dictionary and Merriam-Webster's Collegiate Dictionary), and they further allege that Calzada, Wade, and Pappalardo all actually are aware of the meaning of the word, *see* Compl. ¶¶ 61, 74, 81. Thus, Plaintiffs all have at least a "reasonable degree of certainty" about what is prohibited, which is all that due process requires. *See Roark & Hardee*, 522 F.3d 552-53. The question of whether their journalistic activity constitutes impermissible "surveillance" is a factual inquiry that depends on the particular conduct in which Plaintiffs engage, and not evidence of vagueness in the statute.

Ordinary persons are perfectly capable of understanding the meaning of the word "surveillance," and the Surveillance Provisions do not allow for arbitrary or discriminatory enforcement. But Plaintiffs fault these laws for failing to provide "perfect clarity" and "precise guidance." *Minn. Voters*, 138 S. Ct. at 1891. The Fifth Circuit has never required that "a law 'must delineate the exact actions a [person] would have to take to avoid liability.'" *Doe I*, 909 F.3d at 118 (quoting *Roark & Hardee*, 522 F.3d at 552). This Court should not break with precedent and impose such a requirement now.

Because Plaintiffs' vagueness challenge to the Surveillance Provisions is without merit,

their second claim for relief should be dismissed.

### C.   The No-Fly Provisions Are Constitutional (Third Claim).

The No-Fly Provisions do not implicate the First Amendment at all. They are purely regulations directed at the safe operation of drones within Texas, and they do not mention or relate to photography, journalism, expression, or any other type of expressive activity. Instead, both statutes are concerned solely with the how a person "operates an unmanned aircraft," either "over a correctional facility, detention facility, or critical infrastructure facility," Tex. Gov't Code § 423.0045(b)(1), or "over a sports venue," *id.* § 423.0046(b). It is also a crime to allow a drone "to make contact with" such a facility or to allow it "to come within a distance . . . that is close enough to interfere with the operations of or cause a disturbance to the facility." *Id.* § 423.0045(b)(2)-(3).

Plaintiffs do not explain how the operation of their drones in these places ***itself*** constitutes expressive conduct that implicates the First Amendment. The particular conduct that is forbidden by the No-Fly Provisions—operation of drones in certain places—does not have any attendant "intent to convey a particularized message" and is not itself "expressive." *Johnson*, 491 U.S. at 404; *Littlefield*, 268 F.3d at 283. Accordingly, the First Amendment is simply not implicated by the No-Fly Provisions.

Even if the Court were to find that that the First Amendment has anything to do with these statutes, the No-Fly Provisions would also pass constitutional muster under the *O'Brien* test. *Kleinman*, 597 F.3d at 328 (citing *O'Brien*, 391 U.S. at 376). As explained in connection with the Surveillance Provisions, the No-Fly Provisions are both within the police power of the State and in furtherance of important and substantial governmental interests. In addition to the interests in protecting privacy and private property, the safety and security interests are even more pronounced

27

with respect to the No-Fly Provisions, as they help prevent extreme threats to public safety, such as smuggling contraband into correctional facilities, accidental or intentional damage to critical infrastructure, or disruption and potential harm to spectators at sporting events. *See* Texas Committee Report, 2015 TX H.B. 1481 (NS) (May 8, 2015) ("[I]ncreasing use of [drones] poses a significant safety and security risk for critical state infrastructure and [] establishing state guidelines, enforceable by law, will reduce the risk of accidents and prevent intentional harm."). Third, the No-Fly Provisions have no relation whatsoever to suppression of expression—as stated, they do not implicate expressive conduct at all. Fourth, to the extent that any expressive conduct could be implicated, any restriction would be wholly incidental, and certainly no greater than what is essential to protecting these particularly vulnerable and important locations from interference or damage by drones. Accordingly, even if the Court were to examine these laws through the lens of the First Amendment—which it need not—the No-Fly Provisions easily satisfy intermediate scrutiny.[6]

Plaintiffs also contend that the No-Fly Provisions are unconstitutionally overbroad, but this claim must be rejected. These statutes do not criminalize a substantial amount of protected expressive activity—they criminalize ***no*** protected expressive activity. *Cf. Williams*, 553 U.S. at 297. Again, the mere flying of a drone near a sensitive facility is not expressive—and that is all that the No-Fly Provisions prohibit. Plaintiffs' overbreadth challenge fails.

