UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, *et al.*, | § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. |
| v. | § § | 1:19-cv-00946-RP |
| STEVEN MCCRAW, *et al.*, | § § | |
| Defendants. | § § | |

PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

PRELIMINARY STATEMENT

Through this action, Plaintiffs seek to enforce their right to photograph and record matters of public importance, a right protected by the First Amendment's free speech and free press guarantees. Plaintiffs and their member journalists have exercised this right by using Unmanned Aerial Systems ("UAS," "UAV," or "drones") to gather newsworthy images, but Texas Government Code Chapter 423 now prohibits their use of drones to capture images of private individuals, private property, and critical infrastructure facilities—newsworthy or not. Plaintiffs challenge this law to enforce their constitutional rights and to vindicate the public's interest in receiving newsworthy information.

Defendants fundamentally mischaracterize the Complaint, contending that Plaintiffs "seek nothing less than unrestricted information gathering on any private citizen, anywhere, at any time, by anyone." Defs.' Mot. at 18 (ECF Doc. 19). Far from it. The Complaint seeks to enforce the First Amendment protection of newsgathering, a constitutional protection that extends fully to the use of a UAS to gather newsworthy images. It does not challenge the State's

1

right to enforce generally applicable laws protecting privacy and critical infrastructure, of which there are many. Rather, the Complaint alleges that drone use for newsgathering is protected under the First Amendment, and that the restrictions imposed directly on such newsgathering by Chapter 423 violate the constitutional rights of Plaintiffs and their members.

Having no real basis to deny that the Complaint states a viable constitutional claim, Defendants argue that Plaintiffs lack standing to assert it. They are once again off-base. The statutes at issue restrict First Amendment-protected activity and are unconstitutionally vague and overbroad. As a result, Plaintiffs and their members have been injured through threat of criminal and civil liability and the exercise of self-censorship to avoid such liability. The statutes also conflict with, and are preempted by, federal aviation regulation. Plaintiffs have more than adequately established their standing and have articulated colorable constitutional claims.

## STANDARD OF REVIEW

On Defendants' motion to dismiss Plaintiffs' Complaint for lack of standing and failure to state a claim under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), the Court accepts all factual allegations as true and examines only whether the complaint has sufficiently alleged subject-matter jurisdiction. *Lee v. Verizon Commc'ns., Inc.*, 837 F.3d 523, 533 (5th Cir. 2016).

In a facial attack to plaintiffs' standing, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotations omitted). A motion to dismiss for failure to state a claim places a substantial burden upon the movant. A plaintiff need allege "only enough facts to state a claim of relief that is plausible on its face," and the Court must draw all reasonable inferences in favor of the plaintiff. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). Dismissal is not proper so long as the complaint alleges facts that give rise to "a right to relief above the speculative level." *Id.* at 555.

ARGUMENT

I.    **PLAINTIFFS HAVE STANDING TO BRING THIS ACTION.**

Plaintiffs are an established Texas journalist, Joseph Pappalardo, and two organizations which promote and protect journalism and press photography, the National Press Photographers Association (NPPA) and the Texas Press Association (TPA). Each sufficiently states Article III standing to challenge Texas Government Code Chapter 423 as violating their First Amendment rights.[1]

The Complaint more than plausibly alleges that Pappalardo and NPPA members Guillermo Calzada and Brandon Wade are chilled from engaging in First Amendment-protected activities because of the existence of the challenged provisions in Chapter 423. That is all that is required for this type of claim at this stage in the litigation. Because NPPA members Calzada and Wade have individual standing to sue, NPPA has associational standing to sue as well. NPPA also has organizational standing as a result of having to divert resources to counter the injurious effects of Chapter 423 on its members.[2] This case can proceed upon the Court's determination that any one of the Plaintiffs has sufficiently pled standing, because "the presence

---

[1] Though Plaintiffs do not challenge all provisions of Chapter 423, the challenged provisions will be referred to herein as "Chapter 423" for ease of reference.

[2] Plaintiff TPA also has standing based on the injuries of its member newspapers, which the Complaint states are chilled by Chapter 423 from publishing images captured by UAVs. Compl. ¶¶ 46-47, 57, 59, 62. For example, the Complaint alleges that TPA member *Dallas Morning News* could not risk publishing photos of a community garden captured by a UAV. Compl. ¶ 70. Because there are multiple plaintiffs and only one party need have standing, this Response will focus on NPPA's and Pappalardo's standing to bring this action.

of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).[3]

### A. Self-Censorship Is A First Amendment Injury Conferring Article III Standing.

It is well-established that a plaintiff has Article III standing to challenge a statute on First Amendment grounds if the existence of that statute causes the plaintiff to reasonably self-censor his speech. Traditional Article III standing requirements—injury-in-fact, causation, and redressability—are relaxed in this context "because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *J & B Entm't, Inc. v. City of Jackson, Miss.*, 152 F.3d 362, 366 (5th Cir. 1998) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)); *see also Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 284-85 (6th Cir. 1997) (discussing standing based on self-censorship).

1. *Injury-in-Fact*. "[C]hilling a plaintiffs' speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." *Justice v. Hosemann*, 771 F.3d 285, 291 (5th Cir. 2014) (quoting *Hous. Chronicle Publ'g Co. v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007)). "[I]t is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights"—a credible threat of enforcement is sufficient. *Id.* (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)); *see also Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018).

When "the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute, and there exists a credible

---

[3] Defendants' arguments that Plaintiffs have not pled third-party standing are irrelevant, as Plaintiffs do not allege standing on that basis. *See* Defs.' Mot. at 11-12.

threat of prosecution," it is sufficient to establish an injury-in-fact. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). "A non-moribund statute that 'facially restrict[s] expressive activity by the class to which the plaintiff belongs' presents such a credible threat." *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999) (first alteration in original) (quoting *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)). Passing a law that is "aimed directly" at a plaintiff's First Amendment activities makes it reasonable for a plaintiff to "refrain[] from making, issuing, or distributing" the regulated materials and provides the foundation for a First Amendment injury-in-fact. *Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1192-94 (D.C. Cir. 1992); *see also Mobil Oil Corp. v. Attorney Gen. of Com. of Va.*, 940 F.2d 73, 76 (4th Cir. 1991) (same).

To establish standing for a preenforcement challenge, it is enough to "allege[] *an intention* to engage in a course of conduct arguably affected with a constitutional interest, but proscribed" by a statute, leading the plaintiff to alter his activities. *Babbitt*, 442 U.S. at 298. Whether the government has as of yet exercised its prosecutorial discretion to enforce Chapter 423 is irrelevant to the standing inquiry. "[T]here is no requirement to give [the government] such an opportunity" before challenging an unconstitutional statute. *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 803 (7th Cir. 2016). "The plaintiff need not demonstrate to a certainty that it will be prosecuted," just that it faces that risk. *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1192 (10th Cir. 2000) (internal quotations omitted). This standard applies to statutes with both criminal and civil enforcement mechanisms. *See, e.g.*, *Kimberly-Clark Corp. v. Dist. Of Columbia*, 286 F. Supp. 3d 128, 136-37 (D.D.C. 2017) (finding sufficient credible threat of civil liability to satisfy injury-in-fact requirement) (citing *Susan B. Anthony List v. Driehaus*, 159 U.S. 149, 161 (2014)).

In short, a First Amendment injury exists if the state places "the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity," because, when faced with that choice, the courts recognize it is appropriate (and indeed the government's intent) for the plaintiff to choose compliance. *Steffel*, 415 U.S. at 462. In this suit, as discussed below, each Plaintiff has concretely alleged a cognizable First Amendment injury sufficient to confer standing by pleading that, but for Chapter 423's restrictions, they would use drones for newsgathering in ways that arguably violate the challenged provisions of Chapter 423.

