IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, TEXAS PRESS ASSOCIATION, and JOSEPH PAPPALARDO, | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | 1:19-CV-946-RP |
| STEVEN MCCRAW, *in his official capacity as Director of Texas Department of Public Safety*, RON JOY, *in his official capacity as Chief of The Texas Highway Patrol*, and WES MAU, *in his official capacity as District Attorney of Hays County, Texas*, | § § § § § § § § | |
| Defendants. | § § | |

## ORDER

Before the Court is a Motion to Dismiss by Defendants Steven McCraw, *in his official capacity as Director of Texas Department of Public Safety* ("McCraw"), Ron Joy, *in his official capacity as Chief of the Texas Highway Patrol* ("Joy"), and Wes Mau, *in his official capacity as District Attorney of Hays County, Texas* ("Mau") (together "Defendants"). (Dkt. 19). Plaintiffs National Press Photographers Association ("NPPA"), Texas Press Association ("TPA"), and Joseph Pappalardo ("Pappalardo") (together "Plaintiffs") filed a response. (Dkt. 23). McCraw and Joy replied together, (Dkt. 25), and Mau replied separately, (Dkt. 26).[1] Having considered the briefing, the record, and the applicable law, the Court will grant in part and deny in part the Motion to Dismiss.

---

[1] In his reply, Mau adopted all arguments made by McCraw and Joy in their reply, in addition to asserting separate arguments. (Reply, Dkt. 26, at 1).

## I. BACKGROUND

Plaintiffs challenge the constitutionality of certain provisions of Chapter 423 of the Texas Government Code ("Chapter 423 provisions"), which regulate the use of unmanned aerial vehicles ("UAVs"), otherwise known as drones. (Compl., Dkt. 1, at 1). Plaintiffs allege that the civil and criminal penalties within the Chapter 423 provisions restrict the First Amendment right to newsgathering and speech and chill Plaintiffs and their members from using UAVs for certain newsgathering activities. (*Id.*). The following are facts as alleged within Plaintiffs' complaint. (Dkt. 1).

### A. Surveillance Provisions

Plaintiffs challenge Texas Government Code Sections 423.002, 423.003, 423.004, and 423.006 (together "Surveillance Provisions"). (Compl., Dkt. 1, at 3, 6–8). Section 423.003 imposes criminal and civil penalties by declaring it unlawful to "capture an image of an individual or privately owned real property in [Texas] with the intent to conduct surveillance on the individual or property contained in the image." (*Id.* at 2, 6); TEX. GOV'T CODE § 423.003(a). Section 423.004 criminalizes the possession, disclosure, display, distribution, or other use of images by a person who captured those images in violation of Section 423.003. (Compl., Dkt. 1, at 6); TEX. GOV'T CODE § 423.004(a). Under Section 423.006, a landowner or tenant may bring a civil action against a person who violates Section 423.003 or 423.004. (Compl., Dkt. 1, at 7); TEX. GOV'T CODE § 423.006(a). Section 423.002 exempts certain uses of UAVs from liability under the Surveillance Provisions but does not exempt newsgathering. (Compl., Dkt. 1, at 2, 7); *see* TEX. GOV'T CODE § 423.002. Exemptions include "professional or scholarly research and development or . . . on behalf of an institution of higher education." TEX. GOV'T CODE § 423.002(a)(1).

Plaintiffs argue that the Surveillance Provisions are unconstitutionally content- and speaker-based because the exemptions in Section 423.002 prohibit or allow the use of UAVs based on the purpose for which the image was captured, the identity of the person capturing the image, or the

content of the image. (Compl., Dkt. 1, at 7). Plaintiffs also argue that the Surveillance Provisions are

unconstitutionally vague and overbroad because the term "surveillance" is not defined. (Compl.,

Dkt. 1, at 2).

### B.   No-Fly Provisions

Plaintiffs also challenge Sections 423.0045 and 423.0046 (together "No-Fly Provisions"),

which impose criminal penalties by making it unlawful to fly UAVs over a "Correctional Facility,

Detention Facility, or Critical Infrastructure Facility" or "Sports Venue" at less than 400 feet. (*Id.* at

8–9); TEX. GOV'T CODE § 423.0045, § 423.0046.[2] Plaintiffs contend that when combined with

Federal Aviation Administration ("FAA") regulations, which require UAVs to fly below 400 feet, the

No-Fly Provisions effectively ban UAVs at the listed locations. (Compl., Dkt. 1, at 10–11); *see* 81

Fed. Reg. 42064, 4206 (June 28, 2016); 14 C.F.R. § 107.1(a). The No-Fly Provisions exempt certain

UAV users, including those with a "commercial purpose." (*Id.* at 3); TEX. GOV'T CODE §§

423.0045(c), 423.0046(c).

Plaintiffs challenge the No-Fly Provisions as unconstitutionally vague and overbroad

because the exemption for "commercial purposes" is not defined. (Compl., Dkt. 1, at 10). Plaintiffs

allege that "commercial purpose" is often construed to exclude newsgathering. (*Id.*). Plaintiffs allege

that this leaves visual journalists unable to determine if they are permitted to use UAVs under the

No-Fly Provisions. (*Id.*). Further, Plaintiffs argue that allowing UAVs to be used for commercial

---

[2] Critical infrastructure facilities are defined to include oil and gas pipelines, petroleum and alumina refineries, water treatment facilities, and natural gas fractionation and chemical manufacturing plants. TEX. GOV'T CODE § 423.0045(a), § 423.0045(a). In 2017, critical infrastructure was expanded though legislative amendments to include animal feeding operations, oil and gas drilling sites, and chemical production facilities, among others. *Id.*

In 2017, amendments also extended the No-Fly Provisions beyond critical infrastructure facilities to the use of drones over a "correctional facility" "detention facility," or "sports venue," which includes any arena, stadium, automobile racetrack, coliseum, or any other facility that has seating capacity of more than 30,000 people and is "primarily used" for one or more professional or amateur sport or athletics events. TEX. GOV'T CODE § 423.0045, § 423.0046; 2017 Tex. Sess. Law Serv. Ch. 1010 (H.B. 1424) (Vernon's).

purposes but not newsgathering purposes "single[s] out photojournalists for disfavored treatment" and violates the First and Fourteenth Amendments. (*Id.*). Plaintiffs also allege that the No-Fly Provisions violate the Supremacy Clause by impinging on the federal government's "sole and exclusive authority to regulate the national airspace and aviation safety." (*Id.*).

