# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

|  |  |  |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, *et al.*, | § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. |
| v. | § § | 1:19-cv-00946-RP |
| STEVEN MCCRAW, *et al.*, | § § | |
| Defendants. | § § | |

---

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

James A. Hemphill
Texas State Bar No. 00787674
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Ave., Suite 2700
Austin, Texas 78701
Tel: (512) 480-5762
Fax: (512) 536-9907
jhemphill@gdhm.com

Leah M. Nicholls (*pro hac vice*)
DC Bar No. 982730
Public Justice P.C.
1620 L Street NW, Suite 630
Washington, DC 20036
Tel: (202) 797-8600
lnicholls@publicjustice.net

David A. Schulz (*pro hac vice*)
NY State Bar No. 1514751
Media Freedom and Information
    Access Clinic
Yale Law School
127 Wall Street
New Haven, CT 06511
Tel: (212) 850-6103
Fax: (212) 223-1942
david.schulz@yale.edu

Mickey H. Osterreicher (*pro hac vice*
   pending)
New York State Bar No. 2938678
General Counsel
National Press Photographers Association
Finnerty Osterreicher & Abdulla
70 Niagara Street
Buffalo, NY 14202
Tel: (716) 983-7800
Fax: (716) 608-1509
lawyer@nppa.org

Alicia Wagner Calzada
Texas State Bar No. 24076296
Deputy General Counsel
National Press Photographers Association
Alicia Wagner Calzada, PLLC
12023 Radium, Suite B1
San Antonio, TX 78216
Tel: (210) 825-1449
Alicia@calzadalegal.com

# TABLE OF CONTENTS

TALE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS .............................................................................................2

A.      The Value of Drones to Journalists ................................................................ 2

B.      The Texas Law Restricting Drone Use............................................................6

C.      Plaintiffs and the Effects of Chapter 423 on Their Newsgathering....................8

D.      Procedural Posture ........................................................................................ 12

STANDARD OF REVIEW..........................................................................................13

ARGUMENT................................................................................................................14

I.      CHPATER 423 VIOLATES THE FIRST AMENDMENT................................14

        A.      Chapter 423 Is Subject to Strict Scrutiny ........................................... 15

                1.      Chapter 423 imposes content-based restrictions, triggering
                        strict scrutiny .......................................................................... 15

                        a.      The Surveillance Provisions are speaker-based
                                restrictions ................................................................. 16

                        b.      The Surveillance and No-Fly Provisions discriminate
                                based on content ......................................................... 17

                2.      Chapter 423 significantly inhibits newsgathering,
                        independently triggering strict scrutiny.................................... 18

        B.      The Surveillance and No-Fly Provisions Cannot Survive Strict
                Scrutiny.............................................................................................. 21

                1.      The Surveillance and No-Fly Provisions are not "actually
                        necessary" to protect a compelling interest .............................. 21

                2.      The Surveillance and No-Fly Provisions are not narrowly
                        tailored .................................................................................... 23

                        a.      The Surveillance and No-Fly Provisions are
                                overinclusive and unconstitutionally overbroad........................ 23

        b.      The Surveillance and No-Fly Provisions are underinclusive ................................................................................25

C.     Even Under Intermediate Scrutiny, the No-Fly Provisions Should Be Struck ................................................................................................27

II.     THE SURVEILLANCE AND NO-FLY PROVISIONS ARE UNCONSTITUTIONALLY VAGUE ..............................................................28

A.     Vague Terms in Both Provisions Fail to Provide Notice to Newsgatherers ........................................................................................29

1.     The term "surveillance" is unconstitutionally vague ................................30

2.     The term "commercial" is unconstitutionally vague ................................32

B.     Chapter 423's Vagueness Makes It Susceptible to Discretionary Enforcement .....................................................................................33

III.    PLAINTIFFS HAVE STANDING TO CHALLENGE CHAPTER 423 .........................34

A.     Plaintiff Pappalardo's First Amendment Injury Gives Him Standing ................34

B.     Plaintiff NPPA and TPA Have Associational Standing ........................................35

C.     Plaintiffs NPPA and TPA Also Have Organizational Standing ............................37

CONCLUSION ............................................................................................38

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*ACLU of Ill. v. Alvarez*,
   679 F.3d 583 (7th Cir. 2012) .................................................................... 1, 12, 16, 19

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................ 13

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*,
   564 U.S. 721 (2011) ............................................................................................ 21

*Barr v. American Association of Political Consultants*,
   140 S. Ct. 2335 (2020) .................................................................................. 17, 18

*Branzburg v. Hayes*,
   408 U.S. 665 (1972) ............................................................................................ 19

*Brown v. Entertainment Merchants Association*,
   564 U.S. 786 (2011) ................................................................................ 21, 23, 26

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................................ 13

*Citizens United v. F.E.C.*,
   558 U.S. 310 (2010) ...................................................................................... 16, 17

*Cohen v. Cowles Media Co.*,
   501 U.S. 663 (1991) ............................................................................................ 18

*Consolidated Edison Co. of New York v. Public Service Commission of New York*,
   447 U.S. 530 (1980) ............................................................................................ 23

*Ctr. for Individual Freedom v. Carmouche*,
   449 F.3d 655 (5th Cir. 2006) .............................................................................. 14

*Davis v. East Baton Rouge Parish School Bd.*,
   78 F.3d 920 (5th Cir. 1996) ................................................................................ 20

*In re Express-News Corp.*,
   695 F.2d 807 (5th Cir. 1982) .............................................................................. 20

*FCC. v. Fox TV Stations, Inc.*,
   567 U.S. 239 (2012) ............................................................................................ 29

*First National Bank of Boston v. Bellotti*,
   435 U.S. 765 (1978) ............................................................................................ 20

*Globe Newspaper Co. v. Superior Court,*
457 U.S. 596 (1982) .................................................................. 14, 19, 20

*Grayned v. City of Rockford,*
408 U.S. 104 (1972) .................................................................. 29

*Howard Gault Co. v. Tex. Rural Legal Aid, Inc.,*
848 F.2d 544 (5th Cir. 1988) ..................................................... 29

*Hunt v. Washington State Apple Advertising Commission,*
432 U.S. 333 (1977) .................................................................. 35, 37

*International Society for Krishna Consciousness v. Eaves*
601 F.2d 809 (5th Cir. 1979) ..................................................... 29

*Kolender v. Lawson,*
461 U.S. 352 (1983) .................................................................. 33

*Lakewood v. Plain Dealer Publishing Co.,*
486 U.S. 750 (1988) .................................................................. 34

*Morgan v. Swanson,*
659 F.3d 359 (5th Cir. 2011) ..................................................... 16

*Morse v. Frederick,*
551 U.S. 393 (2007) .................................................................. 16

*Price v. Barr,*
CV 19-3672 (CKK), 2021 WL 230135 (D.D.C. Jan. 22, 2021) ........... 18

*R. A. V. v. St. Paul,*
505 U.S. 377 (1992) .................................................................. 15

*Reagan National Advertising of Austin, Inc. v. City of Austin,*
972 F.3d 696 (5th Cir. 2020) ..................................................... 14, 16, 18

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) .................................................................. *passim*

*Republican Party of Minn. v. White,*
536 U.S. 765 (2002) .................................................................. 23, 24

*Reynolds v. Middleton,*
779 F.3d 222 (4th Cir. 2015) ..................................................... 21

*Richmond Newspapers, Inc. v. Virginia,*
448 U.S. 555 (1980) .................................................................. 19

*Roark & Hardee LP v. City of Austin*,
  522 F.3d 533 (5th Cir. 2008) ..................................................................28, 31

*SEIU, Local 5 v. City of Houston*,
  595 F.3d 588 (5th Cir. 2010) ...........................................................................29

*Shields v. Babbitt*,
  229 F. Supp. 2d 638 (2000) ..............................................................................35

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
  502 U.S. 105 (1991) ....................................................................................15, 16

*Smith v. Goguen*,
  415 U.S. 566 (1975) ..........................................................................................34

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ............................................................................14, 16, 18

*Turner v. Driver*,
  848 F.3d 678 (5th Cir. 2017) .............................................................16, 20, 24

*United Food & Commercial Workers Union Local 751 v. Brown Grp.*,
  517 U.S. 544 (1996) ....................................................................................35, 37

*United States v. Alvarez*,
  567 U.S. 709 (2012) ..........................................................................................21

*United States v. O'Brien*,
  391 U.S. 367 (1968) ....................................................................................27, 28

*United States v. Playboy Entertainment Group, Inc.*,
  529 U.S. 803 (2000) ..........................................................................................21

*United States v. Stevens*,
  559 U.S. 460 (2010) ..........................................................................................25

*United States v. Williams*,
  553 U.S. 285 (2008) ..........................................................................................25

*Valenzuela v. Aquino*,
  853 S.W.2d 512 (Tex. 1993) .............................................................................22

*Washington State Grange v. Washington State Republican Party*,
  552 U.S. 442 (2008) ..........................................................................................25

*Williams-Yulee v. Florida Bar*,
  575 U.S. 433 (2015) ..........................................................................................14

*Women's Medical Center v. Bell*,
   248 F.3d 411 (5th Cir. 2001) ...............................................................28, 29, 30, 34

**Statutes**

TEX. GOV'T CODE § 423.002 ........................................................................*passim*

TEX. GOV'T CODE § 423.003 ..........................................................6, 17, 24, 28, 38

TEX. GOV'T CODE § 423.004 ............................................................................6, 38

TEX. GOV'T CODE § 423.0045 ......................................................................*passim*

TEX. GOV'T CODE § 423.0046 ...........................................................7, 27, 32, 38

TEX. GOV'T CODE § 424.051 ......................................................................22, 27

TEX. GOV'T CODE § 424.052 ......................................................................22, 27

TEX. PENAL CODE § 21.15 ................................................................................22

TEX. PENAL CODE § 12.22 ..................................................................................6

TEX. PENAL CODE § 12.23 ..................................................................................6

**Other Authorities**

14 C.F.R. pt. 107.........................................................................................*passim*

Amazon Prime Air, Amazon.com ......................................................................26

CAMBRIDGE ACADEMIC CONTENT DICTIONARY ................................................32

*Commercial*, BLACK'S LAW DICTIONARY (11th ed. 2019) ..............................32

Federal Rule of Civil Procedure 56 ..................................................................13

First Amendment ...................................................................................*passim*

Fourteenth Amendment ..........................................................................2, 29, 38

MACMILLAN DICTIONARY ................................................................................32

Betsy Morris, *Amazon is Accused of Violating Kids' Privacy With Smart
   Speakers*, THE WALL STREET JOURNAL, May 9, 2019............................................26

Peggy O'Hare, *Aging steel suspected in dam failure at Lake Dunlap*, SAN
   ANTONIO EXPRESS-NEWS, May 16, 2019 ........................................................28

*Surveillance*, AMERICAN HERITAGE DICTIONARY (2019) .............................................. 30

*Surveillance*, BLACK'S LAW DICTIONARY (11th ed. 2019) ...................................... 30, 31

*Texas Land Trends*, Tex. A&M ................................................................................... 24

## PRELIMINARY STATEMENT

This action challenges provisions of Texas Law Chapter 423 that place significant, unconstitutional restrictions on the ability of Plaintiff journalists to gather and disseminate news using unmanned aerial vehicles, commonly known as "UAVs" or "drones." Chapter 423's "Surveillance Provisions" ban the use of drones for "surveillance," a vague term that the statute does not, and Defendants cannot, define. The law's "No-Fly Provisions" prohibit the flying of drones in the vicinity of certain facilities but exempt from the prohibition drones flown for "commercial" purposes—another vague, undefined term that excludes journalists in many contexts. Both provisions have a multitude of exceptions that impermissibly discriminate based upon the speaker and content of the speech. Journalists like Plaintiffs do not explicitly fall within any exemption, and the provisions effectively prohibit Plaintiffs from using drones for their newsgathering.

Newsgathering is a constitutionally protected activity. As this Court recognized in rejecting Defendants' motions to dismiss, newsgathering is "necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." Order on Motions to Dismiss, ECF No. 52, at 18 (quoting *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012)). The Surveillance and No-Fly Provisions trample this right by depriving journalists of the ability to capture newsworthy images. One journalist—a member of Plaintiff National Press Photographers Association ("NPPA") and working for a newspaper member of Plaintiff Texas Press Association ("TPA")—was threatened with penalties under Chapter 423 simply for using a drone to record a newsworthy event from a public place. Many journalists in Texas now avoid using drones out of fear of violating Chapter 423. The law chills the speech and reporting of Plaintiffs, their journalist members, and others similarly situated,

who would otherwise use drones to exercise their constitutionally protected right to gather and report the news.

In denying Defendants' motions to dismiss, this Court acknowledged the apparent constitutional infirmities in the Surveillance and No-Fly Provisions and indicated that the statute was subject to strict scrutiny. *See* Order at 19, 20, 21-22, 24. The undisputed facts now before the Court establish that both provisions unconstitutionally impose speaker- and content-based restrictions, restrain newsgathering, and are impermissibly vague and overbroad. The provisions violate the Plaintiffs' First and Fourteenth Amendment rights and should be declared unconstitutional.

All but prohibited by the law from any use of drones, journalists in Texas are deprived of a key tool for reporting on natural and manmade disasters—such as the 2021 freeze, hurricanes, infrastructure failures, and deadly fires—and for conducting investigations into such important news stories as the conditions in immigration detention camps. Defendants have no compelling governmental interest for imposing such severe limitations on First Amendment protected activity; indeed, the interests they claim Chapter 423 is needed to protect are already fully protected by other Texas laws, which render the Surveillance and No-Fly Provisions unnecessary as well as unconstitutional.

The Court should grant Plaintiffs' motion for summary judgment, declare the Surveillance and No-Fly Provisions unconstitutional, and enjoin Defendants from enforcing them.

## STATEMENT OF FACTS

### A.     The Value of Drones to Journalists

Drones have rapidly taken on an important role in journalism. Digital media is increasingly visual, requiring high-quality imagery both to attract readers and to communicate a story to them. Pappalardo Decl., Pls.' Ex. 5, ¶ 12 ("Modern media is dependent on strong, unique imagery.").

Some of the best and most informative imagery comes from aerial photography, for which "[t]he adage 'a picture is worth a thousand words' is especially apt." Baranetsky Decl., Pls.' Ex. 3, ¶ 6; *see also* Wade Decl., Pls.' Ex. 7, ¶ 9; Ramsess Decl., Pls.' Ex. 6, ¶ 7. Aerial photography, and drone photography in particular, can "add additional information and important perspective for the reader—particularly where, for example, a story covers a large area that would be difficult to visualize or understand without an aerial perspective." Wade Decl., Pls.' Ex. 7, ¶ 4; *see also* Calzada Decl., Pls.' Ex. 4, ¶ 14; Calzada Decl. Ex. C, Pls.' Ex. 4.

For photographers, drones have several advantages over manned aircraft: their low altitude "can allow for better images to be made and can provide more information to the viewer," their maneuverability "enables better and clearer photography," and their on-board technology "stabilizes the camera to make video footage smoother." Wade Decl., Pls.' Ex. 7, ¶ 9. By telling the story better and attracting reader interest, drone reporting can also give a "much-needed competitive edge" to both publications and freelance journalists. Pappalardo Decl., Pls.' Ex. 5, ¶¶ 9, 12, 14.

Given the economic reality of the news industry, drones are often the only option available for capturing aerial photography. Other options are simply too expensive. For Plaintiff Pappalardo, a freelance journalist, "[a]ny use of a helicopter would cost significantly more" than he is paid for an assignment. Pappalardo Decl., Pls.' Ex. 5, ¶ 13. Even for news organizations, which have faced years of declining revenue, helicopters or airplanes are far outside their budgets for a typical story. A helicopter, for instance, costs at least $800 an hour to operate. Calzada Decl., Pls.' Ex. 4, ¶ 15. A drone "costs significantly less." Wade Decl., Pls.' Ex. 7, ¶ 5.

Manned aircraft also pose significantly more safety risks for the pilot, passengers, and people on the ground than drones do. "Several photojournalists have lost their lives in helicopter

crashes while attempting to make pictures for a news story." Wade Decl., Pls.' Ex. 7, ¶ 20; Ramsess Decl., Pls.' Ex. 6, ¶ 8 (listing NPPA articles about specific crashes). "Other people, including pilots and individuals on the ground, lost their lives in some of the same incidents." Calzada Decl., Pls.' Ex. 4, ¶ 16. For NPPA member Guillermo ("Billy") Calzada, an experienced photojournalist, "incidents where photojournalists have died in helicopter crashes while covering news . . . [are] always a thought on [his] mind" when he needs to use a helicopter for photography. Calzada Decl., Pls.' Ex. 4, ¶ 16. On the other hand, the Defendants responsible for statewide law enforcement said they are not aware of any crashes or accidents involving drones over at least the past five years. Hemphill Decl. Ex. A, Pls.' Ex. 1, at 4 (Defendant Mathis' answers to Plaintiffs' interrogatories); Hemphill Decl. Ex. B at 4 (Defendant McCraw's answers to Plaintiffs' interrogatories).

Around the world, journalists "have adopted drones as valuable tools in their reporting, adding depth and perspective to their coverage of important news stories." Ramsess Decl., Pls.' Ex. 6, ¶ 18. Drone images help audiences understand a broad range of stories including construction on public projects, feature stories, infrastructure, natural and manmade disasters. Images taken by declarants in this case show how drone photography adds important information and perspective to a news article. For example:

# Apartment residents tell of flames, smoke, terror



A drone operating at a distance from the scene of the fire captured this view of the Iconic Village Apartments in San Marcos.

## Aging steel suspected in dam failure at Lake Dunlap

Peggy O'Hare, Staff writer
May 16, 2019 | Updated: May 17, 2019 6:31 a.m.



1 of 7

Water spills from the dam at Lake Dunlap on Wednesday. A spill gate's failure led to a virtual draining of the lake Tuesday.

Billy Calzada /Staff photographer

Calzada Decl., Pls.' Ex. 4, ¶¶ 7-14 (apartment fire), ¶ 22 (dam failure); *see also* Wade Decl. Pls.'

Ex. 7, ¶ 17 (community garden); Wade Decl., Pls.' Ex. 7, ¶ 22 (construction of Globe Life Field

in Arlington, Texas); Calzada Decl., Pls.' Ex. 4, ¶ 18 (Texas winter freeze). Without drones, images such as these, and the information they convey, are just not possible.

**B.      The Texas Law Restricting Drone Use**

As passed in 2013 and amended in 2015, Chapter 423 contains two sets of provisions at issue. *First*, Sections 423.002, 423.003, 423.004, and 423.006 (collectively, the "Surveillance Provisions") are directly aimed at photography; they make it unlawful to use a drone to capture an image of a person or a privately owned property with the "intent to conduct surveillance." Doing so is a Class C misdemeanor, punishable by a fine up to $500. TEX. GOV'T CODE § 423.003; TEX. PENAL CODE § 12.23. Displaying or distributing the image is a Class B misdemeanor, punishable by up to 180 days in jail and a $2,000 fine. TEX. GOV'T CODE § 423.004(b); TEX. PENAL CODE § 12.22. Each image a person possesses, displays or distributes is a separate offense. TEX. GOV'T CODE § 423.004(c).

The statute does not define "surveillance." As a result, when asked in discovery whether capturing images by drone for purposes of journalism would constitute "surveillance," two of the defendants could not say. They responded that it was "ultimately a question of law for the Court and, in the context of an individual criminal proceeding, dependent on factual determinations by a jury," adding that journalism "may or may not constitute 'surveillance' as used in Chapter 423." Hemphill Decl. Ex. A, Pls.' Ex. 1, at 8 (Mathis' answers to interrogatories); Hemphill Decl. Ex. B at 8 (McCraw's answers to interrogatories). In testimony submitted to a Senate committee in 2020, Defendant McCraw's agency, the Texas Department of Public Safety stated that "[b]ecause Texas Government Code 423.003 does not define 'surveillance,' it can be argued that anything not specifically listed in 423.002 would be conducting surveillance in violation of 423.003." Hemphill

Decl. Ex. D, Pls.' Ex. 1, at 6 (Texas Department of Public Safety, Testimony in Response to Senate Committee on Business & Commerce Request for Information of September 18, 2020).

The Surveillance Provisions include an extensive list of exceptions permitting certain groups of people to use drones in ways that the law otherwise prohibits, so long as they do it in connection with their professional or academic work. Those exceptions apply to, among others, professors, college students, real estate brokers, pipeline operators, land surveyors, engineers, and insurance underwriters. TEX. GOV'T CODE §§ 423.002(a)(1), (13), (16), (19), (20), (21)(A). There is no exception for journalists.[1] The Surveillance Provisions also exempt anyone who captures an image "from a height no more than eight feet above ground level in a public place." TEX. GOV'T CODE § 423.002(a)(14).

*Second*, Sections 423.0045 and 423.0046 (collectively, the "No-Fly Provisions") make it unlawful to fly drones over a broad range of facilities at less than 400 feet above the ground, including over sports arenas, correctional facilities, animal feedlots, oil and gas drilling sites and pipelines, and petroleum and alumina refineries.[2] Read alongside FAA regulations that prohibit flying drones higher than 400 feet, the No-Fly Provisions bar any drone use (including for photography) over the sites they single out. An offense under the No-Fly Provisions is a Class B misdemeanor, rising to a Class A misdemeanor for repeat offenders. TEX. GOV'T CODE §§ 423.0045(d), 423.0046(d); 14 C.F.R. § 107.51 ("The altitude of the small unmanned aircraft cannot be higher than 400 feet above ground level.").

---

[1] An exception for journalists was included in the Texas Senate bill in 2013, but it was removed after passage. Conference Committee Report, H.B. 912 (May 25, 2013) at 18, http://www.lrl.state.tx.us/scanned/83ccrs/hb0912.pdf#navpanes=0. An exception for journalists was again proposed in the 2017 legislative session, but it did not pass. S.B. 839, Sess. 85(R), (Tex. 2017) https://capitol.texas.gov/BillLookup/History.aspx?LegSess=85R&Bill=SB839.

[2] In the 2021 session, the Texas legislature added airports and military installations to the list of "critical infrastructure facilit[ies]" where drone flying is prohibited. S.B. 149, Sess. 87(R), (Tex. 2021) https://capitol.texas.gov/BillLookup/History.aspx?LegSess=87R&Bill=SB149.

The No-Fly Provisions contain an exemption permitting anyone flying a drone for "commercial" purposes to fly over the designated sites. But neither the statute nor the Defendants define what "commercial" means. Complicating matters, in the photography industry, the definition of "commercial" photography excludes journalism and other editorial photography. Ramsess Decl., Pls.' Ex. 6, ¶ 5; Wade Decl., Pls.' Ex. 7, ¶ 11.

Texas Legislators who passed Chapter 423 were well aware that these provisions would impede journalists. The House's analysis acknowledged the concerns of opponents that it would "hinder free speech and a free press" because drones have become "an increasingly practical and inexpensive way to take aerial photographs for news gathering purposes." House Bill Analysis for HB 912 (May 7, 2013) at 6.[3]

## C.    Plaintiffs and the Effects of Chapter 423 on Their Newsgathering

Plaintiffs are an independent journalist who owns and uses a drone in Texas and organizations that represent the interests of visual journalists in Texas and nationwide.

Plaintiff Joseph Pappalardo is a Texas resident and award-winning freelance journalist who has worked for newspapers across Texas, from the *Dallas Observer* to the *Corpus Christi Caller-Times*. Pappalardo Decl., Pls.' Ex. 5, ¶ 2. He is currently a contributing editor for *Popular Mechanics*. Pappalardo Decl., Pls.' Ex. 5, ¶ 2. He owns an FAA-registered drone, and he maintains a Part 107 Remote Pilot's Certificate.[4] Pappalardo Decl., Pls.' Ex. 5, ¶¶ 3, 4. Because of Chapter 423, he has avoided using his drone to capture images in Texas for such newsworthy stories as events related to Hurricane Harvey, the removal of homeless encampments, the way gridlock hampers emergency responders, and illegal poaching in urban areas. Pappalardo Decl., Pls.' Ex. 5,

---

[3] https://hro.house.texas.gov/pdf/ba83r/hb0912.pdf#navpanes=0.
[4] Part 107 refers to the FAA regulation concerning the operation of small drones. 14 C.F.R. § 107.1(a). Federal law requires those who wish to fly a drone for non-hobby purposes to have a current Part 107 remote pilot's certificate in order to operate in the national airspace.

¶ 14. Pappalardo fears that "using a [drone] for journalistic purposes would put [him] at risk of criminal penalties and subject [him] to liability in a civil lawsuit." Pappalardo Decl., Pls.' Ex. 5, ¶ 5.

Plaintiff National Press Photographers Association is the nation's leading professional organization for visual journalists. Ramsess Decl., Pls.' Ex. 6, ¶ 4. Its membership includes news photographers from print, television, and electronic media, including about 300 members in the State of Texas. Ramsess Decl., Pls.' Ex. 6, ¶ 4. In response to the passage of Chapter 423, NPPA's two counsel have had to divert their time to counteracting the ongoing impact of the law rather than addressing other matters that the NPPA board has prioritized. Ramsess Decl., Pls.' Ex. 6, ¶ 11-12. Among other things, NPPA's attorneys have researched potential First Amendment and preemption defenses in case a member is charged criminally or sued civilly based on a violation of Chapter 423, spoken and written publicly about the law's impact on journalists and how they could minimize the risks it creates, and communicated with lawmakers regarding Chapter 423 and potential amendments. Ramsess Decl., Pls.' Ex. 6, ¶ 16. NPPA has spent hours counseling the heads of photography departments and news organizations as well as individual photographers and members about Chapter 423 compliance. Ramsess Decl., Pls.' Ex. 6, ¶ 16; *see also* Baranetsky Decl., Pls.' Ex. 3, ¶ 15 (general counsel at The Center for Investigative Reporting describing her consultation with an NPPA attorney). All of these activities have prevented NPPA's attorneys from spending time on other efforts that further the broader mission and vision of NPPA. Ramsess Decl., Pls.' Ex. 6, ¶ 12, 16-17.

Plaintiff Texas Press Association ("TPA"), "the voice of the Texas newspaper industry," is one of the nation's oldest and largest newspaper trade organizations. Baggett Decl., Pls.' Ex. 2, ¶ 2. Its members include the *San Antonio Express-News*, the *Dallas Morning News*, the *Austin*

*American-Statesman*, the *Fort Worth Star-Telegram*, and more than 400 other newspapers across the State. Baggett Decl., Pls.' Ex. 2, ¶ 2. Chapter 423 has led some of those newspapers "to avoid the use of drone photography." Baggett Decl., Pls.' Ex. 2, ¶ 3.

The record before the Court reflects the impact on Plaintiffs and on the members of NPPA and TPA. For example, Brandon Wade is an experienced freelance news photographer and a member of the NPPA. Wade Decl., Pls.' Ex. 7, ¶¶ 2-3. His clients include TPA member newspapers *The Dallas Morning News* and the *Fort Worth Star-Telegram*. Wade Decl., Pls.' Ex. 7, ¶ 2; Baggett Decl., Pls.' Ex. 2, ¶ 2. He has an FAA Part 107 certificate to fly small drones in the National Airspace System. Wade Decl., Pls.' Ex. 7, ¶ 6. He estimates that he has lost thousands of dollars in income from not being able to use his drone for news assignments because of the risk of Chapter 423 enforcement. Wade Decl., Pls.' Ex. 7, ¶ 15. Among other things, he could not use a drone to record construction of the new Texas Rangers ballpark for the *Fort Worth Star-Telegram* because the Rangers refused to allow him to shoot drone footage for newsgathering, although the Rangers hired him to do the exact same type of drone photography for their own commercial purposes. Wade Decl., Pls.' Ex. 7, ¶¶ 22-26. As a result of that one incident, he lost thousands of dollars in income. Wade Decl., Pls.' Ex. 7, ¶ 27. Wade's client *The Dallas Morning News* has refused to publish his drone images or video footage and has barred him from shooting drone photos while on assignment for them because of Chapter 423. Wade Decl., Pls.' Ex. 7, ¶¶ 14-17. Another client, The Center for Investigative Reporting, decided not to publish video from his drone and instructed him to limit his drone photography. Wade Decl., Pls.' Ex. 7, ¶ 31; Baranetsky Decl., Pls.' Ex. 3, ¶¶ 18-19.

Guillermo Calzada, a professional photojournalist for more than three decades, is both a member of NPPA and an employee of TPA member *San Antonio Express-News*. Calzada Decl.,

Pls.' Ex. 4, ¶ 2; Baggett Decl., Pls.' Ex. 2, ¶ 2. Calzada was threatened with prosecution for using his drone for newsgathering. Calzada Decl., Pls.' Ex. 4, ¶ 10. On July 24, 2018, four days after an apartment fire in San Marcos, Texas, that killed five people, Calzada was assigned to record the scene for the *Express-News*. Calzada Decl., Pls.' Ex. 4, ¶ 8. He arrived at the site, confirmed there were no flight restrictions in the area, and filed his flight with the FAA. Calzada Decl., Pls.' Ex. 4, ¶ 8. Calzada—who has an FAA Part 107 certificate that qualifies him to operate small drones in the National Airspace System—flew his FAA-registered drone from a public place and never crossed the yellow "do not cross" perimeter tape that surrounded the fire site. Calzada Decl., Pls.' Ex. 4, ¶¶ 5, 8. He flew the drone at an altitude of about 90 feet for three or four minutes. *Id*. Despite his caution, Calzada was soon approached by Alcohol Tobacco and Firearms (ATF) agents and local police, who claimed that he had "violated state law by taking pictures" and if he "published the photos, [he] would be violating state law again." Calzada Decl., Pls.' Ex. 4, ¶¶ 9-10.

As an employee of the newspaper, Calzada does not own the images he creates or control whether they are published. Calzada Decl., Pls.' Ex. 4, ¶ 11. One of the photos he took was published the next day on the front page of the *Express-News*, and it has been republished occasionally in connection with follow-up stories on the fire's aftermath. Calzada Decl., Pls.' Ex. 4, ¶¶ 11-12. After the first publication, a tenant of the building, who was out of town on the day of the fire but whose roommate was killed, emailed Calzada to say "Your photo is the only image I've seen that comes close to representing how I'm feeling inside right now." Calzada Decl., Pls.' Ex. 4, ¶ 14. She added that his drone photo "has somehow helped me in my grieving and healing process. Your photo has had a profound effect on me and I appreciate you for shooting it and sharing it." Calzada Decl., Pls.' Ex. 4, ¶ 14. Despite the newsgathering and storytelling benefits of Calzada's drone photography, he continues to worry that he will be "arrested, fined or sued" as a

result, and he has limited his use of drones for newsgathering. Calzada Decl., Pls.' Ex. 4, ¶¶ 12, 17.

## D.      Procedural Posture

Plaintiffs filed this action on Sept. 26, 2019. Compl., ECF No. 1. Defendants' motions to dismiss were denied by the Court on Nov. 30, 2020 in all respects except for a preemption claim. Order on Motions to Dismiss, ECF No. 52. In finding that Plaintiffs had stated a claim for violation of their First Amendment rights, this Court noted that "newsgathering and recording . . . 'is necessarily included within the First Amendment's guarantee of speech and press rights.'" Order at 18 (quoting *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012)).

The Court concluded that Plaintiffs "plausibly alleged that the Surveillance Provisions impermissibly impose content-based restrictions." *Id.* at 19. Plaintiffs sufficiently alleged that the provisions "are burdening expressive conduct." *Id.* at 18. The allegations were sufficient to state a claim that the provisions "apply speaker-based discrimination and are thus content-based" and subject to strict scrutiny, and that they fail strict scrutiny because they "are not narrowly tailored to protect" the government's stated interest. *Id.* at 18-19. Plaintiffs also plausibly pled the Surveillance Provisions are unconstitutionally vague, given the "multiple possible broad dictionary definitions" of surveillance and "no clarity offered from Defendants," and that they are "overbroad because they restrict a substantial amount of protected activity." *Id.* at 21-22.

