**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, TEXAS PRESS ASSOCIATION, and JOSEPH PAPPALARDO, | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | **Civil Action No. 1:19-CV-00946-RP** |
| STEVEN MCCRAW, in his official capacity as Director of Texas Department of Public Safety, DWIGHT MATHIS, in his official capacity as Chief of the Texas Highway Patrol, and WES MAU, in his official capacity as District Attorney of Hays County, Texas, | § § § § § § § | |
| *Defendants*. | § | |

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

## BACKGROUND AND STATEMENT OF FACTS

### I.        The Texas Privacy Act[1]

Plaintiffs challenge certain portions of the Texas Privacy Act and later amendments to it, enacted into law as Chapter 423 of the Texas Government Code, titled "Use of Unmanned Aircraft," which is located within a section of the Code dealing with "Law Enforcement and Public Protection." *See* Tex. Gov't Code tit. 4, subtit. B; *see also* "Texas Privacy Act," 2013 Tex. Sess. Law Serv. Ch. 1390 (H.B. 912). This chapter regulates the use of unmanned aircraft systems ("UAS"), also commonly referred to as unmanned aerial vehicles ("UAVs") or "drones." Plaintiffs challenge certain portions of the Texas Privacy Act that they have categorized into two different groups: the "Surveillance Provisions" consisting of §§ 423.002-.004 and 423.006, *see* Pls.' Compl. for Declaratory and Injunctive Relief ¶ 3 [ECF No. 1]; and the "No-Fly Provisions" consisting of §§ 423.0045 and 423.0046, *see* Compl. ¶ 3.[2]

#### A.        The Surveillance Provisions

Section 423.003 makes it an offense to "use[] an unmanned aircraft to capture an image of an individual or privately owned real property in this state with the intent to conduct surveillance on the individual or property captured in the image." Tex. Gov't Code § 423.003. It is also an

---

[1] Though the Court is familiar with the statutes at issue in this lawsuit, Defendants provide an abridged overview of Chapter 423 for the sake of completeness and ease of reference. Defendants reincorporate and adopt the fuller explanation from their motion to dismiss as if fully restated herein. ECF No. 19 at 2-6.

[2] Solely for the sake of uniformity and the Court's convenience, Defendants sometimes use Plaintiffs' descriptions of the challenged statutes, without waiving and expressly reserving all rights and arguments. Defendants note that Plaintiffs have not challenged the regulatory and reporting provisions applicable to law enforcement, certain grants of authority given to political subdivisions, or a provision that prohibits certain disclosures of any images obtained in violation of the one of the Surveillance Provisions. *See* Tex. Gov't Code §§ 423.005, .007-.009.

offense to capture such an image and possess, disclose, display, distribute, or otherwise use it. *Id.* § 423.004(a). It is a defense to the inadvertent violation of these provisions if the person destroys and stops using the offending image as soon as it is discovered that it was captured in violation of law. *See id.* §§ 423.003(c), 423.004(d)-(e). Violators are also subject to a civil action by "[a]n owner or tenant of privately owned real property located in this state . . . against a person who . . . captured an image of the property or the owner or tenant while on the property." *Id.* § 423.006(a).

Chapter 423 excepts several broad categories of UAS-captured images. *See id.* § 423.002. Among the most important and broadly applicable exceptions from liability are images of public property and persons in public, images captured with consent, images captured from a flight altitude of no more than eight feet and without amplification, and valid law enforcement uses. *See id.* § 423.002(a)(6), (7), (8), (14), (15). Many other specific commercial and public interest uses are also specifically carved out of the Surveillance Provisions. *See also* Ex. C at 2 (describing exceptions) (NPPA 00414); Ex. D at 2 (same) (NPPA 00539).

### B.     The No-Fly Provisions

Chapter 423 also prohibits the operation of drones over certain critical infrastructure where it could pose a particularly significant threat to public safety. Section 423.0045 makes it an offense to "operate[] an unmanned aircraft over a correctional facility, detention facility, or critical infrastructure facility" less than "400 feet above ground level," or to "allow[] an unmanned aircraft to make contact" with such a facility, or to "allow[] an unmanned aircraft to come within a distance . . . that is close enough to interfere with the operations of or cause a disturbance to the facility." Tex. Gov't Code § 423.0045(b). Certain law enforcement and other governmental entities, and individuals with permission from the owner of the facility, are exempted from this prohibition. *See id.* § 423.0045(c). Section 423.0046 extends similar protections to sports venues.

3

## II.     Operational Characteristics of UAS

Unmanned aircraft are a relatively new and powerful technology, and their operational characteristics present unique opportunities and challenges. As described in the legislative history materials to the Texas Privacy Act, the privacy concerns specific to drones are particularly challenging as compared to conventional aircraft:

> Drones can fly low, are quiet, and can be nearly impossible to see unless a person was looking for them. Helicopters and airplanes are noisy and difficult to miss, so a person over whom a helicopter flies would hear it and would be on notice that there could be someone surveilling or photographing them.

Texas Bill Analysis, 2013 Regular Session, House Bill 912, Texas House Research Organization, TX B. An., H.B. 912 (May 7, 2013) (attached hereto as Exhibit E).

