## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, TEXAS PRESS ASSOCIATION, and JOSEPH PAPPALARDO, <br> *Plaintiffs*, | § <br> § <br> § <br> § <br> § <br> § | |
| v. | § | **Civil Action No. 1:19-CV-00946-RP** |
| | § | |
| STEVEN MCCRAW, in his official capacity as Director of Texas Department of Public Safety, DWIGHT MATHIS, in his official capacity as Chief of the Texas Highway Patrol, and WES MAU, in his official capacity as District Attorney of Hays County, Texas, <br> *Defendants*. | § <br> § <br> § <br> § <br> § <br> § <br> § | |

---

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

The State of Texas has acted proactively and consistent with the U.S. Constitution in setting reasonable limits on the aerial surveillance that can be conducted by drones and their operation ear critical infrastructure facilities and sports venues. As a result of their incorrect reading of Chapter 423 of the Texas Government Code, Plaintiffs insist that both the Surveillance Provisions and the No-Fly Provisions impermissible curtail their right to gather images of newsworthy events. But Plaintiffs' own evidence demonstrates that compliance with Chapter 423 in the conduct of photojournalism is possible, and Defendants' uncontroverted evidence conclusively demonstrates the risks to privacy rights and public safety. Because Chapter 423 is constitutional, Defendants respectfully request that the Court deny Plaintiffs' motion for summary judgment, grant Defendants' motion for summary judgment, and dismiss all claims in this matter.

## BACKGROUND AND STATEMENT OF FACTS

The undisputed factual record demonstrates that Plaintiffs cannot overcome Defendants' sovereign immunity, lack standing, and have brought a meritless challenge to Chapter 423. Moreover, much of Plaintiffs' factual allegations and evidence are irrelevant to the questions of constitutional law before this Court. The facial validity of Chapter 423 does not rise or fall on the particularities of Plaintiffs' circumstances, and Plaintiffs' policy preferences do not set the constitutional standards by which the State may protect the privacy and safety of its citizens. Accordingly, Defendants do not respond to each and every of Plaintiffs' contentions and characterizations. Instead, Defendants incorporate by reference their motion for summary judgment and attached evidence and respond here to the most important issues raised by Plaintiffs' inadequate statement of facts.

### I.    Plaintiffs Highlight the Potential Threats of Unrestricted Drone Surveillance.

Plaintiffs explain in great detail why they would prefer to use drones in their profession

instead of other means of newsgathering, but their explanations only emphasize the threats that the Texas Legislature perceived in enacting Chapter 423. As Plaintiffs recognize, drones can fly at low altitudes, are highly maneuverable, and are readily and cheaply available. Pls.' MSJ at 3. But these attributes are also what make UAS inherently threatening to Texans' privacy and security. The photographic capabilities and quiet, unintrusive operation of UAS technology make real the risk of constant and unseen surveillance that cannot be effectively detected or counteracted, as Defendants' evidence demonstrates. *See* Defs.' MSJ at 4-6. And while Plaintiffs go to great lengths to describe the risks posed by other aircraft, they ignore the serious threats to public safety that drones present. *See id.*; ECF Nos. 65-1, 65-2. Indeed, Plaintiffs failed to present any substantial evidence regarding the safety of UAS, other than the lay opinions and anecdotes of journalists.

Moreover, Plaintiffs misleadingly suggest Defendants agree that UAS accidents do not occur. *See* Pls.' MSJ at 4. As Defendants' summary judgment evidence demonstrates, safe UAS operation requires extensive and diligent maintenance, rigorous training, and careful regulation. *See, e.g.*, Defs.' MSJ at 4-6. Plaintiffs' characterization of the State Defendants' discovery responses is wrong—the State Defendants merely noted that they do not maintain information regarding drone crashes by non-law-enforcement aircraft, and they did not provide information on law-enforcement operations. *See, e.g.*, ECF No. 65-12 at 4 (Def. McCraw's Interrogatory Answers). Accordingly, Plaintiffs' pronouncement that the State Defendants "are not aware of any crashes or accidents involving drones over at least the past five years," Pls.' MSJ at 4, is wrong. Indeed, Defendants have submitted literature from DPS and the federal government regarding the risks presented by UAS. *See* ECF No. 65-1, Exs. A & B.

Finally, Plaintiffs' opinions as to the relative journalistic merit of drone photography compared to other means of capturing images are irrelevant to this litigation. *See, e.g.*, Pls.' MSJ

3

at 3 (describing Plaintiffs' views as to the merit of drone photography). Plaintiffs' belief that drone photography is superior to other methods of newsgathering does not enter the determination of constitutionality; the First Amendment applies with equal force to any protected expressive conduct, but it does not require states to permit unrestricted aerial surveillance with UAS, no matter the aesthetic value of the resulting images. Accordingly, the Court need not engage with these irrelevant and subjective opinions because the content and artistic value of drone-captured photographs has no influence on the constitutional inquiry.

## II.     Plaintiffs Mischaracterize Texas Law

As discussed below, Texas law is constitutional. And issues of law are questions for this Court to decide, not matters for evidentiary dispute. However, Plaintiffs make two incorrect statements about the State Defendants' position on Chapter 423. First, Plaintiffs cite interrogatory responses to suggest Defendants agree that the word "surveillance" is vague because they cannot say whether "capturing images by drone for purposes of journalism would constitute 'surveillance.'" Pls.' MSJ at 6. But "journalism" is not a monolithic concept with a discrete and unvarying meaning. There is no doubt that at least some newsgathering activities can be completely legal within the meaning of Chapter 423—Plaintiffs themselves frequently use UAS in their journalistic endeavors. But Plaintiffs' abstract question is impossible to answer because the specific intent required by the Surveillance Provisions precludes a one-size-fits-all analysis. *See generally* 22 C.J.S. Criminal Law: Substantive Principles § 36 (2021). The question of specific intent to commit a crime is for the jury to decide, and § 423.003 requires specific intent. Accordingly, Plaintiffs' premise reflects a misunderstanding of Chapter 423.

Second, Plaintiffs rely on a hearsay document incorrectly attributed to the Texas Department of Public Safety to characterize Defendant McCraw's position as to the Surveillance

Provisions. *See* Pls.' MSJ at 6. As explained by DPS's UAS Program Manager, that document was created by the Texas Division of Emergency Management, a division of the Texas A&M University System,[1] not DPS, and the committee report referencing this testimony is simply incorrect. *See* ECF No. 65-1 at 8, ¶ 28 (Decl. of Jason Day). Moreover, even if such document were admissible and correctly attributable to a Defendant in this litigation, it states nothing other than what is obvious—Chapter 423 does not contain a separate definition of "surveillance," not because the law is vague (as Plaintiffs suggest), but because the Legislature determined that the word "surveillance" did not need to be defined in a manner that diverges from its commonly understood meaning. As Defendants have explained, this omission does not make the Surveillance Provisions unconstitutionally vague.