Because Plaintiffs' First Amendment challenge to the No-Fly Provisions is without merit, their third claim for relief should be dismissed.

---

[6] There is no need to explore whether the No-Fly Provisions are content neutral because they have nothing to with expressive conduct. But Defendants contend that these provisions do not run afoul of the First Amendment under any test.

### D.    The No-Fly Provisions Are Not Vague (Fourth Claim).

In Plaintiffs' fourth claim for relief, they assert that the No-Fly Provisions are so vague as to deprive them of due process because "[t]he No-Fly Provisions exempt [drone] users acting with a 'commercial purpose' from its criminal prohibitions, but it does not define 'commercial purpose' in the statute." Compl. ¶ 133. Plaintiffs feign confusion as to the meaning of the word "commercial," claiming that some definitions "in the photography industry[] do not encompass activities undertaken for the purpose of gathering the news." Compl. ¶ 38. Again, Plaintiffs' assertion of vagueness is meritless.

As stated, due process only requires that the No-Fly Provisions provide "a reasonable degree of certainty," *Roark & Hardee*, 522 F.3d 552-53, and these laws easily meet that standard. It is curious that Plaintiffs do not turn to the dictionaries that they consulted in determining the meaning of the word "surveillance" when trying to define "commercial." Both Black's Law Dictionary and Merriam-Webster define "commercial" as relating to commerce in any of several ways. *See* Black's Law Dictionary (11th ed. 2019); Merriam-Webster, https://www.merriam-webster.com/dictionary/commercial (last visited October 21, 2019). Again, the question of whether Plaintiffs' journalistic activity is done with a "commercial purpose" is a factual inquiry that depends on the particular conduct in which Plaintiffs engage, and not evidence of vagueness in the statute.

As with the Surveillance Provisions, ordinary persons are perfectly capable of understanding the meaning of the term "commercial purpose," and the No-Fly Provisions do not allow for arbitrary or discriminatory enforcement. But Plaintiffs fault these laws, too, for failing to provide "perfect clarity" and "precise guidance." *Minn. Voters*, 138 S. Ct. at 1891. The Fifth Circuit has never required that "a law 'must delineate the exact actions a [person] would have to

29

take to avoid liability.'" *Doe I*, 909 F.3d at 118 (quoting *Roark & Hardee*, 522 F.3d at 552). This Court should likewise reject Plaintiffs' vagueness challenge to the No-Fly Provisions.

Plaintiffs' fourth claim for relief should be dismissed.

### F. Plaintiffs' Supremacy Clause Challenge Is Meritless (Fifth Claim).

Plaintiffs contend that "the federal government has exclusive authority over regulating the national airspace and aviation safety," and that the No-Fly Provisions are therefore invalid under the Supremacy Clause. Compl. ¶ 142. The U.S. Constitution provides that federal laws "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "Congress may consequently pre-empt, *i.e.*, invalidate, a state law through federal legislation. It may do so through express language in a statute. [Or] Congress may implicitly pre-empt a state law, rule, or other state action." *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1595 (2015).

Here, Plaintiffs have specifically pleaded that only "field preemption" applies.[7] Compl. ¶¶ 141, 144. "In such situations, Congress has forbidden the State to take action in the field that the federal statute pre-empts." *Oneok*, 135 S. Ct. at 1595. "Although the Supreme Court has recognized field preemption claims, it has indicated courts should hesitate to infer field preemption unless plaintiffs show 'that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was 'the clear and manifest purpose of Congress.''" *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018) (quoting *DeCanas v. Bica*, 424 U.S. 351, 357 (1976)). "To establish field preemption, moreover, the plaintiffs must prove that federal law evinces 'the clear and manifest purpose of Congress' to preclude even complementary state

---

[7] Plaintiffs have not pleaded "conflict preemption," which "exists where 'compliance with both state and federal law is impossible,'" *Oneok*, 135 S. Ct. at 1595. Accordingly, Defendants need not and do not analyze such a claim.

legislation on the same subject." *Id.* at 178. Additionally, "the relevant field should be defined narrowly." *Id.* at 177.