2. *Traceability and Redressability*. Each plaintiff also satisfies the traceability and redressability requirements for standing. In the context of a facial First Amendment challenge, where *the law itself* causes the injury, these requirements are easily satisfied so long as the complaint alleges that the plaintiff is injured by the law. *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006) (where potential enforcement caused self-censorship, "causation and redressability prongs of the standing inquiry are easily satisfied"). Here, plaintiffs allege that Chapter 423 causes them (and their members) to self-censor and to divert resources to address the injurious effects of the law on photojournalism, satisfying the traceability requirement. *See* Compl. ¶¶ 45, 60, 64, 69, 71-72, 76, 84-86.

The same reasoning applies to the redressability analysis. Where the injury stems from the law itself, courts look to see whether the injury "will be redressed in the event that the statute is enjoined and/or declared unconstitutional." *Henderson*, 287 F.3d at 379, 382; *see also Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 192 n.5 (5th Cir. 2012) (where injury stemmed from statute, it would be redressed by enjoining the enforcement of the statute); *Ctr. for Individual Freedom*, 449 F.3d at 661 (same); *Initiative &*

*Referendum Inst. v. Walker*, 450 F.3d 1082, 1098 (10th Cir. 2006) (where First Amendment chill

is the injury-in-fact, striking down the statute would redress the injury). Here, a declaration that

Chapter 423 is unconstitutional would lift the chill on Plaintiffs' speech by easing their fears of

criminal and civil prosecution, and reduce or remove NPPA's need to counsel its members about

how to comply with the law. That is enough to satisfy the redressability prong.

### B. Plaintiff Pappalardo Sufficiently Alleges A First Amendment Injury Giving Him Standing To Challenge Chapter 423.

Plaintiff Pappalardo sufficiently alleges an Article III injury-in-fact because he has "an

intention to engage in a course of conduct arguably affected with a constitutional interest, but

proscribed by a statute" that has produced a reasonable fear of state action under that law, which

led him to alter his activities. *Babbitt*, 442 U.S. at 298. Pappalardo alleges that his reasonable

fear of being subject to Chapter 423 penalties caused him to cease using his UAV for

newsgathering purposes altogether, but he would resume drone use absent Chapter 423. Comp.

¶ 84. This pleading suffices at the motion-to-dismiss stage, where "allegations of injury are

liberally construed," *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009), and it is

"presume[d] that general allegations embrace those specific facts that are necessary to support

them." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 889 (1990).

Pappalardo's injuries are not hypothetical or speculative. Pappalardo is a well-established

Texas journalist and owns a UAV registered with the FAA. Compl. ¶ 81. He previously obtained

an FAA Part 107 Remote Pilot's Certificate, which, when renewed, permits him to operate his

UAV in the national airspace. *Id.*[4] Pappalardo is familiar with the requirements and penalties of

---

[4] Defendants claim that Pappalardo's non-renewal of his FAA license constitutes "apathy,"
Defs.' Mot. at 10, when in fact the Complaint is clear that the non-renewal is directly attributable

Chapter 423, but "has found that using his drone in compliance with Chapter 423 does not allow him to gain insights and information important to his role as a journalist, or to capture newsworthy images." Compl. ¶¶ 84-85. Because of Chapter 423, he has ceased using his UAV to capture images altogether. But if Chapter 423 is no longer in force, Pappalardo is poised to use his UAV to capture and publish images that would otherwise be prohibited.

Pappalardo also alleges that because of fear of prosecution under Chapter 423, he has forgone specific opportunities to use his UAV to record newsworthy events, such as: Hurricane Harvey (including panic at the gasoline pumps), flood and wind damage, house fires, construction projects, urban sprawl, the removal of homeless encampments, the route of a proposed toll road, and dumping sites for dead and abandoned animals. Compl. ¶ 85. Defendants quibble with whether capturing images of each of these items would violate Chapter 423, *see* Defs.' Mot. at 9, and given the vagueness of Chapter 423, it's not always clear. But some of the newsworthy images Pappalardo wishes to capture are almost certainly prohibited by Chapter 423. For example, taking aerial images of gas stations, homes that have caught fire, and urban sprawl obviously and necessarily involve "captur[ing] an image of . . . privately owned real property." Tex. Gov't Code § 423.003(a). Because the statute on its face prohibits these protected activities, a credible threat of prosecution exists. *See Susan B. Anthony List*, 573 F.3d at 162-63 (finding standing where conduct is "arguably" proscribed by the law); *Babbitt*, 442 U.S. at 298.

Moreover, Pappalardo alleges that, absent Chapter 423, he intends to use UAVs in the future to capture newsworthy images to report on infrastructure projects, air quality, illegal

---

to the challenged provisions of Chapter 423. As long as Chapter 423 is in force, the Certificate is useless to him. Compl. ¶¶ 15, 84.

poaching in urban areas, and gridlock in the North Texas metroplex. Compl. ¶ 85. As with the

projects Pappalardo has already avoided, at least some of this coverage would likely include

images of private real property or individuals in violation of Chapter 423. At the very least,

Pappalardo alleges sufficient facts of his intent to engage in conduct that has caused him to alter

his activities due to a "reasonable fear" of enforcement. *See Speech First, Inc. v. Fenves*, 384

F.Supp.3d 732, 740 (W.D. Tex. 2019) ("Under a self-censorship theory, a plaintiff may argue her

future speech is chilled by a policy, though not prohibited.").

In sum, Pappalardo has sufficiently alleged that Chapter 423 causes him a direct and

ongoing First Amendment injury. These allegations easily satisfy the injury, traceability, and

redressability requirements of standing to challenge the law's unconstitutionality.

**C. NPPA Sufficiently Alleges Associational Standing To Challenge Chapter 423.**

An organization may bring suit on behalf of its members if it has associational standing.

*Pharmacy Buying Ass'n v. Sebelius*, 906 F. Supp. 2d 604, 617 (W.D. Tex. 2012) (citing *Warth v.

Seldin*, 422 U.S. 490, 511 (1975)). An organization has associational standing when: "(a) its

members would otherwise have standing to sue in their own right; (b) the interests it seeks to

protect are germane to the organization's purpose; and (c) neither the claim asserted nor the

relief requested requires the participation of individual members in the lawsuit." *Id.* at 550

(citation omitted). "[A]s long as resolution of the claims benefits the association's members and

the claims can be proven by evidence from representative injured members, without a fact-

intensive-individual inquiry, the participation of those individual members will not thwart

associational standing." *Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.*, 627 F.3d 547, 552

(5th Cir. 2010).

1. *NPPA's members have standing to sue.* Plaintiffs sufficiently allege that Chapter 423

causes NPPA members Guillermo Calzada and Brandon Wade to suffer First Amendment

injuries for all the same reasons that Pappalardo suffers injury. Both Calzada and Wade are

experienced Texas visual journalists who have an objectively reasonable fear of prosecution

under Chapter 423 if they use their UAVs to capture newsworthy images. Compl. ¶¶ 57-66

(Calzada), 67-80 (Wade). They thus have standing to sue in their own right, giving NPPA

associational Article III standing to sue for them.

Calzada is currently employed by the *San Antonio Express-News*, owns a UAV properly

registered with the FAA, and has a currently active FAA Part 107 Remote Pilot Certificate.

Compl. ¶¶ 57-58. Calzada fears that using his UAV to cover local breaking news, such as fires or

accidents, would subject him to Chapter 423 liability because it would involve photographing

private real property. Compl. ¶¶ 61-62. As such, Chapter 423's apparent prohibition on capturing

and publishing those images is "detrimental" to his exercise of First Amendment-protected

activity. Compl. ¶ 62. And because the statute itself prohibits the protected conduct, it poses a

"credible threat of prosecution." *See KVUE, Inc. v. Moore*, 709 F.2d 922, 930 (5th Cir. 1983),

*summarily aff'd sub nom. Texas v. KVUE-TV, Inc.*, 465 U.S. 1092 (1984) (finding credible fear

of prosecution where state had "not disavowed enforcement," even though statute had not been

enforced).