### C. Parties

Plaintiffs include Joseph Pappalardo ("Pappalardo") and the National Press Photographers Association ("NPPA"). Pappalardo is a Texas reporter who was previously certified to operate a UAV in the national airspace by the FAA. (*Id.* at 4). Pappalardo states that he allowed his certification to expire after the passage of the Chapter 423 provisions due to his inability to legally fly UAVs for newsgathering purposes. (*Id.* at 5). The complaint alleged that the Chapter 423 provisions have chilled Pappalardo's newsgathering because he is concerned about liability under the Chapter 423 provisions. (*Id.* at 20).

NPPA is a national organization that represent the interests of visual journalists, including within Texas. (Compl., Dkt. 1, at 4). NPPA members include photographers from print, television, and electronic media, including approximately 300 members in Texas. (*Id.*). NPPA promotes the role of visual journalism as a public service and advocates for the work of its visual journalist members. (*Id.*).

Plaintiffs allege that NPPA members, including those who live or travel to Texas, regularly use UAVs for newsgathering. (Compl., Dkt. 1, at 12). Plaintiffs argue that NPPA members' newsgathering is chilled by the Chapter 423 provisions. (*Id.*). NPPA usually advises its members on legal issues that face its membership. (*Id.* at 13). Since the passage of the Chapter 423 provisions, NPPA has advised its members about the provisions, including researching the law and meeting with lawmakers and communicating with members about compliance. (*Id.*). Plaintiffs contend that

NPPA has diverted resources from NPPA's core activities as a result of the Chapter 423 provisions. (*Id.*).

Plaintiffs also assert the following facts about NPPA member and video journalist Guillermo Calzada ("Calzada"). (*Id.* at 15). Plaintiffs state that Calzada has an FAA Part 107 Remote Pilot Certificate, which qualifies him to operate UAVs in the national airspace, and that he owns a registered drone. (*Id.*). On July 24, 2018, Calzada used his UAV to report on an arson fire at an apartment complex in San Marcos. (*Id.*). Agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") stopped Calzada and called San Marcos police. (*Id.*). A San Marcos police officer subsequently informed Calzada of the criminal penalties under Chapter 423 if he continued to use his UAV to report on the fire or published any of the captured images. (*Id.*). Plaintiffs allege that in that instance and going forward, Chapter 423 chilled Calzada's speech by causing him to fear prosecution under Chapter 423 for using UAVs for newsgathering. (*Id.* at 16).

Plaintiffs also assert the following facts about NPPA member and news photographer Brandon Wade ("Wade"). (*Id.* at 16). Plaintiffs' state that Wade is qualified to operate UAVs in the national airspace and owns a UAV. (*Id.* at 16–17). Plaintiffs describe several instances where the Chapter 423 provisions have affected Wade's use of UAVs. (*Id.* at 17–18). On August 14, 2017, Wade limited his UAV use when he photographed a water treatment plant because he feared that some photographs would violate the Chapter 423 provisions. (*Id.*). Additionally, a local newspaper declined to publish photographs he took of a community garden after it learned Wade had used a UAV to capture the photographs. (*Id.*). Another local newspaper declined Wade's request to use a UAV for an assignment, causing Wade an estimated $7,200 in lost income. (*Id.* 17–18). Additionally, when Wade was hired to photograph a facility that housed immigrant children, Wade limited where he flew his UAV as a result of the Chapter 423 provisions. (*Id.* at 18). Plaintiffs assert that the uncertainty created by the Chapter 423 provisions has chilled Wade's speech. (*Id.*).

Defendants filed a motion to dismiss for lack of standing under Federal Rule of Civil Procedure 12(b)(1) and to dismiss each of the claims against them for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Mot. Dismiss, Dkt. 19).

## II. LEGAL STANDARD

### A.  Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to assert lack of subject-matter jurisdiction as a defense to suit. Fed. R. Civ. P. 12(b)(1). Federal district courts are courts of limited jurisdiction and may only exercise such jurisdiction as is expressly conferred by the Constitution and federal statutes. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court properly dismisses a case for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied*, 536 U.S. 960 (2002). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* In ruling on a Rule 12(b)(1) motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

### B.  Rule 12(b)(6)

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a

complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). A court may also consider documents that a defendant attaches to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). But because the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint. *Dorsey,* 540 F.3d at 338. "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

### III. DISCUSSION

Defendants move to dismiss for lack of jurisdiction under Rule of Civil Procedure 12(b)(1), alleging that Plaintiffs lack standing and that claims against Mau are barred under the Eleventh Amendment. (Mot. Dismiss, Dkt. 19, at 7–16; Reply, Dkt. 26) Defendants further move to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). (Mot. Dismiss, Dkt. 19, 17–32). The Court will address each argument in turn.

#### A. Plaintiffs' Standing

Under Article III of the Constitution, federal court jurisdiction is limited to cases and controversies. U.S. Const. art. III, 2, cl. 1; *Raines v. Byrd*, 521 U.S. 811, 818 (1997). A key element of the case-or-controversy requirement is that a plaintiff must establish standing to sue. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Defendants argue that each of the Plaintiffs lacks standing. (Mot. Dismiss, Dkt. 19, at 7).

To establish Article III standing, a plaintiff must demonstrate that she has (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *See Lujan*, 504 U.S. at 560–61. Only one party is required to demonstrate standing to satisfy Article III's case-or-controversy requirement. *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). Plaintiffs assert that they have sufficiently pled that Pappalardo has standing as an individual and that NPPA has associational and organizational standing.[3] (Resp., Dkt. 23, at 3–4). The Court agrees.

Defendants first argue that Pappalardo lacks standing. (Mot. Dismiss, Dkt. 19, at 8). Defendants argue that Pappalardo has not been injured because he has never been punished for his use of UAVs. (*Id.*). However, this misstates the burden on Plaintiffs for a First Amendment

---

[3] Plaintiffs also assert that Plaintiff Texas Press Association has standing, but do not rely on this in response to Defendants' motion to dismiss. (*See* Resp., Dkt. 23, at 3 n.2).

preenforcement claim. Plaintiffs need not show that they will be punished, only that the challenged law has caused Plaintiffs to reasonably self-censor their speech for fear of being punished. *Justice v. Hosemann*, 771 F.3d 285, 291 (5th Cir. 2014) ("[C]hilling a plaintiffs' speech is a constitutional harm adequate to satisfy the injury-in-fact requirement."). "[I]t is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution . . . a credible threat of enforcement is sufficient." *Id.* (quotations omitted). Pappalardo need not show that the Chapter 423 provisions have already been enforced against him.