As to the No-Fly Provisions, the Court stated that even assuming Defendants were correct that the provisions further important government interests unrelated to the suppression of free expression, Plaintiffs still "adequately pled the No-Fly Provisions are not narrowly tailored." *Id.* at 23. The Court "agree[d] that Plaintiffs have plausibly raised questions as to how these government interests could be threatened by newsgathering but not by commercial activities [that

are exempted from the provisions]. This inconsistent prohibition of UAVs indicates that the No-Fly Provisions are restricting more speech than necessary to achieve the government's alleged interests." *Id.* at 24. The Court further held that Plaintiffs sufficiently alleged the No-Fly Provisions to be unconstitutionally vague and overbroad. *Id.*

The Court concluded that the allegations were sufficient to show Plaintiffs Pappalardo and NPPA have standing to assert these claims. Pappalardo sufficiently alleged that his "newsgathering activities have been chilled" due to his "reasonable fear of having the Chapter 423 provisions enforced against him." *Id.* at 10. And the Court held the pleadings supported NPPA's associational and organizational standing: associational because the First Amendment activities of two of its members, Calzada and Wade, are chilled by Chapter 423, the interests at stake are germane to NPPA's purpose, and the case does not require involvement of the individual members, *id.* at 11-12; and organizational because NPPA "diverted resources to counter the effects of the Chapter 423 provisions on its members," *id.* at 13.

Following the Court's order, the parties engaged in limited document discovery. The case is now ripe for summary judgment.

## STANDARD OF REVIEW

A party is entitled to summary judgment under Rule 56 if it shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the movant has met its burden, the non-movant must "go beyond the pleadings . . . [to] designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotations omitted). Summary judgment is particularly suited

for facial constitutional challenges such as this one, because "a facial challenge to the constitutionality of a statute presents a pure question of law." *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006).

## ARGUMENT

### I.   CHAPTER 423 VIOLATES THE FIRST AMENDMENT

Chapter 423's Surveillance and No-Fly Provisions unconstitutionally restrain journalists from gathering the news and communicating that news to their readers. Chapter 423 is subject to strict scrutiny because it imposes content-based discrimination. *Sorrell v. IMS Health Inc*., 564 U.S. 552, 564 (2011). In some circumstances, a drone photo taken by a journalist would be illegal while the exact same photo taken by someone in a variety of other groups, such as a student or professor, would not be; in other circumstances, a drone photo's legality would depend entirely on its content. This is classic speaker and content discrimination that must be subjected to strict scrutiny and is permissible only for the most compelling of reasons. None exists here. Additionally, the statute's substantial restriction on journalists' ability to gather and report the news presents an independent need for strict scrutiny. *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607 (1982).

The Fifth Circuit has described strict scrutiny as "a hard standard to meet." *Reagan Nat'l Advert. of Austin v. City of Austin*, 972 F.3d 696, 709 (5th Cir. 2020). Strict scrutiny in First Amendment cases is particularly demanding, and the Supreme Court has "emphasized that it is the rare case in which a State demonstrates that a speech restriction is narrowly tailored to serve a compelling interest." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015) (internal quotations omitted). This is not such a rare case.

Chapter 423 does not survive strict scrutiny because it is neither actually necessary to protect a compelling government interest nor narrowly tailored to do so. The government's asserted interests in privacy and public safety are already adequately protected by other statutes and regulations, and Defendants' own use of those other laws shows they are sufficient to deal with errant drone operators. Moreover, Chapter 423 is not narrowly tailored to protect privacy and safety, even if some need existed, because its provisions are both under- and over-inclusive: they don't prohibit some activity that implicates the state's claimed interests, and they prohibit other activity that does not. For the same reasons Chapter 423 is over-inclusive, it is also unconstitutionally overbroad—yet another reason it should be struck down.

The Surveillance and No-Fly Provisions plainly fail to meet strict scrutiny and therefore cannot be permitted to stand under the First Amendment. The Court should declare Chapter 423 unconstitutional and enjoin its enforcement.

### A.  Chapter 423 Is Subject to Strict Scrutiny

Chapter 423 is subject to strict scrutiny for two independent reasons: (1) the Surveillance Provisions are content- and speaker-based restrictions, and (2) both the Surveillance and No-Fly Provisions more than incidentally impair the ability of journalists to gather and report the news.

#### 1.  Chapter 423 imposes content-based restrictions, triggering strict scrutiny

The Surveillance Provisions of Chapter 423 impose content-based restrictions because they treat journalists differently than other speakers, and both the Surveillance and No-Fly Provisions discriminate based on the content of a drone image itself. It is well established that such content-based restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *see also R. A. V. v. St. Paul*, 505 U.S. 377, 395 (1992); *Simon &*

*Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991); *Reagan Nat'l Advert.*, 972 F.3d at 709.

### a.   The Surveillance Provisions are speaker-based restrictions

Any law that favors some speakers over others "strikes at the very heart of the First Amendment." *Morgan v. Swanson*, 659 F.3d 359, 401 (5th Cir. 2011) (citing *Morse v. Frederick*, 551 U.S. 393, 423 (2007) (Alito, J., concurring)). That is because "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). Therefore, a law that "disfavors" certain speakers is treated as a content-based regulation and subjected to strict scrutiny. *Sorrell*, 564 U.S. at 564-65; *see* Order at 18-19 ("A regulation of speech is content-based if it . . . discriminates between speakers in a way that 'disfavors' certain speakers from exercising their First Amendment rights.").

The Surveillance Provisions of Chapter 423 plainly favor certain speakers.[5] Among others, a "professor," "student," "professional engineer," or "employee of an insurance company" who takes a proscribed image with a drone is exempted from the statute's restrictions, yet a journalist who takes the very same image faces criminal and civil liability. TEX. GOV'T CODE § 423.002(a). Such discriminatory treatment based on speaker identity is inherently suspect, as the Supreme Court has repeatedly explained.

> [T]he Government may commit a constitutional wrong when by law it identifies certain preferred speakers. By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice. . . .

---

[5] Drone photographers are speakers because the First Amendment protects the act of creating speech in the same way as the speech itself. "The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." *Turner v. Driver*, 848 F.3d 678, 689 n.41 (5th Cir. 2017) (quoting *ACLU v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012)). Therefore, "there is no fixed First Amendment line between the act of creating speech and the speech itself." *Id.*

> The First Amendment protects speech and speaker, and the ideas that flow from each.

*Citizens United*, 558 U.S. at 340–41. The Surveillance Provisions impose this exact harm, depriving certain groups of drone operators, such as journalists, from freely capturing and publishing images, even as other groups face no such restrictions. This speaker-based discrimination requires strict scrutiny. *See id.*; *Barr v. Am. Ass'n of Political Consultants,* 140 S. Ct. 2335, 2347 (2020).

>   b.   *The Surveillance and No-Fly Provisions discriminate based on content*

Both the Surveillance and No-Fly Provisions are subject to strict scrutiny for the additional reason that they impose content-based restrictions on speech itself. A law is content-based if it "'on its face' draws distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 163. Thus, where a town's sign code treated signs differently depending on whether their contents concerned how to get to a book club or how to vote in an election, the code was "content based on its face." *Id.* at 164. Here, because the right to capture and publish an image turns on the content of the image, the law is content-based and requires strict scrutiny.[6]

The Surveillance Provisions single out for punishment only those drone images that depict individuals or private real property. TEX. GOV'T CODE § 423.003(a). While capturing or distributing an image of public property is permitted, capturing or distributing an image of private property is prohibited. *Id.*; *see also* TEX. GOV'T CODE § 423.002(a)(15); TEX. GOV'T CODE § 423.004(a) (making it a crime for a photographer to "possesse[], disclose[], display[], distribute[], or otherwise use[]" an image they captured via a drone of "an individual or privately owned real property," unless an exception applies). The statute includes no exception for the

---

[6] While speaker-based discrimination is sufficient on its own to require strict scrutiny review and invalidate Chapter 423, *see* Order at 19 n.7, content-based discrimination independently requires strict scrutiny.

incidental capture or display of images showing private property, even if the drone is flown only over public property and its camera is pointed at public property. Thus, the only way to know whether a particular image is legal is by examining the image's contents. The Supreme Court encountered a similar situation in *Barr*, where the legality of a robocall could not be determined without examining the call's contents. *Barr*, 140 S. Ct. at 2346 (plurality opinion) ("A robocall that says, 'Please pay your government debt' is legal. A robocall that says, 'Please donate to our political campaign' is illegal."). The Court concluded: "That is about as content-based as it gets." *Id.* The same applies here. By subjecting images "to different restrictions" based on whether they depict private rather than public property, the Surveillance Provisions are facially content-based. *Reed*, 576 U. S. at 164.

The No-Fly Provisions are also content-based because they, too, "define[] regulated speech by its function or purpose." *Reagan Nat'l Advert.*, 972 F.3d at 706. When a statute discriminates against speech based on whether it is commercial or not, that is a content-based restriction. *See Price v. Barr*, CV 19-3672 (CKK), 2021 WL 230135, at *10 (D.D.C. Jan. 22, 2021) (restriction on commercial filming was content-based) (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011)). While Chapter 423 disfavors non-commercial speech—unlike in *Sorrell* and *Price*, where commercial speech was disfavored—the principle remains the same: a prohibition that turns on whether the speech is commercial is a content-based restriction. *Id.*; *Reagan Nat'l Advert.*, 972 F.3d at 706.

> ### 2. Chapter 423 significantly inhibits newsgathering, independently triggering strict scrutiny

Freedom to gather and report the news is an essential precondition to a functioning democracy, so a law that imposes more than an incidental limitation on these activities necessarily raises First Amendment concerns. *See Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991). As

the Supreme Court has explained, the First Amendment protects a free press "to ensure that the individual citizen can effectively participate in and contribute to our republican system of selfgovernment." *Globe Newspaper Co.*, 457 U.S. at 604. And "without some protection for seeking out the news, freedom of the press could be eviscerated." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980) (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)) (internal quotations omitted). This Court has similarly recognized that newsgathering "is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." Order at 18 (quoting *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012)).

Simply put, newsgathering is a First Amendment-protected activity, and strict scrutiny of the Surveillance and No-Fly Provisions is thus independently warranted because their provisions substantially burden newsgathering. The record before the Court establishes, *inter alia,* that:

- The provisions facially impose near-blanket restrictions against journalists' use of drones. Calzada Decl., Pls.' Ex. 4, ¶¶ 7-10, 16, 17-19, 21-26; Wade Decl., Pls.' Ex. 7, ¶¶ 14-17, 23-27, 29, 30-31; Hemphill Decl. Ex. D, Pls.' Ex. 1, at 6 (Texas Department of Public Safety, Testimony in Response to Senate Committee on Business & Commerce Request for Information of September 18, 2020).

- News organizations in Texas now avoid publishing drone images for fear of prosecution. Wade Decl., Pls.' Ex. 7, ¶¶ 13-14; Baggett Decl., Pls.' Ex. 2, ¶ 3; Baranetsky Decl., Pls.' Ex. 3, ¶¶ 19-21.

- Journalists in Texas now limit their reporting with drones for fear of violating the law. Calzada Decl., Pls.' Ex. 4, ¶¶ 17, 23; Wade Decl., Pls.' Ex. 7, ¶¶ 12-13; Pappalardo Decl., Pls.' Ex. 5, ¶ 11.

These fears of prosecution are well founded. Calzada—a member of Plaintiff NPPA and an employee of a newspaper member of Plaintiff TPA—was specifically threatened with prosecution under Chapter 423 for using a drone to report on an apartment fire, even though he had taken care to confirm the absence of temporary flight restrictions and ensured that his drone did not pass above the yellow "do not cross" tape. Calzada Decl., Pls.' Ex. 4, ¶ 8. Officers then warned Calzada

19

that publishing the photographs would "violat[e] state law again." Calzada Decl., Pls.' Ex. 4, ¶ 10. Calzada wants to use a drone for ongoing reporting on a dam failure, but believes doing so will put him at risk of liability under the No Fly Provisions. Calzada Decl., Pls.' Ex. 4, ¶¶ 22-23. Wade, meanwhile, was expressly prohibited by the Texas Rangers from using a drone to report on the construction of a publicly-funded stadium. Wade Decl., Pls.' Ex. 7, ¶¶ 22-27.

Such laws that directly inhibit newsgathering "must be . . . necessitated by a compelling governmental interest, and . . . narrowly tailored to serve that interest"—*i.e.*, they are subject to strict scrutiny. *Globe Newspaper Co.*, 457 U.S. at 607. Applying that standard, the Fifth Circuit has twice vacated court orders that blocked journalists from gathering the news, by preventing them from interviewing government employees in one case and former jurors in the other. *Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 928-29 (5th Cir. 1996); *In re Express-News Corp.*, 695 F.2d 807, 808-09 (5th Cir. 1982). Such significant restrictions on newsgathering, the Fifth Circuit observed, infringe not only the rights of journalists, but also the public's "right to receive information." *In re Express-News Corp.*, 695 F.2d at 809; *see also Turner v Driver*, 848 F.3d 678, 688 (5th Cir. 2017) (recognizing that the First Amendment "prohibit[s] government from limiting the stock of information from which members of the public may draw" (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978))).

The Surveillance and No-Fly Provisions threaten substantially more newsgathering than the court orders at issue in either *Express-News Corp* or *Davis*. Rather than limiting journalists' access to specific stories, Chapter 423 restricts journalists' ability to report on newsworthy stories generally—banning a critical avenue of newsgathering. The Surveillance and No-Fly Provisions are subject to strict scrutiny for this reason as well.

**B.  The Surveillance and No-Fly Provisions Cannot Survive Strict Scrutiny**

The Surveillance and No-Fly Provisions fail both of the demanding requirements to meet strict scrutiny and are, therefore, unconstitutional. To satisfy strict scrutiny, Defendants must establish that Chapter 423's restrictions on the gathering and reporting of the news are (1) "'actually necessary' to achieve" a compelling interest, *United States v. Alvarez*, 567 U.S. 709, 725 (2012) (quoting *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011)), and (2) "narrowly tailored to achieve that interest," *Reed*, 576 U.S. at 171 (2015) (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)). Under the "demanding standard" of strict scrutiny, "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *Brown*, 564 U.S. at 799 (quoting *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 818 (2000)).

**1.  The Surveillance and No-Fly Provisions are not "actually necessary" to protect a compelling interest**

The Surveillance and No-Fly Provisions fail strict scrutiny because they are not actually necessary to achieve any compelling government interest. For a restriction to be actually necessary, the government must definitively show that alternative means "would not suffice to achieve its interest." *Alvarez*, 567 U.S. at 726; *see Reynolds v. Middleton*, 779 F.3d 222, 231 (4th Cir. 2015) (emphasizing the state must "*prove* that it actually *tried* other methods to address the problem" before enacting a new law that burdens speech). Defendants cannot do so.

Texas legislators invoked the interests of individual privacy, protection of private property, and the safety of critical facilities to justify Chapter 423, House Bill Analysis for HB 912 (May 7, 2013) at 5,[7] and Defendants have previously cited the same interests, Mot. to Dismiss at 2, 27-28. They cannot show that Chapter 423 is actually necessary to achieving those interests, however,

---

[7] https://hro.house.texas.gov/pdf/ba83r/hb0912.pdf#navpanes=0.

because alternative means enable them to protect the privacy and property of Texans and the safety of critical facilities.

Defendants have a variety of tools to protect the privacy and private property of Texans from overly intrusive or dangerous drone use without Chapter 423. The agencies headed by Defendants Mathis, Chief of Texas Highway Patrol, and McCraw, Director of Texas Department of Public Safety, have interacted with drone operators five times since September 2015, and in each case they relied on Texas' criminal trespass statute, Texas Penal Code § 30.05(a), or the Texas Transportation or Administrative Code, rather than Chapter 423. Hemphill Decl. Ex. A, Pls.' Ex. 1, at 6-7 (Mathis' answers to interrogatories); Hemphill Decl. Ex. B at 6-7 (McCraw's answers to interrogatories). Other laws may also apply when errant drone operators invade legitimate privacy interests. *See, e.g.*, TEX. PENAL CODE ANN §§ 21.15 - .17 (West 2020) (codifying criminal prohibitions on invasive visual recording, unlawful disclosure or promotion of intimate visual material, and voyeurism). Private citizens likewise have a variety of tools to protect their privacy. If a peeping Tom uses a drone to surreptitiously spy on an individual's private activities, for example, a plaintiff could recover under multiple theories, including intrusion upon seclusion. *See Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex. 1993).

Chapter 423 is equally unnecessary to protect safety. If a drone threatens the security of critical facilities, those facilities *already* have legal recourse. *See* TEX. GOV'T CODE §§ 424.051, 424.052 (making it a felony to knowingly damage, impair, or interrupt a critical infrastructure facility).

There is simply no evidence of any unprotected interest addressed by Chapter 423. Lawmakers did not cite a single example of a Texan's safety or privacy actually being threatened by drone use prior to the passage of Chapter 423. Any speculative harm that is hypothetically

unmet by the alternative means available is insufficient to meet the state's burden. *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 543 (1980) ("Mere speculation of harm does not constitute a compelling state interest.").

The summary judgment record establishes that Surveillance and No-Fly Provisions are not actually necessary to achieve the government's stated interests, and they therefore cannot survive strict scrutiny.

### 2.   The Surveillance and No-Fly Provisions are not narrowly tailored

The Surveillance and No-Fly Provisions independently fail strict scrutiny for another reason—they are not narrowly tailored to address the interests the government claims. When a law "affect[s] First Amendment rights" in its pursuit of "legitimate" government interests, it must use "means that are neither seriously underinclusive nor seriously overinclusive." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 805 (2011). The Surveillance and No-Fly Provisions are overinclusive because they apply even where the government's stated interests are not implicated, and they are underinclusive because they exempt numerous speakers who could threaten the state's speculative privacy or safety concerns to the same extent as others. By prohibiting actions that could not harm the government's interests and exempting others that could, Chapter 423 is simultaneously overinclusive and underinclusive and thus doubly fails narrow tailoring.

#### a.   *The Surveillance and No-Fly Provisions are overinclusive and unconstitutionally overbroad*

The Surveillance and No-Fly Provisions fail strict scrutiny because they are overinclusive and, for the same reasons, they are also unconstitutionally overbroad. A law is unconstitutionally overinclusive if it "unnecessarily circumscribe[s] protected expression," *Republican Party of Minn. v. White*, 536 U.S. 765, 775 (2002)). The enormous sweep of the Surveillance Provisions bars much more activity than necessary to meet the state's claimed purpose of protecting privacy.

The Surveillance Provisions forbid the use of drones to gather the news on the 95 percent of the state that is privately owned[8]—and even in the publicly owned parts of the state if private property is incidentally visible in a drone-shot photograph or video. *See* TEX. GOV'T CODE § 423.003. It prevents journalists from using drones to record many scenes that could be recorded from a helicopter, or that anyone standing on public property could easily see and record. Images showing such newsworthy things as an apartment fire or illegal dumping site are off-limits under the Surveillance Provisions if the locations sit on private property, even if they can be seen from public property. As photojournalist Brandon Wade objects, "even if I am physically over public property, I am violating the law by documenting private real property or a person on that property." Wade Decl., Pls.' Ex. 7, ¶ 21(c). Far from being narrowly tailored to protect privacy, this wide-ranging prohibition bars drone recording of most of Texas, including many locations where people have no reasonable expectation of privacy because they can be viewed by anyone standing on nearby public property. Thus, the statute is a textbook example of an overinclusive restriction that "unnecessarily circumscribe[s] protected expression." *Republican Party of Minn.*, 536 U.S. at 775.[9]

The No-Fly Provisions are similarly overinclusive because they bar drone use over sites even at times when a drone indisputably does not pose the risks that the State claims. For example, assuming the State's rationale for prohibiting drone flights over stadiums is for the safety of crowds

---

[8] *See* Inst. Renewable. Nat. Res., *Texas Land Trends*, Tex. A&M, https://txlandtrends.org/files/lt-2014-fact-sheet.pdf.

[9] The Surveillance Provisions are overinclusive for the additional reason that they inhibit citizens from exercising the right to record police activity. The First Amendment protects the right to record the actions of the police, "subject only to reasonable time, place, and manner restrictions" that are "narrowly tailored to serve a significant governmental interest." *Turner v. Lieutenant Driver*, 848 F.3d 678, 688-90 (5th Cir. 2017). The Surveillance Provisions curtail this essential right by prohibiting drone recording of police anywhere but on public property. TEX. GOV'T CODE §§ 423.002(a)(6), 423.002(a)(15), 423.003 (barring images of "any individual" on private property who has not consented).

in attendance, then there is no reason to also prohibit drones over empty stadiums; yet that is exactly what the No-Fly Provisions do. Further, far from improving safety, the inability to use drones to report on infrastructure failures prevents the public from understanding those problems and makes the public less safe.

For the same reasons that the provisions are too broad to meet narrow tailoring, they are unconstitutional under the First Amendment overbreadth doctrine. Under that doctrine, "a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 449, n.6 (2008)). The Surveillance and No-Fly Provisions are unconstitutionally overbroad; they criminalize a large amount of newsgathering that enjoys First Amendment protection. This presents an additional, independent reason the statute is unconstitutional. *See United States v. Williams*, 553 U.S. 285, 292 (2008) ("[A] statute is facially invalid if it prohibits a substantial amount of protected speech.").

### b. The Surveillance and No-Fly Provisions are underinclusive

Both the Surveillance and No-Fly Provisions are also underinclusive—a flaw independently sufficient to render them unconstitutional—because they carve out exemptions allowing a wide array of drone users to engage in activity that implicates the same interests, in the same way as drone photojournalism, that the state says it was trying to protect. As a result, Chapter 423 "leav[es] appreciable damage to [the government's] interest unprohibited." *Reed*, 576 U.S. at 172 (quotation omitted). By failing to regulate large amounts of conduct that pose the same purported threats as newsgathering would to the state's claimed interests, the provisions are impermissibly underinclusive.

25

The Surveillance Provisions contain twenty-one exceptions, including exceptions for images captured "for the purpose of professional or scholarly research and development," or in connection with oil pipeline safety, or for insurance underwriting. TEX. GOV'T CODE § 423.002. Such uses implicate the same privacy concerns as newsgathering would. This "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint," *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 802 (2011), and inadequately protect Texas's purported privacy interests.

The No-Fly Provisions are underinclusive because they exempt the ambiguous and sweeping category of drone operation for a "commercial purpose." TEX. GOV'T. CODE § 423.0045(c). This vague and expansive exception undermines any interest in privacy or safety the government might proport to advance. Surely, safety and privacy are no less implicated when Amazon, a company with a history of privacy issues, begins flying drones for "commercial purpose[s]." *See* Amazon Prime Air, Amazon.com, https://www.amazon.com/Amazon-Prime-Air/b?ie=UTF8&node=8037720011 (videos and frequently asked questions describing Amazon's drone delivery program); Betsy Morris, *Amazon is Accused of Violating Kids' Privacy With Smart Speakers*, THE WALL STREET JOURNAL, May 9, 2019, https://www.wsj.com/articles/amazon-is-accused-of-violating-kids-privacy-with-smart-speakers-11557374460. Indeed, as this Court previously stated, these exceptions "raise[] questions as to how these government interests could be threatened by newsgathering but not by commercial interests." Order at 24. They could not. The government's interests were threatened no more when Wade was hired by the Texas Rangers to take drone images of their new baseball stadium for commercial purposes than when he tried to do the same thing for journalism purposes. *See* Wade Decl., Pls.' Ex. 7, ¶¶ 22-26. Chapter 423 is

fatally underinclusive by carving out from enforcement all of its many exceptions. For that reason, and for the independent reason that it is also fatally overinclusive, Chapter 423 fails narrow tailoring and must be struck down.

### C.  Even Under Intermediate Scrutiny, the No-Fly Provisions Should Be Struck

Even if the No-Fly Provisions did not require strict scrutiny, they would still be subject to intermediate scrutiny because, at minimum, they impose "incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). As shown above, *supra* Part I.A.2, the No-Fly Provisions limit speech. This alone makes them subject to intermediate scrutiny. *O'Brien*, 391 U.S. at 376. "Under intermediate scrutiny, regulation is only permissible if the government has the power to enact the regulation and the regulation (1) furthers an important or substantial government interest that is (2) unrelated to the suppression of free expression and (3) narrowly tailored to advance that interest." Order at 23 (citing *O'Brien*). The No-Fly Provisions fail each prong of the *O'Brien* intermediate scrutiny test.

First, the No-Fly Provisions do not sufficiently further substantial government interests. It is difficult to imagine how the provisions could further a privacy interest by restricting flights over areas where there is no reasonable expectation of privacy, such as a sports venue with a capacity of over 30,000 people, or industrial facilities, dams, and concentrated animal feeding operations— including those facilities that would be visible from public property, or from an airplane or helicopter. *See* Tex. Gov't Code §§ 423.0045(a), 423.0046(a). As for public safety, Texas already has statutes protecting critical infrastructure. *See* Tex. Gov't Code §§ 424.051, 424.052 (making it a felony to knowingly damage, impair, or interrupt a critical infrastructure facility). There is no unmet interest that the No-Fly Provisions meet.

Second, the No-Fly Provisions are related to the suppression of expression. The Provisions advance privacy only by suppressing expressive newsgathering and photography—it is that very

observation or recording that makes the state worried about privacy. The primary difference between the state's pre-existing statutes protecting critical infrastructure and the No-Fly Provisions is that Chapter 423 doesn't prevent damaging or impacting the safety of critical infrastructure; it prohibits gathering information about critical infrastructure. *See* Calzada Decl., Pls.' Ex. 4, ¶ 22 (reporting on series of failing dams that qualify as critical infrastructure under § 423.0045(1-a)(xii)); *see also* Peggy O'Hare, *Aging steel suspected in dam failure at Lake Dunlap*, SAN ANTONIO EXPRESS-NEWS, May 16, 2019.[10]

Finally, the No-Fly Provisions are underinclusive and hence not narrowly tailored because they exempt drone operation for a "commercial purpose." TEX. GOV'T. CODE § 423.0045(c). As discussed above, *see supra*, Part I.B.2.b, any risks conceivably posed by using drones for newsgathering would exist in the same way for drones used for commercial purposes. As a result, even if the No-Fly Provisions are subject only to intermediate scrutiny, they must be struck down because they fail the *O'Brien* test.

## II.     THE SURVEILLANCE AND NO-FLY PROVISIONS ARE UNCONSTITUTIONALLY VAGUE

Both the Surveillance and No-Fly Provisions are unconstitutionally vague, as they fail to define what constitutes impermissible "surveillance" or permitted "commercial purposes." When a "law 'threatens to inhibit the exercise of'" First Amendment rights—as Chapter 423 does here[11]—courts in the Fifth Circuit apply the "stringent vagueness test" described in *Women's Medical Center. Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008); *see*

---

[10] https://www.expressnews.com/news/local/article/Aging-steel-suspected-in-dam-failure-at-Lake-13852316.php#photo-17468924.

[11] The state has already conceded, in a state court case challenging Chapter 423, that at least one part of the Surveillance Provisions "purports to prohibit speech: it is a misdemeanor to disclose or display an image that someone has captured illegally in violation of § 423.003." Hemphill Decl. Ex. E, Pls.' Ex. 1, at 10 n.2 (Amicus Brief of the State of Texas, *Clay Kolle. et al., v. K&K Inez Properties*, *LLC et al.*, Cause No. 17-11-81926-BB (135th Dist. Ct., Victoria County, Tex., Aug. 26, 2020)).

*Women's Med. Ctr. v. Bell,* 248 F.3d 411, 421 (5th Cir. 2001); *see also SEIU, Local 5 v. City of Hous.*, 595 F.3d 588, 596 (5th Cir. 2010) ("Because the First Amendment needs 'breathing space,' government regulation must be drawn with some specificity." (quoting *Howard Gault Co. v. Tex. Rural Legal Aid, Inc.*, 848 F.2d 544, 559 (5th Cir. 1988))). Such uncertainty is also prohibited by the Fourteenth Amendment, particularly where First Amendment rights are at stake. "The Fourteenth Amendment's guarantee of Due Process proscribes laws so vague that persons of common intelligence must necessarily guess at their meaning and differ as to their application." *Women's Med. Ctr.,* 248 F.3d at 421 (cleaned up).

A statute is unconstitutionally vague if it "(1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Women's Med. Ctr.*, 248 F.3d at 421; *see also Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972). Put simply, this "test demands that statutes affecting speech explain precisely what conduct they are proscribing." Order at 20. Chapter 423's two vague terms—"surveillance" and "commercial"—fail both prongs.

### A.  Vague Terms in Both Provisions Fail to Provide Notice to Newsgatherers

The statute's vague terms fail to provide "fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also Int'l Soc'y for Krishna Consciousness v. Eaves,* 601 F.2d 809, 820 (5th Cir. 1979) (law restricting any activity that would "obstruct, delay, or interfere with the free movements . . . or impede the conduct of any authorized business at the Airport" was unconstitutionally vague because it "forced [religious solicitors] to steer wide of any possible violation lest they be unwittingly ensnared" (internal quotations omitted)). They do not meet the *Women's Medical Center* requirement to "provide those targeted

29

by the statute"—here, journalists—"a reasonable opportunity to know what conduct is prohibited." *Women's Med. Ctr.*, 248 F.3d at 421.

### 1. The term "surveillance" is unconstitutionally vague

The Surveillance Provisions do not define the term "surveillance," and neither dictionaries nor the Defendants provide a clear definition, leaving Plaintiffs and other journalists uncertain about what conduct is prohibited. The myriad dictionary definitions of "surveillance" provide no clarity. Surveillance can involve "close observation or listening of a person or place in the hope of gathering evidence." *Surveillance*, BLACK'S LAW DICTIONARY (11th ed. 2019). Or it might be as broad as the "act of observing or the condition of being observed." *Surveillance*, AMERICAN HERITAGE DICTIONARY (2019), www.ahdictionary.com. Either might include journalism—the definitions do not resolve the vagueness.

Defendants are responsible for enforcing the criminal penalties of the Surveillance Provisions, but in their Motion to Dismiss, they "never [took] a stance on whether the activities at issue would be prohibited by the Surveillance Provisions." Order at 21. They still do not. Asked in discovery whether journalism constituted surveillance for purposes of Chapter 423, Defendant Mathis, who is Chief of Texas Highway Patrol, responded that "'journalism' . . . may or may not constitute 'surveillance,'" and considered the question "dependent on factual determinations by a jury." Hemphill Decl. Ex. A, Pls.' Ex. 1, at 8 (Mathis' answers to interrogatories). Defendant McCraw, Director of Texas Department of Public Safety, said the same thing. Hemphill Decl. Ex. B at 8 (McCraw's answers to interrogatories). They offered no further details. If a journalist must first be arrested and stand trial until verdict before learning whether their newsgathering constituted illegal "surveillance," the law is impermissibly vague.

If Texas law enforcement cannot exclude journalism from the definition of "surveillance" as used in the statute, it is unsurprising that journalists worry the definition includes their work. Brandon Wade, an NPPA member and freelance photojournalist, said that the dictionary definition of the word "surveillance" could be construed "broad[ly] enough to include [his] work as a journalist," which has led him to assume out of caution that Chapter 423 applies to his use of drones. Wade Decl., Pls.' Ex. 7, ¶¶ 10-12. The same uncertainty about the definition of "surveillance" has caused Calzada to be "very wary" to fly his drone. Calzada Decl., Pls.' Ex. 4, ¶ 17. *The Dallas Morning News* has a policy against using drones for journalism at all. Wade Decl., Pls.' Ex. 7, ¶¶ 14-17. And Plaintiff Pappalardo has testified to being "concerned that using a [drone] for journalistic purposes would put [him] at risk of criminal penalties and subject [him] to liability in a civil lawsuit." Pappalardo Decl., Pls.' Ex. 5, ¶ 5. As a result, he has "not flown the drone to report any stories in Texas, including many that would have carried great urgency or public importance." Pappalardo Decl., Pls.' Ex. 5, ¶ 11.

These journalists' decisions to scale back or forgo their use of drones for newsgathering highlights one of the pernicious results of a vague statute in the First Amendment context: its chilling effect. *See Roark & Hardee LP*, 522 F.3d at 552. For example, Plaintiff Pappalardo would have used his drone to capture images and video for various news stories addressing topics such as government removal of homeless encampments, the route of a proposed toll road near the Trinity River, and the removal of Confederate statues from public parks, but did not because of Chapter 423. Pappalardo Decl., Pls.' Ex. 5, ¶ 14. His uncertainty about whether that reporting would be "surveillance" is understandable. Pappalardo Decl., Pls.' Ex. 5, ¶ 5. Photographing the removal of homeless encampments would arguably be "close observation" in order to "gather[] evidence." *Surveillance*, BLACK'S LAW DICTIONARY (11th ed. 2019). Plaintiff Calzada similarly

believes that under Chapter 423, "using a UAS for journalistic purposes would put [him] at risk of criminal penalties, and subject [him] to liability in a civil lawsuit," and he is therefore "very wary when [flying his drone], and choose[s] not to fly if law enforcement is anywhere in the vicinity." Calzada Decl., Pls.' Ex. 4, ¶ 17. He says his journalism has been "chilled" by Chapter 423 "by causing [him] to be at risk of civil and criminal liability when [he] photograph[s] important scenes related to news stories using [his] UAS." Calzada Decl., Pls.' Ex. 4, ¶ 23.