Unlike conventional aircraft such as helicopters, which can stay airborne for hours at high altitudes, UAS typically have a limited flight time of less than 30 minutes and must fly below 400 feet and within the visual line of sight of the pilot. Decl. of Jason Day ¶ 18 ("Day Decl.") (attached hereto as Exhibit A). But even at those comparatively lower altitudes, UAS can fly with extreme stealth: "A UAS at 3 feet away is about around 55 db, whereas a helicopter at 1000 feet is around 78 db." *Id.* ¶ 19. "Due to the relatively small size of the average drone and the very large search area in which it can operate, drones are difficult to detect, although some detection methods do exist." *Id.* Ex. A at 9. But these detection methods are technical and specialized, and likely out of reach of the average citizen. *See id.* (describing the possibility of detecting and disrupting UAS radio signals, the use of radar, the limited efficacy of acoustic detection, and the specialized equipment needed for visual detection). Conversely, the UAVs themselves are commercially available to anyone. The equipment and software used by law enforcement is substantially similar or identical to the tools available to anyone for a relatively modest price at an electronics store.

4

*See* Day Decl. ¶¶ 17, 25; Decl. of Lt. Aaron Fritch ¶ 11 ("Lt. Fritch Decl.") (attached hereto as Exhibit B).

Given these characteristics, UAS are well-suited to a variety of law enforcement uses. DPS uses UAS for many types of missions, including search-and-rescue operations, disaster and incident response, and overwatch operations to protect officers, citizens, and critical infrastructure. Day Decl. ¶ 9. But all DPS operations are conducted pursuant to policies that minimize risk, comply with legal requirements such as Chapter 423, and "safeguard the right to privacy of all persons." Day Decl. ¶ 9. UAS technology is particularly important for the THP State Crash Reconstruction Team. *See id.* ¶¶ 7, 10; Lt. Fritch Decl. ¶¶ 5-10. Using publicly available drone technology and software, THP is able to document and forensically map crash scenes in a fraction of the time that non-UAS technology permits, creating thorough, detailed, to-scale images and reconstructions in very short time periods. *See* Lt. Fritch Decl. ¶¶ 6-7.

Proper maintenance is also critical to safe UAS use. Federal regulations contain the simple command that UAS are kept in safe operating condition, but no specific requirements and very little guidance is provided. *See* 14 C.F.R. § 107.15; Day Decl. ¶ 11. In order to ensure the safety of the DPS drone fleet, DPS created a robust maintenance program to ensure safety and compliance with the law. Day Decl. ¶ 12. Absent adequate maintenance, there is an increased "risk of crashes which can endanger persons on the ground or risk property damage." Lt. Frich Decl. ¶ 15.

Safe UAS operation also requires extensive training. Federal requirements to obtain licensure are minimal, and fall well below the standards set for manned aircraft: no practical skills training or testing is required, and pilots need only earn the equivalent of a C- grade on a multiple choice test to obtain their federal license. Day Decl. ¶ 14; *see also* "Become a Drone Pilot," FAA, https://www.faa.gov/uas/commercial_operators/become_a_drone_pilot/ (last visited July 9,

2021). By contrast, DPS requires extensive training that is conducted by leaders in UAS. Day Decl. ¶ 13; Lt. Fritch Decl. ¶ 2. Absent adequate training, UAS pilots are at increased risk of mid-air collisions, crashes, and causing injury or property damage. Lt. Fritch Decl. ¶ 16.

UAS technology is also subject to abuse and misuse. Critical infrastructure facilities and stadiums that are protected by the No-Fly Provisions are particularly vulnerable, and any intentional or unintentional damage to these types of locations could have far-reaching and deadly consequences. *See* Day Decl. Ex. 1 at 4-5; Day Decl. Ex. 2 at 8; Lt. Fritch Decl. ¶¶ 17-18; *see also* Ex. F at 28 ("As the prevalence of drone use grows, so does the corresponding airspace security risk to Critical Infrastructure sites.") (NPPA 00191); Ex. G (NPPA 00097-99). Moreover, criminals have adopted commercially available drone technology for their own illegal purposes, presenting a wide variety of risks that cover the gamut from smuggling contraband into correctional facilities, to weaponizing drones by loading them with explosives, to an attempt to assassinate Venezuelan President Nicolas Maduro. Day Decl. ¶¶ 23-25; Lt. Fritch Decl. ¶ 18; *see also* Day Decl. Ex. A at 4-8; Day Decl. Ex. B at 8, 13-14. Drones can also be adapted to purposes other than capturing images and be equipped with other tools such as saws or flamethrowers. *See* Ex. H at 3-5 (NPPA 00418-20). Finally, even well-meaning drone operators can present significant hazards for law enforcement and other first responders, especially during active operations at crash scenes, crime scenes, and fires. Lt. Fritch Decl. ¶¶ 13-14

Because of these operational characteristics, the Legislature determined that regulation of this nascent and powerful technology is necessary. "[I]ncreasing use of [drones] poses a significant safety and security risk for critical state infrastructure and [] establishing state guidelines, enforceable by law, will reduce the risk of accidents and prevent intentional harm." Texas Committee Report, 2015 TX H.B. 1481 (NS) (May 8, 2015) (attached hereto as Exhibit I).

### III.     Chapter 423's Impact on Plaintiffs

#### A.     Plaintiffs' Allegations

Plaintiffs are two trade organizations comprised of photojournalists, the National Press Photographers Association ("NPPA") and the Texas Press Association ("TPA"), and one freelance reporter, Joe Pappalardo. *See* Compl. ¶¶ 13-15. None of the Plaintiffs allege that they have ever been charged with any Chapter 423 offense, or that they have even been threatened with such a prosecution. *See* Compl. ¶¶ 45-89. Instead, NPPA alleges that it has had to divert resources from its other activities and respond to Chapter 423. Compl. ¶ 56. Pappalardo alleges that "Chapter 423 has chilled [his] speech" and that he "reasonably fears" prosecution for using a drone in the course of his business, though he admits he is no longer licensed to use his drone. Compl. ¶¶ 82-84. TPA does not specifically allege how it has been affected by Chapter 423. *Cf.* Compl. ¶ 14.