Finally, Defendants note that many of the witnesses who testified against the enactment of Chapter 423 listed in the House Research Organization's bill analysis are representatives from NPPA and TPA. *See* ECF No. 65-5. The inclusion of Plaintiffs' legislative testimony in the bill analysis report does not constitute an agreement with Plaintiffs' position in this litigation. It is simply a record of the testimony considered—and rejected—by the Legislature.

### III.   Plaintiffs' Self-Serving Declarations Provide Little Substance to Support Their Claims.

Plaintiffs have offered little other than anecdotal and hearsay statements that fail to establish their entitlement to facial relief. Though Plaintiffs and their affiliates and members profess varying degrees of consternation regarding Chapter 423, the details of their contentions belie these alleged concerns and illustrate the weakness of their claims.

Beginning with Pappalardo, Plaintiffs attempt to describe the supposed chilling effect of

---

[1] *See, e.g.*, TDEM, https://tdem.texas.gov/ (last visited Aug. 9, 2021).

Chapter 423 on their newsgathering activities. Pls.' MSJ at 8-9. Pappalardo has not used drones in his work since 2017, and he describes several incidents where he claims to wish he could have done so. But many of the "missed opportunities" he highlights all seem to fall clearly outside of Chapter 423: the removal of a statue from a public park, ECF No. 63 at 152 ¶ 11; hurricane and other natural disaster damage and public reactions, *id.* at 153 ¶ 14; and stories related to occurrences on public property, *id.* at 153 ¶¶ 14-15. Even for those proposed projects that are not obviously outside of Chapter 423 based on Pappalardo's brief descriptions, Pappalardo describes no intent to conduct surveillance as prohibited by the statute. Pappalardo does not explain how he formed his belief that his ostensible uncertainty over the definition of the word "surveillance" could satisfy the specific intent necessary to constitute a violation of § 423.003.

Regarding NPPA, Plaintiffs emphasize all that NPPA has done to respond to Chapter 423. Pls.' MSJ at 9. The declaration of Akili-Casundra Ramsess, Executive Director of NPPA, makes clear that these activities are not unique or unusual for NPPA, but rather are consistent with NPPA's day-to-day operations. *See, e.g.*, ECF No. 63 at 158-63, ¶¶ 10-18. Much of Ramsess' declaration appears to be based on the hearsay statements of other NPPA employees and her "general interactions with members and our attorneys," so much of it would be inadmissible at trial. *Id.* at 158, ¶ 10; *cf.* Fed. R. Civ. P. 56(c)(2). Ramsess also opines on the "photography industry" definition of the term "commercial," which is idiosyncratic to that industry. *Id.* at 157, ¶¶ 6-7. But Ramsess mentions next to nothing about NPPA's members themselves.

Plaintiffs have little to say about TPA. *See* Pls.' MSJ at 9-10. This is unsurprising, as TPA's claim is virtually nonexistent. The declaration of Donnis Baggett, Executive Vice President of TPA, is based largely on rank hearsay that would be inadmissible at trial. *See* ECF No. 63 at 122, ¶ 3 (noting his assertions are based on "general interactions with representatives of TPA member

6

newspapers"); *cf.* Fed. R. Civ. P. 56(c)(2). Baggett's summary recitation of the Calzada incident adds nothing new to Plaintiffs' claims. *Id.* at 122-23, ¶ 4. And the description of TPA's alleged injuries—that they "occasionally received inquiries" and "distributed a newsletter article" on a single occasion, *id.* at 123, ¶ 5—conclusively demonstrates that TPA has not suffered any direct harm in its own right resulting from Chapter 423, as discussed below.

Plaintiffs rely on Wade's declaration to describe the alleged economic impact of Chapter 423. Pls.' MSJ at 10. Setting aside that the First Amendment protects expression, not pecuniary interests, Wade's declaration leaves many questions unanswered. For example, Wade states that he believes he has "lost thousands of dollars in assignments" from the *Dallas Morning News* due to their policy of refusing to publish drone-captured images. ECF No. 63 at 167, ¶¶ 14-15. This is based on his belief that he would get additional assignments from that news outlet, but he also admits that "there is no way for me to estimate" the alleged loss. *Id.* ¶ 15. Wade does not explain why he thinks he could get more business from *Dallas Morning News*, and no evidence from that publication is present in the record. Moreover, Wade offers no explanation of what he did with his time in the absence of these opportunities. Given Wade's admitted inability to estimate any "losses," it is far from certain that Wade has actually lost any money at all. Wade also explains that he has been able to use his drone on several occasions to get aerial photographs despite Chaper 423, and he does not describe any alleged enforcement actions. *Id.* at 169-70, ¶ 21. Indeed, much of Wade's declaration focuses on the actions of third parties not before the Court: the *Dallas Morning News*, the Texas Rangers, and the Center for Investigative Reporting. *E.g.*, *id.* at 170-73, ¶¶ 22-32.

Next comes Calzada, who describes the sole incident that Plaintiffs have identified where any of them  were so much as threatened with enforcement of Chapter 423. Pls.' MSJ at 10-11.

Calzada's description of his filming of the apartment fire in San Marcos confirms that none of the Defendants had anything to do with this alleged incident. *See* ECF No. 63 at 132, ¶¶ 9-10. More importantly, nothing about Calzada's description of events suggests in any way that he ran afoul of Chapter 423. Calzada filmed from publicly property in compliance with FAA regulations, and he does not describe any specific intent to conduct surveillance—his flight lasted only 3-4 minutes on a single occasion. *See id.* at 131-32, ¶¶ 7-8. So this anecdote amounts to nothing more than a single incident of anonymous, misinformed law enforcement officers issuing a single, dubious warning. Calzada describes another incident during the 2021 winter storm where he captured an image that incidentally included images of dozens of houses in a San Antonio neighborhood. *Id.* at 134 ¶ 18. Again, Calzada describes no specific intent to conduct surveillance on these homes— quite the contrary, he makes clear that their inclusion in the image was incidental to his intent to "make images of San Antonio suffering the effects of the storm," *id.*—and the incident highlights that Calzada continues to use his drone for his photography, earning a living and never having been subject to enforcement of Chapter 423. Calzada describes several other similar anecdotes. *See id.* at 135-36. Finally, Calzada ends his declaration on the point that he believes he is at a "competitive business disadvantage" compared to "[n]ews organizations from other states [that] do not have the oppressive restrictions of Ch. 423." *Id.* at 137 ¶ 25. But this makes no sense. Any drone use in Texas is subject to Texas law. To the extent that Calzada believes he is impacted by Chapter 423 in his reporting in Texas, the same perceived limitations would apply equally to any UAS pilot.