Plaintiffs are simply wrong that field preemption applies to the No-Fly Provisions. "Neither the Supreme Court nor the Fifth Circuit have held that the Federal Aviation Act preempts the entire field of aviation safety." *Monroe v. Cessna Aircraft Co.*, 417 F. Supp. 2d 824, 828 (E.D. Tex. 2006). Indeed, though the Fifth Circuit has specifically found that "passenger safety warnings and instructions" aboard aircraft are preempted by federal law, *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 385 (5th Cir. 2004), its holding was narrowly confined to that issue, *id.* at 386, even after having noted the "broad array of [federal] safety-related regulations" related to aviation, *id.* at 384. Simply put, "[t]here is not sufficient evidence of a clear intent by Congress to preempt, neither through a pervasive scheme of federal regulations set forth by the FAA nor within the Act's text and legislative history." *Monroe*, 417 F. Supp. 2d at 836. Therefore, "[t]he field of aviation safety is not preempted by the Federal Aviation Act." *Id.*[8]

The authority cited by Plaintiffs in their complaint actually undermines their claim. Compl. ¶ 142. In *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624 (1973), the Supreme Court held only that the federal aviation noise regulations were preempted, which is far narrow than what Plaintiffs have alleged. *See id.* at 638-40. And in *Singer v. City of Newton*, 284 F. Supp. 3d 125, 130 (D. Mass. 2017), which Plaintiffs contend will demonstrate that it is "well established that the federal government has exclusive authority over regulating the national airspace and aviation

---

[8] Other courts that purport to have found that the FAA does preempt state law in the field of aviation safety have done so only in narrow contexts of wholly dissimilar cases, such as tree removal surrounding an airport, *Godspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206 (2d Cir. 2011), or the standard of care on a negligence claim, *Crout v. Haverfield Int'l, Inc.*, 269 F. Supp. 3d 90 (W.D.N.Y. 2017). Thus, where the "relevant field" is defined "narrowly," as it should be under Fifth Circuit law, *City of El Cenizo*, 890 F.3d at 177, Plaintiffs cannot establish that there has been field preemption in the area of aviation safety.

safety," Compl. ¶ 142, the court finds that the FAA ***does not*** preempt non-federal regulations in the field of regulation unmanned aircraft. Indeed, the court finds that "***the FAA explicitly contemplates state or local regulation of pilotless aircraft***, defeating [the] argument that the whole field is exclusive to the federal government." *Id.* at 130 (emphasis added). Plaintiffs are thus defeated by their own authority.

Plaintiffs also defeat their Supremacy Clause claim with their own allegations. Plaintiffs themselves admit that "a state may promulgate drone regulations consistent with its traditional police powers, such as to protect privacy or prevent trespass or voyeurism." Compl. ¶ 143. This is exactly the basis and purpose for the No-Fly Regulations, which prohibit voyeurism via drone and protect the privacy of private property owners and the security of critically important facilities and infrastructure. The No-Fly Regulations are a clear exercise of the State's police power, protecting the security and privacy of critical facilities while preventing aerial trespass onto private lands. Accordingly, Plaintiffs' Supremacy Clause claim must fail, and their fifth claim for relief should be dismissed.

## CONCLUSION

For the foregoing reasons, all of Plaintiffs' claims should be dismissed.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief, General Litigation Division

*/s/ Christopher D. Hilton*
CHRISTOPHER D. HILTON
Texas Bar No. 24087727
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120
FAX: (512) 320-0667
christopher.hilton@oag.texas.gov

**Counsel for the State Defendants, Steven McCraw and Ron Joy in their official capacities**

33

McGINNIS LOCHRIDGE LLP
Michael A. Shaunessy, SBN 18134550
Eric Johnston, SBN 24070009
Ethan J. Ranis, SBN 24098303
600 Congress Avenue, Suite 2100
Austin, Texas 78701
(512) 495-6000
(512) 495-6093 FAX
mshaunessy@mcginnislaw.com
ejohnston@mcginnislaw.com
eranis@mcginnislaw.com

By: */s/ Michael A. Shaunessy*
     Michael A. Shaunessy
     State Bar No. 18134550

*ATTORNEYS FOR DEFENDANT WES MAU, IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF HAYS COUNTY, TEXAS*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served via the Court's CM/ECF system on November 5, 2019, to all counsel of record.

*/s/ Christopher D. Hilton*
Christopher D. Hilton