Although those allegations are enough, Calzada's interactions with police further give

rise to his reasonable fear and the credible threat that he will be prosecuted under Chapter 423. In

2018, two police officers approached Calzada while he was using his UAV to report on the

aftermath of a deadly arson fire at the Village Apartments in San Marcos. Compl. ¶ 59. The

officers informed Calzada of the criminal penalties under Chapter 423 that he would be subject

to if he continued to use his UAV to report on the fire or published any of the images he

captured. *Id.* This "conversation"—to use Defendants' terminology—made clear to Calzada that

law enforcement authorities intend to enforce Chapter 423, and demonstrates that his fear of prosecution is far more than "subjective."

Defendants argue lack of standing because Calzada does not allege to have stopped using his drone and could comply with Chapter 423 by doing so. *See* Defs.' Mot. at 12. But Calzada does not need to allege that he altogether stopped photographing news with his UAV to show his speech has been harmed. A demonstration that a law forces the plaintiff to alter his activities or "discourages" his desired speech establishes a cognizable constitutional injury. *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006). Such "intimidation" of speech can take the form of either an absolute bar on speaking or imposing compliance measures before a person can engage in speech. *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392. Calzada states that he is afraid to operate his UAV as a result of Chapter 423, a fear that is "detrimental" to his work. Compl. ¶ 62. The impact this reasonable fear has on Calzada's protected activities establishes an injury for First Amendment standing purposes.

NPPA member Wade also meets the requirements for First Amendment injury-in-fact. Like Calzada, Wade's efforts to use his UAV to capture and publish some aerial images have been limited by Chapter 423's prohibitions, and he has censored his own First Amendment-protected activities out of fear of criminal and civil prosecution under the statute. *See* Compl. ¶¶ 69, 71-73. For example, in 2017, Wade limited the images he took of a water treatment plant that was not operating properly out of fear that he would violate Chapter 423. Compl. ¶ 69. Wade suffered similar limitations on what images he could obtain in photographing a facility housing immigrant children. Compl. ¶ 73. In 2018, Wade—who works as a freelance journalist—offered UAV-obtained images to the *Dallas Morning News*, but it declined to publish them after it learned that they were captured using a UAV. Compl. ¶ 70. Finally, Wade was unable to accept

an important long-term assignment from the *Fort Worth Star-Telegram* to photograph the

construction of a taxpayer-funded stadium because Chapter 423 forbade him from doing so.

Compl. ¶ 71. Defendants attempt to minimize the effect of these "inconvenience[s]." Defs.' Mot.

at 13. But in each of these instances, Chapter 423 caused Wade to circumscribe activities

protected by the First Amendment; and where the state impedes a plaintiffs' desired speech, it

imposes a cognizable constitutional injury. *See Initiative & Referendum Inst.*, 450 F.3d at 1089.

      2. *The issues are germane to NPPA's purpose.* NPPA also satisfies the second prong of

associational standing—that the interests at issue are germane to the association's purpose—

because Calzada and Wade's injuries implicate the core of NPPA's mission to support and

advocate for visual journalists and promote excellence in the profession. Compl. ¶ 54. To further

its mission, NPPA promotes ethical journalism and works to advocate for and improve the legal

landscape for visual journalists, particularly in the areas of First Amendment and copyright

protection. *Id.* Because Calzada's and Wade's injuries stem from restrictions on their First

Amendment rights, this matter is germane to NPPA's mission.

      3. *Individual members' participation is not required.* Finally, participation of NPPA

individual members is not required in this lawsuit because NPPA brings a facial constitutional

challenge, thus satisfying the third requirement of associational standing. *See Comm. for

Effective Cellular Rules v. F.C.C.*, 53 F.3d 1309, 1315 (D.C. Cir. 1995) (third prong "clearly"

met because case brought a "broad facial challenge"); *N.Y. State Club Ass'n. v. City of New York*,

487 U.S. 1, 10 n.4 (1988) (third prong "clearly . . . met" in context of First Amendment facial

challenge). "[T]he third prong of the associational standing test is best seen as focusing on . . .

administrative convenience and efficiency." *United Food & Commercial Workers Union Local

751 v. Brown Group, Inc.*, 517 U.S. 544, 556-57 (1996). It is undoubtedly more administratively

convenient and efficient for NPPA to bring this claim in accordance with its mission than for

every NPPA member who suffers a similar injury due to Chapter 423 to bring individual claims.

### D. NPPA Also Sufficiently Alleges Organizational Standing Because Chapter 423 Has Caused It To Divert Resources Away From Other Activities.

In addition to sufficiently pleading associational standing, NPPA also has organizational

standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), because it has gone

out of its way to devote significant resources to address the impacts of Chapter 423, resources

that it would have otherwise spent on other activities core to its mission. The Complaint alleges

that NPPA has expended substantial resources preparing to serve as a legal resource "in case a

member is charged criminally or sued civilly" under the law; counseling photography

departments, news organizations, individual photographers, and NPPA members about

compliance with the law; and responding to "many" member inquiries asking about how to use

drones to capture the news in light of Chapter 423. Compl. ¶¶ 55-56. These hours "have diverted

resources from NPPA's core activities," such as "advocat[ing] for and improv[ing] the legal

landscape for visual journalists, particularly in the areas of First Amendment and copyright

protection." Compl. ¶¶ 56, 54.[5]

These concrete allegations are more than sufficient at the motion-to-dismiss stage. *See*

*Havens*, 455 U.S. at 379. In *Havens*, the organizational plaintiff made less detailed allegations

regarding its injury than NPPA has, alleging only that it had "been frustrated by defendants'

racial steering practices in its efforts to assist equal access to housing through counseling and

other referral services [because it] had to devote significant resources to identify and counteract

the defendant's [*sic*] racially discriminatory steering practices." *Id.* (alteration in original). The

---

[5] The Complaint contains a typographical error: Paragraph 56 should reference ¶ 54, not ¶ 85.

Supreme Court held that, based on this allegation, "there can be no question that the organization has suffered injury in fact" because such a drain of the plaintiff's resources "constitutes far more than simply a setback to the organization's abstract social interests." *Id.* The Fifth Circuit has also recognized that expending resources to educate an organization's constituents about the parameters of a challenged law is precisely the type of injury that satisfies *Havens*. For example, *OCA-Greater Hous. v. Texas* held that a voting rights organization had standing to challenge a voter law because it had to devote additional resources to its usual get-out-the-vote efforts to educate constituents about compliance. 867 F.3d 604, 609-14 (5th Cir. 2017); *see also Veasy v. Perry*, 29 F. Supp. 3d 896, 903-04 (S.D. Tex. 2014) (same with regard to voter ID law). So too here, NPPA has alleged that the existence of Chapter 423 has caused it to divert staff resources to managing the law's impacts. Such allegations confer organizational standing at this stage of the proceedings.

Defendants wrongly claim that NPPA's diversion of resources to legal counseling does not give rise to an Article III injury. Defs.' Mot. at 14-16. Defendants rely on cases in which the party initiating litigation contends that the litigation itself is the claimed diversion of resources. *See id.* (citing *ACORN v. Fowler*, 178 F.3d 350, 358-59 (5th Cir. 1999); *La. ACORN Fair Housing v. LeBlanc*, 211 F.3d 298, 305-06 (5th Cir. 2000)). Here, in contrast, NPPA has pleaded that Chapter 423 has forced the organization to respond to multiple member inquiries and conduct counseling sessions about how to comply with the law, activities outside the scope of this litigation. Defendants' further reliance on *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010), is similarly misplaced. In that case—which was an appeal after trial, not a case involving adequacy of pleadings—the plaintiff organization only established that it had communicated internally about the challenged ordinance and lobbied against it, but produced no

evidence demonstrating that it had forgone any other activities. *Id.* at 329. Here, NPPA seeks to

mitigate the actual impacts of Chapter 423 on its members, and has had to divert resources away

from other core activities to do so. *See OCA-Greater Hous.*, 867 F.3d at 612 (distinguishing *City*

*of Kyle* on the basis that it involved only lobbying or pre-litigation expenses whereas the plaintiff

in *OCA-Greater Houston* diverted resources to educate its constituents about compliance with

the law).