For standing in a preenforcement challenge, plaintiffs must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed" by the statute. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). "[T]his type of self-censorship must arise from a fear of prosecution that is not 'imaginary or wholly speculative.'" *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006) (quoting *Babbitt*, 442 U.S. at 302). Pappalardo has alleged that he previously used a UAV for newsgathering purposes but has stopped because of concerns about liability under the Chapter 423 Provisions. (Compl., Dkt. 1, at 19–20).

Defendants argue that Pappalardo has not sufficiently demonstrated that the events he chose not to cover would have been unlawful under the Chapter 423 provisions. (Mot. Dismiss, Dkt. 19, at 9). Plaintiffs agree that in some of the alleged instances where Pappalardo would have used a UAV, it is unclear whether the Chapter 423 provisions would prohibit UAV use (largely because Plaintiffs contend the provisions are unconstitutionally vague), but it is at least clear that Chapter 423 prohibits UAVs in some of these instances. (Resp., Dkt. 23, at 8). The Court agrees. The Chapter 423 provisions prohibit the use of UAVs to "capture an image of an individual or privately owned real property." TEX. GOV'T CODE § 423.003(a). Pappalardo states that he would have used a UAV to capture images at gasoline pumps during Hurricane Harvey, homes on fire, and urban sprawl including privately owned real property. (Compl., Dkt. 1, at 20–21). This is sufficient to show that

Pappalardo's intended conduct is "arguably proscribed" by Chapter 423. (*See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014)). Further, the Fifth Circuit has held that, even without a threat of enforcement, "the costs of compliance [with a law] can constitute an injury just as much as the injuries from failing to comply." *Texas v. United States*, 945 F.3d 355, 381 (5th Cir. 2019). As a result, Plaintiffs have sufficiently pled that the conduct would have been unlawful. (Mot. Dismiss, Dkt. 19, at 8–9). Given that Plaintiffs allege Pappallardo would otherwise use a UAV to capture images of a variety of locations plausibly prohibited by the Surveillance or No-Fly Provisions, (*see* Compl., Dkt. 1, at 20–21), there is a non-speculative risk that the Chapter 423 provisions would be enforced against Pappallardo.

Additionally, Pappalardo has plausibly alleged that his reasonable fear of having the Chapter 423 provisions enforced against him has caused him to cease using his UAV for newsgathering. (Resp., Dkt. 23, at 7; Compl., Dkt. 1, at 20 ("Pappalardo became concerned that he would risk liability for criminal and civil penalties if he continued to use his drone for journalistic purposes. . . . Pappalardo has refrained from using his UAV in Texas for any image capturing for newsgathering purposes.")). This is sufficient to demonstrate that Pappalardo's newsgathering activities have been chilled. As a result, Pappalardo has alleged sufficient injury to confer standing to challenge the constitutionality of the Chapter 423 provisions.

Plaintiffs have also plausibly alleged that NPPA has been injured and has standing. Organizations can establish the first standing element, injury-in-fact, under two theories: "associational standing" or "organizational standing.*" OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017); *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020).

Defendants argue that NPPA lacks associational standing. (Mot. Dismiss, Dkt. 19, at 12). "[A]n association has standing to bring suit on behalf of its members when: [1] its members would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to

the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

First, Defendants argue that NPPA members Calzada and Wade lack standing to sue in their own right for the same reasons they argue Pappalardo lacks standing. (Mot. Dismiss, Dkt. 19, at 12). However, like Pappalardo, Plaintiffs have sufficiently alleged that Calzada and Wade would have standing because the Chapter 423 provisions allegedly chilled them from participating in First Amendment protected activity under the Chapter 423 provisions. Plaintiffs plausibly pled that Wade, an NPPA member, has self-censored his UAV use out of fear of liability under the Chapter 423 provisions, chilling his newsgathering activities.  (Compl., Dkt. 1, at 17–18 ("Out of fear of violating Chapter 423, Mr. Wade had to limit where he flew his drone, which hampered his ability to capture newsworthy images."). Going even further, Plaintiffs have demonstrated an instance of enforcement of the Chapter 423 provisions against Calzada, another NPPA member. On July 24, 2018, Calzada was using his UAV to report on an apartment complex fire when ATF Agents stopped him and a San Marcos police officer subsequently informed him of the criminal penalties under the Chapter 423 provisions if he continued to use his UAV or published any of the captured images. (Compl., Dkt. 1, at 16). Plaintiffs have plausibly pled that this enforcement incident chilled Calzada's newsgathering activities going forward. (*Id.* at 16). As a result, NPPA members Calzada and Wade would plausibly have standing in their own right, meeting the first requirement of associational standing.

Second, regarding associational standing, Defendants argue that NPPA has not sufficiently alleged the interests at stake are germane to NPPA's purpose.[4] (Mot. Dismiss, Dkt. 19, at 13–14). NPPA members' alleged injuries stem from First Amendment restrictions, which is germane to NPPA's purpose to "promote ethical journalism and work to advocate for and improve the legal landscape for visual journalists, particularly in the areas of First Amendment and copyright protection." (Compl., Dkt. 1, at 14).

Regarding the third prong of associational standing, Defendants argue that NPPA members' involvement would be required to resolve "fact intensive" inquiries related to the claims. (Mot. Dismiss, Dkt. 19, at 13–14). However, because this is a facial challenge to the Chapter 423 provisions, it is unlikely that the proceedings will be fact intensive or that NPPA's individual members will be required to participate in this lawsuit. *See United Food & Commercial Workers Union Local 751*, 517 U.S. at 546 ("*Hunt* held that 'individual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members." (quoting *Hunt*, 432 U.S. at 342–43)). As a result, Plaintiffs have plausibly pled that NPPA has associational standing.