As this Court has already stated, the "multiple possible broad dictionary definitions" of "surveillance," combined with "no clarity offered from Defendants," Order at 21-22, underscores the unconstitutional vagueness of the provisions.

### 2.  The term "commercial" is unconstitutionally vague

The No-Fly Provisions exempt "commercial" drone use yet fail to say what qualifies as "commercial." As with "surveillance," this ambiguity unconstitutionally deprives newsgatherers of a reasonable opportunity to know whether the exercise of their First Amendment-protected newsgathering rights will subject them to criminal prosecution or civil liability.

The provisions exempt operators of "unmanned aircraft that [are] being used for a commercial purpose." Tex. Gov't. Code §§ 423.0045(c)(1)(E); 423.0046(c)(5). Yet they fail to define "commercial purposes," and—as this Court observed—dictionary definitions "do not provide clear guidance on whether photojournalism is included." Order at 24. "Commercial" might refer merely to the "buying and selling of goods," *Commercial,* Black's Law Dictionary (11th ed. 2019), or it might refer to any moneymaking enterprise, *see, e.g.*, Cambridge Academic Content Dictionary; MacMillan Dictionary. The former would likely exclude newsgathering from the commercial exemption, but the latter may include newsgathering. Other context is no help. Part 107 of the Federal Aviation Regulations, which governs the use of drones

32

for news photography, does not use or define the term "commercial." *See* 14 C.F.R. pt. 107. Within the industry, photojournalism is expressly excluded from "commercial" photography and is instead considered "editorial" photography. Ramsess Decl., Pls.' Ex. 6, ¶ 5; Wade Decl., Pls.' Ex. 7, ¶ 11. Considering industry terms and dictionary definitions, there is no common understanding of "commercial" that either clearly includes or exempts members of the news media.

Once again, the Defendants cannot define "commercial" in this context. Mathis and McCraw each said—with no further details—that journalism "may or may not constitute activity undertaken for a 'commercial purpose' depending on the facts and circumstances of the alleged conduct, including the intent of the alleged actor." Hemphill Decl. Ex. A, Pls.' Ex. 1, at 10 (Mathis' answers to interrogatories); Hemphill Decl. Ex. B at 10 (McCraw's answers to interrogatories). Defendant Mau, asked if journalism constitutes a "commercial purpose," said that he "has never contended one way or the other as to what constitutes a 'commercial purpose' for the purpose of this statute." Hemphill Decl. Ex. C at 9 (Mau's answers to interrogatories).

The statute provides no guidance as to what conduct is "commercial" and therefore exempt from its restrictions, resulting in an "unanswered legal question about whether [Plaintiffs'] conduct [is] prohibited by the No-Fly Provisions." Order at 24. In the absence of clarity as to whether or not Chapter 423 exempts newsgathering, the declarants and other journalists have curtailed their First Amendment activity.

### B.  Chapter 423's Vagueness Makes It Susceptible to Discretionary Enforcement

The vagueness of "surveillance" and "commercial" not only leaves members of the press uncertain about how to comply, but it also risks arbitrary and discriminatory enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (noting that vagueness can vest indefinite discretion in law enforcement). Predictable, consistent, and nondiscriminatory enforcement is even more crucial in a First Amendment context, where there is a risk that police and prosecutors could use

vague laws to target speakers they disagree with. *See Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750 (1988); *Smith v. Goguen,* 415 U.S. 566 (1974). But "it is not clear what is or is not criminalized or prohibited under the provisions." Order at 22. Chapter 423 is unconstitutional because it "is so indefinite that it allows arbitrary and discriminatory enforcement." *Women's Med. Ctr.*, 248 F.3d at 421. Here, Defendants admitted they do not know whether journalism constitutes "surveillance" or a "commercial activity." Hemphill Decl. Ex. A, Pls.' Ex. 1, at 8, 10 (Mathis' answers to interrogatories); Hemphill Decl. Ex. B at 8, 10 (McCraw's answers to interrogatories); Hemphill Decl. Ex. C at 9 (Mau's answers to interrogatories). Without explicit guidance as to whether or not Chapter 423 bars the use of drones for newsgathering, law enforcement can arbitrarily enforce, or threaten to enforce, the Surveillance Provisions against newsgatherers.

Given the Surveillance and No-Fly Provisions' undefined terms, and the accompanying risks of arbitrary enforcement or chilled speech, the provisions are unconstitutionally vague.

## III.   PLAINTIFFS HAVE STANDING TO CHALLENGE CHAPTER 423

Plaintiffs have standing to challenge the constitutionality of Chapter 423. This Court already concluded that the allegations in their Complaint were sufficient to establish standing at the motion to dismiss stage. Order at 15 ("Plaintiffs have sufficiently pled facts to demonstrate NPPA has organizational and associational standing, and that Pappalardo has standing as an individual."). Now, the record facts confirm their standing. There is no dispute as to any fact underlying Plaintiff Pappalardo's individual standing or the associational and organizational standing of Plaintiffs NPPA and TPA.

### A.   Plaintiff Pappalardo's First Amendment Injury Gives Him Standing

Plaintiff Pappalardo sufficiently pleaded an Article III injury-in-fact because he has stopped using his drone for newsgathering in Texas altogether "for fear of facing criminal or civil liability." Pappalardo Decl., Pls.' Ex. 5, ¶¶ 10, 16. But for Chapter 423, Pappalardo would have

used his drone to report on several newsworthy stories, including panic at the gas pumps in the aftermath of Hurricane Harvey, house fires, construction projects, and urban sprawl. Pappalardo Decl., Pls.' Ex. 5, ¶ 14. And but for Chapter 423, he would use his drone for future reporting, including stories about illegal poaching in urban areas and gridlock hampering first responders. Pappalardo Decl., Pls.' Ex. 5, ¶ 14. As a result, the undisputed facts demonstrate that Pappalardo has suffered an injury caused by Chapter 423. *See Shields v. Babbitt*, 229 F. Supp. 2d 638, 654 (2000) (where a party must "forego possibly lawful activity because of his well-founded fear of prosecution," an injury has been suffered).

As for redressability, Defendants McCraw, Mathis, and Mau are all indisputably responsible for enforcing the criminal provisions of Chapter 423. Defendants have conceded that Mau has prosecutorial authority. *See* Order at 14.

### B.     Plaintiff NPPA and TPA Have Associational Standing

The undisputed facts also establish that NPPA and TPA have associational standing. "[A]n association has standing to bring suit on behalf of its members when: [1] its members would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *United Food & Commer. Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). NPPA and TPA meet all three requirements.[12]

*First*, NPPA members Brandon Wade and Guillermo Calzada would have standing in their own right. Wade self-censored his drone photography out of fear of liability under Chapter 423.

---

[12] Of course, the Court noted in its prior decision that Plaintiffs need not rely on TPA's standing because "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." Order at 12 n.4 (quoting *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006)).

Wade Decl., Pls.' Ex. 7, ¶ 31. As a result of Wade's reasonable fear that operating his drone could subject him to criminal penalties under Chapter 423, his newsgathering activities have been chilled and continue to be chilled. Wade Decl., Pls.' Ex. 7, ¶ 13 ("Ch. 423 has chilled my First Amendment news gathering efforts by preventing me from photographing important scenes related to news stories using my UAS."); Wade Decl., Pls.' Ex. 7, ¶ 32 ("It is clear that the existence of Ch. 423 will continue to interfere with my reporting in the future."). He lost a series of assignments, which would have earned him several thousand dollars, because of Chapter 423. Wade Decl., Pls.' Ex. 7, ¶ 15. Similarly, Calzada's newsgathering activities have been chilled since he was approached by San Marcos police in 2018 when he was told he was violating state law for his use of a drone. Calzada Decl., Pls.' Ex. 4, ¶¶ 8-12. As a result of the ambiguity of Chapter 423, he has limited his use of drones to gather the news. Calzada Decl., Pls.' Ex. 4, ¶ 23 ("Ch. 423 has chilled me by causing me to be at risk of civil and criminal liability when I photograph important scenes related to news stories using my [drone]."). Calzada and Wade's experiences establish the first requirement for NPPA's associational standing.

Similarly, Plaintiff TPA's member newspapers have suffered harm caused by Chapter 423. For example, in response to Chapter 423, TPA member *The Dallas Morning News* has been forced to adopt a policy against drone use by staff or freelance photographers on assignment, and specifically avoided publishing photos by Brandon Wade captured by a drone for fear of violating the law. Wade Decl., Pls.' Ex. 7, ¶¶ 14-17. The second and third prongs of the associational standing test apply for TPA in the same way they apply for NPPA. These harms, too, are sufficient to satisfy the first standing requirement.

*Second*, the interest NPPA and TPA seek to vindicate—the right of journalists to use drones as a tool to engage in their First Amendment-protected newsgathering—is clearly germane to the

organizations' purposes. NPPA's mission is supporting and advocating for visual journalists and promoting excellence in the profession. Ramsess Decl., Pls.' Ex. 6, ¶ 11. TPA "promotes the welfare of Texas newspapers, encourages higher standards of journalism, and plays an important role in protecting the public's right to know as an advocate of First Amendment liberties." Baggett Decl., Pls.' Ex. 2, ¶ 2.

*Third*, as a facial challenge to Chapter 423, this lawsuit does not require participation of the individual members. *See United Food & Commer. Workers Union Local 751*, 517 U.S. at 546 ("'[I]ndividual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members." (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977))). Accordingly, having met all three prongs, NPPA and TPA can properly assert associational standing.

### C.     Plaintiffs NPPA and TPA Also Have Organizational Standing

Additionally, NPPA and TPA meet the requirements for organizational standing. An organization can establish standing on its own if it "meets the same standing test that applies to individuals." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 609-14 (5th Cir. 2017). The record demonstrates that NPPA's attorneys have spent hours researching First Amendment protections, meeting with lawmakers in an attempt to revise the provisions of Chapter 423, and counseling members about the Chapter 423 provisions. Ramsess Decl., Pls.' Ex. 6, ¶¶ 12, 16-17. This diversion of NPPA's resources to address the effects of Chapter 423 provisions sufficiently demonstrates an injury. *Steward v. Abbott*, 189 F. Supp. 3d 620 (W.D. Tex. 2016) ("Organizations that seek to establish standing in their own right may satisfy the injury-in-fact requirement by showing a diversion of their resources."). TPA has similarly been required to devote time and resources to discussing Chapter 423 with its members, and it distributed literature regarding the statute to inform its members. Baggett Decl., Pls.' Ex. 2, ¶ 5.

In sum, Chapter 423's provisions are causing NPPA and TPA to divert resources and are inflicting ongoing harms. Enjoining enforcement of those provisions would remedy those harms. NPPA and TPA thus satisfy the causation and redressability requirements of standing.

NPPA and TPA meet the standards for organizational and associational standing, and the Court should grant them the remedy they seek through this summary judgment motion.

## CONCLUSION

The Surveillance and No-Fly Provisions of Chapter 423 unconstitutionally burden Plaintiffs' First and Fourteenth Amendment rights. Accordingly, the Court should grant Plaintiffs' motion for summary judgment, issue a declaratory judgment that Chapter 423 violates Plaintiffs' rights under the First and Fourteenth Amendments; declare that Sections 423.002, 423.003, 423.004, 423.0045, 423.0046, and 423.006 of Chapter 423—the Surveillance and No-Fly Provisions—are unconstitutional; enjoin the Defendants, as well as their officers, agents, employees, attorneys, and all persons in active concert or participation with them, from enforcing the challenged statute; and award Plaintiffs reasonably attorneys' fees, and all other costs allowed pursuant to 42 U.S.C. § 1988(b).

Dated: July 9, 2021

Respectfully submitted,

By: /s/ *James A. Hemphill*
James A. Hemphill
Texas State Bar No. 00787674
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Ave., Suite 2700
Austin, Texas 78701
Tel: (512) 480-5762
Fax: (512) 536-9907
jhemphill@gdhm.com

Leah M. Nicholls (*pro hac vice*)
DC Bar No. 982730
Public Justice P.C.

1620 L Street NW, Suite 630
Washington, DC 20036
Tel: (202) 797-8600
lnicholls@publicjustice.net

David A. Schulz (*pro hac vice*)
NY State Bar No. 1514751
Media Freedom and Information
    Access Clinic
Yale Law School
127 Wall Street
New Haven, CT 06511
Tel: (212) 850-6103
Fax: (212) 223-1942
david.schulz@yale.edu

Mickey H. Osterreicher (*pro hac vice
    pending*)
New York State Bar No. 2938678
General Counsel
National Press Photographers
    Association
Finnerty Osterreicher & Abdulla
70 Niagara Street
Buffalo, NY 14202
Tel: (716) 983-7800
Fax: (716) 608-1509
lawyer@nppa.org

Alicia Wagner Calzada
Texas State Bar No. 24076296
Deputy General Counsel
National Press Photographers
    Association
Alicia Wagner Calzada, PLLC
12023 Radium, Suite B1
San Antonio, TX 78216
Tel: (210) 825-1449
Alicia@calzadalegal.com

**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS | § | |
| ASSOCIATION, TEXAS PRESS ASSOCIATION, | § | |
| and JOSEPH PAPPALARDO, | § | |
| Plaintiffs, | § | |
| | § | |
| *v.* | § | CIVIL ACTION NO. |
| | § | 1:19-CV-00946-RP |
| STEVEN MCCRAW, in his official capacity as | § | |
| Director of Texas Department of Public Safety, | § | |
| DWIGHT MATHIS, in his official capacity as | § | |
| Chief of the Texas Highway Patrol, and | § | |
| WES MAU, in his official capacity as | § | |
| District Attorney of Hays County, Texas, | § | |
| Defendants. | § | |

## EXHIBITS TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

| Pls.' Ex # | Exhibit |
|---|---|
| 1 | Hemphill Declaration and accompanying Exhibits A – E |
| 2 | Baggett Declaration |
| 3 | Baranetsky Declaration |
| 4 | Calzada Declaration and accompanying Exhibits A – D |
| 5 | Pappalardo Declaration |
| 6 | Ramsess Declaration |
| 7 | Wade Declaration and accompanying Exhibits A – C |

**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS | § | |
| ASSOCIATION, TEXAS PRESS ASSOCIATION, | § | |
| and JOSEPH PAPPALARDO, | § | |
| Plaintiffs, | § | |
| | § | |
| *v.* | § | CIVIL ACTION NO. |
| | § | 1:19-CV-00946-RP |
| STEVEN MCCRAW, in his official capacity as | § | |
| Director of Texas Department of Public Safety, | § | |
| DWIGHT MATHIS, in his official capacity as | § | |
| Chief of the Texas Highway Patrol, and | § | |
| WES MAU, in his official capacity as | § | |
| District Attorney of Hays County, Texas, | § | |
| Defendants. | § | |

**DECLARATION OF JIM HEMPHILL**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I submit this declaration to place before the Court the following documents:

A.  Defendant Dwight Mathis' Answers to Plaintiffs' Interrogatories

B.  Defendant Steven McCraw's Answers to Plaintiffs' Interrogatories

C.  Defendant Wes Mau's Answers to Plaintiffs' Interrogatories

D.  Texas Department of Public Safety, Testimony in Response to Senate Committee
    on Business & Commerce Request for Information of September 18, 2020

E.  Amicus Brief of the State of Texas, *Clay Kolle et al., v. K&K Inez Properties*, *LLC
    et al.*, Cause No. 17-11-81926-BB (135th Dist. Ct., Victoria County, Tex., Aug. 26,
    2020).

Documents A, B, and C are true and correct copies of discovery responses served by

Defendants in this case.  Document D is a true and correct copy of a document obtained by an

attorney for the National Press Photographers Association upon a written request to the Senate

Exhibit 1

Committee on Business and Commerce.  Document E is a true and correct copy of an amicus

brief filed in the referenced case, which was served upon counsel for the National Press

Photographers Association because that counsel was on the list to receive electronic service of

pleadings in that case after filing an amicus brief on behalf of the NPPA in that case.

## DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on July 9, 2021.

/s/ James A. Hemphill
James A. Hemphill
Texas State Bar No. 00787674
(512) 480-5762 direct phone
(512) 536-9907 direct fax
jhemphill@gdhm.com
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Ave., Suite 2700
Austin, Texas 78701

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, TEXAS PRESS ASSOCIATION, and JOSEPH PAPPALARDO, *Plaintiffs*, | § § § § § § | |
| v. | § § | **Civil Action No. 1:19-CV-00946-RP** |
| STEVEN MCCRAW, in his official capacity as Director of Texas Department of Public Safety, DWIGHT MATHIS, in his official capacity as Chief of the Texas Highway Patrol, and WES MAU, in his official capacity as District Attorney of Hays County, Texas, *Defendants*. | § § § § § § § | |

## DEFENDANT DWIGHT MATHIS'S ANSWERS TO
## PLAINTIFFS' FIRST SET OF INTERROGATORIES

TO:   Plaintiffs, by and through their attorneys of record, David A. Schulz, Media Freedom and Information Access Clinic, Yale Law School 127 Wall Street, New Haven, CT 06511; James A. Hemphill, Graves, Dougherty, Hearon & Moody, P.C. 401 Congress Ave., Suite 2700, Austin, TX 78701; Leslie A. Brueckner Public Justice P.C., 475 14th Street, Suite 610, Oakland, CA 94612; and Leah M. Nicholls Public Justice P.C., 1620 L Street NW, Suite 630, Washington, DC 20036

Pursuant to Federal Rules of Civil Procedure 26 and 33, Defendant Dwight Mathis, in his official capacity as Chief of the Texas Highway Patrol, submits his Responses to Plaintiffs' First Set of Interrogatories in the above-captioned matter.

1

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief, General Litigation Division

*/s/ Christopher D. Hilton*
CHRISTOPHER D. HILTON
Texas Bar No. 24087727
Deputy Chief
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120
FAX: (512) 320-0667
christopher.hilton@oag.texas.gov

***Counsel for Defendant Dwight Mathis***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served via email on this the 4th day of May, 2021, to all counsel of record.

*/s/ Christopher D. Hilton*
Christopher D. Hilton

2

## OBJECTIONS

Defendant objects to Plaintiffs' instructions and definitions to the extent that they purport to impose obligations on Defendant beyond what is required by the Federal Rules of Civil Procedure and other applicable law. Defendant responds only to the extent required by law.

Defendant objects to the definitions of "record," "describe," and "identify" as being overly broad and unduly burdensome to the extent that they purport to require Defendant to go beyond the obligations imposed by the Federal Rules of Civil Procedure and other applicable law in answering Plaintiffs' discovery requests. Defendant responds only to the extent required by law.

Defendant reserves all objections not explicitly stated herein or inadvertently omitted.

## INTERROGATORIES

**INTERROGATORY NO. 1:**

1.      State the number and location of crashes or accidents that have occurred September 1, 2015, to the present involving drones for which the Department of Public Safety has records and indicate which of those crashes or accidents involved FAA-certified drone pilots.

**ANSWER:**

The foregoing preliminary objections are incorporated herein as if expressly restated in full.

Defendant further objects to this interrogatory to the extent that it calls for information about drones that are operated by law enforcement personnel and by Defendant and Defendant's officers in the course of official business as being vague, ambiguous, and overly broad, and subject to interpretations that call for irrelevant and non-discoverable information, are unduly burdensome, and are not proportional to the needs of the case. Defendant understands this interrogatory to be directed towards crashes or accidents that involved drone use by individuals other than Defendant's officers, Defendant's employees, or any other law enforcement or government agency for their own official business.

Defendant further objects to this interrogatory to the extent that it could be construed as calling for privileged information, including but not limited to the attorney-client privilege, the work product doctrine, the deliberative process privilege, any and all law enforcement investigative privileges, any and all executive or legislative privileges, and other privileges established by law.

Subject to the foregoing objections, and without waiving same, Defendant has no information regarding such incidents.

**INTERROGATORY NO. 2:**

2.      State number and location of crashes or accidents occurring between September 1, 2013 and September 1, 2015, resulting from drones operated over each of the following: sports venues as defined in TEX. GOV'T CODE § 423.0046, correctional facilities, animal feedlots, critical infrastructure facilities as defined in TEX. GOV'T CODE § 423.0045, and government buildings. Also identify which of these involved FAA-certified drone pilots.

**ANSWER:**

The foregoing preliminary objections are incorporated herein as if expressly restated in full.

Defendant further objects to this interrogatory to the extent that it calls for information about drones that are operated by law enforcement personnel and by Defendant and Defendant's officers in the course of official business as being vague, ambiguous, and overly broad, and subject to interpretations that call for irrelevant and non-discoverable information, are unduly burdensome, and are not proportional to the needs of the case. Defendant understands this interrogatory to be directed towards crashes or accidents that involved drone use by individuals other than Defendant's officers, Defendant's employees, or any other law enforcement or government agency for their own official business.

Defendant further objects to this interrogatory to the extent that it could be construed as calling for privileged information, including but not limited to the attorney-client privilege, the work product doctrine, the deliberative process privilege, any and all law enforcement investigative privileges, any and all executive or legislative privileges, and other privileges established by law.

Subject to the foregoing objections, and without waiving same, Defendant has no information regarding such incidents.

**INTERROGATORY NO. 3:**

3.      State how many arrests, if any, have been made under Chapter 423 for each month since

its passage.

**ANSWER:**

The foregoing preliminary objections are incorporated herein as if expressly restated in full.

Defendant further objects to this interrogatory to the extent that it could be construed as calling for privileged information, including but not limited to the attorney-client privilege, the work product doctrine, the deliberative process privilege, any and all law enforcement investigative privileges, any and all executive or legislative privileges, and other privileges established by law.

Subject to the foregoing objections, and without waiving same, Defendant's officers or employees have made no such arrests.

**INTERROGATORY NO. 4:**

4.      Identify any instances from September 1, 2015, to the present in which officers of the

Department of Public Safety or its law enforcement sub-agencies have interacted with a drone

operator, or received complaints regarding possible violations of Chapter 423, and describe the circumstances and contents of each such interaction and/or complaint, including but not limited to the occupation of the drone operator, the way in which the drone was being used, and any instructions given by law enforcement to the drone operator.

**ANSWER:**

The foregoing preliminary objections are incorporated herein as if expressly restated in full.

Defendant further objects to this interrogatory to the extent that it calls for information about drones that are operated by law enforcement personnel and by Defendant and Defendant's officers in the course of official business as being vague, ambiguous, and overly broad, and subject to interpretations that call for irrelevant and non-discoverable information, are unduly burdensome, and are not proportional to the needs of the case. Defendant understands this interrogatory to be directed towards crashes or accidents that involved drone use by individuals other than Defendant's officers, Defendant's employees, or any other law enforcement or government agency for their own official business.

Defendant further objects to this interrogatory to the extent that it could be construed as calling for privileged information, including but not limited to the attorney-client privilege, the work product doctrine, the deliberative process privilege, any and all law enforcement investigative privileges, any and all executive or legislative privileges, and other privileges established by law.

Subject to the foregoing objections, and without waiving same, Defendant has record of five interactions with drone operators. In one instance, a drone operator was issued a citation for a motor vehicle violation after being observed flying a drone on the capitol grounds. In all other instances, the drone operators were issued a warning.

Defendant has the following responsive information regarding interactions with drone operators since September 1, 2015:

| Stop Datetime | Ticket Type | County | Roadway | Statute | Violation Description | Notes |
|---|---|---|---|---|---|---|
| 1/12/2016 13:30 | Warning | Travis | 1500 N. CONGRESS CAPITOL BLDG. | TXPC 30.05(A) | Burglary And Criminal Trespass-Misdemeanor | Flying unmanned (drone) |
| 3/13/2018 13:32 | Warning | Travis | LAVACA @ 13TH ST | TXPC 30.05(A) | Burglary And Criminal Trespass-Misdemeanor | DRONE FLIGHT |
| 7/27/2019 2:52 | Citation | Travis | EB E 11TH ST @ CONGRESS AVE | TXTRC 601.191 | Fail to Maintain Financial Responsibility (#) | observed flying drone in Capitol Grounds |

| 7/27/2019 2:52 | Warning | Travis | EB E 11TH ST @ CONGRESS AVE | TXTRC 547.302(A) | Drive Without Lights-when Required | |
|---|---|---|---|---|---|---|
| 5/3/2020 9:30 | Warning | Travis | LOT 27 | | Permit Use Of Unauthorized Radar Equipment | DRONE- LOT 27 - NO PERMIT |
| 4/21/2021 19:50 | Warning | Travis | COLORADO ST @ W 14TH ST | TXTRC 504.945(A)(1)(2)(3) | Display/Obtain Wrong License Plate | |
| 4/21/2021 19:50 | Warning | Travis | COLORADO ST @ W 14TH ST | 37 TXAC 8.21 | All Other Violations - Capitol Complex | INVESTIGATIVE DETENTION BASED ON VIOLATION OF TXAC 8.21, TXAC 8.21 - OPERATING UAV WHERE PROHIBITED |

No other responsive information is available regarding these incidents.

**INTERROGATORY NO. 5:**

5.       If you contend that capturing information, images or data for the purpose of journalism using drones does not constitute "surveillance" as used in Chapter 423, please describe (a) the definition of "surveillance" that would support such a result; (b) how the determination in the field is made by officers of the Department of Public Safety or its law enforcement sub-agencies as to whether such use does not constitute "surveillance."

**ANSWER:**

The foregoing preliminary objections are incorporated herein as if expressly restated in full.

Defendant further objects to this interrogatory to the extent that it calls for an answer to an entirely legal question that is not appropriate for factual discovery such as interrogatories, but rather must be addressed through briefing and argument to the Court. Moreover, Defendant's mission is to protect and serve Texas and ensure public safety in the face of numerous and evolving threats, not to answer hypothetical legal questions in civil litigation, and Defendant does not purport to bind the State with any description or statement. Defendant reserves the right to, through counsel, make any and all legal or factual arguments in connection with the above-captioned litigation.

Defendant further objects to this interrogatory to the extent that it could be construed as calling for privileged information, including but not limited to the attorney-client privilege, the work product doctrine, the deliberative process privilege, any and all law enforcement investigative privileges, any and all executive or legislative privileges, and other privileges established by law.

Subject to the foregoing objections, and without waiving same, Defendant's officers and employees have not had occasion to make any determinations in the field regarding the application of Chapter 423. *See* answer to interrogatory nos. 3-4. Whether particular conduct constitutes "surveillance" as used in Chapter 423 is ultimately a question of law for the Court and, in the context of an individual criminal proceeding, dependent on factual determinations by a jury. "Journalism" as defined in these interrogatories may or may not constitute "surveillance" as used in Chapter 423 depending on the facts and circumstances of the alleged conduct, including the intent of the alleged actor. *See* Tex. Gov't Code §§ 423.002-.004, 423.006. Someone engaging in "journalism" as defined in these interrogatories who does not have "the intent to conduct surveillance" would not be in violation of Chapter 423. *See id.* § 423.003(a).

**INTERROGATORY NO. 6:**

6.          Describe any training officers of the Department of Public Safety or its law enforcement

sub-agencies have received or receive regarding the enforcement of Chapter 423.

**ANSWER:**

The foregoing preliminary objections are incorporated herein as if expressly restated in full.

Defendant further objects to this interrogatory to the extent that it could be construed as calling for privileged information, including but not limited to the attorney-client privilege, the work product doctrine, the deliberative process privilege, any and all law enforcement investigative privileges, any and all executive or legislative privileges, and other privileges established by law.

Subject to the foregoing objections, and without waiving same, Defendant's officers and employees have not received training regarding the enforcement of Chapter 423.

**INTERROGATORY NO. 7:**

7.          Do you contend that capturing information, images or data for purposes of journalism

using a drone above public property, or above private property with the property owner's

permission, violates any provision of Chapter 423 if the information, image or data depicts other

private property? If so, please (a) set forth the basis for such contention in summary fashion, (b)

describe the public interest or interests (if any) that you contend are served by such a contention, and (c) explain how such legitimate public interest or interests could not be served by an interpretation that would allow drone journalism in such a situation.

**ANSWER:**

The foregoing preliminary objections are incorporated herein as if expressly restated in full.

Defendant further objects to this interrogatory to the extent that it calls for an answer to an entirely legal question that is not appropriate for factual discovery such as interrogatories, but rather must be addressed through briefing and argument to the Court. Moreover, Defendant's mission is to protect and serve Texas and ensure public safety in the face of numerous and evolving threats, not to answer hypothetical legal questions in civil litigation, and Defendant does not purport to bind the State with any description or statement. Defendant reserves the right to, through counsel, make any and all legal or factual arguments in connection with the above-captioned litigation.

Defendant further objects to this interrogatory to the extent that it could be construed as calling for privileged information, including but not limited to the attorney-client privilege, the work product doctrine, the deliberative process privilege, any and all law enforcement investigative privileges, any and all executive or legislative privileges, and other privileges established by law.

Subject to the foregoing objections, and without waiving same, Defendant's officers and employees have not had occasion to make any determinations regarding the application of Chapter 423. *See* answer to interrogatory nos. 3-4. Whether particular conduct violates any provision of 423 is ultimately a question of law for the Court and, in the context of an individual criminal proceeding, dependent on factual determinations by a jury. "Journalism" as defined in these interrogatories may or may not constitute a violation of Chapter 423 depending on the facts and circumstances of the alleged conduct, including the intent of the alleged actor. *See* Tex. Gov't Code §§ 423.002-.004, 423.006. Someone engaging in "journalism" as defined in these interrogatories who does not have "the intent to conduct surveillance" would not be in violation of Chapter 423. *See id.* § 423.003(a).

**INTERROGATORY NO. 8:**

8.      Do you contend that capturing information, images or data using drones for the purpose of journalism constitutes a "commercial purpose" as used in TEX. GOV'T CODE §§ 423.0045(c)(1)(E) and 423.0046(c)(5)? If not, please explain the basis for your contention, including without limitation (a) the definition of "commercial purpose" that would support such a

9

result; (b) how the determination is made as to whether drone use constitutes a "commercial purpose"; (c) the legitimate public interest or interests, if any, that you contend would be served by not considering journalism using a drone as a "commercial purpose"; (d) how such legitimate public interest or interests could not be served by a more narrow interpretation that would consider use of a drone for journalism as a "commercial purpose"; and (e) the legitimate public interest, if any, in differentiating between journalism using a drone, on one hand, and the permitted drone usages set forth in TEX. GOV'T CODE §§ 423.0045(c)(1)(E) and 423.0046(c)(5).

**ANSWER:**

The foregoing preliminary objections are incorporated herein as if expressly restated in full.

Defendant further objects to this interrogatory to the extent that it calls for an answer to an entirely legal question that is not appropriate for factual discovery such as interrogatories, but rather must be addressed through briefing and argument to the Court. Moreover, Defendant's mission is to protect and serve Texas and ensure public safety in the face of numerous and evolving threats, not to answer hypothetical legal questions in civil litigation, and Defendant does not purport to bind the State with any description or statement. Defendant reserves the right to, through counsel, make any and all legal or factual arguments in connection with the above-captioned litigation.

Defendant further objects to this interrogatory to the extent that it could be construed as calling for privileged information, including but not limited to the attorney-client privilege, the work product doctrine, the deliberative process privilege, any and all law enforcement investigative privileges, any and all executive or legislative privileges, and other privileges established by law.

Subject to the foregoing objections, and without waiving same, Defendant's officers and employees have not had occasion to make any determinations regarding the application of Chapter 423. *See* answer to interrogatory nos. 3-4. Whether particular conduct is being undertaken for a "commercial purpose" is ultimately a question of law for the Court and, in the context of an individual criminal proceeding, dependent on factual determinations by a jury. "Journalism" as defined in these interrogatories may or may not constitute activity undertaken for a "commercial purpose" depending on the facts and circumstances of the alleged conduct, including the intent of the alleged actor. *See* Tex. Gov't Code §§ 423.002-.004, 423.006. Someone engaging in "journalism" as defined in these interrogatories who does not have "the intent to conduct surveillance" would not be in violation of Chapter 423. *See id.* § 423.003(a).

**INTERROGATORY NO. 9:**

9.      If you contend that there is a reasonable basis for not including using a drone for purposes

of journalism in the list of exceptions to Chapter 423 set forth in TEX. GOV'T CODE § 423.002,

while including the exceptions in subsections 423.002(a)(1), (13) (19), (20), and/or (21), please

set forth in summary form such alleged reasonable basis.