#### B.     Plaintiffs' Discovery Responses

Plaintiffs' discovery responses have not borne out Plaintiffs' allegations that the existence of Chapter 423 presents a barrier to their journalistic activities. To be sure, Plaintiffs repeated in their discovery responses their conclusory assertions that they fear Chapter 423. But Plaintiffs do not identify any instances of concrete enforcement of Chapter 423 against them, nor do they link any of their professed fears of prosecution to any of the Defendants.

NPPA identifies only three instances of enforcement of threatened enforcement against its members. First, NPPA points to the interaction between its member Guillermo Calzada and unnamed San Marcos police officers. NPPA Resp. at 12.[3] But Mr. Calzada's drone photography taken in conjunction with that incident was in fact published in the San Antonio Express-News,

---

[3] The parties' written discovery responses are attached to the Declaration of Christopher D. Hilton, attached hereto as Exhibit L, and are cited herein as indicated on that Declaration.

and there is no suggestion that he was ever subject to penalty under Chapter 423. *See* Ex. J (CALZADA 00044). Second, NPPA points to the posting of signs on public highways allegedly located in Cameron County, Texas regarding § 423.0045. NPPA Resp. at 12. But two of the photographs of these signs clearly show industrial sites that presumably fall within the definition of "critical infrastructure facility" in § 423.0045(a)(1-a), and more importantly, NPPA has produced no evidence that any of the Defendants have anything to do with such signs being posted or any connection to any theoretical prosecution. *See* Ex. K (NPPA 00409-12). Finally, NPPA points to the existence of a private lawsuit between neighboring property owners. NPPA Resp. at 12. But NPPA admits that neither that lawsuit, nor any other known lawsuit, has anything to do with NPPA or its members. *Id.* Finally, NPPA concedes that it has no knowledge of either NPPA or its members having any communications or interactions with any of the Defendants concerning Chapter 423. NPPA Resp. at 14, 20-21.[4]

The other Plaintiffs' responses further reflect a lack of any concrete incidents forming the basis for their professed fear of Chapter 423. TPA's discovery responses are similar, but even less convincing. *See* TPA Resp. at 10-11, 14-15. Pappalardo's discovery responses likewise do not reflect any concrete impact on him by Chapter 423. He, too, has neither been threatened with enforcement of Chapter 423, nor had any communications or interactions with any of the Defendants. *See* Pappalardo Resp. at 12, 16-17. Simply put, Defendants have no connection to any Plaintiff or any Plaintiffs' asserted concern regarding Chapter 423 liability.

---

[4] Calzada's interaction with the San Marcos police is not attributable to defendants, including Mau, who does not have any jurisdiction or authority over that city law enforcement agency.

## IV.    Procedural History

Plaintiffs initially brought five claims for relief, challenging the Surveillance and No-Fly Provisions under the First and Fourteenth Amendments and arguing that the No-Fly Provisions are pre-empted by federal legislation. *See* Compl. ¶¶ 93-144. Defendants filed a motion to dismiss, ECF No. 19, which the Court granted in part and denied in part, ECF No. 52. The Court dismissed Plaintiffs' preemption claim, but it found that the Complaint made sufficient allegations to overcome Defendants' other Rule 12 challenges and proceed to discovery. Defendants now seek summary judgment on all of Plaintiffs' remaining claims.

## STANDARD OF LAW

"Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Reese v. Sun Life Assur. Co. of Can.*, 482 F. Supp. 3d 407, 412 (W.D. Tex. 2020) (quoting Fed. R. Civ. P. 56(a)). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (cleaned up). A party can support a motion for summary judgment by showing that the adverse party cannot present evidence in support of a fact or element on which they bear the burden of proof. *See* Fed. R. Civ. P. 56(c)(1)(B); *Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003).

## ARGUMENT

## I.    The Court Lacks Jurisdiction.

The Court lacks jurisdiction over Plaintiffs' claims for at least two reasons. First, the evidence demonstrates that the State Defendants do not have a sufficient connection to the

enforcement of Chapter 423 such that the State's sovereign immunity is overcome via *Ex Parte Young*. Second, Plaintiffs have failed to demonstrate that they meet all three elements of standing as to any Defendant.

### A.   Defendants Are Immune.

All Defendants are shielded from Plaintiffs' claims by sovereign immunity. Generally, state sovereign immunity precludes suits against state officials in their official capacities. *See City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). The important case of *Ex parte Young*, 209 U.S. 123 (1908), is an exception to that baseline rule, but state officials must have some connection to the state law's enforcement to ensure that the suit is not effectively a suit against the state itself. *Texas Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2020). The Fifth Circuit has stated:

> Although the precise scope of the requirement for a connection has not been defined, the plaintiff at least must show the defendant has "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (quotation marks omitted). That means the official must be "statutorily tasked with enforcing the challenged law." *In re Abbott*, 956 F.3d at 709. Enforcement typically means "compulsion or constraint." *K.P.*, 627 F.3d at 124. A "scintilla of 'enforcement' by the relevant state official with respect to the challenged law" will do. *City of Austin*, 943 F.3d at 1002.

*Tex. Democratic Party*, 978 F.3d at 179.