Plaintiffs also attach a declaration from a nonparty that adds nothing substantive to this litigation. The declaration of D. Victoria Baranetsky, General Counsel for the Center for Investigative Reporting ("CIR"), contains unqualified and inadmissible legal opinions and a

recitation of the same incidents that Wade descriptions in his declaration. *See* ECF No. 63 at 124-29. This declaration adds nothing to Plaintiffs' claims.

## ARGUMENT

### I.      The Court Lacks Jurisdiction.

Plaintiffs only briefly address their standing to bring this litigation, but nowhere do they address Defendants' sovereign immunity. *See* Pls.' MSJ at 34-38. Because Plaintiffs are proceeding against officials in their official capacity, they bear the burden of proving that the *Ex Parte Young* exception to sovereign immunity applies, and they have not attempted to do so. This is fatal to their claims, as more fully explained in Defendants' motion for summary judgment. Moreover, all Plaintiffs lack standing because they cannot establish the traceability or redressability elements, and Plaintiffs are not entitled to summary judgment on any of the theories of injury-in-fact that they have presented.

### A.      Defendants Are Immune.

As Defendants explained in their motion for summary judgment, all Defendants are shielded from Plaintiffs' claims by sovereign immunity. Defs.' MSJ at 10-11. Sovereign immunity precludes suits against state officials in their official capacities. *See City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). To overcome this immunity under *Ex Parte Young*,

> the plaintiff at least must show the defendant has "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." That means the official must be "statutorily tasked with enforcing the challenged law." Enforcement typically means "compulsion or constraint." A "scintilla of 'enforcement' by the relevant state official with respect to the challenged law" will do.

*Texas Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) (citations omitted). Moreover, "[d]etermining whether *Ex parte Young* applies to a state official requires a provision-by-provision analysis, *i.e.*, the official must have the requisite connection to the enforcement of

the particular statutory provision that is the subject of the litigation." *Id.*

Discovery in this matter has revealed that Plaintiffs cannot overcome this threshold bar to their claims, as explained in Defendants' motion for summary judgment. Defs.' MSJ at 10-11. The State Defendants have no statutory authority to prosecute Chapter 423 offenses and have demonstrated no eagerness to pursue Chapter 423 violators, as the uncontested evidence shows. *See id.* at 11. Moreover, Defendants have no "compulsion or constraint" to do anything with Chapter 423, *see Texas Democratic Party*, 978 F.3d at 179 (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 124), and on the few occasions where DPS officers have had run-ins with drone operators, those officers did not issue warnings based on Chapter 423. Likewise, Mau's office has only charged one person for drone-related conduct in his seven years in office (and those charges were dismissed), and that incident did not involve any of the Plaintiffs or Plaintiffs' members. Moreover, Plaintiffs make no suggestion that case has impacted their use of drones. Plaintiffs have produced no evidence whatsoever of Defendants' willingness to enforce Chapter 423. Because it is Plaintiffs' burden to establish the applicability of *Ex Parte Young*, and because they have utterly failed to do so and have not submitted any evidence on the question, they are not entitled to summary judgment, and instead Plaintiffs' claims should be dismissed.

### B.    All Plaintiffs Lack Standing.

As Defendants explained in their motion for summary judgment, all Plaintiffs lack standing to bring this litigation. *See* Defs.' MSJ at 12-15.

#### 1.    Traceability

There is no causal connection between Plaintiffs' alleged injury and the Defendants. The State Defendants are law enforcement officers, with no prosecution authority themselves. Mau has prosecution authority, but Plaintiffs have neither alleged nor proven that he has used or even

10

threatened to use such authority against them. Moreover, Plaintiffs have not produced any facts to suggest that Defendants have ever or would ever investigate them for any alleged violations of Chapter 423, or even interact with them in any way. In ruling on Defendants' motion to dismiss, the Court previously found that traceability was satisfied because the allegation that Defendants or their employees engage in "enforce[ment] [of] the criminal provisions of Chapter 423." ECF No. 52 at 14. But as stated above, the facts have demonstrated that this allegation was unfounded—Defendants do not and have not enforced Chapter 423, or threatened it, against Plaintiffs. Because Defendants have not interacted with Plaintiffs in any way, and there is no likelihood that they will ever interact regarding Chapter 423, Plaintiffs cannot demonstrate traceability.

Plaintiffs' motion for summary judgment makes only a small nod to traceability: that "[b]ut for Chapter 423, Pappalardo would have used his drone to report on several newsworthy stories," and that "but for Chapter 423, [Pappalardo] would use his drone for future reporting." Pls.' MSJ at 35. But Chapter 423 is not a defendant in this matter. What actions *by defendants* caused Plaintiffs' asserted injuries? None, as Plaintiffs admit. *See* Defs.' MSJ at 11 (citing Plaintiffs' discovery responses). Without an *action* by *these defendants* that is *causally* connected to Plaintiffs' claimed injuries, Plaintiffs cannot demonstrate standing. *See, e.g.*, *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (holding that "the 'irreducible constitutional minimum' of standing" requires plaintiffs to show an injury "that is fairly traceable to the challenged conduct of the defendant"); *Hein v. Freedom from Religion Foundations, Inc.*, 551 U.S. 587, 598 (2007) ("The requisite elements of Article III standing are well established: 'A plaintiff must allege personal injury fairly traceable *to the defendant's allegedly unlawful conduct* and likely to be redressed by the requested relief.'") (emphasis added); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("There must be a causal connection between the injury and *the conduct* complained of—the injury

has to be fairly traceable to the challenged *action of the defendant*.") (cleaned up) (emphasis added); *see also, e.g.*, *California v. Texas*, 141 S. Ct. 2104, 2127 (2021) (Alito, J., and Gorsuch, J., dissenting) (collecting cases) ("Tracing injuries to particular conduct ensures that the properly adverse parties are before the court and reinforces the traditional understanding of legal judgments."). Accordingly, Plaintiffs cannot satisfy traceability.

### 2.  *Redressability*

Plaintiffs also fail to seriously contend with their redressability problem. Their entire argument is: "As for redressability, Defendants McCraw, Mathis, and Mau are all indisputably responsible for enforcing the criminal provisions of Chapter 423. Defendants have conceded that Mau has prosecutorial authority." Pls.' MSJ at 35. "But even if [Plaintiffs] prevail in this litigation, relief would be incomplete because [they] would still be subject to criminal prosecution." *Ctr. for Inquiry, Inc. v. Warren*, 845 F. App'x 325, 328 (5th Cir. 2021). The State Defendants have no authority to prosecute Plaintiffs, so even Plaintiffs' complete victory in this lawsuit against DPS and THP "does not remedy the claimed injury in full." *Id.* at 329. And as to Mau, Plaintiffs seek not just to be free from criminal prosecution in Hays County, but across Texas. No injunctive or declaratory relief against Mau could possibly provide that outcome. Simply put, Plaintiffs cannot through this lawsuit achieve their goals of obtaining a right to conduct unrestricting UAS surveillance of private citizens free from prosecution. Accordingly, the Court cannot redress their complained-of injury of being deprived that asserted right.