Finally, contrary to Defendants' arguments, it is of no consequence that NPPA's

diversion of resources to legal counseling supports its overall mission to protect photojournalists.

Diverting resources establishes standing even if the diversion serves to bolster activities already

within an organization's mission. Where, for example, an organization that conducted voter

registration drives as part of its core mission had to divert additional resources to doing *more*

voter registration drives because of the defendant's illegal action, the court rejected the

defendant's argument that such work was "business as usual," and held that the organization had

standing. *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040-41 (9th Cir. 2015).[6] Just as

in *La Raza*, NPPA's increased efforts to advise its members in light of Chapter 423 are not

"business as usual."

---

[6] *See also, e.g.*, *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d
1216, 1219 (9th Cir. 2012) (holding organizations have standing to sue to stop a roommate-
matching website from discriminating because they undertook a campaign against discriminatory
roommate advertising, even though their ordinary business includes investigating and raising
awareness about housing discrimination); *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 30 (D.C.
Cir. 1990) (Ginsburg, J.) (recognizing standing where defendant's advertising "requir[ed] a
consequent increase in the [plaintiff] organizations' educational programs on the illegality of
housing discrimination").

II.     **CHAPTER 423 ABRIDGES FIRST AMENDMENT RIGHTS.**

There can be no serious dispute that Chapter 423 burdens First Amendment rights by

restricting Plaintiffs' ability to use drones to gather the news, and more specifically to record

newsworthy activity using drones.[7]

"[T]he heart of the First Amendment is the recognition of the fundamental importance of

the free flow of ideas and opinions on matters of public interest and concern." *Hustler Magazine,*

*Inc. v. Falwell*, 485 U.S. 46, 50 (1988). The Supreme Court has thus instructed that both "the

creation and dissemination of information are speech within the meaning of the First

Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). "If the creation of speech

[were not protected] under the First Amendment, the government could bypass the Constitution

by simply proceeding upstream and damming the source of speech." *Western Watershed Project*

*v. Michael*, 869 F.3d 1189, 1196 (10th Cir. 2017) (cleaned up).

For this very reason, the Supreme Court underscored in *Branzburg v. Hayes*, 408 U.S.

665, 707 (1972), that "news gathering is not without its First Amendment protections." In

*Richmond Newspapers, Inc. v. Virginia*, it reaffirmed that "without some protection for seeking

out the news, freedom of the press could be eviscerated." 448 U.S. 555, 576 (1980) (quoting

*Branzburg*, 408 U.S. at 681); *see also Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir.

2017) (same). And because the right to gather the news is essential to the freedoms of speech and

press, the Court has recognized that First Amendment concerns are raised by laws that impose

---

[7] Defendants misunderstand the nature of Plaintiffs' First Amendment claims. Plaintiffs do not
argue that "the piloting of a drone" is itself "inherently expressive." Defs.' Mot. at 19. Rather,
using a drone *for the purposes of newsgathering and recording* is protected First Amendment
activity because it is an "act of making an audio or audiovisual recording [that] is necessarily
included within the First Amendment's guarantee of speech and press rights." *ACLU of Ill. v.*
*Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012).

more than an incidental effect on the ability to gather and report the news. *See Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991); *see also Alvarez*, 679 F.3d 583 at 602.

The Complaint alleges that Chapter 423 imposes just such a non-incidental burden on protected newsgathering activity. It alleges that the Surveillance Provisions have a direct and significant impact on the ability of Plaintiffs and their members to gather news in Texas, and that Plaintiffs and other journalists are chilled from using drones to report on stories of public concern. The Complaint also alleges that the No-Fly Provisions directly and significantly burden the ability of Plaintiffs and their members to record newsworthy events at critical infrastructure facilities, and that some journalists, out of fear of prosecution, have had to curtail their reporting. Compl. ¶¶ 45, 60, 64, 69, 71, 76, 84-86.

Recording is also a protected First Amendment activity burdened by Chapter 423. The Fifth Circuit has specifically recognized that the "First Amendment protects the act of making film," because the ability of citizens to "receive information and ideas" requires that they be able to collect and record information. *Turner*, 848 F.3d at 688-89; *see also Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (finding First Amendment right to record matters of public interest); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (same); *Fields v. City of Philadelphia*, 862 F.3d 353, 355-56 (3d Cir. 2017) (finding "First Amendment right to record police activity in public"). The Supreme Court does not draw a distinction between the process of creating speech and speech itself, for clearly the essential precursors to speech are integral to exercising the free speech right. *Turner*, 848 F.3d at 689; *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1062 (9th Cir. 2010). In other words, the "act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording."

*Alvarez*, 679 F.3d at 595. Without a right to record, the "right to publish or broadcast an audio or audiovisual recording would be insecure, or largely ineffective." *Id.*

Despite Defendants' arguments otherwise, the right to record is not limited to public officials on public property. In *Turner*, the Fifth Circuit explicitly recognized that the First Amendment protects "the broader right to film," in addition to "the particular right to film the police." 848 F.3d at 689. And other courts have repeatedly held that the First Amendment broadly protects making recordings of matters of public interest—even on private property and even when no public officials are involved. *See Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018); *Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193, 1206-08 (D. Utah 2017).

Thus, by restricting Plaintiffs' ability to "capture an image," Tex. Gov't Code § 423.003(a), the Surveillance Provisions directly restrict First Amendment-protected activity. It is of no matter that the law restricts recording in part by providing for a private cause of action— contrary to Defendants' argument, Defs.' Mot. at 19, it is well-settled that a law providing for a private cause of action, in addition to criminal penalties, is a form of state action subject to the First Amendment. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964); *Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 880 (9th Cir. 1987).

Defendants attempt to deny that the Complaint's allegations present any First Amendment issue by arguing that the "'right to speak and publish does not carry with it the unrestrained right to gather information.'" Defs.' Mot. at 18 (quoting *Zemel v. Rusk*, 381 U.S. 1, 17 (1965)). But *Zemel* involved a First Amendment challenge to a generally applicable law banning all travel to Cuba that only indirectly inhibited the flow of information to citizens who might want to travel and see the impact of our government's policies. 381 U.S. at 3-5, 16-17.

18

Such a generally applicable law designed to regulate activities *other than speech* might "incidentally burden[]" speech without First Amendment scrutiny. But Chapter 423 is no such law. The Complaint plausibly alleges that the Surveillance Provisions and the No-Fly Provisions do not simply restrict the flying of drones; rather, they directly prohibit capturing images and more-than-incidentally restrict newsgathering. They are not generally applicable regulations of conduct having only an incidental impact on speech; they are regulations that directly impede First Amendment-protected activity. *See W. Watersheds Project*, 869 F.3d at 1197 (holding that a law prohibiting a trespass done to collect information is not "generally applicable" and is subject to First Amendment scrutiny); *Alvarez*, 679 F.3d at 602-03 (holding that a law targeting a communications technology "burdens First Amendment rights directly, not incidentally").

Nor are Defendants correct to assert that the Complaint demands "an Orwellian result." Defs.' Mot. at 1. The constitutional protection of newsgathering does not bar the state from enforcing laws that safeguard privacy and safety interests in an appropriately focused way. Indeed, many Texas laws protect against invasions of privacy, intrusion, and the like—none of which plaintiffs challenge. *See* Tex. Penal Code § 21.15 (outlawing invasive recording); Tex. Penal Code § 21.17 (outlawing voyeurism). However, the First Amendment *does* prevent the state from unduly restricting the right to gather the news; and Chapter 423 does just this.

## III.   THE COMPLAINT PLAUSIBLY ALLEGES THAT THE SURVEILLANCE PROVISIONS VIOLATE THE CONSTITUTION.

The Complaint alleges that the Surveillance Provisions violate the constitution in three ways: they impose content-based restrictions on protected speech for no sufficiently compelling reason; they are unconstitutionally vague; and they are impermissibly overbroad.

A.  **The Complaint Plausibly Alleges That The Surveillance Provisions Impermissibly Impose Content-Based Restrictions On First Amendment Activity.**

The Supreme Court has made clear that content-based restrictions on First Amendment-protected activity "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015); *see also Sorrell*, 564 U.S. at 565; *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992). The Complaint alleges both that the Surveillance Provisions restrict First Amendment-protected activity on the basis of content and that they are not narrowly tailored to serve a compelling state interest.