Plaintiffs have also plausibly pled that NPPA has organizational standing. "Organizational standing" does not depend on the standing of the organization's members. Instead, an organization can establish standing in its own if it "meets the same standing test that applies to individuals." *OCA-Greater Houston*, 867 F.3d at 610. The Supreme Court has recognized that when an organization's ability to pursue its mission is "perceptibly impaired" because it has "diverted significant resources to counteract the defendant's conduct," it has suffered an injury under Article III. *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) (citing *Havens Realty Corp. v. Coleman*,

---

[4] Defendants make this argument with regard to both organizational Plaintiffs, but "particularly with respect to TPA." (Mot. Dismiss, Dkt. 19, at 13–14). However, Plaintiffs do not rely on TPA's standing to overcome Defendants' motion to dismiss, and they need not. (*See* Resp., Dkt. 23, at 3 n.2); *Rumsfeld*, 547 U.S. at 52 n.2 ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

455 U.S. 363 (1982)). An organization can demonstrate injury "by [alleging] that it had diverted significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and 'perceptibly impaired' the organization's ability to provide its 'activities—with the consequent drain on the organization's resources.'" *Id.*

Plaintiffs have adequately pled that NPPA has been injured because it has diverted resources to counter the effects of the Chapter 423 provisions on its members. NPPA has pled that it advised its members about the legal implications of using UAVs under the Chapter 423 provisions and researched First Amendment protections in the event a member is "charged criminally or sued civilly based on a violation of Chapter 423." (Compl., Dkt. 1, at 14). NPPA alleges that these actions have caused it to divert resources from its core activities, such as "advocat[ing] for and improving the legal landscape for visual journalists." (*Id.*).  Defendants claim that NPPA has not provided enough evidence of diverted resources, such as "man-hours expended" or specific activities resources were diverted away from. (Mot. Dismiss, Dkt. 19, at 16). However, "the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an identifiable trifle." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (quotations omitted). The allegations in Plaintiffs' complaint are sufficient to demonstrate more than an identifiable trifle, (*see* Compl., Dkt. 1, at 14), especially at the motion to dismiss stage, *see Louisiana ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 304–05 (5th Cir. 2000) (noting that in contrast to the pleadings stage, plaintiffs will "have to demonstrate at trial that it has indeed suffered impairment" through a diversion of resources) (quoting *Havens Realty Corp.*, 455 U.S. at 379 n.21)).

There is organizational standing even if NPPA is diverting resources to educate its members about issues related to its core mission of First Amendment protections for journalists. *OCA-Greater Houston*, 867 F.3d 604 at 609–14 (finding that a voting rights organization had standing to challenge a voter law because it had to devote additional resources to get-out-the-vote efforts to educate

voters about compliance); (*contra* Mot. Dismiss, Dkt. 19, at 16). Further, NPPA's diversion of resources to generally advise its members about the legal effects of the Chapter 423 provisions demonstrates standing, as opposed to resources expended in preparation of this litigation. (Compl., Dkt. 1, at 14); *see OCA-Greater Hous.*, 867 F.3d at 612 (distinguishing diverting resources to lobbying or pre-litigation expenses from diverting resources to educate constituents about compliance with law); (*contra* Mot. Dismiss, Dkt. 19, at 16). Thus, NPPA has sufficiently demonstrated an injury under either an associational or organizational theory of standing.

Turning to the other requirements for standing, Defendants have argued that Pappalardo and NPPA's alleged injuries are not traceable to Defendants because they lack prosecutorial authority or have not threatened to use their prosecutorial authority. (Mot. Dismiss, Dkt. 19, at 10; Reply, Dkt. 26, at 4). However, Plaintiffs plausibly pled that McCraw is "responsib[le] for the conduct of the peace officers who enforce the criminal provisions of Chapter 423," and that Joy is "[responsib[le] as a peace officer to enforce the criminal provisions of Chapter 423 and . . . for the conduct of the peace officers who enforce the criminal provisions of Chapter 423." (Compl., Dkt. 1, at 5). Further, Defendants concede that Mau has prosecutorial authority. (Mot. Dismiss, Dkt. 19, at 9). Defendants' connection to the enforcement of Chapter 423, as pled by Plaintiffs, means that an injunction on Defendants and the peace officers they supervise, in addition to a declaratory judgment, would redress Plaintiffs' injury.

Defendants similarly argue that Pappalardo and NPPA's claimed injuries are not redressable by Defendants because Defendants have not indicated they would enforce the Chapter 423 provisions against Pappalardo or NPPA members. (Mot. Dismiss, Dkt. 19, at 9; Reply, Dkt. 26, at 3–4). However, because the Chapter 423 provisions themselves are chilling Plaintiffs' actions, and enjoining enforcement of the provisions would stop Plaintiffs' self-censorship, the redressability requirement is met. *See Ctr. for Individual Freedom*, 449 F.3d at 661 (finding "redressability prongs of

14

the standing inquiry . . . easily satisfied" where "[p]otential enforcement of the statute caused the [plaintiff's] self-censorship, and the injury could be redressed by enjoining enforcement of the [statute]"). As a result, Plaintiffs have sufficiently pled facts to demonstrate NPPA has organizational and associational standing, and that Pappalardo has standing as an individual.

## B. Eleventh Amendment

Mau argues that Plaintiffs' claims against him are barred under the Eleventh Amendment. (Reply, Dkt. 26). The Eleventh Amendment typically deprives federal courts of jurisdiction over "suits against a state, a state agency, or a state official in his official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it." *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014). However, under the *Ex parte Young*[5] exception to sovereign immunity, lawsuits may proceed in federal court when a plaintiff requests prospective relief against state officials in their official capacities for ongoing federal violations. 209 U.S. 123, 159–60 (1908).

"For the [*Ex parte Young*] exception to apply, the state official, 'by virtue of his office,' must have 'some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a representative of the state, and thereby attempting to make the state a party.'" *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019) (quoting *Young*, 209 U.S. at 157); *see also In re Abbott*, 956 F.3d 696, 708 (5th Cir. 2020) ("*Ex parte Young* allows suits for injunctive or declaratory relief against state officials, provided they have sufficient 'connection' to enforcing an allegedly unconstitutional law.").

While "[t]he precise scope of the 'some connection' requirement is still unsettled," the Fifth Circuit has stated that "it is not enough that the official have a '*general* duty to see that the laws of the state are implemented.'" *Texas Democratic Party v. Abbott*, 961 F.3d 389, 400–01 (5th Cir. 2020)

---

[5] 209 U.S. 123 (1908).

(quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)). And "[i]f the official sued is not 'statutorily tasked with enforcing the challenged law,' then the requisite connection is absent and '[the] *Young* analysis ends.'" *Abbott*, 956 F.3d at 709 (quoting *City of Austin*, 943 F.3d at 998). Where, as here, "no state official or agency is named in the statute in question, [the court] consider[s] whether the state official actually has the authority to enforce the challenged law." *City of Austin*, 943 F.3d at 998. Neither a specific grant of enforcement authority nor a history of enforcement is required to establish a sufficient connection. *City of Austin*, 943 F.3d 993 at 1001; *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017). There need be only a "scintilla of enforcement by the relevant state official" for *Ex parte Young* to apply. *City of Austin*, 943 F.3d at 1002 (quotations omitted). Actual threat of or imminent enforcement is "not required." *Air Evac*, 851 F.3d at 519.