**ANSWER:**

        The foregoing preliminary objections are incorporated herein as if expressly restated in full.

        Defendant further objects to this interrogatory to the extent that it calls for an answer to an
entirely legal question that is not appropriate for factual discovery such as interrogatories, but
rather must be addressed through briefing and argument to the Court. Moreover, Defendant's
mission is to protect and serve Texas and ensure public safety in the face of numerous and evolving
threats, not to answer hypothetical legal questions in civil litigation, and Defendant does not
purport to bind the State with any description or statement. Defendant reserves the right to, through
counsel, make any and all legal or factual arguments in connection with the above-captioned
litigation.

        Defendant further objects to this interrogatory to the extent that it could be construed as
calling for privileged information, including but not limited to the attorney-client privilege, the
work product doctrine, the deliberative process privilege, any and all law enforcement investigative
privileges, any and all executive or legislative privileges, and other privileges established by law.

        Subject to the foregoing objections, and without waiving same, Defendant's mission is to
protect and serve Texas by enforcing the laws as enacted by the Legislature. Defendant makes no
factual or policy contention with respect to the wisdom of including or excluding including any
particular exception in Chapter 423, but reserves the right to, through counsel, make any and all
legal or factual arguments in connection with the above-captioned litigation.

**INTERROGATORY NO. 10:**

10.      Please state how the government interests asserted in Defendants' Motion to Dismiss

(Doc. 19) apply when the drone operator uses a drone for journalism, but do not apply when a

drone operator is either a professor or student engaged in scholarly research or otherwise exempted

under TEX. GOV'T CODE § 423.002.

11

**ANSWER:**

The foregoing preliminary objections are incorporated herein as if expressly restated in full.

Defendant further objects to this interrogatory to the extent that it calls for an answer to an entirely legal question that is not appropriate for factual discovery such as interrogatories, but rather must be addressed through briefing and argument to the Court. Moreover, Defendant's mission is to protect and serve Texas and ensure public safety in the face of numerous and evolving threats, not to answer hypothetical legal questions in civil litigation, and Defendant does not purport to bind the State with any description or statement. Defendant reserves the right to, through counsel, make any and all legal or factual arguments in connection with the above-captioned litigation.

Defendant further objects to this interrogatory as vague and ambiguous because it is unclear what it means for a "government interest" to "apply." The government interests exist independently of any particular provision of Chapter 423, including the exceptions listed in Tex. Gov't Code § 423.002. Whether as a matter of policy any particular governmental interest is arguably supported or undermined by any particular provision in Chapter 423 is the responsibility of the Legislature to determine via its enactments.

Defendant further objects to this interrogatory to the extent that it could be construed as calling for privileged information, including but not limited to the attorney-client privilege, the work product doctrine, the deliberative process privilege, any and all law enforcement investigative privileges, any and all executive or legislative privileges, and other privileges established by law.

Subject to the foregoing objections, and without waiving same, Defendant's mission is to protect and serve Texas by enforcing the laws as enacted by the Legislature. Defendant makes no factual or policy contention with respect to the wisdom of the Legislature's decision-making in enacting Chapter 423, but reserves the right to, through counsel, make any and all legal or factual arguments in connection with the above-captioned litigation. Protecting the interests of individual privacy, property rights, and public safety is consistent with Defendant's mission.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, TEXAS PRESS ASSOCIATION, and JOSEPH PAPPALARDO, <br>   *Plaintiffs*, <br><br> v. <br><br> STEVEN MCCRAW, in his official capacity as Director of Texas Department of Public Safety, DWIGHT MATHIS, in his official capacity as Chief of the Texas Highway Patrol, and WES MAU, in his official capacity as District Attorney of Hays County, Texas, <br>   *Defendants*. | § § § § § § § § § § § § § § | Civil Action No. 1:19-CV-00946-RP |

---

## DECLARATION OF LT. AARON FRITCH

---

Pursuant to 28 U.S.C. § 1746, I, Lt. Aaron Fritch, declare as follows:

1. I am a Lieutenant with the State Crash Reconstruction Team of the Texas Highway Patrol.

2. I have reviewed Defendant Dwight Mathis's Answers to Plaintiffs' First Set of Interrogatories, and have personal knowledge of the matters set forth therein.

3. The answers set forth therein are true and correct.

4. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 30th day of April, 2021, in Austin, Texas.

Lt. Aaron Fritch

13

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, TEXAS PRESS ASSOCIATION, and JOSEPH PAPPALARDO, *Plaintiffs*, | § § § § § § | |
| v. | § § | **Civil Action No. 1:19-CV-00946-RP** |
| STEVEN MCCRAW, in his official capacity as Director of Texas Department of Public Safety, DWIGHT MATHIS, in his official capacity as Chief of the Texas Highway Patrol, and WES MAU, in his official capacity as District Attorney of Hays County, Texas, *Defendants*. | § § § § § § § | |

### DEFENDANT STEVEN McCRAW'S ANSWERS TO
### PLAINTIFFS' FIRST SET OF INTERROGATORIES

TO:     Plaintiffs, by and through their attorneys of record, David A. Schulz, Media Freedom and Information Access Clinic, Yale Law School 127 Wall Street, New Haven, CT 06511; James A. Hemphill, Graves, Dougherty, Hearon & Moody, P.C. 401 Congress Ave., Suite 2700, Austin, TX 78701; Leslie A. Brueckner Public Justice P.C., 475 14th Street, Suite 610, Oakland, CA 94612; and Leah M. Nicholls Public Justice P.C., 1620 L Street NW, Suite 630, Washington, DC 20036

Pursuant to Federal Rules of Civil Procedure 26 and 33, Defendant Steven McCraw, in his official capacity as Director of the Texas Department of Public Safety, submits his Responses to Plaintiffs' First Set of Interrogatories in the above-captioned matter.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief, General Litigation Division

*/s/ Christopher D. Hilton*
CHRISTOPHER D. HILTON
Texas Bar No. 24087727
Deputy Chief
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120
FAX: (512) 320-0667
christopher.hilton@oag.texas.gov

**Counsel for Defendant Steven McCraw**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served

via email on this the 4th day of May, 2021, to all counsel of record.

*/s/ Christopher D. Hilton*
Christopher D. Hilton

2

## OBJECTIONS

Defendant objects to Plaintiffs' instructions and definitions to the extent that they purport to impose obligations on Defendant beyond what is required by the Federal Rules of Civil Procedure and other applicable law. Defendant responds only to the extent required by law.

Defendant objects to the definitions of "record," "describe," and "identify" as being overly broad and unduly burdensome to the extent that they purport to require Defendant to go beyond the obligations imposed by the Federal Rules of Civil Procedure and other applicable law in answering Plaintiffs' discovery requests. Defendant responds only to the extent required by law.

Defendant reserves all objections not explicitly stated herein or inadvertently omitted.

## INTERROGATORIES

**INTERROGATORY NO. 1:**

1.      State the number and location of crashes or accidents that have occurred September 1, 2015, to the present involving drones for which the Department of Public Safety has records and indicate which of those crashes or accidents involved FAA-certified drone pilots.

**ANSWER:**

The foregoing preliminary objections are incorporated herein as if expressly restated in full.

Defendant further objects to this interrogatory to the extent that it calls for information about drones that are operated by law enforcement personnel and by Defendant and Defendant's officers in the course of official business as being vague, ambiguous, and overly broad, and subject to interpretations that call for irrelevant and non-discoverable information, are unduly burdensome, and are not proportional to the needs of the case. Defendant understands this interrogatory to be directed towards crashes or accidents that involved drone use by individuals other than Defendant's officers, Defendant's employees, or any other law enforcement or government agency for their own official business.

Defendant further objects to this interrogatory to the extent that it could be construed as calling for privileged information, including but not limited to the attorney-client privilege, the work product doctrine, the deliberative process privilege, any and all law enforcement investigative privileges, any and all executive or legislative privileges, and other privileges established by law.

Subject to the foregoing objections, and without waiving same, Defendant has no information regarding such incidents.

**INTERROGATORY NO. 2:**

2.      State number and location of crashes or accidents occurring between September 1, 2013 and September 1, 2015, resulting from drones operated over each of the following: sports venues as defined in TEX. GOV'T CODE § 423.0046, correctional facilities, animal feedlots, critical infrastructure facilities as defined in TEX. GOV'T CODE § 423.0045, and government buildings. Also identify which of these involved FAA-certified drone pilots.

**ANSWER:**

The foregoing preliminary objections are incorporated herein as if expressly restated in full.

Defendant further objects to this interrogatory to the extent that it calls for information about drones that are operated by law enforcement personnel and by Defendant and Defendant's officers in the course of official business as being vague, ambiguous, and overly broad, and subject to interpretations that call for irrelevant and non-discoverable information, are unduly burdensome, and are not proportional to the needs of the case. Defendant understands this interrogatory to be directed towards crashes or accidents that involved drone use by individuals other than Defendant's officers, Defendant's employees, or any other law enforcement or government agency for their own official business.

Defendant further objects to this interrogatory to the extent that it could be construed as calling for privileged information, including but not limited to the attorney-client privilege, the work product doctrine, the deliberative process privilege, any and all law enforcement investigative privileges, any and all executive or legislative privileges, and other privileges established by law.

Subject to the foregoing objections, and without waiving same, Defendant has no information regarding such incidents.

**INTERROGATORY NO. 3:**

3.      State how many arrests, if any, have been made under Chapter 423 for each month since its passage.

**ANSWER:**

The foregoing preliminary objections are incorporated herein as if expressly restated in full.

Defendant further objects to this interrogatory to the extent that it could be construed as calling for privileged information, including but not limited to the attorney-client privilege, the work product doctrine, the deliberative process privilege, any and all law enforcement investigative privileges, any and all executive or legislative privileges, and other privileges established by law.

Subject to the foregoing objections, and without waiving same, Defendant's officers or employees have made no such arrests.

**INTERROGATORY NO. 4:**

4.      Identify any instances from September 1, 2015, to the present in which officers of the Department of Public Safety or its law enforcement sub-agencies have interacted with a drone

operator, or received complaints regarding possible violations of Chapter 423, and describe the circumstances and contents of each such interaction and/or complaint, including but not limited to the occupation of the drone operator, the way in which the drone was being used, and any instructions given by law enforcement to the drone operator.

**ANSWER:**

The foregoing preliminary objections are incorporated herein as if expressly restated in full.

Defendant further objects to this interrogatory to the extent that it calls for information about drones that are operated by law enforcement personnel and by Defendant and Defendant's officers in the course of official business as being vague, ambiguous, and overly broad, and subject to interpretations that call for irrelevant and non-discoverable information, are unduly burdensome, and are not proportional to the needs of the case. Defendant understands this interrogatory to be directed towards crashes or accidents that involved drone use by individuals other than Defendant's officers, Defendant's employees, or any other law enforcement or government agency for their own official business.

Defendant further objects to this interrogatory to the extent that it could be construed as calling for privileged information, including but not limited to the attorney-client privilege, the work product doctrine, the deliberative process privilege, any and all law enforcement investigative privileges, any and all executive or legislative privileges, and other privileges established by law.

Subject to the foregoing objections, and without waiving same, Defendant has record of five interactions with drone operators. In one instance, a drone operator was issued a citation for a motor vehicle violation after being observed flying a drone on the capitol grounds. In all other instances, the drone operators were issued a warning.

Defendant has the following responsive information regarding interactions with drone operators since September 1, 2015:

| Stop Datetime | Ticket Type | County | Roadway | Statute | Violation Description | Notes |
|---|---|---|---|---|---|---|
| 1/12/2016 13:30 | Warning | Travis | 1500 N. CONGRESS CAPITOL BLDG. | TXPC 30.05(A) | Burglary And Criminal Trespass-Misdemeanor | Flying unmanned (drone) |
| 3/13/2018 13:32 | Warning | Travis | LAVACA @ 13TH ST | TXPC 30.05(A) | Burglary And Criminal Trespass-Misdemeanor | DRONE FLIGHT |
| 7/27/2019 2:52 | Citation | Travis | EB E 11TH ST @ CONGRESS AVE | TXTRC 601.191 | Fail to Maintain Financial Responsibility (#) | observed flying drone in Capitol Grounds |

6

| Date | | Location | | Violation | |
|---|---|---|---|---|---|
| 7/27/2019 2:52 | Warning | Travis | EB E 11TH ST @ CONGRESS AVE | TXTRC 547.302(A) | Drive Without Lights-when Required | |
| 5/3/2020 9:30 | Warning | Travis | LOT 27 | | Permit Use Of Unauthorized Radar Equipment | DRONE- LOT 27 - NO PERMIT |
| 4/21/2021 19:50 | Warning | Travis | COLORADO ST @ W 14TH ST | TXTRC 504.945(A)(1)(2)(3) | Display/Obtain Wrong License Plate | |
| 4/21/2021 19:50 | Warning | Travis | COLORADO ST @ W 14TH ST | 37 TXAC 8.21 | All Other Violations - Capitol Complex | INVESTIGATIVE DETENTION BASED ON VIOLATION OF TXAC 8.21, TXAC 8.21 - OPERATING UAV WHERE PROHIBITED |

No other responsive information is available regarding these incidents.

**INTERROGATORY NO. 5:**

5.      If you contend that capturing information, images or data for the purpose of journalism using drones does not constitute "surveillance" as used in Chapter 423, please describe (a) the definition of "surveillance" that would support such a result; (b) how the determination in the field is made by officers of the Department of Public Safety or its law enforcement sub-agencies as to whether such use does not constitute "surveillance."

**ANSWER:**

The foregoing preliminary objections are incorporated herein as if expressly restated in full.

Defendant further objects to this interrogatory to the extent that it calls for an answer to an entirely legal question that is not appropriate for factual discovery such as interrogatories, but rather must be addressed through briefing and argument to the Court. Moreover, Defendant's mission is to protect and serve Texas and ensure public safety in the face of numerous and evolving threats, not to answer hypothetical legal questions in civil litigation, and Defendant does not purport to bind the State with any description or statement. Defendant reserves the right to, through counsel, make any and all legal or factual arguments in connection with the above-captioned litigation.

7

Defendant further objects to this interrogatory to the extent that it could be construed as calling for privileged information, including but not limited to the attorney-client privilege, the work product doctrine, the deliberative process privilege, any and all law enforcement investigative privileges, any and all executive or legislative privileges, and other privileges established by law.

Subject to the foregoing objections, and without waiving same, Defendant's officers and employees have not had occasion to make any determinations in the field regarding the application of Chapter 423. *See* answer to interrogatory nos. 3-4. Whether particular conduct constitutes "surveillance" as used in Chapter 423 is ultimately a question of law for the Court and, in the context of an individual criminal proceeding, dependent on factual determinations by a jury. "Journalism" as defined in these interrogatories may or may not constitute "surveillance" as used in Chapter 423 depending on the facts and circumstances of the alleged conduct, including the intent of the alleged actor. *See* Tex. Gov't Code §§ 423.002-.004, 423.006. Someone engaging in "journalism" as defined in these interrogatories who does not have "the intent to conduct surveillance" would not be in violation of Chapter 423. *See id.* § 423.003(a).

**INTERROGATORY NO. 6:**

6.         Describe any training officers of the Department of Public Safety or its law enforcement sub-agencies have received or receive regarding the enforcement of Chapter 423.

**ANSWER:**

The foregoing preliminary objections are incorporated herein as if expressly restated in full.

Defendant further objects to this interrogatory to the extent that it could be construed as calling for privileged information, including but not limited to the attorney-client privilege, the work product doctrine, the deliberative process privilege, any and all law enforcement investigative privileges, any and all executive or legislative privileges, and other privileges established by law.

Subject to the foregoing objections, and without waiving same, Defendant's officers and employees have not received training regarding the enforcement of Chapter 423.

**INTERROGATORY NO. 7:**

7.         Do you contend that capturing information, images or data for purposes of journalism using a drone above public property, or above private property with the property owner's permission, violates any provision of Chapter 423 if the information, image or data depicts other private property? If so, please (a) set forth the basis for such contention in summary fashion, (b)

describe the public interest or interests (if any) that you contend are served by such a contention, and (c) explain how such legitimate public interest or interests could not be served by an interpretation that would allow drone journalism in such a situation.

**ANSWER:**

The foregoing preliminary objections are incorporated herein as if expressly restated in full.

Defendant further objects to this interrogatory to the extent that it calls for an answer to an entirely legal question that is not appropriate for factual discovery such as interrogatories, but rather must be addressed through briefing and argument to the Court. Moreover, Defendant's mission is to protect and serve Texas and ensure public safety in the face of numerous and evolving threats, not to answer hypothetical legal questions in civil litigation, and Defendant does not purport to bind the State with any description or statement. Defendant reserves the right to, through counsel, make any and all legal or factual arguments in connection with the above-captioned litigation.

Defendant further objects to this interrogatory to the extent that it could be construed as calling for privileged information, including but not limited to the attorney-client privilege, the work product doctrine, the deliberative process privilege, any and all law enforcement investigative privileges, any and all executive or legislative privileges, and other privileges established by law.

Subject to the foregoing objections, and without waiving same, Defendant's officers and employees have not had occasion to make any determinations regarding the application of Chapter 423. *See* answer to interrogatory nos. 3-4. Whether particular conduct violates any provision of 423 is ultimately a question of law for the Court and, in the context of an individual criminal proceeding, dependent on factual determinations by a jury. "Journalism" as defined in these interrogatories may or may not constitute a violation of Chapter 423 depending on the facts and circumstances of the alleged conduct, including the intent of the alleged actor. *See* Tex. Gov't Code §§ 423.002-.004, 423.006. Someone engaging in "journalism" as defined in these interrogatories who does not have "the intent to conduct surveillance" would not be in violation of Chapter 423. *See id.* § 423.003(a).

**INTERROGATORY NO. 8:**

8.      Do you contend that capturing information, images or data using drones for the purpose of journalism constitutes a "commercial purpose" as used in TEX. GOV'T CODE §§ 423.0045(c)(1)(E) and 423.0046(c)(5)? If not, please explain the basis for your contention, including without limitation (a) the definition of "commercial purpose" that would support such a

9

result; (b) how the determination is made as to whether drone use constitutes a "commercial purpose"; (c) the legitimate public interest or interests, if any, that you contend would be served by not considering journalism using a drone as a "commercial purpose"; (d) how such legitimate public interest or interests could not be served by a more narrow interpretation that would consider use of a drone for journalism as a "commercial purpose"; and (e) the legitimate public interest, if any, in differentiating between journalism using a drone, on one hand, and the permitted drone usages set forth in TEX. GOV'T CODE §§ 423.0045(c)(1)(E) and 423.0046(c)(5).

**ANSWER:**

The foregoing preliminary objections are incorporated herein as if expressly restated in full.

Defendant further objects to this interrogatory to the extent that it calls for an answer to an entirely legal question that is not appropriate for factual discovery such as interrogatories, but rather must be addressed through briefing and argument to the Court. Moreover, Defendant's mission is to protect and serve Texas and ensure public safety in the face of numerous and evolving threats, not to answer hypothetical legal questions in civil litigation, and Defendant does not purport to bind the State with any description or statement. Defendant reserves the right to, through counsel, make any and all legal or factual arguments in connection with the above-captioned litigation.

Defendant further objects to this interrogatory to the extent that it could be construed as calling for privileged information, including but not limited to the attorney-client privilege, the work product doctrine, the deliberative process privilege, any and all law enforcement investigative privileges, any and all executive or legislative privileges, and other privileges established by law.

Subject to the foregoing objections, and without waiving same, Defendant's officers and employees have not had occasion to make any determinations regarding the application of Chapter 423. *See* answer to interrogatory nos. 3-4. Whether particular conduct is being undertaken for a "commercial purpose" is ultimately a question of law for the Court and, in the context of an individual criminal proceeding, dependent on factual determinations by a jury. "Journalism" as defined in these interrogatories may or may not constitute activity undertaken for a "commercial purpose" depending on the facts and circumstances of the alleged conduct, including the intent of the alleged actor. *See* Tex. Gov't Code §§ 423.002-.004, 423.006. Someone engaging in "journalism" as defined in these interrogatories who does not have "the intent to conduct surveillance" would not be in violation of Chapter 423. *See id.* § 423.003(a).

**INTERROGATORY NO. 9:**

9.       If you contend that there is a reasonable basis for not including using a drone for purposes

of journalism in the list of exceptions to Chapter 423 set forth in TEX. GOV'T CODE § 423.002,

while including the exceptions in subsections 423.002(a)(1), (13) (19), (20), and/or (21), please

set forth in summary form such alleged reasonable basis.

**ANSWER:**

The foregoing preliminary objections are incorporated herein as if expressly restated in full.

Defendant further objects to this interrogatory to the extent that it calls for an answer to an entirely legal question that is not appropriate for factual discovery such as interrogatories, but rather must be addressed through briefing and argument to the Court. Moreover, Defendant's mission is to protect and serve Texas and ensure public safety in the face of numerous and evolving threats, not to answer hypothetical legal questions in civil litigation, and Defendant does not purport to bind the State with any description or statement. Defendant reserves the right to, through counsel, make any and all legal or factual arguments in connection with the above-captioned litigation.

Defendant further objects to this interrogatory to the extent that it could be construed as calling for privileged information, including but not limited to the attorney-client privilege, the work product doctrine, the deliberative process privilege, any and all law enforcement investigative privileges, any and all executive or legislative privileges, and other privileges established by law.

Subject to the foregoing objections, and without waiving same, Defendant's mission is to protect and serve Texas by enforcing the laws as enacted by the Legislature. Defendant makes no factual or policy contention with respect to the wisdom of including or excluding including any particular exception in Chapter 423, but reserves the right to, through counsel, make any and all legal or factual arguments in connection with the above-captioned litigation.

**INTERROGATORY NO. 10:**

10.      Please state how the government interests asserted in Defendants' Motion to Dismiss

(Doc. 19) apply when the drone operator uses a drone for journalism, but do not apply when a

drone operator is either a professor or student engaged in scholarly research or otherwise exempted

under TEX. GOV'T CODE § 423.002.

11

**ANSWER:**

The foregoing preliminary objections are incorporated herein as if expressly restated in full.

Defendant further objects to this interrogatory to the extent that it calls for an answer to an entirely legal question that is not appropriate for factual discovery such as interrogatories, but rather must be addressed through briefing and argument to the Court. Moreover, Defendant's mission is to protect and serve Texas and ensure public safety in the face of numerous and evolving threats, not to answer hypothetical legal questions in civil litigation, and Defendant does not purport to bind the State with any description or statement. Defendant reserves the right to, through counsel, make any and all legal or factual arguments in connection with the above-captioned litigation.

Defendant further objects to this interrogatory as vague and ambiguous because it is unclear what it means for a "government interest" to "apply." The government interests exist independently of any particular provision of Chapter 423, including the exceptions listed in Tex. Gov't Code § 423.002. Whether as a matter of policy any particular governmental interest is arguably supported or undermined by any particular provision in Chapter 423 is the responsibility of the Legislature to determine via its enactments.

Defendant further objects to this interrogatory to the extent that it could be construed as calling for privileged information, including but not limited to the attorney-client privilege, the work product doctrine, the deliberative process privilege, any and all law enforcement investigative privileges, any and all executive or legislative privileges, and other privileges established by law.

Subject to the foregoing objections, and without waiving same, Defendant's mission is to protect and serve Texas by enforcing the laws as enacted by the Legislature. Defendant makes no factual or policy contention with respect to the wisdom of the Legislature's decision-making in enacting Chapter 423, but reserves the right to, through counsel, make any and all legal or factual arguments in connection with the above-captioned litigation. Protecting the interests of individual privacy, property rights, and public safety is consistent with Defendant's mission.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, TEXAS PRESS ASSOCIATION, and JOSEPH PAPPALARDO,<br>  *Plaintiffs,*<br><br>v.<br><br>STEVEN MCCRAW, in his official capacity as Director of Texas Department of Public Safety, DWIGHT MATHIS, in his official capacity as Chief of the Texas Highway Patrol, and WES MAU, in his official capacity as District Attorney of Hays County, Texas,<br>  *Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 1:19-CV-00946-RP |

## DECLARATION OF JASON DAY

Pursuant to 28 U.S.C. § 1746, I, Jason L. Day, declare as follows:

1. I am the UAS Program Administrator for the Aviation Operations Division of the Texas Department of Public Safety.

2. I have reviewed Defendant Steven McCraw's Answers to Plaintiffs' First Set of Interrogatories, and have personal knowledge of the matters set forth therein.

3. The answers set forth therein are true and correct.

4. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this the 30th day of April, 2021, in Austin, Texas.


             Jason L. Day

13

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, TEXAS PRESS ASSOCIATION, and JOSEPH PAPPALARDO,** | § § § § § | |
| *Plaintiffs,* | § § | |
| **v.** | § § | **CIVIL ACTION NO. 1:19-CV-00946** |
| **STEVEN MCCRAW, in his official capacity as Director of Texas Department of Public Safety, RON JOY, in his official capacity as Chief of the Texas Highway Patrol, and WES MAU, in his official capacity as District Attorney of Hays County, Texas,** | § § § § § § § § § | |
| *Defendants.* | § | |

**DEFENDANT WES MAU'S OBJECTIONS AND ANSWERS TO**
**PLAINTIFFS' FIRST SET OF INTERROGATORIES**
**TO DEFENDANT WES MAU**

**TO:  Plaintiffs National Press Photographers Association, Texas Press Association, and Joseph Pappalardo, by and through their attorneys of record, James A. Hemphill, GRAVES, DOUGHERTY, HEARON & MOODY, P.C., 401 Congress Avenue, Suite 2700, Austin, Texas 78701.**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Wes Mau, in his official capacity as District Attorney of Hays County, Texas ("Mau") provides the following objections and answers to Plaintiffs' First Set of Interrogatories to Defendant Wes Mau.

Respectfully submitted,

**McGinnis Lochridge LLP**
600 Congress Avenue, Suite 2100
Austin, Texas 78701
512.495.6000 (telephone)
512.495.6093 (telecopier)
mshaunessy@mcginnislaw.com
ejohnston@mcginnislaw.com

By:      _/s/ Michael Shaunessy_
         Michael Shaunessy
         State Bar No. 18134550
         Eric A. Johnston
         State Bar No. 24070009

**_Attorneys for Defendant Wes Mau, in his official capacity as District Attorney of Hays County, Texas_**

## **CERTIFICATE OF SERVICE**

I hereby certify, by signature below, that a true and correct copy of the foregoing was served on the following by electronic mail, on the 4th day of May, 2021:

James A. Hemphill
GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
401 Congress Ave., Suite 2200
Austin, Texas 78701
jhemphill@gdhm.com
***Attorneys for Plaintiffs National Press Photographers Association, Texas Press Association, and Joseph Pappalardo***

Leah M. Nicholls
PUBLIC JUSTICE P.C.
1620 L Street NW, Suite 630
Washington, DC 20036
lnicholls@publicjustice.net
***Attorneys for Plaintiffs National Press Photographers Association, Texas Press Association, and Joseph Pappalardo***

David A. Schulz
Jennifer Pinsof
Francesca L. Procaccini
MEDIA FREEDOM AND INFORMATION ACCESS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, Connecticut 06511
david.schulz@yale.edu
jennifer.pinsof@yale.edu
francesca.procaccini@yale.edu
***Attorneys for Plaintiffs National Press Photographers Association, Texas Press Association, and Joseph Pappalardo***

Leslie A. Brueckner
PUBLIC JUSTICE P.C.
475 14th Street, Suite 610
Oakland, California 94612
lbrueckner@publicjustice.net
***Attorneys for Plaintiffs National Press Photographers Association, Texas Press Association, and Joseph Pappalardo***

Christopher D. Hilton
ASSISTANT ATTORNEY GENERAL
GENERAL LITIGATION DIVISION
P. O. Box 12548, Capitol Station
Austin, Texas 78711-2548
christopher.hilton@oag.texas.gov
**Attorneys for Defendants Steven McCraw and Ron Joy in their official capacities**

/s/ Michael Shaunessy
MICHAEL SHAUNESSY

## OBJECTIONS AND ANSWERS TO INTERROGATORIES

**Interrogatory No. 1:**

Identify any instances in which Hays County law enforcement officers have interacted with a drone operator and describe the circumstances and contents of each such interaction, including but not limited to the occupation of the drone operator, the way in which the drone was being used, and any instructions given by law enforcement to the drone operator.

**Answer:**

In his capacity as District Attorney, Mau does not have control or access to all the records related to members of the Hays County Sheriff's Office or members of the various Hays County Constables Offices that have interacted with "a drone operator." Accordingly, Mau can only respond with regard to actions taken by personnel in his office. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Mau has produced documents from which the answer to Interrogatory No. 1 can be ascertained.

**Interrogatory No. 2:**

For the period between September 1, 2015, and the present, if there were any prosecutions for drone-related activities in Hays County, state the criminal statutes under which they were brought, the date any charges were filed, the date and location of the offense, the occupation of the drone operator, and whether the defendant(s) were FAA-certified drone pilots with FAA-registered drones.

**Answer:**

Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Mau has produced documents from which the answer to Interrogatory No. 2 can be ascertained.

**Interrogatory No. 3:**

For each month since September 2015, state the total number of arrests, if any, that have been made in Hays County for drone-related activities, whether under Chapter 423 or otherwise; the number of such arrests made under Chapter 423; and the number of such arrests made under any other law and identify the law under which such arrest was made.

**Answer:**

In his capacity as District Attorney, Mau does not have control or access to all the records related to members of the Hays County Sheriff's Office or members of the various Hays County Constables Offices that have interacted with "a drone operator." Accordingly, Mau can only respond with regard to actions taken by personnel in his office. To Mau's knowledge, there has only been one arrest for drone-related activities in Hays County since September 2015. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Mau has produced documents from which the remaining answers to Interrogatory No. 3 can be ascertained.

**Interrogatory No. 4:**

For the period between September 1, 2015, and the present, identify any instances in which Hays County law enforcement officers have interacted with a drone operator, or received complaints regarding alleged violations of Chapter 423, and describe the circumstances and contents of each such interaction or complaint, including but not limited to the occupation of the drone operator, the way in which the drone was being used, and any instructions given by law enforcement to the drone operator.

**Answer:**

In his capacity as District Attorney, Mau does not have control or access to all the records related to members of the Hays County Sheriff's Office or members of the various Hays County Constables Offices that have interacted with "a drone operator." Accordingly, Mau can only respond with regard to actions taken by personnel in his office. To Mau's knowledge, there has only been one matter that is responsive to Interrogatory No. 4. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Mau has produced documents from which the answers to Interrogatory No. 4 can be ascertained.

**Interrogatory No. 5:**

For the period between September 1, 2013, and the present, if there were any instances in which an individual was arrested or cited in Hays County under Chapter 423 but was prosecuted under another statute, state the statutes under which the individual(s) was prosecuted, the date of the arrest or citation, the occupation of the drone operator, and whether the defendant(s) were FAA-certified drone pilots with FAA-registered drones.

**Answer:**

In his capacity as District Attorney, Mau does not have control or access to all the records related to members of the Hays County Sheriff's Office or members of the various Hays County Constables Offices that have interacted with "a drone operator." Accordingly, Mau can only respond with regard to actions taken by personnel in his office. To Mau's knowledge, there has only been one arrest and prosecution for drone-related activities in Hays County since September 1, 2013. Pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, Mau has produced documents from which the remaining answers to Interrogatory No. 5 can be ascertained.

**Interrogatory No. 6:**

State whether Hays County maintains records on FAA-registered drones or FAA-certified drone pilots, state the number of such records maintained, and describe the contents of any such records, including but not limited to the profession of any drone pilots mentioned.

**Answer:**

In his capacity as District Attorney, Mau does not have control or access to all the records for any other Hays County Office other than the District Attorney's Office. Accordingly, Mau can only respond with regard to records maintained in his office. The Hays County District Attorney's Office does not maintain records on FAA-registered drones or FAA-certified drone pilots.

**Interrogatory No. 7:**

Please state how the government interests asserted in Defendants' Motion to Dismiss (Doc. 19) apply when the drone operator uses a drone for journalism, but do not apply when a drone operator is either a professor or student engaged in scholarly research or otherwise exempted under TEX. GOV'T CODE § 423.002.