Relying on *Texas Democratic Party v. Abbott*, No. 20-50407, 2020 WL 5422917 (5th Cir. Sept. 10, 2020), *withdrawn and superseded*, 978 F.3d 168 (5th Cir. 2020), the Court previously concluded that the allegation of enforcement authority in the Complaint was sufficient to invoke *Ex parte Young*. ECF No. 52 at 16-17. But the existence of statutory authority on its own is insufficient: the official defendant must have "'the particular duty to enforce the statute in question **and** a demonstrated willingness to exercise that duty.'" *Tex. Democratic Party*, 961 F.3d at 179

(quoting *Morris*, 739 F.3d at 746) (emphasis added). Moreover, "[d]etermining whether *Ex parte Young* applies to a state official requires a provision-by-provision analysis, *i.e.*, the official must have the requisite connection to the enforcement of the particular statutory provision that is the subject of the litigation." *Id.*

Plaintiffs cannot meet this standard. Neither DPS nor THP has made an arrest under Chapter 423. *See* McCraw Answers at 5; Mathis Answers at 5. On the small handful of occasions where a DPS officer has had any interactions with drone pilots, they have never given anything other than a warning for drone-related conduct, and they have never issued a warning for any alleged violation of Chapter 423. *See* McCraw Answers at 6-7. The same is true for Mau, who came into office on January 1, 2014, and in seven years his office has only charged one person for drone-related conduct (and those charges were dismissed), which did not involve any of the Plaintiffs or Plaintiffs' members. *See* Mau Answers at 5-7. Likewise, Plaintiffs' own discovery responses reflect that they have never been threatened with enforcement by any of the Defendants. *See* NPPA Resp. at 14, 20-21; TPA Resp. at 10-11, 14-15; Pappalardo Resp. at 12, 16-17. Finally, the State Defendants do not have any prosecution authority, even if they do have the theoretical, unused authority to make an arrest for Chapter 423.

Like the Attorney General in *Texas Democratic Party*, none of the Defendants have made "a specific threat or indicate[d] that enforcement was forthcoming," nor have they stated that any of the Plaintiffs "had violated at specific law" or otherwise "intimated that formal enforcement was on the horizon." 978 F.3d at 181 (cleaned up). Accordingly, Defendants lack the requisite connection to the enforcement of Chapter 423, and *Ex parte Young* does not apply to waive the State's sovereign immunity. Plaintiffs' claims should therefore be dismissed.

### B.      Plaintiffs Lack Standing.

To satisfy Article III standing, a plaintiff must show: (1) an injury-in-fact; (2) that is traceable to the defendant's challenged conduct (causation); and (3) that is likely to be redressed by a favorable decision in the district court (redressability). *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *see also Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 585-86 (5th Cir. 2006). These elements are "an indispensable part of the plaintiff's case." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The party seeking to invoke federal jurisdiction bears the burden of establishing all three elements. *Id*. If a party lacks standing to bring a claim, the court lacks subject matter jurisdiction over that claim. *See Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015); *Bell v. Redflex Traffic Sys., Inc.*, 374 F. App'x 518, 522 (5th Cir. 2010).

None of the Plaintiffs can satisfy the traceability requirement. As stated, the State Defendants are law enforcement officers, with no prosecution authority themselves. Mau has prosecution authority, but Plaintiffs have neither alleged nor proven that he has used or even threatened to use such authority against them. Moreover, Plaintiffs have not produced any facts to suggest that Defendants have ever or would ever investigate them for any alleged violations of Chapter 423, or even interact with them in any way. The Court previously found that this requirement was satisfied because the allegation that Defendants or their employees engage in "enforce[ment] [of] the criminal provisions of Chapter 423." ECF No. 52 at 14. But as stated above, the facts have demonstrated that this allegation was unfounded—Defendants do not and have not enforced Chapter 423, or threatened it, against Plaintiffs. Accordingly, Plaintiffs' injuries, if any, may be traceable to the mere existence of Chapter 423, but they are not traceable to the conduct of any Defendant.

Plaintiffs also cannot satisfy the redressability requirement. The Court previously found "that an injunction on Defendants and the peace officers they supervise, in addition to a declarative judgment, would redress Plaintiffs' injury." ECF No. 52 at 14. But a declaratory judgment alone cannot form the basis of Plaintiffs' standing because it a procedural convenience only, which cannot enlarge the Court's jurisdiction. *See, e.g.*, *Skelly Oil Co. v. Phillips Petrol. Co.*, 339 U.S. 667, 671-72 (1950). Rather, "[t]o demonstrate redressability, a plaintiff must establish that the practical consequence of a declaration 'would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" *Ctr. for Inquiry, Inc. v. Warren*, 845 F. App'x 325, 328 (5th Cir. 2021) (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)). "Where there is 'a significantly more speculative likelihood of obtaining relief,' redressability is missing." *Id.* (quoting *Utah*, 536 U.S. at 464).

Plaintiffs seek the ability to cover newsworthy events without being subject to Chapter 423. However, to the extent that Defendants have authority to enforce Chapter 423, and even if they were to exercise that authority in the future, a judgment against Defendants in this case "would not fully redress the injuries for which the appellants bring suit." *Id.* Defendants' jurisdictions are limited, and they exercise no control or authority over any of the hundreds or thousands of other law enforcement entities and prosecutors in the State of Texas. Should Plaintiffs seek to conduct drone-based surveillance that violates Chapter 423 in any of these other jurisdictions, their victory in this litigation would not protect them. Accordingly, "even if they prevail in this litigation, relief would be incomplete because the appellants would still be subject to criminal prosecution." *Id.* Simply put, Plaintiffs "ask for relief that does not remedy the claimed injury in full." *Id.* at 329. Accordingly, they "lack standing to maintain this suit." *Id.*

Finally, even if TPA or Pappalardo could satisfy either of these requirements, they both

have failed to demonstrate an injury in fact.[5] TPA's discovery responses indicate that it has done virtually nothing in response to Chapter 423: TPA distributed a single newsletter article that was written by NPPA's counsel, and it has had "general interaction" with its members. TPA Resp. at 11. This is insufficient to demonstrate a diversion-of-resources injury, which requires a showing that an organization "had diverted **significant** resources to counteract the defendant's conduct." *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) (emphasis added). Activities "which basically boil down to examining and communicating about developments" in the law do not confer standing. *Id.* at 238; *see also La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000). Accordingly, TPA's diversion of resources was *de minimis* at most, which is not sufficient to constitute a legally cognizable injury in fact.