### 3.  *Injury-in-Fact*

Plaintiffs' problems with traceability and redressability also serve to highlight the inadequacy of their asserted injury for purposes of establishing standing. Plaintiffs and their members can engage in journalism fully and actively without running afoul of Chapter 423, as

long as they aren't intending to conduct aerial surveillance with UAS, as discussed below. None of the Plaintiffs or their members claim that they intend to conduct such surveillance. And discovery in this matter has not produced any evidence of enforcement or threatened enforcement of Chapter 423 against Plaintiffs by Defendants. Accordingly, Plaintiffs "can establish neither a realistic threat of legal sanction if he engages in the speech in question, nor an objectively good reason for refraining from speaking and 'self-censoring' instead." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018); *see also Speech First, Inc. v. Fenves*, 384 F. Supp. 3d 732, 738-41 (W.D. Tex. 2019). For this reason, the Court should reject all of Plaintiffs' theories of injury-in-fact that rest on a fear-of-prosecution theory, including Pappalardo's assertion of standing and both NPPA's and TPA's assertion of associational standing. *See* Pls.' MSJ at 34-37.

### 4.    Organizational Standing

With respect to NPPA's and TPA's assertion of organizational standing, summary judgment is not proper as to either group. As Defendants discussed in their motion for summary judgment, TPA's asserted injuries are *de minimis*. TPA distributed a single newsletter article that was written by NPPA's counsel, and it has had "general interaction" with its members. This is insufficient to demonstrate a diversion-of-resources injury, which requires a showing that an organization "had diverted significant resources to counteract the defendant's conduct." *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) (emphasis added). Activities "which basically boil down to examining and communicating about developments" in the law do not confer standing. *Id.* at 238; *see also La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000). And TPA does not claim that distributing a single article it did not write caused TPA to put any other projects on hold or change its priorities or activities. *Cf. LeBlanc*, 211 F.3d at 305. Accordingly, TPA has not suffered an injury-in-fact.

13

Regarding NPPA, although Defendants do not seek summary judgment on the group's direct injury-in-fact, *see* Defs.' MSJ at 14 & n.5, NPPA has failed to demonstrate its own entitlement to summary judgment on that issue. NPPA has not identified a single specific project that it was prevented from undertaking as a result of this alleged diversion of resources. Without those details, NPPA's bare assertion that its activities regarding Chapter 423 "diverted [time] from other important matters and projects that support and fulfill NPPA's mission" rings hollow. ECF No. 63 at 159, ¶ 11; *see also id.* at 162-63, ¶ 17. Indeed, it is unclear what, if anything, NPPA would do differently if Chapter 423 were enjoined. NPPA would presumably continue to spend its time "counseling members about the Chapter 423 provisions" and "meeting with lawmakers in an attempt to revise the provisions of Chapter 423." Pls.' MSJ at 37. The Fifth Circuit has squarely rejected these kinds of vague contentions when offered to support an assertion of organizational standing. *See, e.g.*, *LeBlanc*, 211 F.3d at 305-06. Accordingly, NPPA is not entitled to summary judgment on its assertion of organizational standing, both because there remain fact issues for trial and because they have failed to satisfy the elements of traceability and redressability.

## II.    Chapter 423 Is Constitutional.

Plaintiffs' First Amendment challenge rests on a misreading of Chapter 423 that is not supported by its text. Chapter 423 survives any level of constitutional review, and it is not overbroad or subject to arbitrary enforcement. Similarly, Plaintiffs' out-of-context, myopic focus on the words "surveillance" and "commercial" in isolation leads them to believe that Chapter 423 is unconstitutionally vague, when in fact the laws' plain meaning is readily understood. And Plaintiffs' facial constitutional challenges are not supported by either a fair reading of the Chapter 423 or the evidentiary record that Plaintiffs have presented. Accordingly, Plaintiffs' motion for summary judgment should be denied, and Defendants' motion for summary judgment should be

14

granted.

### A.    Chapter 423 Does Not Run Afoul of the First Amendment.

To the extent Chapter 423 applies to protected First Amendment activity at all, it does not create speaker- or content-based restrictions on speech. Plaintiffs' misreading of Chapter 423 consequently leads to the erroneous conclusion that both the Surveillance and No-Fly Provisions are subject to strict scrutiny. As discussed below and in Defendants' motion for summary judgment, to the extent that the First Amendment is implicated at all by Chapter 423, the weak intermediate scrutiny of *United States v. O'Brien*, 391 U.S. 367 (1968), governs the Court's analysis, and all of Chapter 423 is constitutional under that standard. *See* Defs.' MSJ at 15-19. But even assuming arguendo strict scrutiny does apply, Chapter 423 still survives.

### 1.    Chapter 423 Does Not Affect Protected First Amendment Activity.

As Defendants have acknowledged, "The First Amendment literally forbids the abridgment only of 'speech,' but we have long recognized that its protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). And Defendants do not contest that journalists have been granted protection by the Supreme Court. But Chapter 423 does not affect conduct that is protected by the First Amendment, and Plaintiffs' claims proceed from a faulty premise. Defs.' MSJ at 15-17.

"[T]he party invoking the First Amendment's protection [has] the burden to prove that it applies." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013) (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984)). "[O]nly conduct that is 'inherently expressive' is entitled to First Amendment protection." *Id.* (quoting *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006)). "In evaluating whether particular conduct possesses 'sufficient communicative elements' to implicate First Amendment protections,

courts must ask whether '[a]n intent to convey a particularized message was present, and . . . [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 283 (5th Cir. 2001) (quoting *Johnson*, 491 U.S. at 404); *see also Spence v. Washington*, 418 U.S. 405, 410-11 (1974).

"In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Johnson*, 491 U.S. at 404 (quoting *Spence*, 418 U.S. at 410-11) (alterations in original). But "[t]he protection of the First Amendment depends not only on whether the conduct is expressive, but also on the context in which that expression takes place." *Littlefield*, 268 F.3d at 283.

Broadly speaking, Chapter 423 prohibits two activities. The Surveillance Provisions prohibit using "an unmanned aircraft to capture an image of an individual or privately owned real property in this state with the intent to conduct surveillance on the individual or property captured in the image." Tex. Gov't Code § 423.003. And the No-Fly Provisions prohibit operation of "an unmanned aircraft over a correctional facility, detention facility, or critical infrastructure facility" less than "400 feet above ground level," or allowing "an unmanned aircraft to make contact" with such a facility, or allowing "unmanned aircraft to come within a distance . . . that is close enough to interfere with the operations of or cause a disturbance to the facility." *Id.* § 423.0045(b).