A regulation of speech is content-based if it either (1) "applies to particular speech because of the topic discussed or the idea or message expressed," *Reed*, 135 S. Ct. at 2227, or (2) discriminates between speakers in a way that "disfavors" certain speakers from exercising their First Amendment rights. *Sorrell*, 564 U.S. at 564. The Surveillance Provisions do both. The provisions impose liability on the capture of "images of an individual or privately owned real property," Tex. Gov't Code § 423.003(a)—liability based squarely on the content of the image. The provisions also impose liability on only certain individuals—making speaker-based discriminations that disfavor certain speakers, including journalists. Tex. Gov't Code § 423.002(a).

Chapter 423's exemptions demonstrate both content-based liability and speaker-based discrimination. For example, Chapter 423 exempts "professional or scholarly research," "operations and maintenance of utility or telecommunications facilities," and "mapping" from its restrictions on image capture. Tex. Gov't Code § 423.002. These categories are all based on the communicative content of the images. Under the statute, the same image, captured in the same way, would be treated differently if used for mapping or research than if used in a news report.

Chapter 423's speaker-based discriminations include exemptions from the restrictions on image capture for speakers such as "professor[s]," "students[s]," "professional engineer[s]," and "employee[s] of an insurance company." *Id.* These categories are all based on the identity of the speaker, "disfavoring" some and not others. For both of these reasons, the Complaint plausibly alleges that the Surveillance Provisions constitute a content-based regulation. The provisions are thus "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 135 S. Ct. at 2226.

Straining to deny that a constitutional violation is alleged, Defendants' wrongly argue that intermediate scrutiny applies and is satisfied by privacy and public safety interests. Defs.' Mot. at 20-21. First, the Supreme Court has held that *strict* scrutiny applies to content-based regulations, "regardless of the government's benign motive [or] content-neutral justification." *Reed*, 135 S. Ct. at 2228 (citing *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). But even if a lower level of scrutiny applied, it is the government's burden to satisfy it, *see, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 495 (2014); *Edenfield v. Fane*, 507 U.S. 761, 770 (1993); *Reynolds v. Middleton*, 779 F.3d 222, 226 (4th Cir. 2015); and Defendants point to nothing other than their say-so that drone flights threaten privacy and public safety. This is not good enough to dismiss a well-pleaded First Amendment violation. The Supreme Court has made clear that the State must show that its use of "other laws already on the books" or other less restrictive means proved ineffective before it can justify a new law implicating speech, and Defendants haven't attempted to do so here. *McCullen*, 573 U.S. at 494; *see also Reynolds*, 779 F.3d at 231.

Defendants equally fail to explain how Chapter 423 is narrowly tailored to address a compelling government interest, given its myriad exceptions. How is it, for example, that safety

and privacy are implicated when the drone is operated by a journalist, but safety and privacy are

not implicated when the drone is operated by a professor or student? In short, Defendants

woefully fail to rebut the presumptive unconstitutionality of the content-based Surveillance

Provisions, under any level of First Amendment scrutiny.

**B. The Complaint Plausibly Alleges That The Surveillance Provisions Are Unconstitutionally Vague.**

"A fundamental principle in our legal system is that laws which regulate persons or

entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television

Stations, Inc.*, 567 U.S. 239, 253 (2012). "A law is unconstitutionally vague if it (1) fails to

provide those targeted by the statute a reasonable opportunity to know what conduct is

prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement."

*Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001). The Complaint

establishes that the Surveillance Provisions are unconstitutionally vague for both reasons.

The Surveillance Provisions "fail[] to provide those targeted by the statute a reasonable

opportunity to know what conduct is prohibited." *Id.* They prohibit the use of drones to capture

images "with the intent to conduct surveillance," but then leave undefined the "surveillance" that

is being outlawed. Tex. Gov't Code § 423.003. Despite Defendants' facile argument that

"surveillance" has a dictionary definition and thus is not vague, the term has no *single* definition

and can take many meanings. Generally-accepted definitions include:

> "Close observation or listening of a person or place in the hope of gathering evidence." *Surveillance*, Black's Law Dictionary (11th ed. 2019);

> "The act of observing or the condition of being observed." *Surveillance*, AMERICAN HERITAGE DICTIONARY (2019), www.ahdictionary.com; and

> "[C]ontinuous observation of a place, person, group, or ongoing activity in order to gather information." *Surveillance*, Dictionary.com (2019).

These definitions illustrate why the Surveillance Provisions are unconstitutionally vague. If "surveillance" were limited to instances in which a party seeks to "gather evidence" for use in court, then newsgathering would not seem to constitute "surveillance." On the other hand, if any "act of observing" or observation "to gather information" constitutes "surveillance," then newsgathering could well be encompassed and prohibited. Such a broad definition would prohibit using a drone to record virtually anything on private property, including homes damaged by a natural disaster, shoddy construction practices, a public official surveying agricultural lands, the migration of dangerous animals, or the movements of human traffickers and other predators. The term surveillance is so vague that Chapter 423 could be used to criminalize a vast swath of important newsgathering activity.[8]

Such uncertainty is prohibited where First Amendment rights are at stake. "The Fourteenth Amendment's guarantee of Due Process proscribes laws so vague that persons of common intelligence must necessarily guess at their meaning and differ as to their application." *Women's Med. Ctr. of Nw. Hous.*, 248 F.3d at 421 (cleaned up). And an even "more stringent vagueness test should apply where a law 'threatens to inhibit the exercise of constitutionally protected rights.'" *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)). If citizens are unsure what is disallowed, they may be overly cautious and refrain from actions they are constitutionally privileged to take. The Surveillance Provisions have just this effect by chilling Plaintiffs from exercising their First Amendment right to record and gather news.

---

[8] Offenses under the Surveillance Provisions are Class C misdemeanors for image capture or possession, punishable by a fine of up to $500, and Class B misdemeanors for "disclosure, display, distribution, or other use of an image," punishable by up to 180 days in jail, a fine of as much as $2,000, or both. Tex. Gov't Code §§ 423.003, 423.004; Tex. Penal Code §§ 12.22, 12.23.

For these same reasons, the Surveillance Provisions unconstitutionally vest indefinite discretion in law enforcement, *Kolender v. Lawson*, 461 U.S. 352, 357 (1983), and improperly "delegate[] basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). Without a clear definition of "surveillance," courts and law enforcement cannot properly determine if a person is in violation of the law. "[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Id.* at 108. The Surveillance Provisions fail to do so.

### C. The Complaint Plausibly Alleges that the Surveillance Provisions Are Overbroad.

The First Amendment prohibits statutes that punish a substantial amount of First Amendment-protected activity in the course of regulating unprotected conduct. As with vagueness, the danger in these "overbroad" statutes is that they "may deter the legitimate exercise of First Amendment rights." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975); *see also United States v. Stevens*, 559 U.S. 460 (2010) (holding a federal law banning visual and auditory depictions of animal cruelty to be unconstitutionally overbroad). Statutes that are unconstitutionally overbroad in violation of the First Amendment must be narrowed or, if "not easily susceptible of a narrowing construction," struck down. *Erznoznik*, 422 U.S. at 216.

As discussed above, the Surveillance Provisions on their face prohibit a substantial amount of First Amendment-protected activity by prohibiting all recording of "privately owned real property" for surveillance. Tex. Gov't Code § 423.003; *see* pp. 17-19, *supra*. Such a sweeping prohibition restricts drone recording on nearly 95% of the property within the State.[9]

---

[9] *See* Inst. Renewable Nat. Res., *Texas Land Trends*, TEX. A&M, http://texaslandtrends.org/lt-2014-fact-sheet.pdf.