Mau argues that the *Ex parte Young* exception does not apply to him because he lacks a connection to the enforcement of the Chapter 423 provisions. (Reply, Dkt. 26, at 2 (citing *City of Austin*, 943 F.3d at 997)). In contrast, Plaintiffs argue that, as the District Attorney of Hays County, Mau "exclusively represent[s] the state in all criminal matters," such as a prosecution of a Chapter 423 violation. (Surreply, Dkt. 29, at 3 (quoting Tex. Gov't Code Ann. § 44.205 (West)). This prosecutorial power directly related to the Chapter 423 provisions qualifies as a scintilla of enforcement. *Cf. In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020) (holding that the Attorney General had sovereign immunity where "[n]othing in [the challenged law] tasks the Attorney General with enforcing it").

Mau further argues that Plaintiffs have not even shown a willingness for a "scintilla of enforcement" by Mau. *See City of Austin*, 943 F.3d at 1002. However, in *Texas Democratic Party v. Abbott*, the Fifth Circuit held that the *Ex parte Young* exception applied to the Texas Secretary of State when a provision of the Texas Election Code was challenged as unconstitutional, because the

Secretary of State is "charged at least in part with enforcement of the Texas Election Code." *Texas Democratic Party v. Abbott*, No. 20-50407, 2020 WL 5422917, at *6 (5th Cir. Sept. 10, 2020). The Fifth Circuit thus "conclude[d] that there exists a scintilla of enforcement." *Id.* (citations omitted). Because Plaintiffs have pled that Mau is responsible for representing the state in criminal matters, including prosecuting violations of the Chapter 423 provisions, plaintiffs have met their burden of demonstrating a scintilla of enforcement to fall within the *Ex parte Young* exception. The Court rejects the Defendants arguments that *Ex Parte Young* does not apply to Mau.

## C. Surveillance Provisions

Plaintiffs' first claim is that the Surveillance Provisions, Sections 423.002, 423.003, 423.004, and 423.006, prohibit conduct protected by the First Amendment. (Compl., Dkt. 1, at 22). The Surveillance Provisions declare it unlawful to "capture an image of an individual or privately owned real property in [Texas] with the intent to conduct surveillance on the individual or property contained in the image." TEX. GOV'T CODE § 423.003(a). Plaintiffs contend that the Surveillance Provisions chill them from engaging in protected First Amendment activity, including "capturing, disclosing, displaying, and distributing 'images'"; impermissibly regulate speech on the basis of content and speaker; and are overbroad because they do not define "surveillance". (*Id.* at 23–24).

### 1.   Content-based restrictions

In response, Defendants argue that Sections 423.002, and 423.006 do not individually implicate the First Amendment.[6] (Mot. Dismiss, Dkt. 19, at 19). Defendants argue that Section 423.002 only outlines the conduct that is not prohibited by Chapter 423, and therefore does not implicate the First Amendment. (*Id.*). However, Section 423.002 outlines the exemptions allowed for certain individuals and purposes, which goes to the heart of Plaintiffs' First Amendment claim that

---

[6] Defendants do not make this argument about Section 423.004, which criminalizes the possession, disclosure, display, distribution, or other use of images by a person who captured those images in violation of Section 423.003.

the provisions are being selectively applied to some speakers, including to journalists. TEX. GOV'T CODE § 423.002.

Defendants similarly argue that because Section 423.006 only provides for a private cause of action, there is no government restriction on speech as required for a violation of the First Amendment. (Mot. Dismiss, Dkt. 19, at 19); TEX. GOV'T CODE § 423.006(a). The constitutionality of statutes imposing civil liability on private parties, however, may be challenged. *See, e.g., Barr v. Am. Ass'n of Political Consultants, Inc*, 140 S. Ct. 2335, 2345 (2020) (evaluating the constitutionality of a statute that allows private parties to sue to recover damages under the First Amendment).

Defendants further argue that the Surveillance Provisions are not regulating inherently expressive conduct. (Mot. Dismiss, Dkt. 19, at 20 (citing *United States v. O'Brien*, 391 U.S. 367 (1968))). However, Plaintiffs are challenging the use of UAVs for the purpose of newsgathering and recording, "which is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." *ACLU of Ill. v. Alvarez*, 679, F.3d 583, 595 (7th Cir. 2012). Plaintiffs have plausibly alleged that the surveillance provisions are burdening expressive conduct—taking photos and video for newsgathering purposes.  To the extent that Defendants argue that "surveillance" is distinguishable from photography and therefore the surveillance provisions are not prohibiting protected expressive conduct, (Mot. Dismiss, Dkt. 19, at 18–19), that argument only highlights the dispute over the vagueness of the term "surveillance." (Compl., Dkt. 1, at 25 ("Section 423.003 does not define the term 'surveillance.'").

Content-based restrictions on First Amendment protected activity "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A regulation of speech is content-based if it either "applies to particular speech because of the topic discussed or the

idea or message expressed," *id.*, or discriminates between speakers in a way that "disfavors" certain speakers from exercising their First Amendment rights. *Sorrell*, 564 U.S. at 564.

Plaintiffs have sufficiently pled that the Surveillance Provisions apply speaker-based discrimination and are thus content-based.[7] Plaintiffs argue that because the Surveillance Provisions exempt certain speakers from liability, other speakers such as journalists face liability because of the type of speaker they are. (Resp., Dkt. 23, at 20); *see* TEX. GOV'T CODE § 423.002(a). Certain individuals are permitted to capture UAV images under the Surveillance Provisions, such as professors, students, professional engineers, and insurance company employees. TEX. GOV'T CODE § 423.002. Defendants argue that these exemptions are not speaker-based discrimination because the same person could be permitted to use a UAV for an academic purpose, but not for newsgathering—regardless of that person's identity. (Reply, Dkt. 25, at 5). The Court disagrees that Defendants' distinction means the Surveillance Provisions are not speaker-based. The regulation is not speaker-neutral just because one person may simultaneously fall into multiple categories of speakers under the Surveillance Provisions. Instead, the Surveillance Provisions are discriminating based on the type of speaker someone is at the time they are using a UAV because of the exceptions listed in Section 423.002. This goes beyond "an incidental effect on some speakers," as Defendants argue. (Reply, Dkt. 25, at 5 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989))). While the Supreme Court in *Ward* found the government justification for the challenged regulation "ha[d] nothing do with content," Plaintiffs have sufficiently alleged that the Surveillance Provisions' exemptions discriminate based on the type of speakers, and are thus content based. (Compl., Dkt. 1,

---

[7] Plaintiffs also argue that the Surveillance Provisions are content-based because they include exemptions based on the purpose of the images captured with a UAV, such as "professional or scholarly research," "operations and maintenance of utility or telecommunications facilities," and "mapping." (Resp., Dkt. 23, at 20); TEX. GOV'T CODE § 423.002. Defendants argue that because the same image can be prohibited or allowed under the Surveillance Provisions based on how it is being used, the content of the image is not the discriminating factor. (Reply, Dkt. 25, at 5). Because there is also speaker-based discrimination requiring the application of strict scrutiny, the Court does not reach this issue.

at 7–8). As a result, the Court should apply strict scrutiny. *See Sorrell*, 564 U.S. at 564 (applying strict scrutiny where the "statute disfavors specific speakers").