**Answer:**

Mau has not done any extensive research on the subject of Interrogatory No. 7 as he has never been presented with a case against a journalist for an alleged violation of the drone statute. Mau personally does not contend anything other than the noncontroversial proposition that the wording of the statute was determined by the Texas Legislature, because he was not involved in drafting the bill and did not participate in any hearings on the bill. By way of further answer, Texas state and local governments have an "interest" under the circumstances to which the Legislature has indicated that capturing images via unmanned aircraft is unlawful because it puts citizens' privacy and safety at risk which are government interests that apply in every case. The Legislature has determined, however, that the other interests implicated by the non-applicability provisions may also apply, such as documenting crime scenes, inspecting utility easements, searching for missing persons, etc. The Legislature has also recognized that the citizen whose privacy interests are being protected may waive those interests.

**Interrogatory No. 8:**

If you contend that capturing information, images or data for the purpose of journalism using drones does not constitute "surveillance" as used in Chapter 423, please describe (a) the definition of "surveillance" that would support such a result; (b) how the determination by law enforcement in the field is made as to whether such use does not constitute "surveillance."

**Answer:**

Mau has not done any extensive research on the subject of Interrogatory No. 8 as he has never been presented with a case against a journalist for an alleged violation of the drone statute. Mau personally does not contend anything other than the noncontroversial proposition that the wording of the statute was determined by the Texas legislature, because he was not involved in drafting the bill and did not participate in any hearings on the bill. By way of further answer, surveillance is not specifically defined by the statute; however, the term means the same thing whether the "surveillance" is for the purpose of journalism or not.

**Interrogatory No. 9:**

Describe any training officers of Hays County law enforcement have received or receive regarding the enforcement of Chapter 423.

**Answer:**

In his capacity as District Attorney, Mau does not have control or access to all the actions and/or records related to members of the Hays County Sheriff's Office or members of the various Hays County Constables Offices, and, accordingly has no knowledge regarding any training received by Hays County law enforcement officers regarding the enforcement of Chapter 423.

**Interrogatory No. 10:**

Do you contend that capturing information, images or data for purposes of journalism using a drone above public property, or above private property with the property owner's permission, violates any provision of Chapter 423 if the information, image or data depicts other private property? If so, please (a) set forth the basis for such contention in summary fashion, (b) describe the public interest or interests (if any) that you contend are served by such a contention, and (c) explain how such legitimate public interest or interests could not be served by an interpretation that would allow drone journalism in such a situation.

**Answer:**

Mau has not done any extensive research on the subject of Interrogatory No. 10 as he has never been presented with a case against a journalist involving an alleged violation of the drone statute. Mau personally does not contend anything other than the noncontroversial proposition that the wording of the statute was determined by the Texas legislature, because he was not involved in drafting the bill and did not participate in any hearings on the bill. By way of further answer, Mau responds that he only "contends" that the statute speaks for itself, namely that:

    (a) The statute makes it unlawful to capture an image using a drone with intent to conduct surveillance on the subject of the image. The drone's location is not an element of the offense;

    (b) The only difference between the scenario described and one where the drone is flying above private property without the owner's consent would be protection of the owner's airspace. The interests with which the statute is concerned relate to capturing visual imagery, not physical trespass; and

    (c) Mau does not see how capturing images with the intent to publish them can ever serve privacy interests.

**Interrogatory No. 11:**

Do you contend that capturing information, images or data using drones for the purpose of journalism constitutes a "commercial purpose" as used in TEX. GOV'T CODE §§ 423.0045(c)(1)(E) and 423.0046(c)(5)? If not, please explain the basis for your contention, including without limitation (a) the definition of "commercial purpose" that would support such a result; (b) how the determination is made as to whether drone use constitutes a "commercial purpose"; (c) the legitimate public interest or interests, if any, that you contend would be served by not considering journalism using a drone as a "commercial purpose"; (d) how such legitimate public interest or interests could not be served by a more narrow interpretation that would consider use of a drone for journalism as a "commercial purpose"; and (e) the legitimate public interest, if any, in differentiating between journalism using a drone, on one hand, and the permitted drone usages set forth in TEX. GOV'T CODE §§ 423.0045(c)(1)(E) and 423.0046(c)(5).

**Answer:**

Mau has not done any extensive research on the subject of Interrogatory No. 11 as he has never been presented with a case against a journalist involving an alleged violation of drone statute. Mau personally does not contend anything other than the noncontroversial proposition that the wording of the statute was determined by the Texas legislature, because he was not involved in drafting the bill and did not participate in any hearings on the bill. By way of further answer, Mau has never contended one way or the other as to what constitutes a "commercial purpose" for the purpose of this statute.

**Interrogatory No. 12:**

If you contend that there is a reasonable basis for not including using a drone for purposes of journalism in the list of exceptions to Chapter 423 set forth in TEX. GOV'T CODE § 423.002, while including the exceptions in §§ 423.002(a)(1), (13) (19), (20), and/or (21), please set forth in summary form such alleged reasonable basis.

**Answer:**

Mau has not done any extensive research on the subject of Interrogatory No. 12 as he has never been presented with a case against a journalist involving an alleged violation of the drone statute. Mau personally does not contend anything other than the noncontroversial proposition that the wording of the statute was determined by the Texas legislature, because he was not involved in drafting the bill and did not participate in any hearings on the bill. By way of further answer, Mau has never made such a contention one way or the other.

# EXHIBIT D

# HB2340- LEGISLATIVE RECOMMENDATIONS

*These recommendations are designed to protect and define the use of Unmanned Aerial Systems by emergency personnel.*

1) <u>DEFINITIONS</u> —As used in this recommendation, the term:
   a) "**Unmanned Aircraft Systems**" means a powered, aerial vehicle that:
      1. includes aircraft, pilot, and ground control systems
      2. Uses aerodynamic forces to provide aircraft lift
      3. Can fly autonomously or be piloted remotely
      4. Can be expendable or recoverable; and
      5. Does not carry a human operator

   b) <u>Mission Personnel</u>

      1. "**Emergency Responder**" is considered to be Law Enforcement, Emergency Management, Fire Fighter, Medical Services, or a Designated Mission Volunteer
      2. "**Mission Volunteer**" is a person or persons designated by Law Enforcement, Emergency Management, Fire Fighter, and/or a ranking official to assist in a mission and to be utilized during a specific mission

## <span style="color:red">USE OF AN UNMANNED AIRCRAFT SYSTEM BY LAW ENFORCEMENT AND PUBLIC SAFETY</span>

Law Enforcement may use an unmanned aircraft system:

1) to gather evidence in a criminal investigation
   a) under the express terms of a search warrant issued by a Texas court; or.
   b) in accordance with a judicially recognized exception to the warrant requirement.

In situations and for uses not involving a criminal investigation and not intended to lead to the production of evidence for use in a criminal investigation, if the use does not constitute an unwarranted invasion of personal privacy and is consistent with the procedures in.

a) An emergency responder shall not be liable for any damage created by an unmanned aircraft or unmanned aircraft system, as long as said emergency responder is in compliance with FAA regulations, if that damage was caused while the emergency responder was providing, and the unmanned aircraft or unmanned aircraft system was used in the operation, support, or enabling of the emergency services listed.

b) For purposes of this section, "Emergency Responder" means any of the following, if acting within the scope of authority implicitly or expressly provided by a local public entity or a public employee of a local public entity to provide emergency services:
   A. A paid or an unpaid designated mission volunteer
   B. A private entity
   C. Emergency Management Personnel
   D. Law Enforcement
   E. Fire Fighter
   F. Medical Services
   G. Public Works

2.  All of the following terms shall have the same meaning as the terms as used of the Texas Government Code:
     A.     Local public entity
     B.     Public employee of a local public entity.
     C.     Unmanned aircraft.
     D.     Unmanned aircraft system

## <span style="color:red">OBSTRUCTING AN EMERGENCY PERSONNEL WHILE USING AN UNMANNED AIRCRAFT SYSTEMS</span>

1.  For purposes of this section, "Emergency Responder" means any of the following, if acting within the scope of authority implicitly or expressly provided by a local public entity or a public employee of a local public entity to provide emergency services:
    A.  paid or an unpaid designated mission volunteer
    B.  A private entity
    C.  Emergency Management Personnel
    D.  Law Enforcement
    E.  Fire Fighter
    F.  Medical Services

a)  A person commits obstructing an emergency responder when, by using or threatening to use violence, force, physical interference, or an obstacle, such person knowingly obstructs, impairs, or hinders the enforcement of the penal law or the preservation of the peace by a peace officer, acting under color of his or her official authority; knowingly obstructs, impairs, or hinders the prevention, control, or abatement of fire by a firefighter, acting under color of his or her official authority; knowingly obstructs, impairs, or hinders the administration of medical treatment or emergency assistance by an emergency medical service provider, acting under color of his or her official authority; or knowingly obstructs, impairs, or hinders the administration of a designated mission volunteer, acting in good faith to render such care or assistance without compensation at the place of an emergency or accident.

b)  To assure that animals used in law enforcement or fire prevention activities are protected from harm, a person commits obstructing a peace officer or firefighter when, by using or threatening to use violence, force, physical interference, or an obstacle, he or she knowingly obstructs, impairs, or hinders any such animal.

c)  It is not a defense to a prosecution under this section that the peace officer was acting in an illegal manner if he or she was acting under color of his or her official authority. A peace officer acts "under color of his or her official authority" if, in the regular course of assigned duties, he or she makes a judgment in good faith based on surrounding facts and circumstances that he or she must act to enforce the law or preserve the peace.

d)  If a person is alleged to have committed the offense described in subsection (1)(a) or (1)(b) of this section by using or threatening to use an unmanned aircraft system as an obstacle, the offense does not apply if the person who operates the unmanned aircraft system:

e) Obtains permission to operate the unmanned aircraft system from a law enforcement agency or other entity that is coordinating the response of peace officers, firefighters, emergency medical service providers, rescue specialists, or designate mission volunteers to an emergency or accident.

f) Is in compliance with FAA regulations

g) Continues to communicate with such entity during the operation of the unmanned aircraft system; an

h) Complies immediately with any instructions from the entity concerning the operation of the unmanned aircraft system.

2) Repealed

3) Obstructing a peace officer, firefighter, emergency management personnel, medical service provider, or designated mission volunteer is a class B misdemeanor.

4) For purposes of this section, unless the context otherwise requires:

   a) " medical service provider" means a member of a public or private emergency medical service agency, whether that person is a volunteer or receives compensation for services rendered as such emergency medical service provider.

   b) "Obstacle" includes an unmanned aircraft vehicle or unmanned aerial system.

   c) " Designated Mission Volunteer " means a member of a public or private rescue agency, whether that person is a designated volunteer or receives compensation for services rendered as such.

5) <u>Written consent.</u>

A law enforcement agency may operate an unmanned aircraft system for the purpose of acquiring information about an individual, or about the individual's property, if the individual has given written consent to the use of an unmanned aircraft system for those purposes.

# CHAPTER 423 RECOMMENDATIONS

2) <u>DEFINITIONS.</u> —As used in this act, the term:

   a) "Unmanned Aircraft Systems" means a powered, aerial vehicle that:

      1. Unmanned Aircraft systems includes aircraft, pilot, ground control systems

      2. Uses aerodynamic forces to provide vehicle lift.

      3. Can fly autonomously or be piloted remotely.

      4. Can be expendable or recoverable; and

      5. Does not carry a human operator.

   b) "Designated Volunteer" is a person or persons designated by Law Enforcement, Emergency Management, Fire Fighter, and/or a ranking official to assist in a mission and to be utilized during a specific mission

   c) "Image" means a digital record of thermal, infrared, ultraviolet, visible light, or other electromagnetic waves; sound waves; odors; or other physical phenomena which captures conditions existing on or about real property or an individual located on that property. Streaming of data which includes video does not mean capture.

   d) "Imaging device" means a mechanical, digital, or electronic viewing device; still camera; camcorder; motion picture camera; unmanned aerial vehicle, or any other instrument, equipment, or format capable of recording, storing, or transmitting an image and or video.

   e) "Law enforcement agency" means a lawfully established state or local public agency that is responsible for the prevention and detection of crime, local government code enforcement, and the enforcement of penal, traffic, regulatory, game, or controlled substance laws.

   f) "Surveillance" means:

1. With respect to an owner, tenant, occupant, invitee, or licensee of privately-owned real property, the observation of such persons with sufficient visual clarity to be able to obtain information about their identity, habits, conduct, movements, or whereabouts; or

2. With respect to privately owned real property, the observation of such property's physical improvements with sufficient visual clarity to be able to determine unique identifying features or its occupancy by one or more persons.

## PROHIBITED USE OF UNMANNED AERIAL SYSTEMS —

a. A law enforcement agency may not use an Unmanned Aircraft to gather evidence or other information.

b. A person, a state agency, or a political subdivision as defined may not use an Unmanned Aircraft equipped with an imaging device to record an image of privately owned real property or of the owner, tenant, occupant, invitee, or licensee of such property with the intent to conduct surveillance on the individual or property captured in the image in violation of such person's reasonable expectation of privacy without his or her written consent. For purposes of this section, a person is presumed to have a reasonable expectation of privacy on his or her privately owned real property if he or she is not observable by persons located at ground level in a place where they have a legal right to be, regardless of whether he or she is observable from the air with the use of an unmanned aerial system.

## EXCEPTIONS. —This section does not prohibit the use of an Unmanned Aircraft:

c. To counter a high risk of a terrorist attack by a specific individual or organization if the United States Secretary of Homeland Security determines that credible intelligence indicates that there is such a risk.

d. If the law enforcement agency first obtains a search warrant signed by a judge authorizing the use of an unmanned aircraft system.

e. If the law enforcement agency possesses reasonable suspicion that, under particular circumstances, swift action is needed to prevent imminent danger to life or serious damage to property, to forestall the imminent escape of a suspect or the destruction of evidence, or to achieve purposes including, but not limited to, facilitating the search for a missing person.

f. By a person or an entity engaged in a business or profession licensed by the state, or by an agent, employee, or contractor thereof, if the unmanned aircraft is used only to perform reasonable tasks within the scope of practice or activities permitted under such person's or entity's license and regulations. However, this exception does not apply to a profession in which the licensee's authorized scope of practice includes obtaining information about the identity, habits, conduct, movements, whereabouts, affiliations, associations, transactions, reputation, or character of any society,

g. By an employee or a contractor of a property appraiser who uses unmanned aerial systems solely for the purpose of assessing property for ad valorem taxation.

h. To capture images by or for an electric, water, or natural gas utility:

i. For operations and maintenance of utility facilities, including facilities used in the generation, transmission, or distribution of electricity, gas, or water, for the purpose of maintaining utility system reliability and integrity.

j. For inspecting utility facilities, including pipelines, to determine construction, repair, maintenance, or replacement needs before, during, and after construction of such facilities.

HB2340 Task Force Recommendations

k. For assessing vegetation growth for the purpose of maintaining clearances on utility rights-of-way.

l. For utility routing, siting, and permitting for the purpose of constructing utility facilities or providing utility service; or

m. For conducting environmental monitoring, as provided by federal, state, or local law, rule, or permit.

n. For aerial mapping, if the person or entity using an unmanned aerial system for this purpose is operating in compliance with Federal Aviation Administration regulations.

o. To deliver cargo, if the person or entity using an unmanned aerial system for this purpose is operating in compliance with Federal Aviation Administration regulations.

**p.** To capture images necessary for the safe operation or navigation of an unmanned aircraft system that is being used for a purpose allowed under Texas law.

**q.** By a communications service provider or a contractor for a communications service provider for routing, siting, installation, maintenance, or inspection of facilities used to provide communications services.

**r.** To capture images necessary for the safe operation or navigation of an unmanned aircraft system that is being used for a purpose allowed under Texas law during times of disasters.

**USE OF EVIDENCE**. —Evidence obtained or collected in this act is admissible as evidence in a criminal prosecution in any court of law in the state of Texas.

## USE OF UNMANNED AIRCRAFT IN EMERGENCIES AND DISASTERS

1) law enforcement; firefighter; emergency management personnel, and designated mission volunteers may operate an unmanned aircraft system, acquire information through the operation of an unmanned aircraft system, or disclose information acquired through the operation of an unmanned aircraft system, for the purpose of search and rescue activities, as defined in Texas law.

2) law enforcement; firefighter; emergency management personnel and designated mission volunteers may operate an unmanned aircraft system, acquire information through the operation of an unmanned aircraft system, or disclose information acquired through the operation of an unmanned aircraft system, for the purpose of assisting an individual and/or agency in an emergency if:

   a) A law enforcement agency reasonably believes that there is an imminent threat to the life or safety of the individual, and documents the factual basis for that belief; and

   b) Not more than 48 hours after the emergency operation begins, an official of the law enforcement agency files a sworn statement with the circuit court that describes the nature of the emergency and the need for use of an unmanned aircraft system.

3) law enforcement; firefighter; emergency management personnel and designated mission volunteers may operate an unmanned aircraft system, acquire information through the operation of an unmanned aircraft system, or disclose information acquired through the operation of an unmanned aircraft system, during a state of emergency that is declared by the Governor under Texas law if:

   a) The unmanned aircraft system is used only for the purposes of preserving public safety, protecting property, or conducting aerial imagery for the assessment and evaluation of environmental or weather-related damage, erosion, or contamination; and

   b) The unmanned aircraft system is operated only in the geographical area specified in a proclamation pursuant to Texas law.

## PUBLIC SAFETY UNMANNED AIRCRAFT INTERFERENCE

A person who operates an unmanned aircraft system in a manner that is intended to obstruct or interfere with:

1) a law enforcement officer.
2) a firefighter
3) Emergency Management Personnel
4) an emergency medical person; or
5) a designated mission volunteer

while the individual described in subdivisions (1) through (5) is performing or attempting to perform the individual's official duties, commits public safety remote aerial interference, a Class B misdemeanor. However, the offense is a felony if the person has a prior unrelated conviction under this section.


## INVESTIGATIONS OF CRIMES AND ACCIDENTS WHILE USING UNMANNED AIRCRAFT

1) A law enforcement agency may operate an unmanned aircraft system, acquire information through the operation of an unmanned aircraft system, or disclose information acquired through the operation of an unmanned aircraft system, for the purpose of reconstruction of a specific crime scene or accident scene, or similar physical assessment, related to a specific investigation.
2) The period that a law enforcement agency may operate an unmanned aircraft system under this section may not exceed five days for the purpose of reconstruction of a specific crime scene or accident scene, or similar physical assessment, related to a specific investigation.

## 911 AERIAL MAPPING; EMERGENCY SERVICES USES

Because Texas Government Code 423.003 does not define "surveillance," it can be argued that anything not specifically listed in 423.002 would be conducting surveillance in violation of 423.003.

Between annual or scheduled flyovers and mapping and addressing activities, the use of an unmanned aircraft system can be a cost-effective and timely solution to ensure that 9-1-1 service can identify locations effectively to enable the dispatch of emergency services to someone seeking emergency assistance.

Some people may believe that by definition and/or by intent mapping for purposes of 9-1-1 emergency service is currently properly considered as covered to be lawful within 423.002(12), which provides that using a drone is lawful "for the purpose of rescuing a person whose life or well-being is in imminent danger." Cf., Texas Health and Safety Code Ann. Section 772.102 ("It is the purpose of this subchapter to establish the number 9-1-1 as the primary emergency telephone number for use by certain local governments in this state and to encourage units of local government and combinations of the units to develop and improve emergency communication procedures and facilities in a manner that makes possible the quick response to any person calling the telephone number 9-1-1 seeking police, fire, medical, rescue, and other emergency services.").

However, other people may disagree and believe that mapping for purposes of 9-1-1 service is not carefully considered as covered to be lawful within 423.002(12). As such, an appropriate approach to ensure that Chapter 423 does not unintentionally impede the quick response to any person calling the telephone number 9-1-1 seeking police, fire, medical, rescue and other emergency services may be to suggest clarifying amendment changes to Chapter 423.

HB2340 Task Force Recommendations

## **PUBLIC SAFETY TRAINING IN THE USE OF UNMANNED AIRCRAFT**

1) law enforcement; firefighter; emergency management personnel and designated mission volunteers may operate an unmanned aircraft system for the purpose of training in:
   a) The use of unmanned aircraft systems; and
   b) The acquisition of information through the operation of an unmanned aircraft system.
2) Any image or other information that is acquired through the use of an unmanned aircraft system by a law enforcement agency under this section, and any evidence derived from that image or information:
   a) Is not admissible in, and may not be disclosed in, a judicial proceeding, administrative proceeding, arbitration proceeding or other adjudicatory proceeding; and
   b) May not be used to establish reasonable suspicion or probable cause to believe that an offense has been committed unless in violation of Texas Government Code 423.

HB2340 Task Force Recommendations

# EXHIBIT E

CAUSE NO. 17-11-81926-BB

| | |
|---|---|
| **CLAY KOLLE et al.,** | IN THE DISTRICT COURT OF |
| *Plaintiffs,* | VICTORIA COUNTY, TEXAS |
| **v.** | 135TH JUDICIAL DISTRICT |
| **K&K INEZ PROPERTIES, LLC et al.,** | |
| *Defendants.* | |

# AMICUS BRIEF OF THE STATE OF TEXAS

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. McCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief, General Litigation Division

CHRISTOPHER D. HILTON
Assistant Attorney General
Texas Bar No. 24087727

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
Tel.: (512) 463-2120
Fax: (512) 320-0667
christopher.hilton@oag.texas.gov

COUNSEL FOR THE STATE OF TEXAS

# Introduction

The challenged statutes reflect the Legislature's determination that the unrestricted operation of unmanned aircraft (or "drones") poses an intolerable threat of limitless aerial surveillance that would jeopardize public safety and infringe on the privacy rights of all citizens of the State of Texas. Texas Government Code sections 423.002-.004 and 423.006 (the "Surveillance Provisions" or "Drone Surveillance Previsions") prevent drone technology from being used to conduct unauthorized surveillance of private property or citizens. But if Plaintiffs are successful in their challenge, it could usher in an era of surreptitious aerial spying that would subject every Texan to prying eyes from above, permitting drone pilots to conduct surveillance at any time or place across the entire State of Texas. But the Constitution does not require such an Orwellian result. The Drone Surveillance Provisions are reasonable and constitutional regulations that are necessary to protect the public from potential abuse of this technology. The State of Texas respectfully submits that the Court should reject the constitutional challenge to these statutes.

# Interest of Amicus Curiae

The State of Texas, acting through its Attorney General, has a unique interest in the validity and application of the duly enacted laws of its Legislature. Where, as here, the constitutionality of laws of the State of Texas are challenged, the Attorney General, as the chief legal officer of the State, is afforded the opportunity and discretion to intervene as appropriate. *See, e.g.*, Tex. Gov't Code § 402.010. Moreover, the State of Texas and its Attorney General have a solemn responsibility to ensure public safety and protect the privacy rights of Texans. The constitutional challenge to the Drone Surveillance Provisions threatens both.

## Statement of Facts

### I.    These Proceedings

K&K Inez Properties, LLC and David Kucera (collectively, "Kucera") have brought counter-claims against Clay Kolle, Lacy Kolle, and Leona Creek Cattle, LLC (collectively, "Plaintiffs" or "Kolles") pursuant to Texas Government Code chapter 423, §§ 423.003, 423.004, and 423.006. The Kolles moved to sever those counterclaims from the underlying litigation and filed a motion to dismiss and a motion for summary judgment.[1] Although the Kolles have moved to dismiss all claims and argue numerous independent grounds, they have also argued that the provisions of Chapter 423 at issue are unconstitutional.

The Court granted the motion to sever and has now set a hearing on the Kolles' motion to dismiss. Pursuant to Texas Government Code § 402.010, the Attorney General was notified of the Kolles' constitutional challenge and respectfully submits this amicus brief solely to defend the constitutionality of the Drone Surveillance Provisions.

### II.    The Texas Privacy Act and the Drone Surveillance Provisions

The Kolles challenge certain portions of the Texas Privacy Act and later amendments to it, enacted into law as Chapter 423 of the Texas Government Code, titled "Use of Unmanned Aircraft," which is located within a section of the Code dealing with "Law Enforcement and Public Protection." *See* Tex. Gov't Code tit. 4, subtit. B; *see also* "Texas Privacy Act," 2013 Tex. Sess. Law Serv. Ch. 1390 (H.B. 912). This chapter regulates the use of unmanned aircraft (or "UAVs"

---

[1] Kucera filed an opposition, which is docketed under the original Cause No. 17-11-81926-B. Such opposition does not appear to have been docketed under the above-captioned Cause No. 17-11-81926-BB as part of the Court's order granting severance.

or "drones"). Among other provisions, Chapter 423 regulates the types of surveillance that may be conducted with drones, regulates the use of such aircraft by law enforcement agencies, and permits political subdivisions of the State to adopt and enforce ordinances regarding the use of drones during special events. As described in the legislative history materials of the Texas Privacy Act, the privacy and public safety concerns specific to drones are unique and particularly challenging as compared to conventional aircraft:

> Drones can fly low, are quiet, and can be nearly impossible to see unless a person was looking for them. Helicopters and airplanes are noisy and difficult to miss, so a person over whom a helicopter flies would hear it and would be on notice that there could be someone surveilling or photographing them.

Texas Bill Analysis, 2013 Regular Session, House Bill 912, Texas House Research Organization, TX B. An., H.B. 912 (May 7, 2013).

Section 423.003 makes it an offense to "use[] an unmanned aircraft to capture an image of an individual or privately owned real property in this state with the intent to conduct surveillance on the individual or property captured in the image." Tex. Gov't Code § 423.003. It is also an offense to capture such an image and possess, disclose, display, distribute, or otherwise use it. *Id.* § 423.004(a). It is a defense to the inadvertent violation of these provisions if the person destroys and stops using the offending image as soon as it is discovered that it was captured in violation of law. *See id.* §§ 423.003(c), 423.004(d)-(e). Violators of these provisions are also subject to a civil action by "[a]n owner or tenant of privately owned real property located in this state . . . against a person who . . . captured an image of the property or the owner or tenant while on the property." *Id.* § 423.006(a).

Excepted from these prohibitions are certain kinds of image capturing for particular purposes specified by statute. *See id.* § 423.002. For example, it is entirely lawful to use a drone to capture images "of public real property or a person on that property." *Id.* § 423.002(a)(15). Additionally, among many other examples, it is legal to use a drone to capture images with the consent of the subject, *id.* § 423.002(a)(6); for law enforcement to use drones for surveillance "pursuant to a valid search or arrest warrant," *id.* § 423.002(a)(7); or from a flying height of up to eight feet, provided no image amplification is used, *id.* § 423.002(a)(14). There are also a number of exemptions for certain business or public safety purposes, such as "oil pipeline safety," *id.* § 423.002(a)(17); search-and-rescue operations, *see id.* § 423.002(a)(12); and academic purposes, *id.* § 423.002(a)(1).

## ARGUMENT

The Court should reject the Kolles' assertion that the Drone Surveillance Provisions are unconstitutional. These laws pass constitutional muster under the applicable standard of review, and they are neither vague nor overbroad. Similarly, the Kolles' assertion that the Texas Privacy Act is preempted by federal law is meritless. However, the Court should not pass on any of these constitutional questions unless it absolutely must do so. Accordingly, the Court should decline to strike down the Drone Surveillance Provisions as unconstitutional.

## I.    The Drone Surveillance Provisions Are Constitutional

The Kolles contend that the Drone Surveillance Provisions unconstitutionally limit their first amendment rights to freedom of speech and freedom to petition the government. But any assertion that the Drone Surveillance Provisions violate the Constitution is wrong. Most of the provisions do not implicate speech or conduct that is protected by the First Amendment, and to the extent

that the First Amendment is implicated, the Drone Surveillance Provisions are constitutional under the applicable standards.

### A. The First Amendment Is Not Implicated by Sections 423.002, 423.003, and 423.006 of the Texas Government Code.

Most of the Drone Surveillance Provisions implicated by Kucera's counterclaims do not reach conduct that is protected by the First Amendment. Sections 423.002, 423.004, and 423.006 only prohibit the use of drones to conduct surveillance on private property for purposes other than those specified in the twenty-one safe harbor provisions. *See* Tex. Gov't Code § 423.002; *see also id.* § 423.002(a)(15) (permitting the use of drones to capture images "of public real property or a person on that property"). The relevant question, then, is whether the State must allow individuals both to fly drones on or near private property, and to use those drones to conduct surveillance of private property or citizens without authorization, because such activities are expressive conduct that is protected by the First Amendment. The answer is no.

"The First Amendment literally forbids the abridgment only of 'speech,' but we have long recognized that its protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). "In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Id.* (quoting *Spence v. Washington*, 418 U.S. 405, 410-11 (1974)) (alterations in original). But "[t]he protection of the First Amendment depends not only on whether the conduct is expressive, but also on the context in which that expression takes place." *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 283 (5th Cir. 2001).

"[T]he party invoking the First Amendment's protection [has] the burden to prove that it applies." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013) (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984)). "[O]nly conduct that is 'inherently expressive' is entitled to First Amendment protection." *Id.* (quoting *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006)). "In evaluating whether particular conduct possesses 'sufficient communicative elements' to implicate First Amendment protections, courts must ask whether '[a]n intent to convey a particularized message was present, and . . . [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 283 (5th Cir. 2001) (quoting *Johnson*, 491 U.S. at 404); *see also Spence v. Washington*, 418 U.S. 405, 410-11 (1974).

Conducting surveillance of private citizens with a drone does not constitute conduct that is protected by the First Amendment. Piloting a drone "with the intent to conduct surveillance" of "an individual or privately owned real property," Tex. Gov't Code § 423.003(a), is not inherently expressive conduct. There is no "intent to convey a particularized message" when someone flies a drone for the purpose of surreptitious information gathering. *See Little*, 268 F.3d at 283. And even if someone does intend to convey a message, it would not be understood by anyone who happened to view it. *Id.* Indeed, one of the benefits of drones is that they are not loud and disruptive, like a helicopter would be. Thus, the conduct prohibited by the Surveillance Provisions—the piloting of a drone to conduct surveillance—cannot itself be inherently expressive, as one of its main benefits is secrecy. *See also* Texas Bill Analysis, 2013 Regular Session, House Bill 912, Texas House Research Organization, TX B. An., H.B. 912 (May 7, 2013) ("Drones can fly low, are quiet, and

can be nearly impossible to see unless a person was looking for them."). Accordingly, because § 423.003 does not prohibit expressive conduct, the First Amendment is not implicated.

Two of the other challenged provisions also do not implicate the First Amendment. Section 423.002 provides the exceptions of types of conduct that are ***not*** prohibited. *See* Tex. Gov't Code § 423.002. Plaintiffs do not explain how a statute which lays out conduct ***that is not illegal*** could possibly abridge their First Amendment rights. Likewise, § 423.006 provides only for a private cause of action for individuals who are illegally photographed under § 423.003. *See* Tex. Gov't Code § 423.006. This statute is wholly contingent on the other Drone Surveillance Provisions, so it does not merit or require separate constitutional analysis.

The Kolles' arguments to the contrary are unavailing. Because the Drone Surveillance Provisions do not prohibit the use of drones to capture images "of public real property or a person on that property," Tex. Gov't Code § 423.002(a)(15), the line of cases which have held that there is a First Amendment "right to record" the activities of government officials—such as recording a police officer conducting his duties in public—have no application to the Kolles' arguments. *Cf., e.g.*, *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 379 (S.D.N.Y. 2015) (citing cases from the First, Seventh, Ninth, and Eleventh Circuits). Likewise, cases that suggest the act of photography carry with it some element of expression have no application to the Drone Surveillance Provisions, which prohibit only using drones to conduct "surveillance." *See* Tex. Gov't Code § 423.003(a); *cf. ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012). Moreover, the Kolles' allusions to newsgathering and "matters of public concern" does not provide them with an exception. *See Branzburg v. Hayes*, 408 U.S. 665, 682 (1972) ("It is clear that the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil

or criminal statutes of general applicability."). Finally, nothing about the particular circumstances of the Kolles' alleged use of drones to photograph the disputed water incursions, or the Kolles' intended use of that information to petition the government, changes this conclusion. The Supreme Court has long held that the First Amendment "does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). But this is exactly the right that the Kolles claim. The Kolles cannot satisfy their burden to prove their entitlement to constitutional protections merely by asserting it, and they have not provided any authority or argument as to why the right to petition the government is in any way implicated by the Drone Surveillance Provisions. Indeed, the statutes on their face have absolutely nothing to do with petitioning the government.

Because three of the four Drone Surveillance Provisions do not regulate conduct that is protected by the First Amendment, the Kolles' First Amendment arguments must fail.