Moreover, none of the Plaintiffs can demonstrate an injury in fact based on a fear-of-prosecution theory. As stated, Plaintiffs' discovery responses indicate that none of them have been subject to enforcement or threatened with enforcement, and none have interacted with any Defendant regarding Chapter 423. The Court previously held that based on the allegations, "there is a non-speculative risk that the Chapter 423 provisions would be enforced against Pappalardo." ECF No. 52 at 10. But discovery has not revealed any facts to suggest this is true, as explained above. Accordingly, Plaintiffs "can establish neither a realistic threat of legal sanction if he engages in the speech in question, nor an objectively good reason for refraining from speaking and 'self-censoring' instead." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018); *see also Speech First, Inc. v. Fenves*, 384 F. Supp. 3d 732, 738-41 (W.D. Tex. 2019).

In sum, while the Court may have determined that Plaintiffs had adequately alleged in their

---

[5] Defendants do not concede that NPPA has established a diversion-of-resources injury and contend that, at a minimum, genuine issues of material fact exist for trial, *cf.* ECF No. 52 at 52, but they do not seek summary judgment as to NPPA injury in fact.

14

Complaint that they have standing, Plaintiffs have not proven it. The Court should conclude that it lacks jurisdiction and dismiss Plaintiffs' claims.

## II.      Defendants Are Entitled to Summary Judgment on Each of Plaintiffs' Claims.

### A.      The Surveillance Provisions Are Constitutional.

1.      The Surveillance Provisions Are Not Impermissible Content-Based Restrictions.

At the motion-to-dismiss stage, the Court concluded that the Surveillance Provisions implicate the First Amendment and constitute speaker-based discrimination that subjects these statutes to the strict scrutiny applied to content-based restrictions on speech. *See* ECF No. 52 at 17-20. At least in part, the Court's determination was based on the alleged vagueness of the term "surveillance" which, as discussed below, is not supportable at the summary judgment stage. *See id.* at 18. The Court also stated that "the Surveillance Provisions are discriminating based on the type of speaker someone is at the time they are using a UAV because of the exceptions listed in Section 423.002." *Id.* at 19. Accordingly, the Court concluded that the Surveillance Provisions are subject to strict scrutiny and that Plaintiffs had adequately alleged that they are unconstitutional.

Defendants respectfully disagree that the Surveillance Provisions are subject to strict scrutiny, as discussed below. Nevertheless, even if they are, the Surveillance Provisions are constitutional, and Defendants are entitled to summary judgment on this claim.

Plaintiffs' asserted right to conduct unrestricted aerial surveillance with a drone is found nowhere in the First Amendment. "The First Amendment literally forbids the abridgment only of 'speech,' but we have long recognized that its protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). "In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether '[a]n intent to convey a particularized message was present, and [whether] the

15

likelihood was great that the message would be understood by those who viewed it.'" *Id.* (quoting *Spence v. Washington*, 418 U.S. 405, 410-11 (1974)) (alterations in original). But "[t]he protection of the First Amendment depends not only on whether the conduct is expressive, but also on the context in which that expression takes place." *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 283 (5th Cir. 2001).

"[T]he party invoking the First Amendment's protection [has] the burden to prove that it applies." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013) (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984)). "[O]nly conduct that is 'inherently expressive' is entitled to First Amendment protection." *Id.* (quoting *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006)). "In evaluating whether particular conduct possesses 'sufficient communicative elements' to implicate First Amendment protections, courts must ask whether '[a]n intent to convey a particularized message was present, and . . . [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 283 (5th Cir. 2001) (quoting *Johnson*, 491 U.S. at 404); *see also Spence v. Washington*, 418 U.S. 405, 410-11 (1974).

Unrestricted UAS surveillance could not have been within the Framers' thinking when devising the First Amendment. Whatever First Amendment rights Plaintiffs and other photojournalists apply, the Supreme Court has long held that "[t]he right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). But Plaintiffs seek nothing less than unrestricted information gathering on any private citizen, anywhere, at any time, by anyone.

Piloting a drone "with the intent to conduct surveillance on the individual or property captured in the image," Tex. Gov't Code § 423.003(a), is not inherently expressive conduct. There

is no "intent to convey a particularized message" when someone flies a drone for the purpose of surreptitious information gathering. *See Little*, 268 F.3d at 283. And even if someone does intend to convey a message, it would not be understood by anyone who happened to view it. *Id.* Indeed, one of the benefits of drones that Plaintiffs allege is that they are not "loud and disruptive to a news scene," like a helicopter. Compl. ¶ 49. Thus, even Plaintiffs apparently would agree that the conduct prohibited by the Surveillance Provisions—the piloting of a drone—cannot itself be inherently expressive, as one of its main benefits is secrecy. *See also* Texas Bill Analysis, 2013 Regular Session, House Bill 912, Texas House Research Organization, TX B. An., H.B. 912 (May 7, 2013) ("Drones can fly low, are quiet, and can be nearly impossible to see unless a person was looking for them."). As discussed below, the use of the term "surveillance' does not alter this conclusion. Accordingly, conducting aerial surveillance with a drone is not constitutionally protected expressive conduct.