Neither of these provisions makes any mention of journalism or newsgathering. The No-Fly Provisions do not refer to any conduct that has communicative or expressive elements at all—they simply prohibit the piloting of a drone in certain locations. Plaintiffs contend that these provisions "substantially burden newsgathering," Pls.' MSJ at 19, but this assertion in belied by

16

the statutes' text. Nothing about the No-Fly Provisions limits in any way a journalist's ability to capture images—including using a drone—or to report on any topic that they wish. But a journalist who uses a drone may not threaten the health and safety of other Texans by dangerously piloting a drone near critical facilities. *See, e.g.*, ECF No. 65-2 ¶¶ 15-18. Simply put, the No-Fly Provisions regulate conduct, not speech, and are not subject to First Amendment analysis.

Likewise, the conduct prohibited by the Surveillance Provisions is not entitled to First Amendment protections. If Plaintiffs were correct that these provisions "facially impose near-blanket restrictions against journalists' use of drones," Pls.' MSJ at 19, the analysis may differ. However, that assertion is flatly contradicted by both the text of Chapter 423 and Plaintiffs' own evidence—they frequently use drones to gather news. *See, e.g.*, ECF No. 63 at 126-28, ¶¶ 8-20 (describing Wade's use of drones in gathering news); ECF No. 63 at 134, ¶ 17 (noting Calzada's continued use of drones to capture images). Moreover, none of the Plaintiffs state that they posses the intent to conduct surveillance during their journalistic activities that would bring them within the ambit of § 423.003. Without the "conscious objective or desire to engage in the conduct or cause the result," Tex. Penal Code § 6.03(a), Plaintiffs cannot violate the Surveillance Provisions.

Plaintiffs' entire theory of First Amendment injury is that the Texas Legislature intended, and the Surveillance Provisions actually state, that an intent to conduct "surveillance" is indistinguishable from an intent to conduct "journalism" or "newsgathering." Nothing in the record supports this conclusion. As Defendants have explained, and as any person of common intelligence can understand, "surveillance" is a concept that is distinct from mere "observation" or even "newsgathering." The commonly available and understood definitions reflet that for an action to constitute "surveillance," there must be an element of prolonged time periods and/or some degree of surreptitiousness or invasion of one's expectation that they are not being watched. *See* Defs.'

17

MSJ at 20-21.

But the task presented to the Court is not to define "surveillance" in the abstract, but to determine whether Chapter 423 infringes on Plaintiffs' First Amendment rights as journalists in any way. Whatever overlap could exist between the term "surveillance" and terms for other types of observation, drone photography with the intent to engage in "journalism" contains an additional, obvious element that is absent from the term "surveillance"—that is, the intent to gather information on a newsworthy topic for dissemination to the public. *See, e.g.*, "journalism," Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/journalism (last visited Aug. 9, 2021) ("the work of collecting, writing, and publishing news stories and articles in newspapers and magazines or broadcasting them on the radio and television"); "journalism," Dictionary.com, https://www.dictionary.com/browse/journalism (last visited Aug. 9, 2021) ("the occupation of reporting, writing, editing, photographing, or broadcasting news or of conducting any news organization as a business"); "newsgathering," Dictionary.com, https://www.dictionary.com/browse/newsgathering (last visited Aug. 9, 2021) ("of or relating to the process of collecting and reporting the news"); "journalism," Macmillan Dictionary, https://www.macmillandictionary.com/us/dictionary/american/journalism (last visited Aug. 9, 2021) ("the activity of reporting the news for a newspaper, magazine, radio program, or television program"); "journalism," Merriam-Webster, https://www.merriam-webster.com/dictionary/journalism (last visited Aug. 9, 2021) ("the collection and editing of news for presentation through the media"); *see also, e.g.*, "press," Black's Law Dictionary (11th ed. 2019) ("The news media; print and broadcast news organizations collectively."); *id.*, "watchdog journalism" ("Investigative journalism that seeks to uncover facts and expose abuses of power, esp. by the government, to the public.").

To be clear, the Court need not engage in the semantic dissection of commonly used

18

dictionaries to decide whether the Surveillance Provisions implicate protected First Amendment activity. A person of ordinary intelligence would readily understand the difference between "surveillance" and "journalism," and a juror would take into account the subjective intent of the accused in evaluating the lawfulness of the prolonged, surreptitious, or invasive capture of images by drone in evaluating whether Chapter 423 had been violated. *See* Tex. Gov't Code § 423.003(a) (requiring specific intent "to conduct surveillance on the individual or property captured in the image"). Plaintiffs' complaints about the Surveillance Provisions stem from unreasonable doubts and an overly stringent standard of clarity that is not required by the Constitution. And Plaintiffs' ostensible concern for incidental capture of impermissible images is belied by their continued use of drones for journalism. *See, e.g.*, ECF No. 63 at 126-28, ¶¶ 8-20; ECF No. 63 at 134, ¶ 17.

Regardless of Plaintiffs' complaints to contrary, then, both the Surveillance and No-Fly Provisions fall outside the protections of the First Amendment, and even Plaintiffs do not contend the First Amendment protects an unrestricted right to prolonged or invasive aerial spying via UAS. Indeed, as Defendants have explained, it is impossible to imagine the Framers intended that the First Amendment would make inevitable a futuristic dystopia where one's every move was subject to invisible monitoring from above. *Cf., e.g.*, *Zemel v. Rusk*, 381 U.S. 1, 17 (1965) ("The right to speak and publish does not carry with it the unrestrained right to gather information."); *Ramie v. City of Hedwig Village, Texas*, 765 F.2d 490, 492 (5th Cir. 1985) (acknowledging the constitutional right to privacy). Any confusion (real or imagined) about whether Chapter 423 prohibits journalism is resolved by the text of the Surveillance Provisions—which addresses "surveillance," not "journalism"—and the No-Fly Provisions—which regulate UAS flight, not speech. Accordingly, the Court should reject Plaintiffs' First Amendment challenges.

> 2. *Even if the First Amendment Were Implicated by Chapter 423, the Challenged Laws Survive Intermediate Scrutiny.*

Even if the Court were to disagree about whether the First Amendment provides protections for the conduct prohibited by Chapter 423, the only level of scrutiny that could apply is intermediate scrutiny under *O'Brien*. Where conduct that is not inherently expressive, but nonetheless may have "some expressive content," is at issue, courts "apply the intermediate scrutiny test articulated by the Supreme Court in *United States v. O'Brien*." *Kleinman v. City of San Marcos*, 597 F.3d 323, 328 (5th Cir. 2010) (citing *O'Brien*, 391 U.S. 367). "Under *O'Brien*, a regulation is constitutional if it is within the constitutional power of the government; it furthers an important or substantial governmental interest; the government interest is unrelated to the suppression of free expression; and the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* (citing *O'Brien*, 391 U.S. at 376). As Defendants have explained, *see, e.g.*, Defs.' MSJ at 18, Chapter 423 survives this test.