Furthermore, the statute bars images of "any individual," unless that individual gives consent or

is on public property. Tex. Gov't Code §§ 423.002(a)(6), 423.002(a)(15), 423.003. The statute's

plain text even prohibits capturing images of public officials, such as police officers, on private

property—a prohibition that conflicts with the Fifth Circuit's holding that the First Amendment

protects the right to record the actions of the police, "subject only to *reasonable* time, place, and

manner restrictions." *Turner*, 848 F.3d at 688 (emphasis added). And even accepting the

Defendants' contention that privacy and safety are the purposes underlying Chapter 423, the

Surveillance Provisions go well beyond restricting activities that raise such concerns—there is

simply no privacy or safety interest, for example, in prohibiting aerial footage of an extinguished

apartment fire, air quality, or dumping sites.

Defendants' unfounded claim that "very little protected expressive activity is even

implicated by the Surveillance Provisions, much less criminalized," is thus demonstrably

incorrect. Defs.' Mot. at 24. As a threshold matter, with no clear definition of what activity

constitutes "surveillance," Defendants cannot possibly demonstrate how much protected

expressive activity is implicated. This lack of clarity is precisely why Chapter 423 is not only

vague but also overbroad—because "it is unclear whether it regulates a substantial amount of

protected speech." *United States v. Williams*, 553 U.S. 285, 304 (2008). Moreover, the bald

assertion that the statute reaches little constitutionally protected conduct requires factual inquiry,

which is inappropriate on a motion to dismiss. The Complaint plausibly alleges that the

Surveillance Provisions restrict a "substantial amount of protected expressive activity," and are

thus unconstitutionally overbroad, which is all Plaintiffs must do at this stage of the proceedings.

IV.   **THE COMPLAINT PLAUSIBLY ALLEGES THAT THE NO-FLY PROVISIONS VIOLATE THE CONSTITUTION.**

Plaintiffs have plausibly alleged that the No-Fly Provisions of Chapter 423 are facially unconstitutional. These provisions prohibit flying less than 400 feet over a broad range of what the statute calls "critical infrastructure facilities," including oil drilling sites and pipelines, animal feedlots, detention facilities, and sports venues. Tex. Gov't Code §§ 423.0045, 423.0046. As alleged in the Complaint, these restrictions, subject to criminal penalties, are unconstitutional for three reasons: they constitute aviation safety laws that are preempted by the Federal Aviation Act and federal regulations; they unconstitutionally burden First Amendment-protected activity; and they are unconstitutionally vague.

**A. The Complaint Plausibly Alleges That The No-Fly Provisions Are Preempted**

The No-Fly Provisions are preempted by federal aviation law both because Congress has preempted state aviation safety regulations and because they directly flout and impede the objectives of federal aviation safety law.

Federal law impliedly preempts state law through the doctrines of field preemption and obstacle preemption. *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 384 (5th Cir. 2004). Field preemption exists where a scheme of federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, or where an Act of Congress touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (internal quotations omitted). Obstacle preemption invalidates state laws that "interfere[] with the achievement of federal objectives." *Witty*, 366 F.3d at 384. The No-Fly Provisions are preempted under both doctrines.

1. *Field preemption.* The federal air safety regulatory scheme is so pervasive, and the
federal interest in uniform aviation safety regulations so dominant, that it preempts the field. The
Federal Aviation Act "was enacted to create a uniform and exclusive system of federal regulation
in the field of air safety. It was passed by Congress for the purpose of centralizing in a single
authority the power to frame rules for the safe and efficient use of the nation's airspace." *Tweed-
New Haven Airport Auth. v. Tong*, 930 F.3d 65, 74 (2d Cir. 2019) (cleaned up). The Act grants to
the federal government the "exclusive sovereignty of airspace of the United States." 49 U.S.C. §
40103(a)(1), and vests the Federal Aviation Administration (FAA) with the authority to regulate
aviation safety, "develop plans and policy for the use of the navigable airspace," and "establish
security provisions that will encourage and allow maximum use of the navigable airspace by
civil aircraft." 49 U.S.C. § 40103(b). Under this authority, the FAA has enacted comprehensive
regulations that "prescribe[] rules governing the operation of aircraft within the United States."
14 C.F.R. § 91.1. *See generally* 14 C.F.R. pts. 91-107.

This pervasive scheme of federal regulation has led six Circuit Courts to conclude that
the Federal Aviation Act preempts the entire field of aviation safety regulation. *See Tweed-New
Haven Airport Auth.*, 930 F.3d at 74; *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1326 (10th
Cir. 2010); *Montalvo v. Spirit Airlines*, 508 F.3d 464, 473 (9th Cir. 2007); *Greene v. B.F.
Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 795 (6th Cir. 2005); *Abdullah v. Am. Airlines, Inc.*,
181 F.3d 363, 371 (3d Cir. 1999).[10] Both the Fifth Circuit and the Supreme Court have held that

---

[10] Defendants are entirely off base in trying to distinguish these holdings by arguing that they
found preemption "only in narrow contexts of wholly dissimilar cases, such as tree removal
surrounding an airport or the standard of care on a negligence claim." Defs.' Mot. at 31 n.8
(citations omitted). Courts have found that the Federal Aviation Act preempts laws regulating
safe flight altitudes over villages, *Allegheny Airlines v. Vill. of Cedarhurst*, 238 F.2d 812 (2d Cir.
1956), runway length, *Tweed-New Haven Airport Auth.*, 930 F.3d 65, airline alcoholic beverage

federal law requires "a uniform and exclusive system of federal regulation" to achieve the "delicate balance between safety and efficiency, and the protection of persons on the ground" that the Federal Aviation Act aims to achieve. *Witty*, 366 F.3d at 385 (quoting *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 638-39 (1973)).

Federal drone safety regulations are part of this pervasive scheme of federal regulation. These federal regulations squarely govern where drones can safely fly without threatening public safety or infrastructure. Congress directed the Secretary of Transportation to "develop a *comprehensive* plan to safely accelerate the integration of civil unmanned aircraft systems into the national airspace system," 49 U.S.C. § 44802(a)(1) (emphasis added), and empowered the Secretary to promulgate rules on unmanned aircraft systems, *id.* § 44802(b). This includes the authority to "define the acceptable standards for operation . . . of civil unmanned aircraft systems." *Id.* § 44802(a)(2)(A)(i). The FAA has used this authority to issue a broad array of safety-related regulations governing drone use. *See* 14 C.F.R. pt. 107. These regulations dictate operating rules, pilot qualifications, and pilot certifications for UAVs. *See* 14 C.F.R. §§ 107.11-.51, 107.53-.79. Importantly, FAA regulations directly address UAV flight in airspace where drones could pose a threat to public safety and infrastructure. FAA regulations restrict flight near aircraft, *id.* § 107.37, over people, *id.* § 107.39, in controlled airspace, *id.* § 107.41, near airports, *id.* § 107.43, in prohibited or restricted areas, *id.* § 107.45, and near areas designated by a notice to airmen, *id.* § 107.47. Under these regulations, the FAA restricts flights over natural disaster

---

service, *O'Donnell*, 627 F.3d 1318, pilot qualifications and medical standards, *Ventress v. Japan Airlines*, 747 F.3d 716 (9th Cir. 2014), and aerobatic activity above a local airport, *Int'l Aerobatics Club Chapter 1 v. City of Morris*, 76 F. Supp. 3d 767 (N.D. Ill. 2014). Two of these cases—*Allegheny Airlines* and *Int'l Aerobatics Club Chapter 1*—deal specifically with regulations of aircraft in flight at low altitudes in order to protect people on the ground, which can hardly be called "wholly dissimilar" from a Texas law that regulates aircraft in flight at low altitudes.

areas, 14 C.F.R. §§ 91.137-138, public figures, *id.* § 91.141, and sporting events, *id.* § 91.145.
*See also, e.g.*, Fed. Aviation Admin, NOTAM No. 7/4319 (2017) (prohibiting unauthorized
flights below 3000 feet within three nautical miles of certain sporting events).