Even assuming that Defendants will demonstrate a compelling government interest, Plaintiffs have plausibly argued that the Surveillance Provisions are not narrowly tailored to protect this interest in light of the numerous exceptions included in the Surveillance Provisions. *See* TEX. GOV'T CODE § 423.002. Plaintiffs question why government interests in privacy and public safety are implicated for journalists using UAVs, but not for other individuals exempted under the Surveillance Provisions. (Resp., Dkt. 23, at 22). The Court agrees that some of these exceptions leave open the question of whether the Surveillance Provisions are narrowly tailored. As a result, Plaintiffs' complaint has plausibly alleged that the Surveillance Provisions impermissibly impose content-based restrictions.

### 2.   Surveillance Provisions Vagueness

Plaintiffs assert that the Surveillance Provisions are impermissibly vague because they do not define the term "surveillance." (Compl., Dkt. 1, at 25); *see* TEX. GOV'T CODE § 423.003(a). A more stringent vagueness test applies where a law "interferes with the right of free speech." *Hoffman Estates v. Flipside*, 455 U.S. 489, 499 (1982). "A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Women's Med. Ctr. of Nw. Haus. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001). This test demands that statutes affecting speech explain precisely what conduct they are proscribing. *See Edwards v. South Carolina*, 372 U.S. 229, 236 (1963). "Due Process proscribes laws so vague that persons 'of common intelligence must necessarily guess at [their] meaning and differ as to [their] application.'" *Bell*, 248 F.3d 411 at 421 (alterations in original) (quoting *Smith v. Goguen*, 415 U.S. 566, 572 n.8 (1974)). In other words, the government

may regulate conduct that affects speech "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

Plaintiffs argue that because an ordinary person could not define "surveillance," Plaintiffs are uncertain about what activity is prohibited by the Surveillance Provisions, as are law enforcement and the judiciary. (Compl., Dkt. 1, at 25). Defendants attempt to use a dictionary definition used by Plaintiffs to demonstrate that "surveillance" has a common definition. (Compl., Dkt. 1, at 6; Mot. Dismiss, Dkt. 19, at 26). However, Plaintiffs effectively counter this by providing multiple dictionary definitions where the definition of surveillance is broad enough that the application of the Surveillance Provisions is unclear. (*See* Resp., Dkt. 23, at 22–23). For instance, "[c]lose observation or listening of a person or place in the hope of gathering evidence," (Compl., Dkt. 1, at 6 (citing BLACK'S LAW DICTIONARY (10th ed. 2014))), might include newsgathering in an understanding of "observation or listening" but not within the requirement to "gather evidence." (*Id.*).

Defendants argue that statutes need not provide "perfect clarity" or "precise guidance." (Mot. Dismiss, Dkt. 19, at 26 (citing *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018))). However, at no point do Defendants attempt to define the term "surveillance" or point to any authority or evidence that outlines what type of UAV use is prohibited under "surveillance." They argue that Plaintiffs have not shown their actions would violate the Surveillance Provisions, (*see* Mot. Dismiss, Dkt. 19, at 9), but never take a stance on whether the activities at issue would be prohibited by the Surveillance Provisions. Defendants instead argue it is a factual inquiry as to whether Plaintiffs' conduct is prohibited by the Surveillance Provisions, not a question of whether the provisions are themselves vague. (Mot. Dismiss, Dkt. 19, at 26). However, Defendants never indicate what interpretation of the Surveillance Provisions should govern such a factual inquiry, and instead only assert that "[o]rdinary persons are perfectly capable of understanding the meaning of the word 'surveillance.'" With multiple possible broad dictionary definitions from Plaintiffs, and no

clarity offered from Defendants, the Court finds that Plaintiffs have plausibly pled that the Surveillance Provisions are unconstitutionally vague.

### 3. Surveillance Provisions Overbreadth

Under the "First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). Plaintiffs assert that the Surveillance Provisions are unconstitutionally overbroad because they prohibit "image capture" for purposes of "surveillance," which although not defined could be understood to include newsgathering activities. (Compl., Dkt. 1, at 24). Plaintiffs allege that the Surveillance Provisions regulate more speech than the First Amendment allows and unconstitutionally chills Plaintiffs from protected activity. (*Id.*).

Defendants argue that very little protected expressive activity is regulated by the Surveillance Provisions. (Mot. Dismiss, Dkt. 19, at 24; Reply, Dkt. 25, at 7). However, as discussed above, Plaintiffs adequately plead that "surveillance" is impermissibly vague, indicating that the scope of what the Surveillance Provisions prohibit is not itself clear. *See Williams*, 553 U.S. at 304 ("In the First Amendment context plaintiffs may argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech."). Defendants' claim that the Surveillance Provisions "do not criminalize a substantial amount of protected expressive activity," (Reply, Dkt. 25, at 7), fails because it is not clear what is or is not criminalized or prohibited under the provisions. Plaintiffs have plausibly alleged that some of the Plaintiffs' newsgathering conduct is protected First Amendment conduct and is prohibited by the surveillance provisions, (*see* Compl., Dkt. 12–21, 22–24), and thus they are not "brainstorming hypotheticals." (Reply, Dkt. 25, at 7). Plaintiffs have plausibly alleged that the Surveillance Provisions are overbroad because they restrict a substantial amount of protected activity. The Court rejects Defendants' efforts to dismiss claims against the Surveillance Provisions.

### D. No-Fly Provisions

The No-Fly Provisions prohibit "operat[ing] an unmanned aircraft," either "over a correctional facility, detention facility, or critical infrastructure facility," Tex. Gov't Code § 423.0045(b)(1), or "over a sports venue," *id.* § 423.0046(b). The No-Fly Provisions further prohibit drones from "mak[ing] contact with" such a facility or to allow it "to come within a distance . . . that is close enough to interfere with the operations of or cause a disturbance to the facility." *Id.* § 423.0045(b)(2)-(3).