### B.   The Drone Surveillance Provisions Constitutionally Regulate Conduct.

Even if the Drone Surveillance Provisions implicated the First Amendment at all—which they mostly do not—they are still constitutional. Where conduct that is not inherently expressive but nonetheless may have "some expressive content" is at issue, courts "apply the intermediate scrutiny test articulated by the Supreme Court in *United States v. O'Brien*." *Kleinman v. City of San Marcos*, 597 F.3d 323, 328 (5th Cir. 2010) (citing *United States v. O'Brien*, 391 U.S. 367 (1968)). "*O'Brien* rests on the principle that when 'speech' and 'non-speech' elements are united in a course of conduct, a valid governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.* (citing *O'Brien*, 391 U.S. at 376). "Under *O'Brien*, a regulation is constitutional if [1] it is within the constitutional power of the government; [2] it furthers an important or substantial governmental interest; [3] the government interest

is unrelated to the suppression of free expression; and [4] the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* (citing *O'Brien*, 391 U.S. at 376). The Drone Surveillance Provisions easily meet this standard.

First, regulation of public safety and privacy rights through limiting surveillance is within the traditional police powers of the State. Second, the governmental interests at stake are of the utmost importance. If the Drone Surveillance Provisions are struck down, any individual's right or expectation of privacy will be completely eviscerated. There would be little to stop drones from flying into anyone's backyard to conduct surveillance on private citizens and their families. Likewise, private property rights would be significantly impugned. Without the Texas Privacy Act, any privately owned land or building would be subject to surveillance by anyone with a drone. Moreover, significant public safety and security risks also motivate and justify governmental restrictions. Allowing malicious actors to conduct unlimited, unrestrained, covert drone surveillance on private property and citizens puts them at risk of in a way that cannot be matched by more conventional technologies, putting Texans at greater risk of theft or violent crime. But these are just some of the important interests protected by the Texas Privacy Act. As drone technology matures, it could pose new threats that cannot yet be imagined. Yet the Kolles would have the State stand idly by and have this Court create a constitutional right to record anything from virtually anywhere.

Third, the Surveillance Provisions are unrelated to the suppression of free expression. The purpose of the Texas Privacy Act is not to discriminate against landowners, drone operators, journalists, those petitioning the government, or anybody else conveying any particular kind of message. There are alternatives for aerial image capture, such as helicopters, that the Surveillance Provisions would not prohibit and that could be used to capture the same images that a drone could

capture. Rather, these statutes are necessary to protect other rights and compelling interests, and they are unrelated to the suppression of speech.

Fourth, to the extent that the Surveillance Provisions present any "incidental restriction on alleged First Amendment freedoms," such restrictions are "no greater than is essential to the furtherance of that interest." *Kleinman*, 597 F.3d at 328. As explained, the Surveillance Provisions permit the use of drones to capture images of public places and, for certain purposes, of private property, which minimizes to the greatest extent possible any incidental restrictions. *See* Tex. Gov't Code § 423.002; *see also id.* § 423.002(a)(15) (permitting the use of drones to capture images "of public real property or a person on that property"). Furthermore, the Surveillance Provisions allow for alternatives such as helicopters. Accordingly, the Surveillance Provisions pass the *O'Brien* test and constitute constitutionally permissible regulations on conduct, even if such conduct can be said to have expressive elements.

**C.    To the Extent that the Drone Surveillance Provisions Regulate Expression, They Are Constitutional.**

To the extent that the Court construes the Drone Surveillance Provisions to directly regulate expression,[2] these statutes are content-neutral and constitutional under that test as well. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 125 S. Ct. 2218, 2227 (2015).

---

[2] Only one of the challenged Surveillance Provisions purports to prohibit speech: it is a misdemeanor to disclose or display an image that someone has captured illegally in violation of § 423.003. *See* Tex. Gov't Code § 423.004(a). As discussed above, the remaining statutes do not implicate the First Amendment or, at most, constitute regulations of expressive conduct. But to the extent that the remaining statutes can be construed as direct regulations of protected expression, this analysis is equally applicable.

"This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id.* (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 562-64 (2011)). In other words, "[t]he principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

"The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* (citing *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48 (1986)). "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Id.* (quoting *Clark*, 468 U.S. at 293).

All of the Surveillance Provisions readily meet this standard, as the content of any of the drone-captured surveillance is irrelevant to whether the images have been illegally captured. It does not matter ***what*** is depicted in the drone-captured image, so long as the statutory prerequisites of drone ***surveillance*** are satisfied. *See* Tex. Gov't Code § 423.003 (prohibiting the capture of ***any*** image of individuals or privately owned real property); *see also* § 423.002 (exempting any type of image that is captured pursuant to certain authorizations). The Surveillance Provisions are entirely agnostic as to who or what is being surveilled. Drone operators are prohibited from targeting ***any*** private individual or private real property and disseminating their ill-gotten surveillance.

11

There is no suggestion in the Texas Privacy Act of a governmental objection to the content any message presented in any image captured by drone operators, and that the Surveillance Provisions have "an incidental effect on some speakers or messages but not others" does not make them impermissible under the First Amendment. *Ward*, 491 U.S. at 791. The Surveillance Provisions are content neutral, narrowly tailored, and leave open myriad alternatives for lawful capture of images. *See id.* Accordingly, all of the Drone Surveillance Provisions are constitutional.

### D.   The Drone Surveillance Provisions Are Not Overbroad.

"The traditional rule is that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *New York v. Ferber*, 458 U.S. 747, 768 (1982). "This general rule reflects two 'cardinal principles' of our constitutional order: the personal nature of constitutional rights and the prudential limitations on constitutional adjudication." *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999) (quoting *Ferber*, 458 U.S. at 767). "By focusing on the factual situation before us, and similar cases necessary for development of a constitutional rule, we face flesh and blood legal problems with data relevant and adequate to an informed judgment." *Id.* (internal quotation marks omitted). Accordingly, invalidation for overbreadth is "strong medicine" that the Supreme Court has "employed . . . with hesitation, and then only as a last resort." *Id.* (internal quotation marks omitted).

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). Courts then consider "whether the statute . . . criminalizes a substantial amount of protected expressive activity." *Id.* at 297. "The 'mere fact

that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.'" *Id.* at 303 (quoting *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)).

The Surveillance Provisions prohibit only the use of drones to conduct surveillance private real property and individuals on private property without authorization and outside of the nearly two-dozen other exceptions provided by statute. As explained above, very little protected expressive activity is even implicated by the Surveillance Provisions, much less criminalized. No person is restrained by the Surveillance Provisions from saying whatever they wish or photographing whatever they wish using any other lawful means. The Court need not brainstorm hypothetical scenarios where expressive activity may be at issue because there is not a "substantial amount" of First Amendment protected activity that is implicated by the Surveillance Provisions. Accordingly, Plaintiffs' overbreadth challenge must fail.

### E.    The Drone Surveillance Provisions Are Not Void for Vagueness.

"The Fourteenth Amendment's guarantee of Due Process proscribes laws so vague that persons 'of common intelligence must necessarily guess at [their] meaning and differ as to [their] application.'" *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001) (alterations in original) (quoting *Smith v. Goguen*, 415 U.S. 566, 572 n.8 (1974)). "A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Id.* (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).

The Fifth Circuit has "rejected that a law 'must delineate the exact actions a [person] would have to take to avoid liability.'" *Doe I v. Landry*, 909 F.3d 99, 118 (5th Cir. 2018) (quoting *Roark &*

*Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008)). "'[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1891 (2018) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)) (alteration in original). "No policy can be so specific as to cover every conceivable situation and to disallow all discretion or interpretation in its application." *Ne. Penn. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 327 F. Supp. 3d 767, 784 (M.D. Penn. 2018). "'[O]nly a reasonable degree of certainty is required.'" *Roark & Hardee*, 522 F.3d 552-53 (quoting *United States v. Tansley*, 986 F.2d 880, 885 (5th Cir. 1993)) (emphasis and internal quotation marks omitted).

The Kolles' assertion that the word "surveillance" renders the Texas Privacy Act unconstitutionally vague is completely meritless. Plaintiffs' position is undermined by their own pleadings, where the list and describe definitions of the word "surveillance" from commonly available dictionaries. Thus, The Kolles all have at least a "reasonable degree of certainty" about what is prohibited, which is all that due process requires. *See Roark & Hardee*, 522 F.3d 552-53. The question of whether their alleged activity constitutes impermissible "surveillance" is a factual inquiry that depends on the particular conduct in which Plaintiffs engage, and is not evidence of vagueness in the statute.

As with the overbreadth challenge, the Court need not engage in a string of hypotheticals in order to find arguable edge cases. Ordinary persons are perfectly capable of understanding the meaning of the word "surveillance," and the Surveillance Provisions do not allow for arbitrary or discriminatory enforcement. Plaintiffs fault these laws for failing to provide "perfect clarity" and "precise guidance." *Minn. Voters*, 138 S. Ct. at 1891. But the Fifth Circuit has never required that

"a law 'must delineate the exact actions a [person] would have to take to avoid liability.'" *Doe I*, 909 F.3d at 118 (quoting *Roark & Hardee*, 522 F.3d at 552). This Court should not break with precedent and impose such a requirement now. Accordingly, the Drone Surveillance Provisions are not void for vagueness.

## II.   Federal Law Does Not Preempt the Texas Privacy Act.

The Kolles are incorrect the Federal Aviation Act ("FAA") preempts or affects in any way the validity of the Drone Surveillance Provisions. As an initial matter, the Court need not engage in *any* preemption analysis because the Kolles have not explained how any purported preemption—even if it existed, which it does not—would operate to preempt the Drone Surveillance Provisions. The Kolles contend that preemption applies because the FAA's regulation of "aviation safety." But the Drone Surveillance Provisions do not relate to aviation safety at all. Nobody is prohibited from lawfully operating a drone by the provisions of the Texas Privacy Act at issue in this case. The Drone Surveillance Provisions only regulate what a person may do with their drone—that is, they may not conduct unauthorized surveillance—and Chapter 423 says nothing about where or how drones may be flown. For this reason, the Kolles' arguments regarding preemption are a red herring. The conduct regulated by the Drone Surveillance Provisions has nothing to do with aviation safety. Accordingly, the Court need not analyze any further.

Even if the Court were to conduct a preemption analysis regarding these statutes, however, there is still no basis for finding that state law has been preempted. The Kolles have asserted both field preemption and obstacle preemption in their filings, but neither doctrine is applicable.

### A.   Field Preemption

Although it is unclear from Kolles' pleadings whether they assert field preemption with respect to Kucera's claim under § 423.006, to the extent that they do argue this doctrine, it is inapplicable. In situations where field preemption applies, Congress has forbidden the State to take action in the field that the federal statute pre-empts." *Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1595 (2015). "Although the Supreme Court has recognized field preemption claims, it has indicated courts should hesitate to infer field preemption unless plaintiffs show 'that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was 'the clear and manifest purpose of Congress.'''" *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018) (quoting *DeCanas v. Bica*, 424 U.S. 351, 357 (1976)). "To establish field preemption, moreover, the plaintiffs must prove that federal law evinces 'the clear and manifest purpose of Congress' to preclude even complementary state legislation on the same subject." *Id.* at 178. Additionally, "the relevant field should be defined narrowly." *Id.* at 177.

The Kolles' argument that the FAA has preempted the entire field of aviation safety regulation is simply wrong. "Neither the Supreme Court nor the Fifth Circuit have held that the Federal Aviation Act preempts the entire field of aviation safety." *Monroe v. Cessna Aircraft Co.*, 417 F. Supp. 2d 824, 828 (E.D. Tex. 2006). Though the Fifth Circuit has specifically found that "passenger safety warnings and instructions" aboard aircraft are preempted by federal law, *Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 385 (5th Cir. 2004), its holding was narrowly confined to that issue, *id.* at 386, even after having noted the "broad array of [federal] safety-related regulations" related to aviation, *id.* at 384. Simply put, "[t]here is not sufficient evidence of a clear intent by Congress to preempt, neither through a pervasive scheme of federal regulations set forth by the FAA nor

within the Act's text and legislative history." *Monroe*, 417 F. Supp. 2d at 836. Therefore, "[t]he field of aviation safety is not preempted by the Federal Aviation Act." *Id.*[3]

Authority cited by the Kolles undermines their assertion of field preemption. In *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624 (1973), the Supreme Court held only that the federal aviation noise regulations were preempted, which is far narrow than what Plaintiffs have alleged. *See id.* at 638-40. And in *Singer v. City of Newton*, 284 F. Supp. 3d 125, 130 (D. Mass. 2017), the court found that the FAA *does not* preempt non-federal regulations in the field of regulation unmanned aircraft. Indeed, the court found that "***the FAA explicitly contemplates state or local regulation of pilotless aircraft***, defeating [the] argument that the whole field is exclusive to the federal government." *Id.* (emphasis added). Accordingly, field preemption does not apply.

### B.    Obstacle Preemption

"Under the doctrine of conflict preemption, state law is preempted when 'it actually conflicts with federal law.'" *Univ. of Tex. Sys. v. Alliantgroup LP*, 400 F. Supp. 3d 610, 616 (S.D. Tex. 2019) (quoting *English. v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)). The Drone Surveillance Provisions do

---

[3] Other courts that purport to have found that the FAA does preempt state law in the field of aviation safety have done so only in narrow contexts of wholly dissimilar cases, such as tree removal surrounding an airport, *Godspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206 (2d Cir. 2011), or the standard of care on a tort claim, *Montalvo v. Spirit Airlines*, 508 F.3d 464 (9th Cir. 2007); *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784 (6th Cir. 2005); *Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363 (3d Cir. 1999); *Crout v. Haverfield Int'l, Inc.*, 269 F. Supp. 3d 90 (W.D.N.Y. 2017). *See also, e.g.*, *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65 (2d Cir. 2019) (prohibiting of runway construction); *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318 (10th Cir. 2010) (requiring airline to obtain alcoholic beverage license); *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218 (2d Cir. 2008) (mandating provision of certain amenities on commercial passenger flights). Thus, where the "relevant field" is defined "narrowly," as it must be under Fifth Circuit law, *City of El Cenizo*, 890 F.3d at 177, Plaintiffs cannot establish that there has been field preemption that relates to the Drone Surveillance Provisions.

not stand in the way of the accomplishment of any federal policy, which defeats the Kolles' assertion of obstacle preemption. *See Zadeh*, 820 F.3d at 751 (holding that obstacle preemption is "when a state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'") (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). As demonstrated in Plaintiffs' cited authority, "the FAA explicitly contemplates state or local regulation of pilotless aircraft." *See Singer*, 284 F. Supp. at 130. The Kolles do not explain what "obstacle" the prohibition on the unrestricted surveillance of private property and citizens could possibly present to the accomplishment of the FAA's objectives. The Texas Privacy Act presents ***no obstacle*** to the FAA because the two statutory schemes regulate different conduct.

For the foregoing reasons, the Kolles' assertions of federal preemption fail.

## III.  The Court Should Address the Constitutional Challenge Only as a Last Resort.

"A statute is presumptively constitutional." *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 169 (Tex. 2004) (citing *Barshop v. Medina Cnty. Underground Water Conversation Dist.*, 925 S.W.2d 618, 625 (Tex. 1996)). Courts "presume that when enacting legislation, the Legislature intends to comply with the state and federal constitutions." *Stockton v. Offenbach*, 336 S.W.3d 610, 618 (Tex. 2011) (citing Tex. Gov't Code § 311.021(1)). Accordingly, courts "are obligated to avoid constitutional problems if possible." *Brooks*, 141 S.W.3d at 169. "As a rule, we only decide constitutional questions when we cannot resolve issues on nonconstitutional grounds." *In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003).

The Kolles' motion to dismiss the counterclaims against them raises numerous nonconstitutional grounds that the Court should consider before address the merits of the constitutional challenge. Although the challenged statutes are constitutional, as described above, the Court should

not address that question unless it is absolutely necessary. Texas takes no position with respect the merits of Kucera's counterclaims or the Kolles' other defenses and grounds for dismissal, but the Court's obligation to avoid constitutional questions if possible requires the Court to consider and rule on each of the Kolles' other arguments before turning to the constitutional challenge.

## Conclusion

The Court should decline to consider the constitutionality of the challenged provisions of the Texas Privacy Act or, if such a ruling necessary, find that those provisions are constitutional.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Jeffrey C. Mateer
First Assistant Attorney General

Ryan L. Bangert
Deputy First Assistant Attorney General

Darren L. McCarty
Deputy Attorney General for Civil Litigation

Thomas A. Albright
Chief, General Litigation Division

/s/ Christopher D. Hilton
Christopher D. Hilton
Assistant Attorney General
Texas Bar No. 24087727

Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Tel.: (512) 463-2120
Fax: (512) 320-0667
christopher.hilton@oag.texas.gov

Counsel for the State of Texas

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing pleading has been served on all

counsel of record or unrepresented parties on August 26, 2020, in accordance with Rule 21a of the

Texas Rules of Civil Procedure, electronically through the electronic filing system, electronic mail,

or certified and registered U.S. Mail.

/s/ Christopher D. Hilton
Christopher D. Hilton

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, TEXAS PRESS ASSOCIATION, and JOSEPH PAPPALARDO, Plaintiffs, | § § § § § | |
| v. | § § § | CIVIL ACTION NO. 1:19-CV-00946-RP |
| STEVEN MCCRAW, in his official capacity as Director of Texas Department of Public Safety, DWIGHT MATHIS, in his official capacity as Chief of the Texas Highway Patrol, and WES MAU, in his official capacity as District Attorney of Hays County, Texas, Defendants. | § § § § § § § § | |

**DECLARATION OF DONNIS BAGGETT,
EXECUTIVE VICE PRESIDENT, TEXAS PRESS ASSOCIATION**

My name is Donnis Baggett. I am over 18 years of age, have never been convicted of any felony or any crime involving moral turpitude, and have personal knowledge of the facts stated in this declaration.

1.  I am the Executive Vice President of the Texas Press Association (TPA). I have been with TPA since 2012. Before working with TPA, I had almost four decades of experience as a newspaper journalist. I worked as a reporter, assistant city editor and assistant state editor for *The Dallas Morning News* before being named state editor of that newspaper in 1982. I was later promoted to assistant managing editor in charge of the Sunday edition. I became publisher and editor of the *Bryan-College Station Eagle* in 1995 and served as the publisher of the *Waco Tribune-Herald* from 2010-2012. I am a former president of the Press Club of Dallas, a former board member of the Freedom of Information Foundation of Texas, and a member of the Texas Newspaper Foundation Hall of Fame.

Exhibit 2

2.      TPA is the voice of the Texas newspaper industry. It promotes the welfare of Texas newspapers, encourages higher standards of journalism, and plays an important role in protecting the public's right to know as an advocate of First Amendment liberties. TPA is one of the nation's oldest and largest newspaper trade associations, founded in 1880. It represents approximately 400 paid-circulation member newspapers, both dailies and non-dailies. Its members include *The Dallas Morning News*, the *San Antonio Express-News*, the *Fort Worth Star-Telegram*, and the *Austin American-Statesman*.

3.      Through my work with TPA, including general interactions with representatives of TPA member newspapers, I have become aware that the Texas laws restricting drone photography and areas in which drone flight is prohibited (generally referred to in this Declaration as "Chapter 423") have limited the ability of TPA member newspapers to cover breaking news safely and inexpensively. I have become aware that the restrictions of Chapter 423 have led some newspapers to avoid the use of drone photography. Drone photography allows journalists to capture images that would not be available from ground level and offers an alternative for aerial photography that is much less expensive, less cumbersome, and more rapidly available than helicopters or airplanes, which pose an inherent danger of crashes that can result in serious injuries or death.

4.      Through my work with TPA, I have become aware of the incident in which Guillermo Calzada, while on assignment for TPA member newspaper the *San Antonio Express-News*, was threatened with arrest and/or criminal prosecution for using a drone to photograph the aftermath of a fire in San Marcos, Texas. This type of news event is a typical example of one that would benefit from drone photography if such were allowed by Texas law. Obtaining aerial photographic coverage of an incident such as this would be much more expensive and difficult if

2

use of a helicopter or airplane was required, and most TPA-member newspapers would not have the budget or time for such coverage.

5.    TPA has occasionally received inquiries from representatives of member newspapers, and had discussions with those representatives, regarding Chapter 423's effect in limiting its members' ability to cover breaking news safely and inexpensively.  TPA has also distributed a newsletter article regarding Texas drone photography restrictions, available at https://www.texaspress.com/sites/default/files/ebulletins/0914e-newsletter.pdf.

6.    Based on my experience in newspapers and with TPA, I know that drones allow visual journalists to capture more informative, more timely, and higher quality images.  I also know, based on my experience, that many news organizations have also reduced their staff due to budgetary concerns. As a result, visual newsgathering increasingly depends on independent visual journalists, who generally cannot afford to use helicopters or airplanes for newsgathering.

### DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on July _7_, 2021.

signature of declarant

3

**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS | § | |
| ASSOCIATION, TEXAS PRESS ASSOCIATION, | § | |
| and JOSEPH PAPPALARDO, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 1:19-CV-00946-RP |
| | § | |
| STEVEN MCCRAW, in his official capacity as | § | |
| Director of Texas Department of Public Safety, | § | |
| DWIGHT MATHIS, in his official capacity as | § | |
| Chief of the Texas Highway Patrol, and | § | |
| WES MAU, in his official capacity as | § | |
| District Attorney of Hays County, Texas, | § | |
| Defendants. | § | |

<u>**DECLARATION OF D. VICTORIA BARANETSKY,**</u>
<u>**GENERAL COUNSEL, THE CENTER FOR INVESTIGATIVE REPORTING**</u>

My name is D. Victoria Baranetsky. I am over 18 years of age, have never been convicted of any felony or any crime involving moral turpitude, and have personal knowledge of the facts stated in this declaration.

1.      I am general counsel at The Center for Investigative Reporting ("CIR"), which is a nonprofit news organization established under the laws of California with its principal place of business in Emeryville, CA. CIR operates Reveal, an investigative news program that publishes an online news site at revealnews.org, a weekly public radio show and podcast called *Reveal*, as well as documentaries distributed through various programming such as PBS Newshour, Frontline, and Netflix.

2.      Founded in 1977 as the nation's first nonprofit investigative news organization, today, Reveal is one of the country's most trusted media outlets. CIR has received multiple awards for its reporting. In the past several years, CIR has been a Pulitzer Prize finalist, received three

Exhibit 3

Edward R. Murrow Awards, a duPont Award and a Peabody for its journalism under the Reveal brand.

3.      CIR's journalism is far-reaching; the Reveal podcast alone has 3 million weekly listeners in the United States, which does not include the number of listeners it reaches on syndicated radio stations all across the country. Internationally, Reveal's podcast has 64 million downloads and its show airs on several other countries' radio stations.

4.      As general counsel, I oversee all legal matters, including advising reporters on newsgathering, libel, privacy, subpoenas, security, prepublication, and other newsroom matters. I also counsel the C-level suite, advise the board, and oversee the advisory board.

5.      Prior to CIR, I worked at the Wikimedia Foundation, the Reporters Committee for Freedom of the Press, and The New York Times. I have a law degree from Harvard Law School, a master's degree in philosophy from Oxford University, a graduate degree from Columbia Journalism School, and a bachelor's degree from Columbia University. I am barred to practice law in California, New Jersey, and New York. Currently, I am a fellow at the Tow Center for Digital Journalism at Columbia University and also teach media law and the First Amendment at Berkeley Law School as an adjunct professor.

6.      Reveal's reporting often includes various multi-media images, including still photos as well as video, to help the public understand Reveal's reporting more effectively. These images are especially important to reporting, by providing additional information and more keen perspectives that cannot otherwise be translated through text. The adage "a picture is worth a thousand words" is especially apt in describing the importance of aerial imagery, which can add a unique element to a story by showing a large area of land in one shot, or giving a better idea of what a place looks like, that simply cannot be understood through words. For instance, seeing the

impacts of a hurricane or the aerial view of a region affected by war is not a concept that can easily, or even at all, be translated in language.

7.     When Reveal editors decide that they need aerial images to enhance their reporting, Reveal hires an experienced and licensed news photographer to operate a drone, if the images cannot be obtained through some other way. As a nonprofit newsroom with a limited budget, Reveal cannot use helicopters, as they are cost prohibitive.

8.     In June 2018, Reveal reporters covering the immigration beat were investigating the private shelters contracted by the U.S. Department of Health and Human Services and the Office of Refugee Resettlement to hold immigrant unaccompanied minors.  In particular, one of Reveal's stories was about the Shiloh Treatment Center, a residential child care center in Manvel, Texas that has been widely cited for various violations, including abuse and nonconsensual administration of medications to children occupants. The reporting revealed that despite a history of physical and sexual abuse, the Shiloh Treatment Center continued to receive millions in federal tax dollars to house immigrant children. The lead article in the series can be found here: https://revealnews.org/article/federal-agency-sent-immigrant-kids-to-dangerous-youth-facility-despite-serious-warning-signs/.

9.     In connection with its reporting of the Shiloh Treatment Center, Reveal hired Brandon Wade, a Texas-based freelance photojournalist, to capture aerial images showing readers what the Shiloh Treatment Center looked like, how remote it was, as well as the layout of its buildings. Reveal's editors determined it was important to include these images in our reporting for the public to have a holistic understanding of where the children were, as the images reveal a large compound, without many buildings, in a somewhat remote area.

10.     On June 28, once the editors notified me of their decision to use the drone, I immediately asked the editors to put a hold on the assignment until I had time to review the potential risks under the state law and federal law given the factual circumstances.  Having followed the changes in drone law since 2013 and having attended the Poynter Institute's Drone Journalism School in Portland, Oregon, where I learned about the various laws regulating journalists' use of drones, I knew there may be laws impacting reporters using this technology.

11.     As a media attorney and general counsel, I am obligated to ensure CIR is not putting a freelancer in harm's way or exposing itself to unwise legal liability.

12.     After reviewing the FAA's federal regulations, I researched Texas' law, Chapter 423, which prohibits various types of drone use. I determined that federal regulations do not restrict these actions and other states do not restrict journalists using drones like Texas does. But I was concerned about how the Texas' statute applied to journalists using drones, and what the possible consequences would be for Mr. Wade as well as CIR.

13.     After further analyzing Chapter 423, I determined that there was ambiguity about what type of drone use qualified as "commercial" under the law.  I also determined there was ambiguity as to whether the images Mr. Wade captured or CIR's use of them would qualify as commercial.

14.     I also determined that the law was likely unconstitutional as it was vague, not narrowly tailored, overbroad and seemed to target journalists. *See similar ALDF v. Wasden*, 878 F.3d 1184 (9th Cir. 2018) (discussing constitutional objections to an Idaho statute that made it a crime to videorecord or photograph agricultural production).

15.     I then conferred with Alicia Wagner Calzada, counsel from the NPPA, over the phone about Texas' drones law.  I confirmed that she also shared my interpretation and asked

whether there was a precedent of other newsrooms using drones in the area. Ms. Calzada explained that at least two other news stations had used drones to do their reporting and that the Texas law had not been enforced against those news organizations.

16.     I then asked the reporters what locations they wanted to record via drone. Finally, Mr. Wade and I exchanged emails discussing whether he was licensed to operate a drone under federal law. I also asked where he would ostensibly be operating the drone from and whether it was possible to shoot the images while he operated the drone from public land and it flew over public land.

17.     I determined that Mr. Wade could proceed to record images—although in a more restricted way than he would have otherwise, so CIR and Mr. Wade would have stronger defenses if needed.

18.     To reduce the chance that CIR or Mr. Wade would face a legal challenge, I asked Mr. Wade to be careful to only stand on public property while flying his drone and to ensure the drone only flew over public property. I also asked that Mr. Wade ensure he was in the air for the shortest period of time possible and that he confirm when the project started and was complete. I told Mr. Wade that if any authorities came, he should stop immediately and contact me directly.

19.     Reveal paid Mr. Wade for his images and video of the Shiloh Treatment Center. I further advised Reveal's editors to publish only still photos of the Shiloh Treatment Center to decrease the likelihood of a challenge under Chapter 423, since the video would have made it more obvious that the recordings were taken with a drone.

20.     If Mr. Wade had not been restricted, more comprehensive images likely could have been taken. Similarly, if Reveal had published the video, readers of Reveal would have obtained a better understanding of where the shelter was located and how remote it is.

21.     Given the lack of parity with other state laws as well as the practical prohibitions it creates on reporting, Chapter 423 seems to me to be a method of preventing reporting on important matters of public interest. It is especially troubling that the statute's criminalization of drone use opens the door to selective prosecutions of a journalists who produce stories to benefit the public. In this way the Chapter 423 poses a substantial risk of criminalizing lawful—and constitutionally protected—newsgathering activity and chilling the very type of investigative journalism that has previously led to positive reforms and important changes in our society.

22.     I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct to the best of my knowledge and belief.


Executed July 2, 2021 in Berkeley, California.

*s/ D. Victoria Baranetsky*
D. Victoria Baranetsky

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, *et al.* | § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. |
| v. | § § | 1:19-cv-00946-RP |
| STEVEN MCCRAW, *et al.*, | § § | |
| Defendants. | § § | |

---

**DECLARATION OF GUILLERMO ("BILLY") CALZADA IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

1.      My name is Guillermo ("Billy") Calzada. I am over the age of eighteen (18) years. I have never been convicted of a felony or a crime involving moral turpitude, am under no disabilities, and am fully competent and qualified to make this declaration.

2.      I am a staff photojournalist at the *San Antonio Express-News*. I have worked there for over twenty years in my capacity as a news photographer covering a wide range of news stories including sports, spot news, features, portraits, and natural disasters. I have been a professional photojournalist for over three decades, and most of that has been in the state of Texas. I began my career as a staff photographer at the *El Paso Herald-Post* in 1987 and after that newspaper closed, I worked for two years as a staff photographer for the *Orlando Sentinel* before returning to Texas for my current position. During this time, I have received numerous state, regional and national awards for my journalism.

3.      I am a member of the National Press Photographers Association and have been since at least 1986. As a member, I have signed the NPPA Code of Ethics, available at this link: https://nppa.org/nppa-code-ethics.

4.      In my capacity as a photojournalist, I often have occasion to do aerial photography. Aerial photographs provide a perspective that can add significant information and depth to a news story. Particularly when a news scene or a story involves a large area of land, showing the reader the aerial perspective enhances the story significantly.

5.      I have a remote pilot airman certificate with a small UAS rating, which qualifies me to operate a small unmanned aircraft system (also called a UAS or drone) in the National Airspace System of the United States. I obtained this certificate by passing the FAA's Knowledge Test, after attending 16 hours of training, 80 hours of studying FAA regulations and related laws as well as studying scientific information relevant to operating in the National Airspace System. My UAS is registered with the FAA.

6.      I personally own a GoPro Karma drone which I use for newsgathering purposes when the situation requires it. These images relate to a wide range of matters of public concern.

7.      On July 20, 2018, there was a devastating and deadly fire at the Iconic Village Apartments in San Marcos, Texas. There were numerous fatalities.

8.      On Tuesday, July 24, 2018, on assignment for the *San Antonio Express-News*, I flew my UAS near the sight of the fatal fire. I pulled up to a location across the street from the property. A makeshift chain-link fence had been placed around the property and yellow "do not cross" tape was on the fence. Before I launched, I checked for any temporary flight restrictions in

the area. There were none. I used the Airmap iPhone app to file my flight with the FAA. I launched

from a takeoff point about 60 feet from the fence and tape and was in the air for approximately 3

to 4 minutes. I estimate that my altitude was about 90 feet. At no time was my UAS directly above

the property enclosed by the yellow tape.

9.      After I finished taking pictures, I put my drone in my car. I was about to close my

Airmap plan when a gentleman wearing a helmet with an ATF logo approached me and asked who

I was and what I was doing. I answered his questions. He was courteous. I was too. He then told

me that I was interfering with a federal investigation, I responded that neither my person nor my

UAV had crossed the yellow tape. He asked if I had flown directly over the burned property. I said

no. I told him that I launched straight up, and recovered straight down, using a nearby electric wire

as my guide, and not crossing the wire. The agent again claimed that I was interfering. I politely

disagreed with him as my photography did not interfere with any investigation. The agent, whose

name I did not get, called the San Marcos police. He left and another ATF agent came and stood

with me until the local police came.

10.      Two officers from the San Marcos Police then arrived, asked for my ID and ran it.

One of the two officers stated that she did some research on the way over and found a state law

relating to drones. She said that I had violated state law by taking pictures. She told me that if I

published the photographs, I would be violating state law again. She then told me that she wasn't

going to cite me at that time.