To the extent that First Amendment protections do apply, the appropriate level of scrutiny is not strict, but rather intermediate. Where conduct that is not inherently expressive, but nonetheless may have "some expressive content," is at issue, courts "apply the intermediate scrutiny test articulated by the Supreme Court in *United States v. O'Brien*." *Kleinman v. City of San Marcos*, 597 F.3d 323, 328 (5th Cir. 2010) (citing *United States v. O'Brien*, 391 U.S. 367 (1968)). "*O'Brien* rests on the principle that when 'speech' and 'non-speech' elements are united in a course of conduct, a valid governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.* (citing *O'Brien*, 391 U.S. at 376). "Under *O'Brien*, a regulation is constitutional if it is within the constitutional power of the government; it furthers an important or substantial governmental interest; the government interest is unrelated to the suppression of free expression; and the incidental restriction on alleged First

Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* (citing *O'Brien*, 391 U.S. at 376). The Surveillance Provisions meet this standard, as Defendants have previously explained.[6]

First, regulation of UAS is within the traditional police powers of the State. Second, the governmental interests at stake are of the utmost importance, as explained above—the privacy and security risks posed by UAS surveillance are extreme. *See generally* Day Decl., Lt. Fritch Decl. Third, the Surveillance Provisions are unrelated to the suppression of free expression, as journalists remain free to capture the same images using conventional aircraft or other means; rather, the Surveillance Provisions are necessary to safeguard the public from abuse or misuse of UAS technology. Fourth, to the extent that the Surveillance Provisions present any "incidental restriction on alleged First Amendment freedoms," such restrictions are "no greater than is essential to the furtherance of that interest." *Kleinman*, 597 F.3d at 328. The Surveillance Provisions have carved out many types of drone use and methods of image capture to minimize any incidental restrictions to the greatest extent possible. Accordingly, the *O'Brien* test is satisfied.

To the extent that the Court construes the Surveillance Provisions to directly regulate expression,[7] these statutes are content-neutral and constitutional under that test as well. "The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citing

---

[6] Defendants incorporate by reference as if expressly restated in full the legal argument from their motion to dismiss. ECF No. 19.

[7] Only one of the challenged Surveillance Provisions purports to prohibit speech: it is a misdemeanor to disclose or display an image that someone has captured illegally in violation of § 423.003. *See* Tex. Gov't Code § 423.004(a).

*Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48 (1986)). "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Id.* (quoting *Clark*, 468 U.S. at 293). Recognizing the Court's prior disagreement as to this point, *see* ECF No. 52 at 19-20, Defendants respectfully maintain that the Surveillance Provisions are entirely agnostic as to who or what is being surveilled. It does not matter ***what*** is depicted in the drone-captured image, so long as the statutory prerequisites of drone surveillance are satisfied—a determination that cannot be made based solely on the content of the image or the identity of the speaker, but rather requires an inquiry into the speaker's intent, regardless of their identity. *See, e.g.*, Tex. Gov't Code § 423.003.

Even if strict scrutiny were to apply, however, the Surveillance Provisions still survive. Under strict scrutiny, "[t]he State must show that the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'" *Burson v. Freeman*, 504 U.S. 191, 198 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011). The Surveillance Provisions satisfy this burden. They each are designed to achieve the compelling and important state interests of protecting privacy rights and the safety and security of persons and property. *See, e.g.*, Texas Committee Report, 2015 TX H.B. 1481 (NS) (May 8, 2015); Texas Bill Analysis, 2013 Regular Session, House Bill 912, Texas House Research Organization, TX B. An., H.B. 912 (May 7, 2013); Day Decl.; Lt. Fritch Decl. And they are narrowly drawn to achieve that end by prohibiting only UAS surveillance done "with the intent to conduct surveillance on the individual or property captured in the image." Tex. Gov't Code § 423.003. The prohibition does not extend to incidental capture of images, or the capture of images that does not constitute surveillance, or to individuals who do not *intend* to conduct surveillance, regardless of whether they have some other culpable mental

state. Moreover, the Surveillance Provisions are further tailored through the many excepted types of permissible surveillance. Only someone who targets a particular individual or property, intends to conduct surveillance on that individual or property, and who does not otherwise fall within the limits on liability contained in the Surveillance Provisions, is subject to liability. Accordingly, the Surveillance Provisions would survive strict scrutiny, even if its application were appropriate. Summary judgment in favor of Defendants on this claim is therefore appropriate.

2.      The Surveillance Provisions Are Not Unconstitutionally Vague.

The Court previously concluded that Plaintiffs had plausibly alleged that the Surveillance Provisions are unconstitutionally vague, focusing on the word "surveillance" and the Plaintiffs' allegations of vagueness. ECF No. 52 at 20-22. Plaintiffs' argument rested primarily on multiple dictionary definitions that do not perfectly align. But while that may have been sufficient for the motion-to-dismiss stage, Plaintiffs have failed to prove their vagueness challenge.

"The Fourteenth Amendment's guarantee of Due Process proscribes laws so vague that persons 'of common intelligence must necessarily guess at [their] meaning and differ as to [their] application.'" *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001) (alterations in original) (quoting *Smith v. Goguen*, 415 U.S. 566, 572 n.8 (1974)). "A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Id.* (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)). "'[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1891 (2018) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)) (alteration in original).