Plaintiffs make no argument that the Surveillance Provisions would not survive the *O'Brien* test. *See* Pls.' MSJ at 27-28. Accordingly, the Court need only consider whether the No-Fly Provisions survive *O'Brien* analysis. As to the governmental interest, Plaintiffs argue that "[t]here is no unmet interest that the No-Fly Provisions meet" because other provisions of the Texas Government Code "mak[e] it a felony to knowingly damage, impair, or interrupt a critical infrastructure facility." Pls.' MSJ at 27 (characterizing Tex. Gov't Code §§ 424.051, .052). Plaintiffs cite no authority for the proposition that the State can only protect its legitimate interests in one manner at a time, and they substitute their judgment that the No-Fly Provisions are unnecessary for the judgment of the Texas Legislature. Moreover, the cited provisions make it a felony to intentionally or knowingly cause actual damage or impairment to a critical infrastructure facility, but they do nothing to protect these facilities from the *risk* of damage and harm that

unrestricted UAS flights would present *before* that risk turns into disaster. And Plaintiffs cite no authority for the proposition that a State cannot regulate proactively, before a risk of harm comes to fruition and results in actual harm.

Plaintiffs next conclude that the No-Fly Provisions "are related to the suppression of expression" because without such a relation, the No-Fly Provisions could not support the State's interest in protecting privacy. Pls.' MSJ at 27-28. Even if this shaky assumption were true, Plaintiffs entirely ignore the very real and important safety and security interests that the No-Fly Provisions indisputably serve. *See, e.g.*, ECF No. 65-2, ¶¶ 15-18; Defs.' MSJ at 25. Furthermore, Plaintiffs are in no way inhibited by Chapter 423 from gathering news about critical infrastructure facilities—they simply may not do so by flying their drones in an unsafe proximity to these facilities outside the parameters of the No-Fly Provisions.

Finally, Plaintiffs assert that the No-Fly Provisions are not narrowly tailored because they are underinclusive to the extent that "they exempt drone operation for a 'commercial purpose.'" Pls.' MSJ at 28 (Tex. Gov't Code § 423.0045(c)). But as discussed below in connection with Plaintiffs' vagueness challenge, the "commercial purpose" exemption must be read *in pari materia* with the FAA regulations that they reference and incorporate. *See* Tex. Gov't Code §§ 423.0045(b)(1)(E), 423.0046(c)(5); Defs.' MSJ at 25-26. Those FAA regulations ensure that drone operators are licensed and that their flights are registered with the FAA. This exception reflects the Legislature's decision to limit the scope of the No-Fly Provisions by carving out the UAS operations that present the least risk of injury to the safety and security of the public. Accordingly, the Legislature's tailoring of the No-Fly Provisions ensures that they survive intermediate scrutiny.

3.      *There Is No Basis to Apply Strict Scrutiny to Chapter 423.*

Plaintiffs incorrectly assert that strict scrutiny applies to Chapter 423 for three reasons: (1) the Surveillance Provisions are speaker-based restrictions, (2) both the Surveillance and No-Fly Provisions discriminate based on content, and (3) both the Surveillance and No-Fly Provisions significantly inhibit newsgathering. Pls.' MSJ at 15-20. Plaintiffs are wrong on all accounts.

a.      The Surveillance Provisions Are Not Speaker-Based Restrictions.

Plaintiffs contend that the Surveillance Provisions are speaker-based restrictions that "plainly favor certain speakers" because of the exemptions that are listed in § 423.002(a). Pls.' MSJ at 16-17. As a threshold matter, the separate classification of the Surveillance Provisions as "speaker-based" is not a dispositive label that determines the level of constitutional scrutiny to be applied. To the contrary, "[c]haracterizing a distinction as speaker based is only the beginning—not the end—of the inquiry." *Reed v. Town of Gilbert, Arizona*, 576 U.S. 155, 170 (2015). "Indeed, the Court has held that 'laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference.'" *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2347 (2020). Accordingly, for the reasons discussed below, because the Surveillance Provisions are not content-based restrictions, the separate label of "speaker-based" does not alter the level of constitutional inquiry to be applied.

Plaintiffs also misunderstand the nature of these safe harbor provisions. The identity of the UAS pilot does not determine whether the safe harbor applies—it is his or her subjective intent that controls. The Surveillance Provisions prohibit only those drone operators who are capturing images with the intent to "conduct surveillance." But if a drone pilot is intending to do something else entirely—including but not necessarily limited to one of the safe harbor activities listed in § 423.002(a)—and does not act with the specific intent necessary to violate the Surveillance

provisions, then the identity of the speaker is completely irrelevant. The exact same person can take the exact same image and either (1) abide by Chapter 423 if he does not use a drone, (2) abide by Chapter 423 if he uses a drone but does not intend to conduct surveillance of the subject of the image, (3) abide by Chapter 423 if he does intend to conduct surveillance of the subject but is doing so for one of the purposes listed in the safe harbor provisions, or (4) violate Chapter 423 if he does not fall within a safe harbor and he intends to conduct surveillance on his subject. In other words, the same person—regardless of who they are—can take the same image—regardless of what it depicts—and either violate Chapter 423 or not depending on variables that have nothing to do with the speaker's identity or the content of the image. Accordingly, the Surveillance Provisions are not speaker-based restrictions.

<blockquote>

b.    The Surveillance and No-Fly Provisions Are Not Content-Based Restrictions.
</blockquote>

Chapter 423's regulations on drone use are not content-based restrictions on speech. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 125 S. Ct. at 2227. "This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id.* (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 562-64 (2011)). In other words, "[t]he principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

"The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect

on some speakers or messages but not others." *Id.* (citing *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48 (1986)). "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Id.* (quoting *Clark*, 468 U.S. at 293).

There is no genuine issue of material fact that Chapter 423 serves the important governmental interests of protecting privacy and public safety. *See generally* ECF Nos. 65-1, 65-2. The Legislature has not expressed via the Surveillance Provisions disagreement with any category of speech, whether journalistic or otherwise, because the determination of whether given images are unlawful hinges not on their content, but on the intent of the drone pilot. The safe harbor provisions in § 423.002(a) do not alter this conclusion, as each of those exclusions also looks at the purpose of the UAS operator, not the content of the message. If the exact same image can be permissible or prohibited under the Surveillance Provisions based on the subjective, specific intent of the person who captured it, then it cannot be said that the government has preferred some speech content over others—the content of the image is simply not dispositive of the question. Plaintiffs are therefore wrong when they say that "the only way to know whether a particular image is legal is by examining the image's contents." Pls.' MSJ at 18. Indeed, the image itself is virtually irrelevant, because it is the intent of the UAS operator that controls.