The No-Fly Provisions' prohibition on flight less than 400 feet over critical infrastructure
facilities is preempted because it aims to address the same issue that the federal air safety laws
already govern. Tex. Gov't Code §§ 423.0045(b)(1), 423.0046(b). As Defendants concede,
Texas's purposes in enacting the statute included safety and security. Defs.' Mot. at 32. But the
FAA has already regulated where drones can safely and securely fly. *See* 14 C.F.R. §§ 91.137-
145, 99.7, 107.37-47. By seeking to further restrict where drone pilots may fly, Texas is
attempting to second-guess federal law's exclusive judgment about the "balance between safety
and efficiency, and the protection of persons on the ground." *Lockheed Air Terminal*, 411 U.S. at
638-39 (citations omitted). Because "[i]ntervening in the FAA's careful regulation of aircraft
safety cannot stand," the No-Fly Provisions are preempted. *See Singer v. City of Newton*, 284 F.
Supp. 3d 125, 133 (D. Mass. 2017).[11]

Defendants' attempt to avoid this inevitable conclusion by claiming that Texas acted
within its local power to protect privacy and prevent aerial trespass is unpersuasive. Defs.' Mot.
at 32. Local authorities are not constrained by preemption doctrine from adopting privacy and

---

[11] The district court in *Singer* invalidated a local ordinance restricting the use of UAVs as
preempted by federal law on conflict preemption grounds, but relied heavily on decisions
involving field preemption. The court reasoned that "aviation safety is an area of exclusive
federal regulation," and thus the ordinance, which added additional safety requirements on top of
those imposed by federal law, conflicted with "the FAA's careful regulation of aircraft safety."
284 F. Supp. 3d at 132-33. Whether analyzed through the lens of conflict preemption or field
preemption, *Singer* makes clear that state drone air safety regulations are preempted.

aerial trespass laws.[12] But the No-Fly Provisions go further. They are "[o]perational UAS restrictions on flight altitude [or] flight paths . . . [and] regulation[s] of the navigable airspace," which the FAA recognizes are particularly likely to be preempted.[13] They restrict flights over areas where there is no reasonable expectation of privacy, such as sports venues with a capacity of over 30,000 people and industrial facilities, dams, and concentrated animal feeding operations. Tex. Gov't Code §§ 423.0045(a), 423.0046(a). And they prohibit flights regardless of whether they "enter into the immediate reaches of the air space next to the land" and whether they "interfere[] substantially with the . . . use and enjoyment of the land"—both of which are required before a flight infringes a property right under Texas law. *Bevers v. Gaylord Broad. Co., L.P.*, No. 05-01-00895-CV, 2002 Tex. App. LEXIS 5083, at *16 (Tex. App. July 18, 2002); *accord* Rest. of Torts (2d), § 159(2); *see also City of Austin v. Travis Cty. Landfill Co.*, 73 S.W.3d 234, 240 (Tex. 2002) (aircraft overflights only constitutional taking if they "directly, immediately, and substantially interfere with the land's use and enjoyment").

2. *Obstacle preemption.* The No-Fly Provisions are also preempted for interfering with the achievement of two principal federal objectives underlying the Federal Aviation Act: national uniformity of air safety regulations and safely integrating drone use into the national airspace.[14]

---

[12] Indeed, Plaintiffs do not assert that the Surveillance Provisions are preempted by federal aviation law.

[13] *See* Office of the Chief Counsel, Fed. Aviation Admin., *State and Local Regulation of Unmanned Aircraft Systems (UAS): Fact Sheet* 3 (Dec. 17, 2015), https://www.faa.gov/uas/public_safety_gov/public_safety_toolkit/media/UAS_Fact_Sheet_Final.pdf.

[14] Defendants argue, without citing authority, that they "need not . . . analyze" conflict preemption if Plaintiffs did not explicitly identify that legal theory in the complaint. Defs.' Mot. at 30 n.7. This is wrong. "Federal Rule of Civil Procedure 8(a) does not require that a plaintiff correctly plead the theory of recovery it hopes to use in holding a defendant liable." *Se. Medpro LLC v. VHS San Antonio Partners, LLC*, No. CV 5:14-1111 (RCL), 2015 WL 13063780, at *5 n.4 (W.D. Tex. Aug. 13, 2015). Rather, "[a] complaint is sufficient if the plaintiff is entitled to

The regulations pose an obstacle to the federal object of uniform air safety regulations. "A uniform and exclusive system of federal regulation" is necessary to fulfill "the congressional objectives [of safety and efficiency] underlying the Federal Aviation Act." *Lockheed Air Terminal*, 411 U.S. at 639; *accord Witty*, 366 F.3d at 385. And Congress made clear that drones are part of this uniform and exclusive system when it directed the Secretary of Transportation to plan for the "integration of civil unmanned aircraft systems *into the national airspace system*." 49 U.S.C. § 44802(a)(1). Allowing states to impose their own regulations necessarily impedes uniformity and exclusivity.

### B. The Complaint Plausibly Alleges that the No-Fly Provisions Abridge First Amendment-Protected Activity.

As discussed above, laws that burden protected newsgathering activities are subject to First Amendment scrutiny, even when those laws facially regulate only conduct. For example, courts have held that laws governing the sale of merchandise—facially regulating only conduct—implicate the First Amendment when people who wish to sell communicative merchandise challenge those laws. *See, e.g.*, *Weinberg v. Chicago*, 310 F.3d 1029 (7th Cir. 2002); *Perry v. Los Angeles Police Dep't*, 121 F.3d 1365 (9th Cir. 1997); *ISKCON of Potomac, Inc. v. Kennedy*, 61 F.3d 949 (D.C. Cir. 1995). So too here, the No-Fly Provisions facially regulate only UAV flight, but nonetheless impermissibly burden First Amendment-protected activity by prohibiting a primary method of gathering the news in particularly newsworthy locations.

Moreover, laws that "single[] out the press for special treatment" contravene the First Amendment, even if they do not directly regulate speech. *Minneapolis Star & Tribune Co. v.*

---

relief under any legal theory." *Id.* (quoting *Thompson v. Allstate Ins. Co.*, 476 F.2d 746, 749 (5th Cir. 1973)).

*Minnesota Com'r of Revenue*, 460 U.S. 575, 582 (1983). Differential treatment of the press poses the threat that the government will use that differential treatment to censor its critics, "undercutting the basic assumption of our political system that the press will often serve as an important restraint on government." *Id.* at 585. The special importance of the press should give added weight to the fundamental principle that "the First Amendment stands against attempts to disfavor certain subjects or viewpoints." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). Speaker-based distinctions are constitutionally suspect because of the threat they pose: "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Id.*

Plaintiffs have plausibly alleged that the No-Fly Provisions significantly burden their First Amendment rights. They have plausibly alleged a fear of prosecution for recording newsworthy events over "critical infrastructure facilities" and sports venues, and demonstrated instances when they have had to limit their reporting to avoid violating the No-Fly Provisions. Compl. ¶¶ 45, 60, 64, 69, 71, 72, 76, 84-86. Plaintiffs also have plausibly alleged that the No-Fly Provisions "single out journalists for disfavored treatment by prohibiting the use of drones for newsgathering purposes over facilities of public interest, while broadly exempting governmental and commercial uses of UAVs in these same zones." *Id.* at ¶ 119. Plaintiffs have alleged both an incidental burden on First Amendment-protected activities and impermissibly differential treatment of the press in violation of the First Amendment.

Even if the No-Fly Provisions only incidentally restrain First Amendment-protected activity, laws that impose such restraints are still subject to intermediate First Amendment scrutiny. *See United States v. O'Brien*, 391 U.S. 367 (1968). Under intermediate scrutiny, a government regulation is permissible only if the government has the power to enact the

regulation and the regulation (1) "furthers an important or substantial governmental interest" that is (2) "unrelated to the suppression of free expression" and (3) narrowly tailored to advance that interest. *Id.* at 377.

At the outset, Defendants cannot satisfy this test because Texas does not have the power to enact air safety regulations. *See* Section IV.A, *supra*. Furthermore, the No-Fly Provisions also fail each element of the *O'Brien* test.