#### 1.   No-Fly Provisions Constitutionality

Plaintiffs plead that the No-Fly Provisions violate the First Amendment as an unconstitutional restraint on expressive conduct. (Compl., Dkt. 1, at 26). In the alternative, Plaintiffs also plead that the No-Fly Provisions impose an incidental restraint on protected conduct, in which case intermediate scrutiny applies. (Reply, Dkt. 23, at 32 (citing *United States v. O'Brien*, 391 U.S. 367 (1968))). Under intermediate scrutiny, regulation is only permissible if the government has the power to enact the regulation and the regulation (1) "furthers an important or substantial government interest" that is (2) "unrelated to the suppression of free expression" and (3) narrowly tailored to advance that interest. *Id.* at 377. Plaintiffs have sufficiently pled facts to plausibly allege the No-Fly Provisions are unconstitutional under intermediate scrutiny.

Even assuming the No-Fly Provisions further an important government interest and that interest is unrelated to the suppression of free expression, which the parties dispute, Plaintiffs have adequately pled the No-Fly Provisions are not narrowly tailored. While Defendants have pointed to government interests that may be sufficient to meet the first requirement of an important or substantial government interest, (Mot. Dismiss, Dkt. 19, at 27–28), Plaintiffs allege that the exemptions for commercial interests in the No-Fly Provision undercut the purported importance of these government interests. (Resp., Dkt. 23, at 34); Tex. Gov't Code §§ 423.0045(c), 423.0046(c).

The Court agrees that Plaintiffs have plausibly raised questions as to how these government interests could be threatened by newsgathering but not by commercial activities. (*Cf.* Reply, Dkt. 25, at 8 (explaining only that the provisions' exceptions "allow drone activity where it does not undermine the purpose of the statute")). This inconsistent prohibition of UAVs indicates that the No-Fly Provisions are restricting more speech than necessary to achieve the government's alleged interests.

Plaintiffs have also plausibly pled that the No-Fly Provisions are vague and overbroad because "commercial purpose" is not defined in the exemptions from the No-Fly Provisions and is often construed to exclude newsgathering. (Compl., Dkt. 1, at 10, 28–29). Plaintiffs cite multiple dictionary definitions of "commercial" that do not provide clear guidance on whether photojournalism is included. (Resp., Dkt. 23, at 35–36). For instance, "the buying and selling of goods," BLACK'S LAW DICTIONARY (11ᵗʰ ed. 2019), seems less likely to include photojournalism. (Resp., Dkt. 23, at 35–36). Whereas Plaintiffs assert that other dictionaries define "commercial" to mean any moneymaking enterprise, seemingly more likely to include photojournalism within the definition. (*Id.* (citing CAMBRIDGE ACADEMIC CONTENT DICTIONARY, MACMILLAN DICTIONARY)).

Defendants dismiss these interpretations as "hypertechnical parsing of various dictionaries" and once again argue that "ordinary persons are perfectly capable of understanding the meaning of the term 'commercial purpose,'" (Mot. Dismiss, Dkt. 19, at 29; Reply, Dkt. 25, at 8), but at no point provide any guidance as to how the Court should interpret "commercial purpose." Defendants assert that whether Plaintiffs' conduct is prohibited is a factual inquiry. (Mot. Dismiss, Dkt. 19, at 29). However, even if a factual inquiry determined that Plaintiffs' conduct was for journalistic purposes, Plaintiffs have sufficiently pled that there would be an unanswered legal question about whether the conduct was prohibited by the No-Fly Provisions.  As a result, Plaintiffs have plausibly pled the No-Fly Provisions violate the First Amendment.

2.   <u>No-Fly Provisions Preemption</u>

Plaintiffs additionally plead that the No-Fly Provisions violate the Supremacy Clause because the federal government has exclusive authority to regulating the national airspace and aviation safety. (Compl., Dkt. 1, at 29 (citing *Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624 (1973); *Singer v. City of Newton*, 284 F. Supp. 3d 125, 130 (D. Mass. 2017))); 49 U.S.C. § 40103 (2019) ("The United States Government has exclusive sovereignty of airspace of the United States"). Plaintiffs claim that "[b]y banning drone use within the airspace around critical infrastructure and other facilities, Texas is attempting to regulate aviation safety through its No-Fly Provisions" and the No-Fly Provisions are thus preempted. (Compl., Dkt. 1, at 30).

Field preemption exists when "Congress has forbidden the State to take action in the field that the federal statute pre-empts." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015). Field preemption exists where a scheme of federal regulation "is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, or where an Act of Congress touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (internal quotations omitted). Alternatively, obstacle preemption can invalidate state laws that "interfere[] with the achievement of federal objectives." *Witty v. Delta Air Lines, Inc.*, 366 F.3d, 380, 394 (5th Cir. 2004). Plaintiffs argue that the No-Fly Provisions are preempted under field preemption and obstacle preemption. Although, "the categories of preemption are not rigidly distinct," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 n.6 (2000), the Court will address each in turn.

With regard to field preemption, Plaintiffs point to six other Circuit Courts that have concluded the FAA preempts the entire field of aviation safety regulation. (Resp., Dkt. 23, at 27) (citing cases from the 3rd Circuit, 6th Circuit, 9th Circuit, 10th Circuit)). While the Fifth Circuit has

not held that the FAA preempts the entire field of aviation safety, *Monroe v. Cessna Aircraft Co.*, 417 F. Supp. 2d 824, 828 (E.D. Tex. 2006), it has held that certain state laws are preempted by the FAA. *Witty*, 366 F.3d at 385 ("We hold that federal regulatory requirements for passenger safety warnings and instructions are exclusive and preempt all state standards and requirements."). Plaintiffs do not argue that all UAV regulations are preempted, but that at the very least the No-Fly Provisions are preempted. (*See* Amicus, Dkt. 35, at 6 ("Plaintiffs do not and need not allege that every law conceivably touching aviation safety is preempted.")).

The "key question is . . . at what point the state regulation sufficiently interferes with federal regulation that it should be deemed pre-empted." *Prokaski v. Frontier Airlines, Inc.*, No. 12-CA-512-LY, 2012 WL 12892285, at *2 (W.D. Tex. Aug. 29, 2012) (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 107 (1992)); *see also Witty*, 366 F.3d at 385 ("[E]ach [preemption] case turns on the peculiarities and special features of the federal regulatory scheme in question."); *Singer*, 284 F. Supp. 3d at 129 ("[Exclusive federal sovereignty of the airspace] does not preclude states or municipalities from passing any valid aviation regulations, but courts generally recognize that Congress extensively controls much of the field.").