11.      I do not own or control what is published by the *Express-News*.

12.      The *Express-News* published one of the aerial photographs that I took—as the lead

image on the front-page story about the fire—on July 24, 2018. A true and correct copy of the

front page from that day is attached to this declaration as Exhibit A. The photo has been republished many times since as a part of follow-up stories and will continue to be re-published as the story evolves. I continue to worry that I might be arrested, fined or sued as a result of the publication and republication of this image.

13.     The fire at the Iconic Village Apartments in San Marcos is a matter of public concern as it involves significant questions about public safety, the possibility of a crime, and the tragic death of 5 people.

14.     After the aerial photo from the Iconic Village Apartments was published, I received an email from one of the tenants who was out of town the day of the fire, but whose roommate died in the blaze. She wrote that "Your photo is the only image I've seen that comes close to representing how I'm feeling inside right now." She added that the photograph "has somehow helped me in my grieving and healing process. Your photo has had a profound effect on me and I appreciate you for shooting it and sharing it." A true and correct copy of that email is attached to this declaration as Exhibit B.

15.     Renting a helicopter to make aerial images costs at least $800 per hour. It is simply not feasible to hire a helicopter for every story that would benefit from aerial photographs. For the San Marcos apartment fire story, I could have taken the same images with a helicopter, but it would have been prohibitively expensive.

16.     In addition to the cost of flying a helicopter for aerial photographs, flying in a helicopter is inherently risky. Over the course of my career, I have become aware of multiple incidents where photojournalists have died in helicopter crashes while covering news. Other people, including pilots and individuals on the ground, lost their lives in some of the same

incidents. It is always a thought on my mind when I need to take a helicopter to do aerial photographs.

17.     Ch. 423 of the Texas Government Code makes it an offense to use "an unmanned aircraft to capture an image of an individual or privately owned real property in this state with the intent to conduct surveillance on the individual or property captured in the image." Because the word "surveillance" is not defined and the dictionary definition of "surveillance" is broad enough to include my work as a journalist, I am concerned that using a UAS for journalistic purposes would put me at risk of criminal penalties, and subject me to liability in a civil lawsuit. My July 24, 2018 encounter with the San Marcos police department has elevated my concern for this risk. I continue flying my UAS, but I am very wary when I do, and choose not to fly if law enforcement is anywhere in the vicinity. I have two small children and the risk of being arrested is a significant deterrent for me as it would cause trauma to them as well.

18.     Chapter 423's "surveillance" provision is particularly harmful to my ability to use my UAS to take photos of major news stories in or near neighborhoods, such as floods, fires or other newsworthy events. As Chapter 423 is written, I believe it could subject me to liability for including homes that are adjacent to newsworthy events in my photography without permission of the homeowners. For example, during the deadly winter storm in February 2021, when the roads were nearly impassable, I used my drone to make images of San Antonio suffering the effects of the storm. A true and correct copy of a contemporaneous publication of one of these images in the *Express-News*, is attached as Exhibit C. There were dozens of houses in this photograph and timely obtaining permission from each property owner would have been impossible—making complying with Ch. 423 in this instance equally impossible.

19.     Chapter 423 also makes it an offense to fly over its designated "No-Fly" zones, which include sports arenas and correctional facilities. This creates additional hurdles to flying, even if I think that the situation is newsworthy. The "No-Fly" provisions of Chapter 423 contain an exemption for drone use for a "commercial purpose." However, the statute does not define the word "commercial" and in the photography industry, journalism is not considered "commercial" photography. Therefore, as Chapter 423 is written, I believe it would subject me to liability for flying in the designated "No-Fly" zones.

20.     A few weeks ago, I had an assignment to photograph Nelson Wolff Stadium, the home to San Antonio's minor league baseball team, the San Antonio Missions (also sometimes called the Flying *Chanclas*). The assignment would have benefitted from aerial images. However, the stadium is located Class D airspace because of its proximity to Kelly Field, and the adjacent air force base. This area is in a zero grid, meaning the permissible altitude for flying a drone is normally zero unless you have a waiver. Because of this I applied to the Federal Aviation Administration (FAA) for a waiver. I was granted the waiver and now I have permission to fly my drone in the area around Kelly Field, including Nelson Wolff Stadium- as long as I get approval from the airport control tower, to ensure there wouldn't be a conflict with flight operations. The waiver is attached to this declaration as Exhibit D.

21.     I have permission from the FAA – including a registration for my drone, a Part 107 pilot's license, and a specific waiver authorization – to fly my drone over and around Nelson Wolff Stadium. However, if I do so, I would still be subject to liability pursuant to Texas Government Code § 423.0046, which prohibits me from flying my drone over the stadium—even when it is empty. Massive military C-5, C-17 and F-16 planes fly over the stadium on a regular basis for flight operations, but I am banned from flying my tiny drone. Additionally, the extensive federal

authorization I have for these flights would not protect me from the "surveillance" provisions in Chapter 423 if a property owner near Nelson Wolff Stadium objects when their property is included in an image of this area.

22.     In 2019, I photographed a story about a series of failing dams and lakes that are a part of the Guadalupe-Blanco River Authority in Central Texas. Homes and businesses in the surrounding area were facing significant impact. One of them was Lake Dunlap -- a high hazard dam which qualifies as critical infrastructure under § 423.0045(1-a)(xii). I photograph infrastructure for the newspaper often as a part of my job and therefore, when I photographed the dam with my drone, I didn't think about the fact that doing so would subject me to liability under Ch. 423's No-Fly critical infrastructure provision. The story and resulting photographs can be found at the following link.    https://www.expressnews.com/news/local/article/Aging-steel-suspected-in-dam-failure-at-Lake-13852316.php#photo-17468924. As a journalist, it is important for me to capture images in the way that conveys the story in the most effective way, and I have a need to continue photographing this dam and other area dams with my drone as the *Express-News* continues reporting on this story which impacts thousands of people.

23.     Ch. 423 has chilled me by causing me to be at risk of civil and criminal liability when I photograph important scenes related to news stories using my UAS, which I am authorized to operate in the National Airspace.

24.     I believe that the citizens of Texas have been harmed by incomplete reporting on stories where I could have, but I was unable to, use my UAS, which I am authorized to operate in the National Airspace.

25.     My news organization competes with news organizations from around the country, and around the world. News organizations from other states do not have the oppressive restrictions of Ch. 423 and are able to use UAS in their reporting, making their coverage more complete and increasing the understanding of the reader. The statute puts me and my news organization at a competitive business disadvantage when we are unable to capture and publish UAS images as a part of our news coverage.

26.     Based on my past experiences, I believe that Ch. 423 will continue to put me at risk for criminal and civil liability for my reporting, and this risk has a continuing chilling effect on my reporting.

## DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on June 21, 2021.

*/s/ Guillermo Calzada*
signature of declarant

# EXHIBIT A

**WORLD**

## Wildfires driving residents into sea

Greeks are asking for help, as fast-moving fires have killed more than 70 people — some of whom drowned after they leapt into the sea. **Page A8**


Valerie Gache / Getty Images

**SPORTS**

## You still have to love the guy, Green says of Kawhi

Page C1

**BUSINESS**

## Retired banker Frost recovering from stroke

Page B1

# San Antonio Express-News

ExpressNews.com and mySA.com | **Wednesday, July 25, 2018** | THE VOICE OF SOUTH TEXAS SINCE 1865

# Apartment residents tell of flames, smoke, terror


Billy Calzada / Staff photographer
A drone operating at a distance from the scene of the fire captured this view of the Iconic Village Apartments in San Marcos.

## Bedlam jolted many awake in San Marcos

**By John MacCormack**
STAFF WRITER

SAN MARCOS — Early Friday, Jackson King awoke to the sound of breaking glass at the Iconic Village Apartments. He thought someone was burglarizing his home.

But one glance told him it was far worse than a break-in: The ceiling of his ground-floor apartment already was cloaked in smoke.

"My roommate ran to open the front door. Nothing but fire.

He flung the door shut because of the heat and smoke," he said.

King, 22, felt like he was suffocating. He dropped to the floor, and with his roommate, crawled beneath the smoke to a bedroom window and to safety.

"After that, we started helping people. Some were jumping from the second floor. A couple of girls hurt themselves," he said, describing the chaos and fear as the blaze raced through his building — Building 500 — about 4:30 a.m.

The inferno killed five people at the complex, all in Building 500. The apartments, which are two blocks from Texas State University, long have been used by students who attend the school.

*Terror continues on A10*


Marvin Pfeiffer / Staff photographer
A volunteer helps Jackson King, 22, a senior at Texas State University, to his car at the San Marcos Activity Center. King lived on the first floor of building 500 at the complex.

# Alamo Colleges will raise tuition

## 15% increase set in January

**By Alia Malik**
STAFF WRITER

Starting in January, Alamo Colleges students will pay an additional $13 per credit hour for tuition, a 15 percent increase for in-district students.

The boost is needed because a "perfect storm" of declining state funding and enrollment growth is about to crash into the fiscal year that begins in September, Diane Snyder, vice chancellor for finance and administration, told the district's board earlier this month.

"This is the year that we need
*Colleges continues on A10*

# U.S. plans to prop up farmers in trade war

## $12 billion in aid now on the way

**By Lynn Brezosky**
STAFF WRITER

The Trump administration pledged $12 billion in financial assistance to U.S. farmers Tuesday as it reiterated attacks on the "illegal trading practices" it blames for a broadening trade war with China and other countries.

It was a dose of relief for rural Texans — among the nation's largest exporters of cotton and sorghum to China — and a
*Farmers continues on A9*

**Recycled news:** Trump tells the VFW he dislikes the media. **A7**

## High-impact research near Uvalde

### Evidence sought of a prehistoric meteorite strike

**By Brian Contreras**
STAFF WRITER

UVALDE — Dwight Jurena is sitting by U.S. 83, just south of this community, where the Hill Country meets the South Texas plains.

Actually, it's all plains here — aside from an old fence along

the highway, a coil of rusty barbed wire hanging off it, there's not much to see except scrub and mesquite trees.

"This is as featureless as that one scene in 'Fargo' when the guy comes off the highway to bury the briefcase and it's snow in either direction," he remarks. "Except we don't have snow; we have brush."

But Jurena, an adjunct instructor of geology at San Antonio College, isn't interested in what's above ground. He's focused on what's below — the remains of a massive crater

formed when a meteorite struck the earth tens of millions of years ago.

Hoping to prove the meteorite hypothesis, Jurena is spending a few mid-July days in the company of students researching a geological structure called Bee Bluff.

In a neon orange vest and wide-brimmed hat, he talked about earth science as if unaware of how well he knows the topic. He can say so much, so fast, that students have

*Uvalde continues on A13*


Marvin Pfeiffer / Staff photographer
SAC students Emily Reyes (from left) and Jonathan Garcia take readings from a gravity meter along with geologist and adjunct faculty instructor Dwight Jurena.

**WEATHER**
HIGH **99**   LOW **76**   Shower
Full report, C8


**TRICENTENNIAL**
Triangular skyscraper was a work of art. **Page A12**


**Subscriber bonus:** It's the bun that makes the burger
» ONLINE E-EDITION, PAGE EE1


153rd year, No. 298.
40 pages, © 2018
San Antonio Express-News




**Luxury Value We Just Can't Keep Quiet About!**




# EXHIBIT B

**From:** **Arley Nevar** arleynevar@gmail.com 
**Subject:** San Marcos Fire Photos
**Date:** July 31, 2018 at 12:02 PM
**To:** bcalzada@aol.com

Hi Billy,

    I came across your aerial photo of the apartment building that burned down in San Marcos and was wondering if you have any more.  I lived in that building for years and subleased my room last summer for a spontaneous adventure that I only recently returned from.  I had just renewed my lease right before I sublet because I loved the place and my roommate and planned on staying a long time.  So, my lease would have ended at the end of this month and I would still be living there at the time of the fire.  My sweet roommate, James Miranda, was still living there and died in the fire.  Your photo is the only image I've seen that comes close to representing how I'm feeling inside right now.  The version that was released in the news has trees blocking the view of where my apartment would have been.  I'm attaching a screen shot with an arrow drawn pointing to my apartment.  I'm hoping you might have a shot from an angle that shows that area better.  If not, maybe you could send me even a better resolution version of the photo the news released.  I don't want to reproduce it or post it anywhere, I just want it for my own personal reflection.  This has been a strange experience for me and I'm just trying to heal.  Even if you can't give me anything at all, I want you to know that the image I've already seen, the one used in the news story, has somehow helped me in my grieving and healing process.  Your photo has had a profound effect on me and I appreciate you for shooting it and sharing it.

Thank you,
Arley Nevar



# EXHIBIT C

A8 | Tuesday, February 16, 2021 | ExpressNews.com | San Antonio Express-News

## FROM THE COVER

**WINTER STORM HITS TEXAS**

# BLACKOUTS
*From page A1*

electrical network, declared a power generation shortfall emergency statewide and asked electricity delivery companies to reduce load through controlled outages.

Some 3.6 million customers were without power in Texas, including some 1.2 million in the Houston area, the worst power crisis in the state in a decade. The forced outages are expected to last through part of today, ERCOT said.

CenterPoint Energy, the regulated utility that delivers electricity to Houston-area homes and provides natural gas service, started rolling blackouts in the Houston region at the order of state power regulators. It said customers experiencing outages should be prepared to be without power at least through Monday.

"How long is it going to be? I don't know the answer," said Kenny Mercado, executive vice president of the Houston utility. "The generators are doing everything they can to get back on. But their work takes time, and I don't know how long it will take. But for us to move forward, we have got to get generation back onto the grid. That is our primary need."

Dan Woodfin, ERCOT's senior director of system operations, said the rolling blackouts are taking more power offline for longer periods than ever. An estimated 34,000 megawatts of power generation – more than a third of the system's total generating capacity – had been knocked offline by the extreme winter weather amid soaring demand as residents cranked up heating systems.

The U.S. Energy Department, in response to an ERCOT request, issued an order late Monday authorizing power plants throughout the state to run at maximum output levels, even if it results in exceeding pollution limits.

Ed Hirs, an energy fellow in the economics department at the University of Houston, blamed the failures on the state's deregulated power system, which doesn't provide power generators with the returns needed to invest in maintaining and improving power plants.

"The ERCOT grid has collapsed in exactly the same manner as the old Soviet Union," Hirs said. "It limped along on underinvestment and neglect until it finally broke under predictable circumstances.

"For more than a decade, generators have not been able to charge what it costs them to produce electricity," Hirs said. "If you don't make a return on your money, how can you keep it up? It's like not taking care of your car. If you don't change the oil and tires, you can't expect your car to be ready to evacuate, let alone get you to work."

Woodfin said ERCOT and generators followed best practices for winterization but that the severity of the weather was unprecedented – "well beyond the design parameters of an extreme Texas winter."

The hit to power generation came as frigid weather froze wind turbines and forced outages among natural gas and other power plants. Most of the power knocked offline came from thermal sources, Woodfin said, particularly natural gas.

Natural gas supplies for electric generation are already strained in the winter, the peak season for gas used for heating, adding pressure to supplies used to generate electricity.

The Texas Railroad Commission, which regulates oil and natural gas in the state, said Monday afternoon that some producers, especially in the Permian Basin and Panhandle, were experiencing unprecedented freezing conditions, causing concern for employee safety and affecting production.

As part of its statewide response, the commissioners issued an emergency order Friday evening to manage shortages of natural gas, requiring gas to first be delivered to residences, hospitals,

## How we got here

The frigid air mass that settled over Texas froze wind turbines and caused natural gas producers to dial back production to protect personnel and equipment.

As part of its statewide response, the Texas Railroad Commission, which regulates oil and natural gas in the state, issued an emergency order Friday evening to manage shortages of natural gas, requiring gas to be delivered first to residences, hospitals, schools, churches and other locations that meet human needs, then to power plants and then to industrial users.

Electricity generators in the state rely heavily on gas and wind power, and the cutbacks forced the Electric Reliability Council of Texas, the state's electricity grid manager, to declare a statewide power generation shortfall emergency. It asked electricity delivery companies to reduce load through controlled outages.

The problem was exacerbated by downed power lines caused by icing that could keep some customers in the cold and dark for an extended time.

schools, churches and other locations that meet human needs, then to power plants and then to industrial users.

ERCOT and utility officials called on Texans to do as much as they can to conserve energy.

"Every single watt of savings is one watt that we don't have to go take out at somebody's house," Mercado said. "For those who still have power, whether it is commercial, a school, residential, if they can bring their demand for electricity down, that would help us."

With demand high and supplies short, wholesale electricity prices have spiked, and because of the nature of electric power contracts, those increases may be felt by consumers well after the region has thawed. Wholesale electricity sold near the $9,000-per-megawatt-hour maximum in power markets across the state Monday as the system struggled to meet demand, according to ERCOT.

The system hit a record early Monday morning of more than 69,000 megawatt-hours, well above the previous winter record of about 66,000 megawatt-hours, set in 2018.

ERCOT entered emergency conditions and initiated rotating outages at 1:25 a.m. Monday. As the regulator calls for reductions in demand, each supplier is responsible for reducing its share of the gap by its share of the market. In the case of CenterPoint, that's about 25 percent, ERCOT's Woodfin said.

Oncor, which serves the Dallas area and beyond, is responsible for 36 percent.

Rotating outages could be initiated until this weather emergency ends, with this morning at the highest risk period for blackouts, Houston Mayor Sylvester Turner said.

"These are not rolling blackouts. We are dealing with systemwide power outages across the state," Turner tweeted at 8:11 a.m.

Downed power lines caused by icing could keep some customers in the cold and dark for an extended time.

Hirs said Houston residents can expect more power outages in the future.

"The year 2011 was a miserable cold snap, and there were blackouts," Hirs said. "It happened before and will continue to happen until Texas structures its electricity market."

*marcy.deluna@chron.com*
*amanda.drane@chron.com*
*rebecca.carballo@chron.com*


Snow covers houses and yards in the Harmony Hills neighborhood on the North Side. The cold weather forced the closure of many schools and businesses Monday, as well as the cancellation of all departing and arriving flights at San Antonio International Airport for Monday and today.
Billy Calzada / Staff photographer

---

# WEATHER
*From page A1*

if you must leave home," he added. "In addition to icy conditions, the extreme cold is dangerous. Stay indoors if possible."

San Antonians awakened Monday to see 3 to 6 inches of powdery snow and to feel bitter cold, that shattered record low temperatures not seen in the Alamo City since Dec. 22, 1989.

As the day began, temperatures dropped to 9 degrees at San Antonio International Airport, with wind chill readings that were well below zero. Anywhere from 3 to 5 inches of snow fell across San Antonio and a wide swath of South-Central Texas from near east of Eagle Pass to Austin. But in some parts of the Hill Country, it was even higher – 6 to 7 inches of snow piled up.

The high Monday barely reached freezing and then started a downhill slide into the 20s, making certain that the snow and ice already on the ground would remain not only into today but also Wednesday, when highs will reach the upper 40s before overnight temperatures tumble back into the 20s, bringing yet another hard freeze.

Weather conditions will look similar Thursday, with a high of 40 and and low of 23.

Compounding the cold were rolling power outages caused in part by the state's overtaxed electricity grid system. To conserve power, CPS Energy began controlled outages at 1:30 a.m. Monday. But the utility said that if an outage lasted longer than 15 minutes, it likely was part of a separate outage, not related to a rolling blackout. As of 4:45 p.m. Monday, the utility had 327 outages affecting 202,155 customer accounts, about 23 percent of its total accounts, according to its website.

In some cases, electricity would snap on briefly and be lost again. At one home in the Great Northwest Silver Creek subdivision, a resident said she hadn't had power for more than eight minutes an hour throughout the afternoon.

Still, parts of the Lone Star State fared even worse.

Roy Ferguson, a state district court judge for an area that includes Brewster, Culberson, Hudspeth, Jeff Davis and Presidio counties, said in a tweet after noon Monday that far West Texas – including all of the Big Bend area – would be without power for more than 24 hours, including throughout Monday night.

"Plus, no cell service or water," he added.

There were fewer problems on San Antonio roads than some might have expected, perhaps because many overpasses and bridges were closed. Police Lt. Jesse Salame said the number of accidents Monday appeared to be significantly lower than average.

Altogether, 1,178 crash calls for service had been logged from 9 p.m. Saturday through 3:30 p.m. Monday, but some likely were duplicate calls.

Thirteen San Antonio police vehicles were damaged. One patrolman badly injured in a weather-related accident, Officer Travis Gossett, was listed in stable condition at University Hospital, but Salame said his injuries were significant.

A two-year veteran, he was on foot and attempting to direct traffic in the main lanes of U.S. 281 North at Brook Hollow when he was struck by a vehicle about 2:20 a.m. Sunday.

"He's got a long road to recovery, but he's a real healthy and strong guy," Salame said.

The number of calls went down significantly Sunday night and into Monday. Police fielded about 100 for weather-related accidents from 3 p.m. to midnight Sunday and since had taken an additional 30 calls since, Salame said.

The icy weather contributed to two fatal traffic accidents Sunday. One was at 6:30 a.m. in the 3800 block of northbound Interstate 35, and the other was at 1:22 p.m. on an overpass on O'Conner Road at Weidner.

Sheriff Javier Salazar said a 78-year-old man was found dead in the front yard of a home on the Northwest Side. Authorities believe that the man, who was leaving home for an appointment, fell. He was later found dead by EMTs.

No foul play was suspected, Salazar said. While it has not been confirmed that his death was related to the weather, "it is safe to say weather contributed," he said.

San Antonio firefighters responded to two accidents and two structure fires, but spokesman Joe Arrington said the biggest call volume had been for falls, with more than 30 reported late Sunday once ice formed on paved areas. He warned people to be careful when out in the snow because of the icy surface below.

VIA Metropolitan Transit announced just after noon Monday that it had temporarily suspended all bus, VIAtrans and VIA Link service until further notice while roads and highways remain closed or unsafe for travel.

Many schools, universities and businesses were closed Monday, some for the Presidents Day holiday but also for the inclement weather. Dozens of flights to and from San Antonio International Airport were delayed or canceled Monday, and all are canceled today as well.

Wolff, who estimated that 5 inches of snow fell on the Northwest Side area where he lives, called the winter storm a historic event, comparable to the great snow decades ago when the white stuff lasted three, four or even five days.

"It's absolutely beautiful out there," he said. "Of course, it's a really, really exciting period of time for young kids. My two youngest grandkids, they took them outside and they were laying in the snow doing the angel thing with their legs.

"It's a winter wonderland that they will hardly see, maybe once or twice in a lifetime down here," he said.

*ezavala@express-news.net |*
*Twitter: @elizabeth2863*


The Alamo stands behind a layer of snow early Monday. The National Weather Service said temperatures were expected to plunge by this morning to as low as 7 degrees in North Bexar County and 9 in the south toward Pleasanton.
William Luther / Staff photographer

# EXHIBIT D

DEPARTMENT OF TRANSPORTATION
FEDERAL AVIATION ADMINISTRATION

# CERTIFICATE OF WAIVER OR AUTHORIZATION

| ISSUED TO | POC PHONE NUMBER |
|---|---|
| Guillermo Calzada | 210-889-3117 |

ATTN: Guillermo Calzada

This certificate is issued for the operations specifically described hereinafter.  No person shall conduct any operation pursuant to the authority of this certificate except in accordance with the standard and special provisions contained in this certificate, and such other requirements of the Federal Aviation Regulations not specifically waived by this certificate.

OPERATIONS AUTHORIZED

Operations under this certificate of authorization are limited to the maximum altitude listed below. This altitude is an absolute value and it shall not be added to the height of any structures.
Class of Airspace: D
At or Below: Altitudes in accordance with the published UAS Facility Map (UASFM)
Under the Jurisdiction of: Kelly Field Airport Air Traffic Control Tower (SKF ATCT)
Airport Identifier: KSKF

LIST OF WAIVED REGULATIONS BY SECTION AND TITLE

N/A

## STANDARD PROVISIONS

1.  A copy of the application made for this certificate shall be attached and become a part hereof.
2.  This certificate shall be presented for inspection upon the request of any authorized representative of the Federal Aviation Administration, or of any State or municipal official charged with the duty of enforcing local laws or regulations.
3.  The holder of this certificate shall be responsible for the strict observance of the terms and provisions contained herein.
4.  This certificate is nontransferable.

Note-This certificate constitutes a waiver of those Federal rules or regulations specifically referred to above.  It does not constitute a waiver of any State law or local ordinance.

## SPECIAL PROVISIONS

Special Provisions 1 to 3, inclusive, are set forth in this authorization.

This certificate 2021-P107-CSA-11314 is effective from May 27, 2021 to May 26, 2023 and is subject to cancellation at any time upon notice by the Administrator or his/her authorized representative.

### BY DIRECTION OF THE ADMINISTRATOR

| FAA, Central Service Area | Vonnie L. Giles |
|---|---|
| (Region) | (Signature) |
| May 26, 2021 | Tactical Operations Team Manager, AJV-C23 |
| (Date) | (Title) |

FAA Form 7711-1 (7-74)

## SPECIAL PROVISIONS

**1. CONTACT INFORMATION:**

a. Guillermo Calzada is the person designated as responsible for the overall safety of UAS operations under this Certificate of Waiver or Authorization. During UAS operations for on-site communication/recall, the Responsible Person shall be continuously available for direct contact at 210-889-3117 by SKF ATCT or designated representative.

b. The Responsible Person listed on this Authorization must maintain a current list of pilots by name and the remote pilot certificate number(s) associated with the Authorization holder's operation. This list must be presented for inspection upon request from the Administrator or an authorized representative.

**2. SCHEDULE/COORDINATION OF FLIGHT OPERATIONS:**

a. This Certificate of Waiver or Authorization and the Special Provisions shall be in effect between civil sunrise and civil sunset local time.

b. This airspace authorization does not relieve the remote pilots from the responsibility to check the airspace they are operating in and comply with all restrictions that may be present in accordance with see 14 CFR 107.45 and 107.49 (a)(2), such as restricted and Prohibited Airspace, Temporary Flight Restrictions, etc.

c. SKF ATCT may disapprove, terminate, restrict, or delay UAS flight operations covered by this authorization at any time.

d. The operator is responsible for reviewing the published UASFM at https://udds-faa.opendata.arcgis.com/ and scroll down and open the "Visualize It" section prior to each flight to ensure that no changes have been made to the map (i.e., altitude changes, airspace modifications, etc.). If you need to operate at an altitude that is not in accordance with the published UASFM, you must apply for a new authorization requesting that altitude.

e. At no times are operations permitted over SKF airfield as depicted in Attachment 1.

f. Operator shall contact SKF ATCT one (1) working day prior to scheduled proposed operations at, 210-925-2547, and provide the following:

   i. Schedule of flight (time and duration)
   ii. Location where flight will occur (coordinates and radius)
   iii. Altitude

g.  Operator may be required to maintain direct two-way radio communication with ATC and, if required, must comply. When necessary the ATC frequency will be provided to operator during call to SKF ATCT 30-minutes prior to flight.

h.  Operator shall notify SKF ATCT immediately upon completion of UAS flight operations at 210-925-2547.

i.  Photography, and/or video of the military installations and assets or the military ranges are illegal and prohibited by Federal law.

3.  **EMERGENCY/CONTINGENCY PROCEDURES -** Lost Link/Lost Communications Procedures:

a.  Lost Link and Fly Away Procedures: In the event of a lost link and / or fly away, the UAS pilot shall immediately notify SKF ATCT at  210-925-2547 and state the following:
    i.    UA Altitude
    ii.   UA last known location
    iii.  Direction of flight/heading
    iv.   Fuel on board/battery time
    v.    Pilot's intentions
    vi.   Termination of flight/emergency condition

b.  If the UAS loses communications or loses its GPS signal, the UA must return to a pre-determined location within the operating area and land.

c.  The PIC must abort the flight in the event of unpredicted obstacles or emergencies.

14 CFR 107.41 Wide Area Airspace Authorization          Page 4 of 4
FAA Form 7711-1 2021-P107-CSA-11314

**ATTACHMENT 1**

SKF Class D Airspace

Not authorized in the **RED**-bordered areas, regardless of displayed altitude



THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS | § | |
| ASSOCIATION, TEXAS PRESS ASSOCIATION, | § | |
| and JOSEPH PAPPALARDO, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 1:19-CV-00946-RP |
| | § | |
| STEVEN MCCRAW, in his official capacity as | § | |
| Director of Texas Department of Public Safety, | § | |
| DWIGHT MATHIS, in his official capacity as | § | |
| Chief of the Texas Highway Patrol, and | § | |
| WES MAU, in his official capacity as | § | |
| District Attorney of Hays County, Texas, | § | |
| Defendants. | § | |

## DECLARATION OF JOE PAPPALARDO

1.      My name is Joe Pappalardo. I am over the age of eighteen (18) years. I have never

been convicted of a felony or a crime involving moral turpitude, am under no disabilities, and am

fully competent and qualified to make this affidavit.

2.      I am a self-employed journalist. I have worked as a journalist for 25 years, including

at the *Dallas Observer*, the *Corpus Christi Caller-Times*, and in Mexico. I am currently a

contributing editor for *Popular Mechanics*, where I previously worked as a senior editor on the

staff for seven years. I have covered a wide range of stories from travel features to breaking news

events. I've also published three non-fiction science books, *Spaceport Earth*, *Sunflowers: The

Secret History*, and *Inferno*, with a fourth due to be published in 2022. I have won several awards

for my journalistic work, including a 2018 first place Aerospace Media Award for Innovation in

Aerospace Journalism and Publishing and a 2017 first place award for feature story from the

Association of Alternative Newsmedia.

Exhibit 5

3.     I have a Part 107 Remote Pilot's Certificate, which has qualified me to operate a small unmanned aircraft system (also called a UAS, UAV, or drone) in the National Airspace System of the United States. I obtained this certificate in January 2017 after dozens of hours studying FAA regulations and related laws as well as studying scientific information relevant to operating in the National Airspace System. My Part 107 Remote Pilot's Certificate is subject to periodic renewal to remain valid.  I now keep my certification valid, even though I do not routinely fly my drone for newsgathering purposes in my home state of Texas even though I cover events happening here.  Whenever I have used a UAS for newsgathering purposes, my Part 107 Remote Pilot's Certificate has been valid.

4.     My UAS is a DJI Phantom 3. It is registered with the FAA.

5.     Ch. 423 of the Texas Government Code makes it an offense to use "an unmanned aircraft to capture an image of an individual or privately owned real property in this state with the intent to conduct surveillance on the individual or property captured in the image." Because the word "surveillance" is not defined and the dictionary definition of "surveillance" is broad enough to include my work as a journalist, I am concerned that using a UAS for journalistic purposes would put me at risk of criminal penalties and subject me to liability in a civil lawsuit.

6.     In 2017, I wrote an article for the *Dallas Observer* about the challenges of being a journalist who uses a drone for reporting purposes. In addition to relating my personal experience, I researched the problem that Ch. 423 poses for journalists in Texas. The article won the aforementioned first place prize at the international 2018 Aerospace Media Awards in the category of Innovation in Aerospace Journalism and Publishing.

7.     If a journalist rented a helicopter numerous times to take photos of ongoing illegal dumping on private property, they would not violate Ch. 423. But if I take the same photos with a

drone, I am liable to be arrested. I am also in the distribution business, so the higher civil fines delineated in Ch. 423 could apply.

8.     In the process of my reporting for the article described in Paragraph 6 above, I communicated with the sponsor of the Texas Privacy Act, Rep. Lance Gooden. He admitted that there was no FAA guidance on drone use for photojournalism when the legislation originally passed. He stated that he was open to adjusting the law; however, the Texas legislature did not pass a revision of Ch. 423 that would have exempted journalists who have an FAA Part 107 license from Ch. 423.

9.     My experience as a journalist has taught me that readers are interested in images that capture human emotion, or drama, or changes, and my experience using drones for newsgathering and photography has taught me that drones can be a valuable tool for obtaining those types of images – but Ch. 423 makes it very difficult if not impossible to use drones to obtain such images.  While working for the *Observer*, I attempted a few times to use drone photography while adhering to what I understand the requirements of Ch. 423 to be, but the overall impact was low, since flying only over public property and photographing only public property results in limited and impersonal footage without significant impact.

10.     I spoke to one of my corporate bosses at what was then known as Village Voice Media, which owned the company that published the *Dallas Observer*, about Ch. 423. My boss told me that Village Voice Media would not provide me with a defense in any legal action if I were to take images with my UAV in contravention of Ch. 423. In December of 2017, following that conversation, I used my UAV for newsgathering once more: to capture images of a location where a body had been discovered. These images showed an area in a public park, and I captured these images from within the public park, again following the requirements of Ch. 423 to the best of my

knowledge. However, after December of 2017, I have refrained from using a UAV in Texas for any image capturing for newsgathering purposes due to my concern about possibly violating Chapter 423.

11.    Since December 2017, I have not flown the drone to report any stories in Texas, including many that would have carried great urgency or public importance. For example, UAV-captured images or video of the removal of a Robert E. Lee statue from a public park in Dallas would have generated a lot of interest and drawn more attention to the *Observer's* coverage of the removal, but I refrained from capturing any images or video of the statue removal because of Ch. 423. Given the extensive number of private properties that would inevitably have appeared in the video, it would not have been practical to get permission from every property owner.

12.    Modern media is dependent on strong, unique imagery. Social media is a critical path to reach a broad audience, and success in these media requires compelling photos and videos. Publications with small budgets, like the *Observer*, can gain a much-needed competitive edge using drone imagery. It is clear from online metrics that readers are interested in aerial coverage and that it is a cost-effective way to produce more pageviews. When we introduced drone footage onto the *Observer* website, both video and still photos, the audience reaction was quantifiably positive, based on internal web metrics and social media interaction. The still images solve a persistent problem with quality images in the newspaper - having a drone pilot on staff produces unique images and without hiring a freelancer, not to mention the cost of a similar image taken by a helicopter. As a freelance journalist, using drone footage can double fees on an assignment by providing a video component to pitches. In Texas, these tools are not available for journalists.

13.    If I am in a situation where I determine that my reporting or the story would benefit from aerial footage, my only option would be to use my UAS (if allowed under law) because small

news outlets do not have any budgets for helicopter photography—far from it. Any use of a helicopter would cost significantly more than I am paid to do the article as a freelance journalist.

14.     A UAS is an important reporting tool because, by providing a different perspective, it increases the reader's—and my own—understanding of a story. I believe that the citizens of Texas have been harmed by incomplete reporting on stories where I could have, but was unable to, use my UAS. But for Ch. 423, I would have used my UAS to capture images and/or video to help with many stories beyond the Confederate statues removal mentioned above, including:

   a)  Pre- and post-storm events related to Hurricane Harvey, including a gasoline panic at the pumps.

   b)  Flood and wind damage in other storms.

   c)  House fires.

   d)  Construction projects.

   e)  Urban sprawl.

   f)  The removal of homeless encampments.

   g)  The route of a proposed toll road near the Trinity River.

   h)  A story about Deep Ellum property ownership.

   i)  Areas where people routinely dump off dead or unwanted animals.

15.     Additional, future story ideas I have that would benefit from UAS footage include:

   a)  Documenting (with permission) construction of major infrastructure projects, such as a new bridge in Corpus Christi.

   b)  Air quality monitoring at various altitudes.

   c)  The presence of persistent illegal poaching in urban areas.

   d)  The way gridlock is hampering first responders in the North Texas metroplex.

16.     Ch. 423 has chilled my First Amendment newsgathering efforts by causing me to stop my use of a UAS to capture newsworthy stories for fear of facing criminal or civil liability,

even though I am authorized to operate in the National Airspace when my Part 107 Remote Pilot's Certificate is valid.

17.    As a freelance journalist, I compete with other freelance journalists from around the country and around the world. Journalists from other states do not have the oppressive restrictions of Ch. 423 and are able to use drones in their reporting, making their coverage more dynamic and increasing the understanding of the reader. Because of this, I am at a competitive disadvantage when compared to reporters in other states and I am unable to do the complete reporting that journalists in other states are able to do. As a freelancer, being able to provide aerial imagery can be the difference between selling a pitch or being denied. Many outlets can't afford to assign photographers, yet social media, print publications and websites all rely on images in their layouts. Filling that hole at low cost is a competitive advantage.  Also, offering multimedia to assigning editors is another opportunity opened by drones. For example, when assigned to cover a rocket launch competition as a freelance print reporter for a national magazine, I spoke to the web editor and told him I could fly my drone during launches and capture aerial video (having obtained permission from the event). I was able to nearly double my fee for the assignment by adding drone video.

18.    Many rules outside Ch. 423 limit drone flights.  FAA rules require that drones be operated within line of sight, which greatly limits drone use.  There are height ceilings, bans on flights near the U.S. border and over physical infrastructure, layers of restricted airspace near airports, all of which limit where drones can fly, and all administered by the FAA. The National Park Service bans them from its land. I also have reason to believe that the FAA closely monitors drone flights; after one incident, an FAA representative contacted me and claimed that I had flown

in a helicopter corridor, although those aren't marked on maps given to drone pilots, including from the FAA itself.

## DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on June 18, 2021.

_____
signature of declarant

**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS | § | |
| ASSOCIATION, TEXAS PRESS ASSOCIATION, | § | |
| and JOSEPH PAPPALARDO, | § | |
| Plaintiffs, | § | |
| | § | |
| *v.* | § | CIVIL ACTION NO. |
| | § | 1:19-CV-00946-RP |
| | § | |
| STEVEN MCCRAW, in his official capacity as | § | |
| Director of Texas Department of Public Safety, | § | |
| DWIGHT MATHIS, in his official capacity as | § | |
| Chief of the Texas Highway Patrol, and | § | |
| WES MAU, in his official capacity as | § | |
| District Attorney of Hays County, Texas, | § | |
| Defendants. | § | |

**DECLARATION OF AKILI-CASUNDRIA RAMSESS IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

1.     My name is Akili-Casundria Ramsess. I am over the age of eighteen (18) years. I have never been convicted of a felony or a crime involving moral turpitude, am under no disabilities, and am fully competent and qualified to make this affidavit.

2.     I am the executive director of the National Press Photographers Association (NPPA). Prior to becoming executive director, I spent many years as newsroom leader, from director of photography, editor, multimedia producer and photographer, working for organization such as the *Los Angeles Times*, *Associated Press*, *Atlanta Journal & Constitution*, *San Jose Mercury News* and the *Orlando Sentinel*. During that period I won numerous picture editing and multimedia awards with the Society for News Design (SND), Pictures of the Year International (POYi) and NPPA's Best of Photography competitions. I am on the advisory board and am former chair of National Association of Black Journalists (NABJ) Visual Task Force and on the advisory board of the Eddie Adams Workshop.

1

3.    As Executive Director of NPPA, I meet regularly with leaders of news organizations, photojournalists, and the leaders of other journalism organizations. I also oversee NPPA's multiple competitions and have served as a judge on other prominent journalism competitions through which I am aware of the latest trends in excellence in visual journalism. Additionally, I oversee a myriad of NPPA programs, and communicate regularly with NPPA's attorneys regarding our legal advocacy work. It is in this capacity that I have become aware of the facts outlined in this declaration.

4.    The NPPA is the nation's leading professional organization for visual journalists. Its membership includes news photographers from print, television, and electronic media. NPPA represents journalists throughout the country, and our membership includes about 300 members in the State of Texas.

5.    In the photography industry news photographers are generally not considered to be "commercial" photographers. Commercial photographers provide images for marketing and advertising purposes, while "editorial" photographers capture images to illustrate non-fiction accounts for news outlets. Within the photography industry, the work that visual journalists engage in is typically considered "editorial" and not "commercial."

6.    When a photographer is engaged in "editorial" photography, there are industry standards prohibiting unethical behavior. The most prominent code of ethics involving visual journalism is the NPPA Code of Ethics, available here: https://nppa.org/nppa-code-ethics. All members must agree to the NPPA Code of Ethics in order to join NPPA.

7.    Drones are an important part of the visual journalism industry. The aerial photography that visual journalists create using drones adds important information, perspective and understanding to the audience and readers—particularly when reporting on a large area.  They

are relatively low-cost to buy and operate, and are easier and safer than alternative means of creating aerial photography.

8.    Too many photojournalists—including NPPA members—have lost their lives in helicopter crashes while covering news events or stories. NPPA has several articles on its website that report on these tragic events, including the following:

    a)  Donald Winslow, *Two Killed in KOMO-TV Seattle Helicopter Crash*, WWW.NPPA.ORG, March 18, 2014, https://nppa.org/news/two-killed-komo-tv-seattle-helicopter-crash;

    b)  *Two Photographers Killed In Florida Helicopter Crash*, WWW.NPPA.ORG, SEPT. 11, 2007, https://nppa.org/news/two-photographers-killed-florida-helicopter-crash.

9.    Only the largest news outlets have the financial ability to rent a helicopter for aerial photography. Many news outlets cannot afford to use helicopters for aerial photography at all. Because of its lower barrier to entry, drones are used on a much more frequent basis than helicopters for aerial photography. Despite that, I am not aware of a single injury due to crashes while journalists reporting with drones.

10.    Through my work with NPPA, including general interactions with members and our attorneys, I have become aware that the Texas laws restricting drone photography and areas in which drone flight is prohibited (generally referred to in this Declaration as "Chapter 423") have limited the ability of NPPA members to cover breaking news safely and inexpensively.  I have become aware that the restrictions of Chapter 423 have led some newspapers to eliminate or greatly reduce the use of drone photography and has caused photojournalists to self-censor their use of drone photography in the state of Texas.

11.     NPPA has two outside counsels Mickey Osterreicher and Alicia Calzada. When they work on one matter, their time is diverted from other important matters and projects that support and fulfill NPPA's mission. NPPA's attorneys report to me and the board of directors on a regular basis and work on behalf of the organization on matters that the board has prioritized. They focus their legal efforts on assisting the organization in its mission to support and advocate for visual journalists and promote excellence in the profession.

12.     In response to the passage of Chapter 423, NPPA diverted resources to counteracting the ongoing impact of the law. Among other things, it has devoted time and resources to research First Amendment protections in case a member is charged criminally or sued civilly based on a violation of Chapter 423, met with lawmakers in an attempt to revise the law, and monitored amendments to the law. NPPA has spent hours counseling the heads of photography departments and news organizations as well as individual photographers and members about Chapter 423 compliance. All of these activities have prevented NPPA's attorneys from spending time on other efforts that further the broader mission and vision of NPPA.

13.     NPPA's Deputy General Counsel (an outside counsel position), Alicia Calzada advocates for NPPA and its members through legislative efforts, litigation, amicus briefs, educational efforts, and cooperation with other groups that support NPPA's mission. In 2013, the National Press Photographers Association established the Alicia Calzada First Amendment Award, which it now awards annually to individuals who have shown a dedication to supporting the First Amendment. Ms. Calzada has over a decade of experience serving the legal needs of a range of local and national media organizations including print, electronic, and television organizations as well as individual journalists, trade associations and photographers, on a variety of litigation matters and other matters involving defamation, First Amendment, and copyright

infringement. She was involved in the effort to obtain passage of multiple First Amendment laws in Texas including Texas' Anti-SLAPP law and the Defamation Mitigation Act. She also counsels corporate and journalism clients on social media, photography use, drone use, open government, and contract issues. Prior to becoming an attorney, she was a photojournalist for two decades, both as a staff and independent photographer. Between 2005-2006, Ms. Calzada served as president of the NPPA.

14.     NPPA's General Counsel Mickey Osterreicher is also an expert on legal issues related to photojournalism, including drone journalism. Mickey is experienced in contract, media, copyright and First Amendment Law. He has been actively involved in matters such as cameras in the courtroom, the federal shield law, media access, public photography, use of drones for newsgathering and copyright infringement. Every year, on behalf of NPPA, Mickey organizes and runs the Drone Journalism Leadership Summit which brings together leaders in the drone journalism industry. On behalf of NPPA, Mickey has helped influence federal drone regulation as it relates to journalists through his participation in committees and public comment on rulemaking by the Federal Aviation Administration and the Department of Homeland Security and as an official observer to the Uniform Law Commission's Tort Law Relating to Drones Act committee. He has also moderated panels on drone use by media and law enforcement for the International Association of Chiefs of Police (IACP) and Unmanned Vehicle Systems International (AUVSI). The Society of Professional Journalists (SPJ) honored him in 2015 as a "Fellow of the Society," the highest professional honor given by the Society for extraordinary contribution to the profession.

15.     In 2013, in her capacity as an attorney for NPPA, Ms. Calzada testified against the passage of HB 912, the bill which created Ch. 423. In her testimony, she alerted the legislature to the unconstitutional nature of the bill.

16.     In response to the passage of Chapter 423 ("the law"), Ms. Calzada diverted her time and resources to counteracting the ongoing impact of the law. Among other things, as Deputy General Counsel, she engaged in the following activities:

a) Researched potential First Amendment defenses in the event a member is faced with criminal or civil penalties for violating the law.

b) Researched potential preemption defenses in the event a member is faced with criminal or civil penalties for violating the law.

c) Met with photo department heads in Texas, outlining the burdens imposed on journalists by Chapter 423, explaining the constitutional problems with Chapter 423, and providing information on how to minimize the risks under the law.

d) Counseled individual members, outlining the burdens imposed on journalists by Chapter 423, explaining the constitutional problems with Chapter 423, and providing legal advice on how to minimize the risks under the law.

e) Provided information to clients of members, and their counsel, outlining the burdens imposed on journalists by Chapter 423, and explaining the constitutional problems with Chapter 423, and providing information on how to minimize the risks under the law.

f) Counseled individual members who have been threatened with enforcement and blocked from using drones due to Chapter 423.

g) Spoke publicly to journalists, attorneys, editors and others, outlining the burdens imposed on journalists by Chapter 423, explaining the constitutional problems with Chapter 423, and providing legal information on how to minimize the risks under the law.

6

h) Wrote articles directed at journalists and news organizations outlining the burdens imposed on journalists by Chapter 423, explaining the constitutional problems with Chapter 423, and providing legal information on how to minimize the risks under the law.

i) Communicated with lawmakers in attempts to prevent the passage of the critical infrastructure portion of the law.

j) Communicated with lawmakers in an attempt to get them to revise the law and add newsgathering exception.

k) Drafted written testimony in response to the interim charge of the Texas legislature regarding Chapter 423.

l) Communicated with members and other journalists, to provide information for them to advocate for the addition of a newsgathering exception.

m) Communicated with the general public on the burdens imposed on journalists by Chapter 423, and explaining the constitutional problems with Chapter 423, and efforts for the addition of a newsgathering exception.

n) Drafted an amicus brief in a civil lawsuit where a member of the general public is faced with civil liability for a violation of the law, and in which the law was being challenged as unconstitutional and preempted. *See Kolle v. K&K Inez Properties, LLC*, Cause No. 17-11-81926-BB in the 135th Judicial District in Victoria County, Texas.

17.    As a non-profit, NPPA has limited funds. Ms. Calzada worked with NPPA's General Counsel Mickey Osterreicher on the above activities, and they both spend significant working hours on NPPA activities, but that time is also not without its limits. All of the above

activities have prevented our lawyers from spending time on other efforts that further the broader mission and vision of NPPA.

18.     Journalists throughout the world have adopted drones as valuable tools in their reporting, adding depth and perspective to their coverage of important news stories. Based on my experience with NPPA and in the visual journalism industry, drones will continue to be an important method of reporting for journalists and Ch. 423 will continue to unduly interfere with journalists' ability to report on matters of public concern in Texas.

## DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on July  6  , 2021.

_____

Akili-Casundria Ramsess

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, *et al.* | § § § | |
| Plaintiffs, | § | CIVIL ACTION NO. |
| v. | § § | 1:19-cv-00946-RP |
| STEVEN MCCRAW, *et al.*, | § | |
| Defendants. | § § | |

---

**DECLARATION OF BRANDON WADE**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

1.      My name is Brandon Wade.  I am over the age of eighteen (18) years.  I have never been convicted of a felony or a crime involving moral turpitude, am under no disabilities, and am fully competent and qualified to make this affidavit.

2.      I am a self-employed freelance photojournalist and a resident of Texas. My work appears regularly in the *Dallas Morning News*, the *Fort Worth Star-Telegram*, the Associated Press and Getty Images. For these clients, I cover a wide range of news stories from sports to features to natural disasters and other major and minor news events.

3.      I am a member of the National Press Photographers Association. As a member, I have signed the NPPA Code of Ethics, available at this link: https://nppa.org/nppa-code-ethics.

1

Exhibit 7

4.     As a photojournalist, I often use aerial photography. Aerial photographs can add additional information and important perspective for the reader—particularly where, for example, a story covers a large area that would be difficult to visualize or understand without an aerial perspective. Aerial photographs can also be useful when trying to give the reader a sense of place, or a better understanding of a scene, regardless of the size. My talent and skill with aerial photography sets me apart from my peers.

5.     I have a private pilot's license and have done aerial photography from an airplane and from a helicopter. This is quite expensive for the client and is not an option for most assignments. To fly a Cessna costs $210 per hour for a plane and a pilot, before the photographer is paid. A helicopter is far more costly. An unmanned aerial system, on the other hand, costs significantly less per hour to operate, as the primary costs involve capital investment, which can be shared by my clients.

6.     In addition to having a private pilot's license, I have a remote pilot airman certificate with a small UAS rating, which qualifies me to operate a small unmanned aircraft system (also called a UAS or drone) in the National Airspace System of the United States. I obtained this certificate after reviewing FAA regulations and related laws as well as studying scientific information relevant to operating in the National Airspace System. This is known as a Part 107 license.

7.     I have a DJI Mavic 2 zoom UAS and have flown a DJI Phantom 3 professionally as well. The DJI Mavic 2 zoom UAS has obstacle avoidance sensors all around the aircraft. While not entirely fool proof, they reduce the chances of the drone accidentally crashing into objects.

8.     I have Verifly insurance standard policy which covers me for liability up to $1 million damage.

9.     A UAS is a superior method of aerial photography in many circumstances. The low altitude that can be flown using a UAS can allow for better images to be made and can provide more information to the viewer. The maneuverability of a UAS enables better and clearer photography. And a UAS typically has a piece of equipment called a gimbal, which stabilizes the camera to make video footage smoother. In addition, technology related to drones continues to provide new and more informative ways to use the cameras.

10.     Ch. 423 of the Texas Government Code makes it an offense to use "an unmanned aircraft to capture an image of an individual or privately owned real property in this state with the intent to conduct surveillance on the individual or property captured in the image." Because the word "surveillance" is not defined and the dictionary definition of "surveillance" is broad enough to include my work as a journalist, I am concerned that using a UAS for journalistic purposes would put me at risk of criminal penalties, and subject me to liability in a civil lawsuit.

11.     I am also aware of the provisions of Ch. 423 of the Texas Government Code restricting overflight of certain "critical infrastructure facilities" and sports venues. There is an exception for "commercial" use of drones, but the term "commercial" is not defined, and in the photography industry news photographers are generally not considered to be "commercial" photographers.

12.     Because of Ch. 423 of the Texas Government Code, I do not use my drone for journalism nearly as often as I would like. I really have to weigh the importance of the assignment and I often don't use my drone because of the risk of enforcement.

13.     Ch. 423 has chilled my First Amendment news gathering efforts by preventing me from photographing important scenes related to news stories using my UAS, which I am authorized to operate in the National Airspace. In addition, it has chilled me because I have a client who will not publish drone images taken on assignment, due to the law.

14.     One of my clients is the *Dallas Morning News*. The editors at the *Dallas Morning News* will license drone photos that I happen to shoot on my own, "on spec" (meaning that those photos are not created on an assignment, but taken on my own initiative, which they are not required to pay for unless they want to use them). However, I am not allowed to shoot drone photographs when working on assignment for them and if I do, they will not publish the images, per their company policy. This is in line with the policy that they have for their staff photographers, who are prohibited from using drone photography in Texas because of the risk of liability created by Ch. 423.

15.     I am one of the main freelancers that the *Dallas Morning News* relies on, and I am the only freelancer with a Part 107 drone license and a drone. I believe I have lost thousands of dollars in assignments from this client because were it not for Ch. 423, I believe I would have additional assignments to engage in drone photography for the *Morning News*. As these are assignments that never existed, there is no way for me to estimate the depth of this loss of income.

16.     There have been times when it was not feasible to operate a helicopter or airplane to make images for a story, but aerial photographs from a UAS would have increased the understanding of the reader and would have improved my reporting on a story. But Ch. 423 prevented that reporting from seeing the light of day. For example, on March 20, 2018, I shot a feature assignment for the *Dallas Morning News* of a large community garden north of Dallas. I shot ground-level features and at the end I flew the drone to capture the scale of the garden from the air in several photos. I turned the drone photos into the *Morning News* and proactively alerted them that some of the images I had submitted contained drone photos. The editor that I worked with on the assignment told me in an email that "the photos are awesome." A true and correct copy of an email discussing the images and the policy is attached to this affidavit as Exhibit A.

17.     Because of their policy against using drones for assigned photography, the *Morning News* did not use the drone photos of the community garden. No publication would ever rent a helicopter to shoot images of a community garden, but the drone footage provides a view that tells the story better than images from the ground ever could. The resulting story and images that were published can be found at this link: https://www.dallasnews.com/arts-entertainment/2018/04/04/the-community-garden-in-lake-highlands-is-citizen-involvement-at-its-best/. True and correct copies of the drone photos that the *Dallas Morning News* refused to publish because of Ch. 423 are attached to this affidavit as Exhibit B.

18.     Although I have a pilot's license, each time I have to fly a helicopter or airplane to make aerial images, the news organization I work with must spend significantly more for

5

the assignment. It is simply not feasible to hire a helicopter or plane for every story that would benefit from aerial photographs.

19.    In nearly all circumstances when I have an aerial assignment, I would prefer to use a UAS, especially my new one. It's more dynamic, less expensive, and significantly more flexible.

20.    In addition to the cost of flying a helicopter for aerial photographs, flying in a helicopter is inherently risky. Several photojournalists have lost their lives in helicopter crashes while attempting to make pictures for a news story. The risk of flying helicopters and airplanes concerns me and it is safer for me to make aerial photographs using a UAS. If an airplane crashes, I may lose my life, and the pilot might also lose their life. If I survive, the damage would be significant and expensive. Using a UAS for aerial photography is also safer than a helicopter for those on the ground, should there be an adverse event such as a crash. On the other hand, if a drone crashes, the risks to life and limb are low and the financial risk is only a few thousand dollars if that.

21.    In addition to the cost and safety concerns related to helicopters, there are some situations where a helicopter is not practical, but a UAS would be an easy and safe method to get aerial photographs. For example:

   a.  During the unprecedented winter storm in February 2021, I used my drone to capture images that showed the impact on my local neighborhood. Through the unique vantage point of low level aerial drone photography, I was able to quickly show any viewer the wide ranging impact the storm had. Since I captured the images on my own accord, there was no guarantee that I would be paid for my

work and the resulting photos. It was up to The Dallas Morning News to decided if they would purchase the photos from me.

b.   I recently photographed a golf course in North Dallas with the permission of the golf course owner. With the UAS, I was able to fly relatively low to the course and get more compelling imagery than I could have with a helicopter.

c.   In 2016, I covered flooding in Granbury, Texas with a UAS. The location of the UAS, just above the treeline, enabled me to document flooding issues that I wouldn't have been able to capture with an airplane. At the time, I was under the assumption that I would be complying with the law if I stayed over public property and so I attempted to do so. It was very difficult to do so. I later learned that even if I am physically over public property, I am violating the law by documenting private real property or a person on that property.

d.   On August 14, 2017, I documented a story about a water treatment plant that wasn't operating properly. The UAS enabled me to document the plant in relation to the neighborhoods where spillage had occurred in the plant. Out of fear of violating Ch. 423, I made sure not to fly directly over the plant while photographing it. The plant appeared to be surrounded by a fence.

22.   In May of 2018, I was offered an assignment for the *Fort Worth Star-Telegram*, to document the construction of the Globe Life Field, the new ballpark for the Texas Rangers. This assignment would have documented the progress of construction every two weeks, through the end of construction, which was completed in 2020. With UAS technology, I would have been able to program the path of the drone so that it could take

images from the same exact location over time. This would increase the public's understanding of the $1.1 billion retractable-roof ballpark project, paid for in part by the City of Arlington taxpayers.

23.     Because of Ch. 423, I had to ask the Texas Rangers baseball team for permission to use my UAS to shoot the construction project for the newspaper. Permission was denied. I would not need permission to shoot the same images with a helicopter or airplane, but it would be prohibitively expensive to do so every two weeks, and the quality of the footage would not be anywhere near as good because you cannot attach a stabilized camera with a gimbal in a workable manner to an aircraft without a significant investment which is not available.

24.     Attached to this affidavit as Exhibit C is a true and correct copy of the email sent to me by the Rangers, denying my request and stating that they were "not permitting any drone filming by individual media outlets."

25.     While they denied the news media permission to film the construction by drone, the Rangers actually hired me to do drone photography of the stadium construction on a quarterly basis for their own public relations purposes. However, per our contractual agreement, they own the copyright to the footage I shot and I am not permitted to share it with members of the news media. The news media was provided with only a small portion of limited footage, chosen by the Rangers, of the footage that I shot. The footage that I shot for the Rangers that was released to the public is available at the following links:

a.     https://www.instagram.com/p/BuZ0czmHtmJ/?utm_medium=share_sheet

b.     https://www.instagram.com/p/BcVKifkBZbW/?utm_medium=share_sheet

26.     While the Texas Rangers cited "a number of security and safety reasons" for not allowing drone filming by individual media outlets, they have not specified what those reasons are and they have not explained why it is unsafe for me to engage in drone filming for the *Fort Worth Star-Telegram*, when it is perfectly safe for me to engage in drone filming on their behalf.

27.     I lost thousands of dollars in assignment fees due to the refusal of the Texas Rangers to permit me to complete the Globe Life Field assignment for the Fort Worth Star-Telegram. This does not include additional licensing fees which I often am able to get from my work.

28.     On June 13, 2014, I photographed the dramatic planned destruction of a home that was collapsing into Lake Whitney. I was flying in a Cessna for the aerial images. There was a delay in the planned event, and we had to spend 2 hours circling the scene in the plane while we waited for it to begin. Circling the area for an additional two hours cost hundreds of dollars more, and we almost missed the event because the pilot had another client booked and had to return to the airport. Had I been able to use a drone, I would have sat in my car until the event began, and then flown for a few minutes to take similar photographs. The resulting aerial images are available at this link: https://www.reuters.com/search/pictures?blob=Lake+Whitney&sortBy=&dateRange=.

29.     In April 2016, I used my drone to document hail damage in Wylie, Texas. This was an important matter of public concern, and my drone images communicated the level of devastation better than photos from the ground alone could have. Because of Chapter 423, I had to ask every homeowner whose property was going to be in the images for

permission to shoot the destruction with my drone. While each of the homeowners gave permission, if I was in a news helicopter, I would have been able to just make the images without that limitation or restriction. A copy of the video I shot for this coverage is available at: https://www.youtube.com/watch?v=GGjahPaV2CI .

30.    In August of 2018, I was hired by The Center for Investigative Reporting (CIR) to use my UAS to shoot images of Shiloh Treatment Center, a facility where four children have died since 1993 after being physically restrained, and other have been physically and sexually abused. The facility housed immigrant children in the custody of the U.S. Department of Health and Human Services. CIR learned that the children housed at Shiloh had been given psychotropic medications without parental consent. As a result of CIR's earlier reporting, a federal judge ordered the Office of Refugee Resettlement to remove children from Shiloh unless they pose a risk of harm to themselves or to others. See, https://www.texastribune.org/2018/07/31/judge-orders-government-release-immigrant-kids-texas-shelter/

31.    When CIR learned of Ch. 423, they were extremely concerned that my reporting could lead to liability and almost cancelled the assignment. In the end I sent the client still photographs and video and they published the still images only. I had to pay extra attention to where I was flying. I stayed over the public road and made sure I was shooting above public property in order to put myself in the best position possible in case of legal liability. This hampered my ability to tell the story in the best way possible.

32.    It is clear that the existence of Ch. 423 will continue to interfere with my reporting in the future.

## **DECLARATION UNDER PENALTY OF PERJURY**

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on July __6__, 2021.

_____

Brandon Wade

# EXHIBIT A

 Gmail

Brandon Wade <brandon@brandonwade.com>

## drone stills of Lake Highland Community Garden
2 messages

**Brandon Wade** <brandon@brandonwade.com>                Tue, Mar 20, 2018 at 4:27 PM
To: Vernon Bryant <vbryant@dallasnews.com>
Cc: Irwin Thompson <irwinthompson@att.net>

Don't know if the powers that be are ok with you guys using drone photos now or not, but I shot a few on my Lake Highland Community Garden (lhgarden) assignment this afternoon.

As far as the FAA is concerned, it's been legal for awhile now.

469-235-2552
@brandonphoto
www.BrandonWade.com

**Bryant, Vernon** <vbryant@dallasnews.com>                Tue, Mar 20, 2018 at 5:28 PM
To: Brandon Wade <brandon@brandonwade.com>, Marcia Allert <mallert@dallasnews.com>
Cc: Irwin Thompson <irwinthompson@att.net>

The photos are awesome. That decision is above my pay grade. I'll leave that to the bosses. Thanks for sending them.

vb

[Quoted text hidden]
--
Vernon Bryant
Staff Photographer
The Dallas Morning News

# EXHIBIT B

Aerial drone photos from the community garden in Lake Highlands, shot by Brandon Wade, that were not published because of client Dallas Morning News' reluctance to take or publish drone photos due to Ch. 423. The  story and images that were published can be found at this link: https://www.dallasnews.com/arts-entertainment/2018/04/04/the-community-garden-in-lake-highlands-is-citizen-involvement-at-its-best/









# EXHIBIT C



## Drone shot for Star-Telegram
2 messages

**Blake, John** <JBlake@texasrangers.com>                                    Mon, May 14, 2018 at 2:37 PM
To: "brandon@brandonwade.com" <brandon@brandonwade.com>
Cc: "Pelletier, Madison" <mpelletier@texasrangers.com>


Brandon, thank you for the inquiry on behalf of the Star-Telegram. As you are well aware, the Rangers and Manhattan have authorized quarterly drone filming for our internal use and we have been sharing this with media outlets. As a result, we are not permitting any drone filming by individual media outlets for a number of security and safety reasons.

Please pass along to the Star-Telegram that we are happy to share portions of the footage we have filmed and will film as this project continues. Thank you for your understanding.

**From:** Brandon Wade <brandon@brandonwade.com>
**Date:** May 9, 2018 at 9:26:45 AM CDT
**To:** Madison Pelletier <mpelletier@TexasRangers.com>
**Subject: Drone shot for Star-Telegram**

> The Star-Telegram wants me to start conducting drone flights documenting the construction progress of the new ballpark. They want me to do the first one within the next 10 days.
>
> I was thinking I could do it this Friday morning before the Safety Signing job... before it gets to windy and while the morning light is nice. I'm thinking 8am.
>
> You (or anyone else) would not have to be there with me. I would fly it from outside the construction area and of course I would insure the flight with all the same "additional insureds" as I do for when I fly for you.
>
> Sent from my iPad
> www.BrandonWade.com
> 469-235-2552
> @brandonphoto

NOTICE: This e-mail communication and any attachments which accompany it are expressly intended to be sent to and used solely by the recipient identified in this communication and constitute confidential correspondence between the sender and the intended recipient. If you receive this e-mail in error or are not the intended recipient, please inform noc@texasrangers.com immediately and delete this e-mail and any attachments (as well as any copies) from your information systems. If you are not the intended recipient, you are hereby notified that you are prohibited from disclosing, using, disseminating, or reproducing all or any portion (or conveying to any other person the substance of any portion) of this communication or any attachments thereto. This e-mail is being transmitted by an individual who has been authorized to hold an e-mail account maintained by Rangers Baseball LLC (the "Rangers"), and as such, the Rangers reserve the right to monitor all communications to and from this e-mail account. The views or opinions contained in this e-mail and any attachments are those of the author and are not necessarily endorsed by the Rangers, and as such the Rangers are not responsible for its content or any misuse or unauthorized disclosure of its content.

Brandonwade.com Mail - Drone Shot for Star-Telegram
Case 1:19-cv-00946-RP   Document 63   Filed 07/09/21   Page 182 of 182
4/25/21, 8:56 AM

**Brandon Wade** <brandon@brandonwade.com>   Mon, May 14, 2018 at 2:58 PM
To: "Blake, John" <JBlake@texasrangers.com>
Cc: Madison Pelletier <mpelletier@texasrangers.com>
Bcc: dkent@star-telegram.com

Thanks for getting back to me on this. I understand the team's and Manhattan's position.

The Star-Telegram's photo director, David Kent, would like to be included on any press releases or notifications about the availability of future drone footage. His email is dkent@star-telegram.com

Thanks!

469-235-2552
@brandonphoto
www.BrandonWade.com

[Quoted text hidden]