"Surveillance" is not a word that is *per se* fatal to any statute in which it appears. The

commonly available definitions involve a common thread of "surveillance" as being an act distinct from mere "observation," which involves prolonged time periods and/or some degree of surreptitiousness or invasion of one's expectation that they are not being watched. *See* Compl. ¶ 24; *see also* "surveillance," Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/surveillance (last visited July 9, 2021) ("the careful watching of a person or place, especially by the police or army, because of a crime that has happened or is expected"); "surveillance," Dictionary.com, https://www.dictionary.com/browse/surveillance (last visited July 9, 2021) ("a watch kept over a person, group, etc., especially over a suspect, prisoner, or the like[;] . . . continuous observation of a place, person, group, or ongoing activity in order to gather information"); "surveillance," Macmillan Dictionary, https://www.macmillandictionary.com/us/dictionary/american/surveillance (last visited July 9, 2021) ("the process of carefully watching a person or place that may be involved in a criminal activity"). No definition would support the conclusion that a single incidental capture of an image could constitute "surveillance" as Plaintiffs fear.

The precise contours of this definition need not be answered in this lawsuit—it is enough that individuals have a "reasonable opportunity to know what conduct is prohibited." *Bell*, 248 F.3d at 421. Even the U.S. Department of Homeland Security saw no need to define "surveillance" in the context of describing the threat of hostile surveillance posed by UAS. *See* Day Decl. Ex. 2 at 30. Plaintiffs simply have not demonstrated that persons of common intelligence are without a sufficient opportunity to understand what is prohibited. And it is no answer to say that surreptitious drone imaging may have some qualities of newsworthiness. As explained, the Supreme Court has long held that "[t]he right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel*, 381 U.S. at 17.

Additionally, it is inappropriate to focus solely on the word "surveillance" in isolation. Section 423.003 prohibits the use of a drone to capture images "with the intent to conduct surveillance on the individual or property captured in the image." By focusing solely on the word "surveillance," two critical elements of this phrase are ignored. First, the drone operator's "intent" is paramount. Plaintiffs or anyone else who do not intend to gather information on a subject surreptitiously or for prolonged periods, but perhaps do so through inadvertence in the course of conducting a permissible UAS flights, do not violate § 423.003 by its very terms. Second, the intended surveillance must be directed at the individual or property captured in the image. Any photographs that are not intended to surveil a particular target, but which incidentally capture a bystanding individual or property, would not necessarily violate the Surveillance Provisions as to the bystander. These are fact-bound questions that are appropriate for judges and juries to decide in the context of individual cases—a notion that does not offend, but rather advances, the principles of due process on which Plaintiffs' vagueness claim rests.

In sum, only an unfairly stringent and demanding reading of the Surveillance Provisions and the word "surveillance" in isolation could support Plaintiffs' vagueness challenge. They have not produced evidence to overcome the straightforward conclusion dictated by the text of the statute itself: that governments are not prohibited from using the word "surveillance" in their laws. Accordingly, Plaintiffs' vagueness claim should be rejected, and summary judgment entered for Defendants.

3.      The Surveillance Provisions Are Not Overbroad.

In ruling on Defendants' motion to dismiss, the Court stated that as a result of its conclusion as to Plaintiffs' vagueness claim, the contours of what the Surveillance Provisions prohibit are unclear, and therefore it could not be said that Plaintiffs' allegations regarding overbreadth were

implausible. *See* ECF No. 52 at 22. Defendants respectfully submit that in light of Plaintiffs' failure to prove their First Amendment and vagueness claims, Plaintiffs' overbreadth claim should fail as well.

"The traditional rule is that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *New York v. Ferber*, 458 U.S. 747, 768 (1982). "This general rule reflects two 'cardinal principles' of our constitutional order: the personal nature of constitutional rights and the prudential limitations on constitutional adjudication." *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999) (quoting *Ferber*, 458 U.S. at 767). "The 'mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.'" *United States v. Williams*, 553 U.S. 285, 303 (2008) (quoting *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)).

For the reasons explained above and in Defendants' motion to dismiss, ECF No. 19, incorporated herein as if restated in full, Plaintiffs' overbreadth claim fails and none of the evidence adduced during discovery affects that conclusion. At bottom, no person is restrained by the Surveillance Provisions from saying whatever they wish or photographing whatever they wish using any other lawful means. The only prohibition is intentional, targeted surveillance using UAS technology—a technology that poses grave threats to the privacy and safety of every citizen and must be used and regulated with caution. Because the Surveillance Provisions prohibit only the use of drones to conduct surveillance of private real property and individuals on private property, without authorization and outside of the nearly two-dozen other exceptions provided by statute, they are not overbroad. Accordingly, this challenge fails as well, and summary judgment in

Defendants' favor on the Surveillance Provision claims is appropriate.

## B. The No-Fly Provisions Are Constitutional.

At the motion-to-dismiss stage, the Court concluded that Plaintiffs plausibly alleged claims challenging the No-Fly Provisions on First Amendment, vagueness, and overbreadth grounds. The Court determined Plaintiffs had adequately pleaded that the No-Fly Provisions would fail at least the third prong of the *O'Brien* test and that these statutes were also plausibly alleged to be vague and overbroad because of the use of the term "commercial purpose." *See* ECF No. 52 at 23-24. Notwithstanding the Court's ruling, however, Plaintiffs have failed to establish these claims, and summary judgment for Defendants is appropriate.

As an initial matter, there is no basis to conclude that the No-Fly Provisions implicate expressive conduct. By their terms, they simply regulate the safe operation of drones within Texas, and they do not mention or relate to photography, journalism, expression, or any other type of expressive activity or image capture. Both statutes are concerned solely with the how a person "operates an unmanned aircraft," either "over a correctional facility, detention facility, or critical infrastructure facility," Tex. Gov't Code § 423.0045(b)(1), or "over a sports venue," *id.* § 423.0046(b). The particular conduct that is forbidden by the No-Fly Provisions—operation of drones in certain places—does not have any attendant "intent to convey a particularized message" and is not itself "expressive." *Johnson*, 491 U.S. at 404; *Littlefield*, 268 F.3d at 283. Accordingly, the First Amendment is simply not implicated by the No-Fly Provisions.

Even if the Court were to find that that the First Amendment has anything to do with these statutes, the No-Fly Provisions would also pass constitutional muster under the *O'Brien* test. *Kleinman*, 597 F.3d at 328 (citing *O'Brien*, 391 U.S. at 376). As explained in connection with the Surveillance Provisions, the No-Fly Provisions are both within the police power of the State and

in furtherance of important and substantial governmental interests. In addition to the interests in protecting privacy and private property, the safety and security interests are even more pronounced with respect to the No-Fly Provisions, as they help prevent extreme threats to public safety, such as smuggling contraband into correctional facilities, accidental or intentional damage to critical infrastructure, or disruption and potential harm to spectators at sporting events. *See, e.g.*, Texas Committee Report, 2015 TX H.B. 1481 (NS) (May 8, 2015); Texas Bill Analysis, 2013 Regular Session, House Bill 912, Texas House Research Organization, TX B. An., H.B. 912 (May 7, 2013); Day Decl.; Lt. Fritch Decl. Third, the No-Fly Provisions have no relation whatsoever to suppression of expression—as stated, they do not implicate expressive conduct at all. Fourth, to the extent that any expressive conduct could be implicated, any restriction would be wholly incidental, and no greater than what is essential to protecting these particularly vulnerable and important locations from interference or damage by drones. Accordingly, even if the Court were to examine these laws through the lens of the First Amendment—which it need not—the No-Fly Provisions satisfy intermediate scrutiny.[8]

Plaintiffs further contend that the No-Fly Provisions are unconstitutionally overbroad, but this claim must also be rejected. These statutes do not criminalize a substantial amount of protected expressive activity—they criminalize **no** protected expressive activity. *Cf. Williams*, 553 U.S. at 297. Again, the mere flying of a drone near a sensitive facility is not expressive—and that is all that the No-Fly Provisions prohibit. Plaintiffs' overbreadth challenge fails.

Finally, Plaintiffs' vagueness claim also fails, primarily because the focus on the word "commercial" incorrectly narrows the interpretive question before the Court. The No-Fly

---

[8] There is no need to explore whether the No-Fly Provisions are content neutral because they have nothing to with expressive conduct. But Defendants contend that these provisions do not run afoul of the First Amendment under any test.

Provisions except from their prohibitions conduct by "an operator of an unmanned aircraft that is being used for a commercial purpose, if the operation is conducted in compliance with: (A) each applicable Federal Aviation Administration rule, restriction, or exemption; and (B) all required Federal Aviation Administration authorizations." Tex. Gov't Code §§ 423.0045(b)(1)(E), 423.0046(c)(5). The FAA's regulations on Small Unmanned Aircraft Systems, found in 14 C.F.R part 107, are therefore central to the definition of this exception. The FAA also provides extensive public guidance about the activities covered by Part 107. *See, e.g.*, "Certificated Remote Pilots including Commercial Operators," FAA, https://www.faa.gov/uas/commercial_operators/ (last visited July 9, 2021). Accordingly, the type of "commercial" flights envisioned by the No-Fly Provisions' exception should be understood in the context of what isn't covered by Part 107—that is, recreational drone use. *See, e.g.*, 49 U.S.C. § 44809; "Recreational Flyers & Modeler Community-Based Organizations," FAA, https://www.faa.gov/uas/recreational_fliers/ (last visited July 9, 2021). The "commercial purpose" exception to the No-Fly Provisions is therefore fully explained by referencing the relevant FAA regulations.

Because Plaintiffs' vagueness challenge to the No-Fly Provisions is premised on a myopic focus on the word "commercial," without full consideration to the entire language of the statute, the Court should reject this claim and enter summary judgment in favor of Defendants.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for summary judgment, and all of Plaintiffs' claims should be dismissed.

26

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief, General Litigation Division

*/s/ Christopher D. Hilton*
CHRISTOPHER D. HILTON
Texas Bar No. 24087727
So. District No. 3029796
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120
FAX: (512) 320-0667
christopher.hilton@oag.texas.gov

***Counsel for the State Defendants, Steven McCraw
and Dwight Mathis in their official capacities***

McGINNIS LOCHRIDGE LLP
Michael A. Shaunessy, SBN 18134550
Eric Johnston, SBN 24070009
600 Congress Avenue, Suite 2100
Austin, Texas 78701
(512) 495-6000
(512) 495-6093 FAX
mshaunessy@mcginnislaw.com
ejohnston@mcginnislaw.com

By: */s/ Michael A. Shaunessy*
    Michael A. Shaunessy
    State Bar No. 18134550

*ATTORNEYS FOR DEFENDANT WES MAU, IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF HAYS COUNTY, TEXAS*

28

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served via the Court's CM/ECF system on July 9, 2021, to all counsel of record.

*/s/ Christopher D. Hilton*
Christopher D. Hilton