With respect to the No-Fly Provisions, Plaintiffs' argument is even more specious. The No-Fly Provisions have nothing whatsoever to do with speech. They are a regulation on the piloting of UAS near critical infrastructure facilities in order to protect them from the risks posed by unrestricted drone flights. Plaintiffs assert that regulations on commercial speech are disfavored, but they cannot point to any statutory language in the No-Fly Provisions that discusses commercial speech at all. Rather, the exception for flights made for "commercial purposes" and its attendant

24

incorporation of FAA standards—on the face of the statute—has nothing whatsoever to do with speech. Simply put, the notion that the No-Fly Provisions constitute a content-based regulation on speech finds no support in the text of Chapter 423.

Accordingly, for the foregoing reasons, neither the Surveillance Provisions nor the No-Fly Provisions constitute content-based restrictions on speech.

c.   The Surveillance and No-Fly Provisions Do Not Unconstitutionally Inhibit Newsgathering.

Relying on two Fifth Circuit cases that, according to Plaintiffs, "vacated court orders that blocked journalists from gathering the news," they conclude that "Chapter 423 restricts journalists' ability to report on newsworthy stories generally" and "ban[s] a critical avenue of newsgathering." Pl.' MSJ at 20. On this basis, Plaintiffs conclude that strict scrutiny applies to any case involving a member of the media.

As an initial matter, the notion that Chapter 423 constitutes a "ban" would be surprising to some of the Plaintiffs, who have continued to use drones for photojournalism since the passage of Chapter 423. *See, e.g.*, ECF No. 63 at 126-28, ¶¶ 8-20; ECF No. 63 at 134, ¶ 17. Moreover, the two cases that Plaintiffs rely upon simply have nothing to do with this litigation. Both are reversals of court orders in specific cases that totally prohibited members of the media from any newsgathering activity regarding the subject at issue. In *Davis v. East Baton Rouge Parish School Board*, the Court entered an order requiring a school board to formulate a desegregation plan in secret without public comment, which "clearly constitute[d] a prior restraint on the speech of the Board members, attorneys, and employees to which it applies." 78 F.3d 920, 928-29 (5th Cir. 1996). And in *In re Express-News Corp.*, the Fifth Circuit reversed a court that prohibited any interviews with former jurors "concerning the deliberations or the verdict of the jury, except by leave of court," with a rule that was unlimited in time and scope. 695 F.2d 807, 808 (5th Cir. 1982).

But these cases shed no light on Chapter 423, which regulates drone flight, but creates no restriction at all on the right to gather news via any means other than UAS surveillance, and permits drone photography as long as it is done without the specific intent to conduct surveillance.

"The right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). "The right to gather news is not, of course, absolute. Nor does it guarantee journalists access to sources of information not available to the public generally." *In re Express-News Corp.*, 695 F.2d at 809. A law is not subject to strict scrutiny every time a journalist is subjected to it. Indeed, as the Supreme Court observed:

> There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right. The right to speak and publish does not carry with it the unrestrained right to gather information.

*Zemel*, 381 U.S. at 16-17. Just as a journalist cannot go wherever they please, whenever they please, with the First Amendment as their weapon, so too journalists are not permitted to fly drones wherever they please, whenever they please—and this does not offend the First Amendment or require strict scrutiny of Chapter 423.

> d.     Even If Strict Scrutiny Applies, Chapter 423 Passes Constitutional Muster.

Even if strict scrutiny were to apply, however, the Surveillance Provisions still survive. Under strict scrutiny, "[t]he State must show that the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'" *Burson v. Freeman*, 504 U.S. 191, 198 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983)); *see also Sorrell*, 564 U.S. 552. The Surveillance Provisions satisfy this burden. They each are designed to achieve the compelling and important state interests of protecting privacy rights and the safety and

26

security of persons and property. *See, e.g.*, Defs.' MSJ at 19-20 (citing evidence). And they are narrowly drawn to achieve that end by prohibiting only UAS surveillance done "with the intent to conduct surveillance on the individual or property captured in the image." Tex. Gov't Code § 423.003. The prohibition does not extend to incidental capture of images, or the capture of images that does not constitute surveillance, or to individuals who do not intend to conduct surveillance, regardless of whether they have some other culpable mental state. Moreover, the Surveillance Provisions are further tailored through the many excepted types of permissible UAS operations. Only someone who targets a particular individual or property, intends to conduct surveillance on that individual or property, and who does not otherwise fall within the limits on liability contained in the Surveillance Provisions, has violated Chapter 423. Accordingly, the Surveillance Provisions would survive strict scrutiny, even if its application were appropriate.

Plaintiffs contend that because the State has other tools that could be used "to protect the privacy and private property of Texans from overly intrusive or dangerous drone use without Chapter 423." Pls.' MSJ at 22. But Plaintiffs are wrong. UAS technology permits observers to conduct surveillance on private citizens without violating criminal trespass laws, as many of Plaintiffs' own stories of newsgathering illustrate. Moreover, it is no answer to say that peeping tom and voyeurism laws are also available to protect citizens' privacy. *See* Pls.' MSJ at 22 (citing Tex. Penal Code §§ 21.15-.17, 30.05(a)). Under Plaintiffs' vision for society, highly maneuverable and hard-to-detect drones could take pictures of any private citizen, no matter their location or their expectation of privacy, as long as the drone operator did not trespass or record any invasive material of a sexual nature. The Texas Legislature has disagreed with Plaintiffs' policy choice, and that choice is entitled to respect as a compelling state interest. Likewise, as discussed above, the statutes which prohibit *actual* damage or interruption at critical infrastructure facilities do nothing

to curb the *risk* of dangerous collisions with drones before tragedy strikes. Accordingly, without Chapter 423, important and compelling governmental interests in protecting Texans from the invasions of privacy and threats to public safety would be vulnerable to this nascent and rapidly evolving technology in chilling ways.

Chapter 423 is also narrowly drawn to achieve these ends. The Surveillance Provisions prohibit *only* that conduct which presents the most serious threats to individuals' expectations of privacy: unrestricted aerial surveillance with a virtually invisible drone. Likewise, the No-Fly Provisions prohibit only those drone flights that pose the greatest risk to the critical infrastructure of the State, while allowing those who follow FAA regulations to fly their drones unencumbered by restrictions that are necessary for amateur pilots. And Plaintiffs' assertion that there are no instances of actual harm caused by UAS falls flat given the undisputed testimony in the record that drones can present serious threats to security, property, and life. *See generally* ECF No. 65-1 & Exs. A-B; *cf.* Pls.' MSJ at 22-23. Accordingly, even if strict scrutiny were to apply to Chapter 423—which is does not—the challenged statutes would still survive the Court's First Amendment analysis.

### 4.      Chapter 423 is Not Unconstitutionally Overbroad or Underinclusive.

For substantially the same reasons discussed above, Chapter 423 is not unconstitutionally overbroad in what it prohibits, as it is narrowly tailored to prevent serious risks posed by UAS and imposes at most an incidental burden on protected First Amendment activity. Plaintiffs' argument that a prohibition on using drones over empty stadiums does not protect the public completely ignores the property damage that a maliciously or negligently piloted drone could cause. *See* Pls.' MSJ at 24-25. Likewise, Plaintiffs' suggestion that critical infrastructure is actually made *safer* by unrestricted amateur drone flyovers is a bare assumption, unsupported by evidence, and directly

contradicted by the analysis of experts at both the State and federal level. *See* ECF No. 65-1 Ex. A & B; *cf.* Pls.' MSJ at 25.

Plaintiffs' attack on the supposed underinclusiveness of Chapter 423 is really just an attack on the government's asserted interest, and it rests on Plaintiffs' policy preferences about which safe harbor activities should be included in Chapter 423. Regarding the Surveillance Provisions, each of the safe harbors contained in § 423.002(a) represent situations where those intending to conduct surveillance are doing so on subjects who have very little expectation of privacy (such as those in public places or enduring a disaster), or where the intent of the surveillance is not to invade private lives but to serve the public good (such as military operations, satellite mapping, the containment of hazardous materials, or the inspection and maintenance of pipelines and utilities). Far from being "underinclusive," these safe harbor provisions simply reflect the Legislature's narrow tailoring of Chapter 423. Similarly, the No-Fly Provisions carve out those who are flying in accordance with FAA regulations and under an FAA license, ensuring that primarily amateur and hobbyist drone pilots—who are presumably those most likely to create a risk at critical infrastructure facilities—are prevented from flying in areas critical to society.[2]

Accordingly, because Chapter 423 is not overbroad and strongly supports the State's interests, Plaintiffs' First Amendment challenges fail.

### B.    Chapter 423 Is Not Unconstitutionally Vague.

"The Fourteenth Amendment's guarantee of Due Process proscribes laws so vague that persons 'of common intelligence must necessarily guess at [their] meaning and differ as to [their] application.'" *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001)

---

[2] Plaintiffs' passing reference to Amazon is irrelevant and inadmissible at trial. *See* Pls.' MSJ at 26.

(alterations in original) (quoting *Smith v. Goguen*, 415 U.S. 566, 572 n.8 (1974)). "A law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *Id.* (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)). Both the Surveillance Provisions and the No-Fly Provisions meet this standard.

> 1. *The Use of the Term "Surveillance" Does Not Invalidate the Surveillance Provisions.*

As discussed above, *see supra* at 17-18, and in Defendants' motion for summary judgment, *see* Defs.' MSJ at 20-22, which is incorporated herein by reference, the use of the term "surveillance" does not doom any statute in which it appears. It is untrue that "a journalist must first be arrested and stand trial until verdict before learning whether their newsgathering constituted illegal 'surveillance,'" Pls.' MSJ at 30, because that journalist knows his own subjective intent and whether he is intending to conduct legitimate newsgathering activities or nefarious surveillance. It is the journalist himself who decides whether he has the specific intent required for a violation of the Surveillance Provisions.

What Plaintiffs seek is an exact delineation of the conduct prohibited by the Surveillance Provisions, but the law does not require an exacting degree of specificity. "Perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1891 (2018) (cleaned up). And as discussed herein, Plaintiffs' self-serving, alleged doubts about whether certain conduct falls within or without the Surveillance Provisions' prohibitions are not sufficient to give rise to a genuine issue of material fact where the ordinary meaning of the words at issue is sufficient. Likewise, the use of the term "surveillance" does not allow for arbitrary and discriminatory enforcement. Plaintiffs mislead when they claim that "Defendants admitted they do not know whether journalism

constitutes 'surveillance' or a 'commercial activity.'" Pls.' MSJ at 34. As discussed above, "journalism" is not a monolithic activity with an unvaryingly certain meaning, and Plaintiffs' attempt to treat wholesale the issue of "journalism" under Chapter 423 reflects their fundamental misunderstanding of what Chapter 423 prohibits, not an infirmity in the law. Accordingly, the Surveillance Provisions are not unconstitutionality vague.

2.    *The Use of the Term "Commercial" Does Not Invalidate the No-Fly Provisions.*

Plaintiffs' argument with respect to the "commercial purpose" exception to the No-Fly Provisions is only colorable if one entirely ignores the reference to and incorporation of FAA rules and authorizations. *See, e.g.*, Tex. Gov't Code § 423.0045(c)(1)(E). The FAA's regulations on Small Unmanned Aircraft Systems, found in 14 C.F.R part 107, are central to the definition of this exception. The FAA also provides extensive public guidance about the activities covered by Part 107. *See, e.g.*, "Certificated Remote Pilots including Commercial Operators," FAA, https://www.faa.gov/uas/commercial_operators/ (last visited Aug. 9, 2021). Accordingly, the type of "commercial" flights envisioned by the No-Fly Provisions' exception should be understood in the context of what isn't covered by Part 107—that is, recreational drone use. *See, e.g.*, 49 U.S.C. § 44809; "Recreational Flyers & Modeler Community-Based Organizations," FAA, https://www.faa.gov/uas/recreational_fliers/ (last visited Aug. 9, 2021). The "commercial purpose" exception to the No-Fly Provisions is therefore fully explained by referencing the relevant FAA regulations.

Properly understood, Plaintiffs have no argument that the No-Fly Provisions are vague or subject to arbitrary and discriminatory enforcement. Dictionary definitions are irrelevant, and the idiosyncratic distinction between "commercial" and "editorial" photography looks at the No-Fly Provisions through the wrong lens. Chapter 423 regulates the piloting of drones, not the practice

of photography, and the FAA's distinction between commercial pilots and recreational pilots is clear. Accordingly, the No-Fly Provisions are neither vague nor susceptible to arbitrary application.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment, grant Defendants' motion for summary judgment, and dismiss all of Plaintiffs' claims.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief, General Litigation Division

*/s/ Christopher D. Hilton*
CHRISTOPHER D. HILTON
Texas Bar No. 24087727
So. District No. 3029796
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120
FAX: (512) 320-0667
christopher.hilton@oag.texas.gov

***Counsel for the State Defendants, Steven McCraw
and Dwight Mathis in their official capacities***

MCGINNIS LOCHRIDGE LLP
Michael A. Shaunessy, SBN 18134550
Eric Johnston, SBN 24070009
600 Congress Avenue, Suite 2100
Austin, Texas 78701
(512) 495-6000
(512) 495-6093 FAX
mshaunessy@mcginnislaw.com
ejohnston@mcginnislaw.com

By: */s/ Michael A. Shaunessy*
    Michael A. Shaunessy
    State Bar No. 18134550

*ATTORNEYS FOR DEFENDANT WES MAU, IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY OF HAYS COUNTY, TEXAS*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing document has been served via

the Court's CM/ECF system on August 9, 2021, to all counsel of record.

*<u>/s/ Christopher D. Hilton</u>*
Christopher D. Hilton