1. *The No-Fly provisions do not sufficiently further substantial interests.* As alleged in the Complaint, the No-Fly provisions do not advance any important or substantial governmental interest. Compl. ¶ 123. Defendants offer four interests for the law—protecting privacy, private property, safety, and security—but the mere recitation of these interests, again, is insufficient to counter Plaintiffs' well-plead allegation that the law does not further these or any other substantial interests, particularly on a motion to dismiss where the court makes all reasonable inferences in favor of the plaintiff. Defendants have not explained how a privacy interest could justify restricting flights over areas where there is no reasonable expectation of privacy, such as a sports venue with a capacity of over 30,000 people, or industrial facilities, dams, and concentrated animal feeding operations. *See* Tex. Gov't Code §§ 423.0045(a), 423.0046(a). The law does a poor job of protecting any alleged private property interest, as the provisions ban many types of flight that would not infringe any property right. *See* Section IV.A, *supra*.

Defendants' safety and security justifications are also dubious. Defendants have not shown a *single* instance of drone-related damage to critical infrastructure or sports venues, nor have they shown that federal regulations and state property and tort laws are insufficient to protect these facilities. Furthermore, the No-Fly Provisions contain nine exemptions from the prohibition against UAV use over designated facilities, including drone use for "commercial

purposes." Tex. Gov't Code §§ 423.0045(c)(1)(E), 423.0046(c)(5). It is difficult to ascertain how drone use over these facilities for "commercial purposes" poses less of a threat to safety and security than drone use for newsgathering. Such "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 802 (2011). The law's broad exemptions thus further undercut its supposed justifications.

2. *The No-Fly provisions are related to the suppression of expression.* Plaintiffs plausibly allege that one of the Legislature's true interests is the suppression of speech, not protecting critical infrastructure. Compl. ¶ 124. Defendants now argue that their interest is in preserving privacy, but the No-Fly Provisions advance privacy only to the extent they suppress newsgathering and photography—without the attendant act of observation or recording, a drone flight cannot violate privacy. Furthermore, if the Texas Legislature's interest was to prevent disruption to critical infrastructure and sports venues, it could have banned flights with intent to damage, destroy, impair, or interrupt the operation of protected facilities, as it has done in other provisions of Texas law protecting critical infrastructure. *See* Tex. Gov't Code §§ 424.053(a), 424.054(a). Indeed, the No-Fly Provisions are redundant of *more severe* penalties already in place to protect infrastructure safety, further supporting an inference that these provisions are meant to limit conduct that has no risk of harming the covered facilities. *See* Tex. Gov't Code §§ 424.051, 424.052 (making it a felony to knowingly damage, impair, or interrupt a critical infrastructure facility).

3. *The provisions are not narrowly tailored.* Finally, the No-Fly Provisions restrict far more First Amendment-protected conduct than necessary to protect Texas's alleged interests.

These provisions restrict all UAV newsgathering below 400 feet over covered facilities.[15] But as just discussed, a landowner's property right to exclude overflights is not so broad, the restricted areas have little interest in privacy, and other, less-restrictive laws already in place are more than sufficient to protect infrastructure safety and security. Simply stated, because federal law and other Texas laws adequately protect critical infrastructure facilities and sports venues, while restricting far less protected speech, the No-Fly Provisions restrict more speech than necessary to achieve Texas's purported public safety interest. *See McCullen*, 573 U.S. at 494; *Reynolds*, 779 F.3d at 231 (emphasizing the state must "*prove* that it actually *tried* other methods to address the problem" before enacting a new law that burdens speech (emphases in original)).

### C. The No-Fly Provisions Are Unconstitutionally Vague.

Plaintiffs have also plausibly alleged that the No-Fly Provisions are unconstitutionally vague. As explained above, a law that threatens to inhibit speech must "rigorous[ly] adhere[]" to the requirement that it "provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited." *Doe I v. Landry*, 909 F.3d 99, 116 (5th Cir. 2018). The No-Fly Provisions do not satisfy this demanding test.

The No-Fly Provisions provide an exception for operators of "unmanned aircraft that [are] being used for a commercial purpose, if the operation is conducted in compliance with" applicable FAA rules, restrictions, exemptions, and authorizations. Tex. Gov't. Code §§ 423.0045(c)(1)(E); 423.0046(c)(5). But they do not define "commercial purpose"—a term that is subject to conflicting ordinary and technical meanings, making it unclear whether drone newsgathering for hire or compensation is a "commercial purpose." Dictionaries are split

---

[15] When read in conjunction with the FAA regulations, which require UAVs to fly below 400 feet, the No-Fly Provisions function as a near absolute ban on the use of UAVs in these locations.

between those that limit "commercial" to trade or "the buying and selling of goods," BLACK'S LAW DICTIONARY (11th ed. 2019), and those that use "commercial" to mean any moneymaking enterprise. *See, e.g.*, CAMBRIDGE ACADEMIC CONTENT DICTIONARY; MACMILLAN DICTIONARY. Part 107 of the Federal Aviation Regulations, which governs the use of UAVs for news photography, does not use or define the term "commercial." *See* 14 C.F.R. pt. 107. And within the industry, photojournalism is expressly considered to not be "commercial" photography. *See* Getty Images, Customer Support, https://www.gettyimages.com/customer-support.

Because the term "commercial purpose" is ambiguous and undefined by Chapter 423, journalists cannot know whether they are subject to the No-Fly Provisions when they fly for their work, even when in full compliance with FAA rules. This deprives them of their constitutional right to have "fair notice" of what the law forbids, "so that its prohibitions may be avoided by those who wish to do so." *Serv. Employees Int'l Union, Local 5 v. City of Houston*, 595 F.3d 588, 596–97 (5th Cir. 2010). Without "explicit standards" for police officers and prosecutors to apply the law, journalists will be subject to the risk of "arbitrary and discriminatory applications." *See Roark & Hardee LP*, 522 F.3d at 551. For these reasons, Plaintiffs have plausibly alleged that the No-Fly Provisions are unconstitutionally vague.

## CONCLUSION

Plaintiffs have sufficiently alleged that the challenged provisions of Chapter 423 unconstitutionally burden their First and Fourteenth Amendment rights. Their well-pled allegations establish their standing to bring this action to protect their rights. Accordingly, the Court should deny the motion to dismiss.

Dated: December 3, 2019

Respectfully submitted,

David A. Schulz (*pro hac vice*)
NY State Bar No. 1514751
Jennifer Pinsof (*pro hac vice*)
IL State Bar No. 6327449
Francesca L. Procaccini (*pro hac vice*)
NY State Bar No. 5458575
Joe Burson (law student)
Timur Ackman-Duffy (law student)
Media Freedom And Information
 Access Clinic
Yale Law School
127 Wall Street
New Haven, CT 06511
Tel: (212) 850-6103
Fax: (212) 223-1942
david.schulz@yale.edu

/s/ *James A. Hemphill*
James A. Hemphill
Texas State Bar No. 00787674
(512) 480-5762 direct phone
(512) 536-9907 direct fax
jhemphill@gdhm.com
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Ave., Suite 2700
Austin, Texas 78701

Leslie A. Brueckner (*pro hac vice*)
CA Bar No. 14098
Public Justice P.C.
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150
lbrueckner@publicjustice.net

Leah M. Nicholls (*pro hac vice*)
DC Bar No. 982730
Public Justice P.C.
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
lnicholls@publicjustice.net

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of December, 2019, the foregoing was electronically filed with the Clerk of Court using the CM/ECT system, which will send notification of such filing to the following counsel of record:

Michael A. Shaunessy
Eric Johnston
Ethan J. Ranis
McGinnis Lochridge LLP
600 Congress Avenue, Suite 2100
Austin, Texas 78701

Ken Paxton
Attorney General of Texas
Jeffrey C. Mateer
First Assistant Attorney General
Darren L. McCarty
Deputy Attorney General for Civil Litigation
Thomas A. Albright
Chief, General Litigation Division
Christopher D. Hilton
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

/s/ *James A. Hemphill*
James A. Hemphill