In this case, federal law has not completely preempted the field regarding UAVs flying over certain buildings and structures. *See City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018) ("[C]ourts should hesitate to infer field preemption unless plaintiffs show that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was the clear and manifest purpose of Congress." (quotations omitted)). Plaintiffs have not adequately demonstrated that the No-Fly Provisions fall into a field of aviation regulation that the federal government intended to completely occupy. *See Singer v. City of Newton*, 284 F. Supp. 3d 125, 130 (D. Mass. 2017) ("[T]he FAA explicitly contemplates state or local regulation of pilotless aircraft, defeating [plaintiff's] argument that the whole field is exclusive to the federal government.").

Plaintiffs' arguments for field preemption center on the fact that there are federal regulations in place governing issues related to the No-Fly Provisions. *See* Pub. L. No. 115–254 § 369, 132 Stat. 3186, 3311 (2018). Plaintiffs plead that the federal government has "already identified categories of critical infrastructure and directed the FAA to establish processes to prohibit or restrict the operation of drones over such infrastructure. (Compl., Dkt. 1, at 29). Plaintiffs argue that federal regulations already govern where UAVs can safely fly without threating public safety or infrastructure, allowing UAVs to fly near critical infrastructure under 400 feet. (Resp., Dkt. 23, at 28). Plaintiffs contend that the No-Fly Provisions interfere with Congress's judgment about the "balance between safety and efficiency, and the protection of persons on the ground." *Lockheed Air Terminal*, 411 U.S. at 638–39 (citations omitted).

However, Plaintiffs have not adequately demonstrated that Congress intended to prohibit states from passing additional regulations related to UAVs, even ones related to existing FAA regulations. Instead, parties agree that a state may "promulgate drone regulations consistent with its traditional police powers, such as to protect privacy or prevent trespass or voyeurism." (Compl., Dkt. 1, at 29–30; Mot. Dismiss, Dkt. 19, at 32). Overall, Plaintiffs' claims center on whether UAVs can be used in certain areas for newsgathering and have not demonstrated that the No-Fly Provisions are intended to affect, or indeed do affect, aviation safety in the airspace. Thus, the Court agrees that these regulations are related to the State's police powers, and Plaintiffs have not shown that the No-Fly Provisions fall into an entirely preempted field. However, whether these regulations are constitutional or valid exercises of these police powers is another matter, as discussed above.

Additionally, even without field preemption, there can be conflict preemption. *See Singer*, 284 F. Supp. 3d at 130 ("The FAA's guidance . . . hints that whether parallel regulations are enforceable depends on the principles of conflict preemption."). Plaintiffs argue there is obstacle preemption, a form of conflict preemption, because the No-Fly Provisions interfere with the federal goals of 1)

national uniformity of air safety regulations and 2) safely integrating drone use into the national airspace. (Resp., Dkt. 23, at 30).

First, Plaintiffs argue that the No-Fly Provisions conflict with national regulations because they interfere with national uniformity of air safety regulations. (*Id.*). Plaintiffs further clarify that while states are not always prohibited from regulating airspace, regulations "on flight altitude [or] flight paths . . . [and] regulation[s] of the navigable airspace" are particularly likely to be preempted. (Resp., Dkt. 23, at 30).[8] However, Congress enacted the Federal Aviation Act "in response to a series of 'fatal air crashes between civil and military aircraft operating under separate flight rules.'" (Amicus, Dkt. 42, at 4–5 (citing *Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 368 (3d Cir. 1999)). Plaintiffs have not demonstrated how these concerns, or similar concerns over consistency in regulations, apply to UAVs flying under 400 feet, or in the case of the No-Fly Provisions, not flying in an area at all. Instead, Defendants argue that because the purpose of the federal prohibition on UAVs flying over 400 feet is to prevent interference with passenger aircraft and to prevent collisions with buildings, there is no conflict between the No-Fly Provisions and this purpose. (Reply, Dkt. 25, at 10). While uniformity may be a goal and priority related to FAA regulations of UAVs, Plaintiffs have not demonstrated that any issues or conflicts, analogous to avoiding crashes, are created by the No-Fly Provisions' additional regulations.

Second, Plaintiffs point to Congress's direction that the Secretary of Transportation "develop a comprehensive plan to safely accelerate the integration of civil unmanned aircraft systems into the national airspace system," (Resp., Dkt. 23, at 30 (citing 49 U.S.C. § 44802(a)(1))). Plaintiffs and amicus rely on *Singer* to argue that the No-Fly Provisions interfere with this goal of a comprehensive plan for UAVs. In *Singer*, a Massachusetts District Court found conflict preemption

---

[8] *See* Office of the Chief Counsel, Fed. Aviation Admin., *State and Local Regulation of Unmanned Aircraft Systems (UAS): Fact Sheet* 3 (Dec. 17, 2015).

where regulations prohibited UAV flight below 400 feet over all private and public land. *Singer*, 284 F. Supp. 3d at 131–33. The court in *Singer* found that this "constitute[d] a wholesale ban on drone use in [the city]," which "thwarts not only the FAA's objectives, but also those of Congress for the FAA to integrate drones into the national airspace." *Id.* at 132. The No-Fly Provisions in this case are not regulating such a broad area of Texas airspace, but is instead only certain structures. *See* TEX. GOV'T CODE §§ 423.0045, 423.0046. Although the No-Fly Provisions prohibit UAVs in more areas than national regulations, Plaintiffs have not adequately pled that these prohibitions are so broad as to interfere with the goal of integrating UAVs into the national airspace, especially if the FAA "contemplated co-regulation of drones [with states] to a certain extent." *Singer*, 284 F. Supp. 3d at 132 (citing 81 Fed. Reg. 42063 § (III)(K)(6)).

Plaintiffs have not sufficiently pled that the No-Fly Provisions conflict with federal goals for uniform UAV regulation or to integrate UAVs into the national airspace. As a result, the No-Fly Provisions neither regulate a field that is entirely preempted by federal regulation nor conflict with federal regulation.

## III. CONCLUSION

Accordingly, **IT IS ORDERED** that Defendants' Motion to Dismiss, (Dkt. 19), is **GRANTED IN PART** and **DENIED IN PART**. The Court **DISMISSES WITH PREJUDICE** Plaintiffs' preemption claim. Defendants motion to dismiss is **DENIED** as to all other claims.

**SIGNED** on November 30, 2020.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE