# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, *et al.*, | § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. |
| v. | § § | 1:19-cv-00946-RP |
| STEVEN MCCRAW, *et al.*, | § § | |
| Defendants. | § § | |

## REPLY IN FURTHER SUPPORT
## OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

James A. Hemphill
Texas State Bar No. 00787674
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Ave., Suite 2700
Austin, Texas 78701
Tel: (512) 480-5762
Fax: (512) 536-9907
jhemphill@gdhm.com

Leah M. Nicholls (*pro hac vice*)
DC Bar No. 982730
Public Justice P.C.
1620 L Street NW, Suite 630
Washington, DC 20036
Tel: (202) 797-8600
lnicholls@publicjustice.net

David A. Schulz (*pro hac vice*)
NY State Bar No. 1514751
Media Freedom and Information
    Access Clinic
Yale Law School
127 Wall Street
New Haven, CT 06511
Tel: (212) 850-6103
david.schulz@yale.edu

Mickey H. Osterreicher (*pro hac vice*)
New York State Bar No. 2938678
General Counsel
National Press Photographers Association
Finnerty Osterreicher & Abdulla
70 Niagara Street
Buffalo, NY 14202
Tel: (716) 983-7800
Fax: (716) 608-1509
lawyer@nppa.org

Alicia Wagner Calzada
Texas State Bar No. 24076296
Deputy General Counsel
National Press Photographers Association
Alicia Wagner Calzada, PLLC
12023 Radium, Suite B1
San Antonio, TX 78216
Tel: (210) 825-1449
Alicia@calzadalegal.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 2

I.      DEFENDANTS FAIL TO MAKE THE CASE THAT CHAPTER 423 IS
        CONSTITUTIONAL ................................................................................................ 2

        A.      The Intent Element Cannot Save the Surveillance Provisions ................................ 2

                i.      "Surveillance" remains ambiguous .............................................. 2

                ii.     Plaintiffs' newsgathering could still constitute prohibited
                        "surveillance" under Defendants' definitions ............................... 4

                iii.    The intent element does not avoid Chapter 423's chilling
                        effect ............................................................................. 5

        B.      The No-Fly Provisions Restrict Speech and Are Subject to the First
                Amendment ................................................................................ 6

II.     CHAPTER 423 VIOLATES THE FIRST AMENDMENT ............................................ 7

        A.      Chapter 423 Is Subject to Strict Scrutiny ......................................... 7

                i.      Speaker discrimination requires strict scrutiny ........................... 7

                ii.     Content discrimination requires strict scrutiny ........................... 9

                iii.    Restrictions on newsgathering require strict scrutiny ................. 10

        B.      Chapter 423 Fails Strict Scrutiny .................................................. 11

                i.      The Surveillance Provisions fail strict scrutiny ......................... 11

                ii.     The No-Fly Provisions fail strict scrutiny ............................... 12

        C.      Chapter 423 Would Also Fail Intermediate Scrutiny ......................... 13

        D.      The Statute Is Unconstitutionally Vague and Overbroad ................... 14

III.    THE COURT HAS JURISDICTION ........................................................................ 16

        A.      Defendants Do Not Have Sovereign Immunity ................................ 16

      B.      Plaintiffs Have Standing ......................................................................................... 16

CONCLUSION ..................................................................................................................... 19

3750058.v1

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*ACLU of Ilinois. v. Alvarez*,
    679 F.3d 583 (7th Cir. 2012) ........................................................................ 6, 7, 10

*Animal Legal Defense Fund v. Vaught*,
    No. 20-1538, 2021 WL 3482998 (8th Cir. Aug. 9, 2021) ...................................... 17

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*,
    564 U.S. 721 (2011) ........................................................................................ 11

*Association of Community Organizations for Reform Now v. Fowler*,
    178 F.3d 350 (5th Cir. 1999) ............................................................................ 18

*Babbitt v. United Farm Workers National Union*,
    442 U.S. 289 (1979) .......................................................................................... 6

*Barr v. American Association of Political Consultants*,
    140 S. Ct. 2335 (2020) .................................................................................... 8, 9

*Branzburg v. Hayes*,
    408 U.S. 665 (1972) ........................................................................................ 10

*Buehrle v. City of Key West*,
    813 F.3d 973 (11th Cir. 2015) ............................................................................ 7

*Cablevision Systems Corp. v. FCC*,
    649 F.3d 695 (D.C. Cir. 2011) .......................................................................... 13

*Citizens United v. FEC*,
    558 U.S. 310 (2010) ....................................................................................... 7, 8

*Consolidated Edison Co. v. Public Service Commission*,
    447 U.S. 530 (1980) .................................................................................... 11, 12

*El Paso Cty. v. Trump*,
    408 F. Supp. 3d 840 (W.D. Tex. 2019) .............................................................. 19

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ........................................................................................ 18

*KVUE, Inc. v. Moore*,
    709 F.2d 922 (5th Cir. 1983) ............................................................................ 16

3750058.v1

*Mai v. United States*,
    974 F.3d 1082 (9th Cir. 2020) ............................................................................... 13

*Price v. Barr*,
    514 F. Supp. 3d 171 (D.D.C. 2021) ....................................................................... 10

*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015) ............................................................................................ 8, 11

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980) ................................................................................................ 10

*Roark & Hardee LP v. City of Austin*,
    522 F.3d 533 (5th Cir. 2008) .................................................................................... 2

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) .................................................................................................. 18

*Scott v. Schedler*,
    771 F.3d 831 (5th Cir. 2014) .................................................................................. 19

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ............................................................................................... 7, 9

*Texas Democratic Party v. Abbott*,
    978 F.3d 168 (5th Cir. 2020) .................................................................................. 16

*Turner Broadcasting System, Inc. v. FCC*,
    512 U.S. 622 (1994) .................................................................................................. 9

*Turner v. Driver*,
    848 F.3d 678 (5th Cir. 2017) .................................................................................... 6

*United States v. O'Brien*,
    391 U.S. 367 (1968) ........................................................................................... 13, 14

*United States v. Virginia*,
    518 U.S. 515 (1996) ................................................................................................ 13

*United States v. Williams*,
    553 U.S. 285 (2008) ................................................................................................ 14

*Women's Medical Center v. Bell*,
    248 F.3d 411 (5th Cir. 2001) ............................................................................... 3, 15

**Statutes**

Tex. Code Crim. Proc. art. 2.12 ................................................................................... 16

3750058.v1

Tex. Code Crim. Proc. art. 2.13 ................................................................................................ 16

Tex. Code Crim. Proc. art. 14.01 .............................................................................................. 16

Tex. Gov't Code § 411.006 ....................................................................................................... 16

TEX. GOV'T CODE § 423.002 ...................................................................................................... 7

TEX. GOV'T CODE § 423.003 ................................................................................................. 2, 7, 9

TEX. GOV'T CODE § 423.0045 ........................................................................................ 8, 9, 12, 15

3750058.v1

# INTRODUCTION

Defendants' opposition brief repeats the same incorrect arguments from their summary judgment motion. They continue to ignore inconvenient provisions in Chapter 423 and omit a long list of relevant First Amendment precedent contradicting their positions. They offer few new arguments and none that counter Plaintiffs' entitlement to summary judgment.

Defendants do not controvert any of Plaintiffs' evidence; they only attempt to quibble with how to interpret some of the facts laid out in Plaintiffs' declarations. To the extent the evidence is even necessary for ruling in Plaintiffs' favor on this facial challenge, Plaintiffs' evidence remains uncontested.

As Plaintiffs established in their motion for summary judgment, and further supported in their opposition to Defendants' motion, Chapter 423 violates the First Amendment. The Surveillance Provisions restrict speech by making it a crime to obtain, possess, or publish images. Both the Surveillance and No-Fly Provisions further restrict speech by imposing limits on where and how people can capture images. They are subject to strict scrutiny because they discriminate based on the speaker and the content of an image, and they hinder Plaintiffs' exercise of their First Amendment right to gather the news. The provisions fail strict scrutiny because they are neither narrowly tailored nor actually necessary to address the state's asserted interests. They are additionally unconstitutional because they are vague and overbroad.

Plaintiffs have shown that Defendants do not have sovereign immunity, as they have both the duty and willingness to enforce Chapter 423. And Plaintiffs have standing to bring this case: They have suffered injuries-in-fact that are traceable to the Defendants and redressable by this Court. None of Defendants' arguments to the contrary hold water. The Court should grant Plaintiffs' motion for summary judgment.

**ARGUMENT**

## I.   DEFENDANTS FAIL TO MAKE THE CASE THAT CHAPTER 423 IS CONSTITUTIONAL

Defendants' arguments in support of Chapter 423's constitutionality rest primarily on two fundamentally incorrect claims: (1) the Surveillance Provisions' intent element—which criminalizes recording drone images of individuals or private property if the person does so "with the intent to conduct surveillance," TEX. GOV'T CODE § 423.003(a)—clarifies the meaning of the word "surveillance" and ensures the law would not apply to Plaintiffs' newsgathering, and (2) the No-Fly Provisions have no impact on speech. These claims appear throughout Defendants' opposition brief, but neither is correct.

### A.  The Intent Element Cannot Save the Surveillance Provisions

The Surveillance Provisions' intent requirement does not render those provisions constitutional because (1) requiring an "intent to conduct surveillance" does not avoid the unconstitutional vagueness of "surveillance," (2) it does not place Plaintiffs' newsgathering outside the scope of the statute, and (3) it does not address one of the central First Amendment harms that Chapter 423 causes: the chilling effect on journalists who avoid exercising their First Amendment rights for fear of violating the statute. *See Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546 (5th Cir. 2008) (laws may be struck down when they "have the capacity 'to chill constitutionally protected conduct, especially conduct protected by the First Amendment'" (quoting *United States v. Gaudreau*, 860 F.2d 357, 360 (10th Cir. 1988))).

#### i.   "Surveillance" remains ambiguous

As Plaintiffs explained in their opposition to Defendants' motion, requiring an intent to conduct surveillance does nothing to clarify what "surveillance" means. Pls.' Opp. to Defs.' Mot., ECF No. 67 ("Pls.' Opp.") at 11. The word remains vague, and Defendants have failed to show

that it "provide[s] those targeted by the statute a reasonable opportunity to know what conduct is prohibited" or forecloses the possibility of "arbitrary and discriminatory enforcement." *Women's Med. Ctr. v. Bell,* 248 F.3d 411, 421 (5th Cir. 2001).

Instead, Defendants offer a variety of contradictory definitions, any of which could still include journalism within Chapter 423's proscriptions. In their motion for summary judgment, Defendants suggested that "surveillance" was limited to the context of a criminal investigation or law enforcement activity. Defs.' Mot. for Summ. J., ECF No. 65 ("Defs.' Mot.") at 21; Pls.' Opp. at 11. Or maybe, they say, it only applies to "continuous" or "prolonged" observation. Defs.' Mot. at 21, 22. Now, in their opposition brief, Defendants offer a different definition, this one unsupported by any citation: only "nefarious" surveillance is prohibited. Defs.' Opp. to Pls.' Mot., ECF No. 68 ("Defs.' Opp.") at 30.

As with the Defendants' other attempts at definitions, the text of the statute does not support this "nefarious" interpretation—it includes no such limitation. And the Defendants' continuing need to add adjectives to limit the meaning of "surveillance" demonstrates the word's ambiguity when standing on its own. *See* Pls.' Opp. at 12. Moreover, even if the Surveillance Provisions only prohibited "nefarious surveillance" (and there is no reason to think they do), it would still be unclear whether that applied to journalists. "Nefarious" is an entirely subjective term. For instance, the targets of investigative journalists—people whose corruption, abuse, or lawbreaking is being exposed—would likely describe those journalists' work as nefarious, even though such journalism lies at the heart of the First Amendment.

At bottom, although Defendants claim that the definition of "surveillance" is well understood, even they acknowledge that many people do not share their view. The police officers who told Calzada he was violating the law by flying his drone above a public street to gather news

about a deadly apartment fire, Calzada Decl., Pls.' Ex. 4, ¶¶ 8-12, were, according to Defendants, simply "misinformed," Defs.' Opp. at 8. The same for journalists—Plaintiffs and members of Plaintiffs' organizations—who fear that Chapter 423 impedes their newsgathering, so much so that they have limited or avoided assignments to try to comply with the law. For all of these people, Defendants dismiss their "alleged concerns." Defs.' Opp. at 5. But the sheer number of people whose behavior demonstrates their uncertainty about Chapter 423's meaning belies Defendants' claims about the law's clarity.

### ii. *Plaintiffs' newsgathering could still constitute prohibited "surveillance" under Defendants' definitions*

Even if Defendants' various definitions for "surveillance" were correct, Plaintiffs' newsgathering could still be included in the term. In fact, Defendants seem to admit that some of Plaintiffs' reporting *is* "surveillance." Defendants wrote in their brief that drone technology "permits observers to conduct surveillance . . . as many of Plaintiffs' own stories of newsgathering illustrate." Defs.' Opp. at 27.

Even the newsgathering examples that Defendants claim are not surveillance still fit their definitions. At one point, they say that "surveillance" means "continuous observation . . . in order to gather information" or gathering information "for prolonged periods," Defs.' Mot. at 21-22, yet they contend that Plaintiff Joseph Pappalardo's plan to use a drone to document the aftermath of a hurricane would not be "surveillance," Defs.' Opp. at 6. They do not explain why. A news report about long lines at gas stations that tracks how the lines change throughout the day could easily require "continuous observation" or gathering information for "prolonged periods." The same is true for the story that Pappalardo was unable to report about removal of homeless encampments, *see* Pappalardo Decl., Pls.' Ex. 5, ¶ 14, and several other news reports: getting the story could require lengthy observation.

4

Reporting on other stories that Defendants confidently state would not violate Chapter 423 could also run afoul of Defendants' other definitions. They say "surveillance" means "the process of carefully watching a person or place that may be involved in a criminal activity," Defs.' Mot. at 21, yet they do not explain how Pappalardo's story about people "dump[ing] off dead or unwanted animals," Pappalardo Decl., Pls.' Ex. 5, ¶ 14, would not be surveillance—it would likely require "carefully watching a person" who may be "involved in a criminal activity." Pappalardo did not report that story with a drone because he feared he would violate Chapter 423. *Id.* And then there is the story he hopes to report in the future about the "presence of persistent illegal poaching in urban areas." *Id.* ¶ 15. That, too, will likely require "carefully watching a person or place that may be involved in a criminal activity." Defendants claim Pappalardo's reporting would not violate Chapter 423, but they have no explanation for why. Their own definitions show Pappalardo was right to fear violating the law.

*iii. The intent element does not avoid Chapter 423's chilling effect*

The possibility that newsgathering could constitute "surveillance" predictably causes a chilling effect, leading journalists to avoid newsgathering and speech that are protected by the First Amendment but that they fear could lead to their arrest and prosecution under Chapter 423. Pappalardo has stopped using drones for newsgathering altogether "for fear of facing criminal or civil liability," preventing him from reporting on many newsworthy stories. Pappalardo Decl., Pls.' Ex. 5, ¶¶ 10, 14-16. The law has also led NPPA members Wade and Calzada to curtail using drones to report the news. Wade Decl., Pls.' Ex. 7, ¶¶ 13-14, 31; Calzada Decl., Pls.' Ex. 4, ¶ 24.

Defendants dismiss the law's chilling effect by arguing that a "journalist knows his own subjective intent and whether he is intending to conduct legitimate newsgathering activities or nefarious surveillance," and therefore should have nothing to fear. Defs.' Opp. at 30. This is pure

sophistry. It assumes that the time, expense, and uncertainty of defending against such charges, regardless of the outcome, is not a deterrent.

Defendants themselves are unwilling to state that they would never enforce the law against a journalist using a drone to report the news, claiming that journalism is too vague a concept to be able to definitively say whether it constitutes "surveillance." Defs.' Opp. at 4. Yet they expect journalists to trust police, prosecutors, and juries to properly distinguish journalism from surveillance. First Amendment jurisprudence does not require speakers to get arrested, charged, and proceed through trial before they can know the extent of their First Amendment rights. *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979). A law that requires them to do so, like Chapter 423, predictably results in the chilling effect that Plaintiffs suffer today.

### B. The No-Fly Provisions Restrict Speech and Are Subject to the First Amendment

Defendants are equally off-base in arguing that the No-Fly Provisions have no impact on speech. They baldly assert that "[n]othing about the No-Fly Provisions limits in any way a journalist's ability to capture images—including using a drone," Defs.' Opp. at 17, as if a complete prohibition on flying a drone in certain areas did not preclude taking images with the drone.

Plaintiffs' opposition brief fully explained why a prohibition on drone use imposes a restriction on speech. Pls.' Opp. at 3-5. For many kinds of stories, drones are the only viable tool for Plaintiffs and other journalists to capture images—they are the only way to gather the news and report it to the public. Pls.' Mot. at 2-6. Yet Defendants continue to ignore the long line of caselaw establishing that *methods of creating speech*—here, the use of drones to create images and gather the news—enjoy the same level of First Amendment protection as the speech itself. *Turner v. Driver*, 848 F.3d 678, 689 n.41 (5th Cir. 2017) ("The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." (quoting *ACLU of Ill. v.*

*Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012))); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (finding "the *creation* and dissemination of information are speech within the meaning of the First Amendment" (emphasis added)). That is because a "regulation limiting the creation of [speech] curtails expression as effectively as a regulation limiting its display." *Buehrle v. City of Key W.*, 813 F.3d 973, 977 (11th Cir. 2015); *see also Citizens United v. FEC*, 558 U.S. 310, 336 (2010) ("Laws enacted to control or suppress speech may operate at different points in the speech process."). Defendants have no answer. Chapter 423's restrictions on flying drones necessarily restrict recording images.

## II.   CHAPTER 423 VIOLATES THE FIRST AMENDMENT

### A.  Chapter 423 Is Subject to Strict Scrutiny

Plaintiffs established that Chapter 423 is subject to strict scrutiny, and Defendants failed to show otherwise. The statute's speaker discrimination requires strict scrutiny, as does its content discrimination and restrictions on the right to gather the news.

#### *i.  Speaker discrimination requires strict scrutiny*

Defendants do not dispute that Chapter 423 discriminates based on the identity of the speaker, although they attempt to recast the discriminatory exemptions as "safe harbors." Defs.' Opp. at 22. The different terminology has no significance,[1] as the text of the statute makes plain that some speakers are favored and some are not: The Surveillance Provisions do not apply to a professor who uses a drone to take a photo for research, but they do to a journalist who takes the same photo for newsgathering. *See* TEX. GOV'T CODE § 423.003(a). The Supreme Court has made

---

[1] Although it does not change the constitutional analysis, the Defendants' attempt to rebrand the exemptions as "safe harbors" that benefit the public has no basis in the exemptions themselves. Defendants offer no explanation for how, for example, the public benefits from a "safe harbor" for real estate brokers using drones for purposes of marketing a property. TEX. GOV'T CODE § 423.002(a)(13). Defendants themselves described these as "exceptions," not "safe harbors," in their motion for summary judgment. Defs.' Mot. at 3.

clear that this is speaker discrimination. *Citizens United*, 558 U.S. at 340 ("[T]he Government may commit a constitutional wrong when by law it identifies certain preferred speakers.").

Rather than fighting the losing battle of whether this is speaker discrimination, Defendants focus their argument on a claim that speaker discrimination does not trigger strict scrutiny. The caselaw proves them wrong. Restrictions on certain speakers necessarily mean restrictions on their speech, so "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Id.*; *see also Barr v. Am. Ass'n of Political Consultants,* 140 S. Ct. 2335, 2347 (2020). The First Amendment necessarily "protects speech and speaker, and the ideas that flow from each." *Citizens United*, 558 U.S. at 341. Laws that impose different restrictions on different speakers demand strict scrutiny.

Defendants suggest that speaker categorization is permissible if it is not motivated by content preferences. Even if that were true, Chapter 423's speaker-based distinctions *are* motivated by content preferences—they are a backdoor into discriminating based on content. For example, the law permits the Guadalupe-Blanco River Authority to capture drone footage of its dam at Lake Dunlap and distribute for their own public relations purposes. Tex. Gov't Code § 423.0045(c)(1). But a journalist faces legal peril by doing the same to report on a potential dam failure. *See* Calzada Decl., Pls.' Ex. 4, ¶ 22. Brandon Wade's experience with the Texas Rangers exemplifies the point. The team hired him to capture drone photos of their new stadium, which they curated and published to promote their multi-million dollar, publicly funded construction project. Wade Decl., Pls.' Ex. 7, ¶ 25. But they were unwilling to let him use a drone to capture images for a newspaper, which would publish pictures they did not choose or control. Wade Decl., Pls.' Ex. 7, ¶¶ 22-24. In each case, there was content—and a speaker—that the Legislature favored, and content the Legislature disfavored. Such a distinction demands strict scrutiny. *Reed v. Town of Gilbert, Ariz.*, 576 U.S.

155, 170 (2015) ("[W]e have insisted that 'laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference.'" (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994))).

## ii. Content discrimination requires strict scrutiny

Defendants do not dispute that content-based restrictions demand strict scrutiny. *See* Defs.' Opp. at 23. They offer only specious arguments for why Chapter 423's restrictions are not content-based.

The Surveillance Provisions are content-based because they only prohibit certain images, based on the images' content. The statute expressly states that it is a criminal offense to, among other things, use a drone to "capture an image of an individual or privately owned real property in this state"—the content is what makes one image criminal and another not. TEX. GOV'T CODE § 423.003. Defendants make the extraordinary claim that "the image itself is virtually irrelevant" to whether the Surveillance Provisions prohibit it, Defs.' Opp. at 24, a claim completely disconnected from the text of the statute. In reality, there is no way to know if a particular image is prohibited without examining the image's content. That is as content-based as it gets. *Sorrell*, 564 U.S. at 564 (a law that disfavors "speech with a particular content" is content-based); *see also Am. Ass'n of Political Consultants*, 140 S. Ct. at 2346.

The No-Fly Provisions are also content-based. By permitting commercial drone operators—and thus commercial drone photographers—and prohibiting non-commercial drones, TEX. GOV'T CODE § 423.0045(c)(1)(E), the No-Fly Provisions prohibit any speech that is made for a non-commercial purpose. In *Sorrell*, the Supreme Court concluded that a prohibition on pharmacies disclosing data to companies that were going to use it for marketing purposes, but not to groups that would use it for non-marketing purposes, was a content-based restriction because it "disfavors marketing, that is, speech with a particular content." *Sorrell*, 564 U.S. at 564. Relying

on that decision, another district court recently found that a restriction on "commercial filming" was content-based. *Price v. Barr*, 514 F. Supp. 3d 171, 188 (D.D.C. 2021). The same is true here, where groups that would use drone photography for non-commercial purposes are disfavored. Defendants have no answer, and instead simply repeat their false claim that a restriction on speakers is not a restriction on speech. *See* Defs.' Opp. at 24-25; *but see supra* § I.B.

### iii.   *Restrictions on newsgathering require strict scrutiny*

The statute is also subject to strict scrutiny because it significantly inhibits newsgathering. Because "without some protection for seeking out the news, freedom of the press could be eviscerated," *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980) (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)), newsgathering "is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording," Order on Motions to Dismiss, ECF No. 52, at 18 (quoting *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012)).

Plaintiffs' declarations establish that Chapter 423 inhibits newsgathering. It is undisputed that, among other things, the law has caused news organizations to avoid publishing drone images, Wade Decl., Pls.' Ex. 7, ¶¶ 13-14; Baggett Decl., Pls.' Ex. 2, ¶ 3; Baranetsky Decl., Pls.' Ex. 3, ¶¶ 19-21, and journalists to limit their reporting with drones, Calzada Decl., Pls.' Ex. 4, ¶¶ 17, 23; Wade Decl., Pls.' Ex. 7, ¶¶ 12-13; Pappalardo Decl., Pls.' Ex. 5, ¶ 11. Defendants observe that Chapter 423 does not prohibit all newsgathering. Defs.' Opp. at 4 ("[A]t least some newsgathering activities can be completely legal within the meaning of Chapter 423."). But the fact that *some* journalists have still been able to report *some* stories with drones is not relevant to whether this law is constitutional. The record fully establishes that Plaintiffs have been restricted in their newsgathering, and the caselaw makes clear that restrictions on newsgathering require strict scrutiny.

### B.  Chapter 423 Fails Strict Scrutiny

A statute can pass strict scrutiny only if it is "actually necessary" to address a compelling government interest, *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011), and "narrowly tailored to achieve that interest," *Reed*, 576 U.S. at 171 (2015) (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)). Chapter 423 is neither.

#### i.    The Surveillance Provisions fail strict scrutiny

As in their summary judgment motion, Defendants make no attempt to explain how the parts of the Surveillance Provisions that criminalize possession or distribution of photos could pass strict scrutiny. For the rest of the Surveillance Provisions, they are not narrowly tailored for the reasons described in Plaintiffs' briefs. Pls.' Mot. for Summ. J., ECF No. 63 ("Pls.' Mot.") at 23-27; Pls.' Opp. at 8-9. They are overinclusive because they prohibit activity that would not implicate the state's asserted interests—their sweeping provisions bar journalists from recording images with drones in the 95 percent of the state that is private property, even when the same image could be recorded with a helicopter or by standing on public property. And they are underinclusive because their long list of exemptions allow certain people to engage in the very activity that the state claims it needs to regulate.

The Surveillance Provisions are also not actually necessary. Defendants strain to suggest that existing laws do not address harms that the Surveillance Provisions do. But the most they can come up with is the prospect that the Surveillance Provisions uniquely prohibit using a drone to photographically invade privacy *without* capturing sexual activity. Defs.' Opp. at 27. They offer no evidence that such non-sexual invasion of privacy is a problem in Texas. And while they say that Chapter 423 protects the state from a "futuristic dystopia where one's every move was subject to invisible monitoring from above," Defs.' Opp. at 19, such a hyperbolic and speculative claim is insufficient to demonstrate the type of compelling need required to satisfy strict scrutiny, *Consol.*

*Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 543 (1980) ("Mere speculation of harm does not constitute a compelling state interest."). In any event, other states do not impose restrictions on journalists' use of drones like Texas does, Baranetsky Decl., Pls.' Ex. 3, ¶ 12, and they have not found themselves in the "dystopia" that Defendants fear.

The other claims Defendants make about the dangers of drones are similarly far-fetched. The fact remains that none of the Defendants have needed to warn, arrest, or prosecute anyone using Chapter 423; instead, they have used other laws to address Texans who used drones in problematic ways. Defs.' Mot. at 11; Hemphill Decl. Ex. A, Pls.' Ex. 1, at 6-7 (Mathis' answers to interrogatories); Hemphill Decl. Ex. B at 6-7 (McCraw's answers to interrogatories); Defs.' Mot. at 11. Their opposition brief raises no new argument for why the Surveillance Provisions are actually necessary.

ii.     *The No-Fly Provisions fail strict scrutiny*

The No-Fly Provisions also lack narrow tailoring and actual necessity, and they therefore fail strict scrutiny. Defendants claim the provisions are narrowly tailored because they prohibit only drones that "pose the greatest risk" while "allowing those who follow FAA regulations to fly their drones unencumbered by restrictions,"[2] Defs.' Opp. at 28—a statement completely at odds with the text of the statute. The statutory exemption that mentions FAA regulations only pertains to *commercial* drone operators. TEX. GOV'T CODE § 423.0045(c)(1)(E). If a drone is not "being used for a commercial purpose," then it cannot fly, regardless of whether the pilot follows FAA regulations. *Id*. The FAA regulation requirement is not the narrow tailoring that defendants claim.

---

[2] Although Defendants' summary judgment motion suggested that FAA regulations were inadequate to protect citizens' safety, Defs.' Mot. at 5-6, their opposition brief now acknowledges that drone operators who follow all FAA regulations pose no safety concerns. Defs.' Opp. at 28. Those are the same regulations that Plaintiffs follow. Pappalardo Decl., Pls.' Ex. 5, ¶¶ 3, 4; Wade Decl., Pls.' Ex. 7, ¶ 6; Calzada Decl., Pls.' Ex. 4, ¶ 5.

As Plaintiffs have explained, the No-Fly Provisions are not narrowly tailored because they bar drone use over sites at all times, even when a drone would indisputably pose no risk—thus, they are overinclusive—and they are underinclusive because they exempt commercial operators, who implicate the state's interest in safety no less than do the Plaintiffs, who follow all the same safety and training regulations. Pls.' Mot. at 24-27.

Defendants offer no persuasive argument that the No-Fly Provisions are actually necessary. They admit that existing laws "prohibit *actual* damage or interruption at critical infrastructure facilities." Defs.' Opp. at 27-28 (emphasis in original). They say there is still a need for laws that "curb the *risk*" of damage before damage actually occurs. But deterrence is the point of all criminal laws, and Defendants offer no evidence of any substantial risk not properly deterred by other laws. Moreover, as the Defendants describe it, the only purpose of the No-Fly Provisions is prohibiting actions that could create a risk of damage but no actual damage. They do not explain how the state's interest in safety could be addressed by prohibiting acts that cause no damage, or why a more narrowly tailored statute that addresses the purported safety risks would not suffice. The No-Fly Provisions are not actually necessary for addressing the state's interest in safety.

### C.  Chapter 423 Would Also Fail Intermediate Scrutiny

As an initial matter, intermediate scrutiny is far from the "weak" standard that Defendants claim. Defs.' Opp. at 15. The Supreme Court has set out a stringent three-part test. *United States v. O'Brien*, 391 U.S. 367, 376 (1968). It is a "demanding" standard. *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 713 (D.C. Cir. 2011); *Mai v. United States*, 974 F.3d 1082, 1094 (9th Cir. 2020) (Bumatay, J., dissenting) (citing *United States v. Virginia*, 518 U.S. 515, 533 (1996)). If this Court were to conclude strict scrutiny did not apply to the Surveillance or No-Fly Provisions, intermediate scrutiny would. *See* Pls.' Mot. at 27-28; Pls.' Opp. at 9.

13

The provisions fail intermediate scrutiny for the reasons described in Plaintiff's prior briefs:

- The Surveillance and No-Fly Provisions do not further an important government interest. Many laws already exist to address the same interests the Defendants claim here, the provisions include extensive exemptions that undercut their supposed purpose, and none of the Defendants have seen a need to enforce the statute.

- The government interests are not unrelated to suppression of expression. Chapter 423 only advances the privacy interest by prohibiting recording, possessing, and distributing certain images. And the state advances its safety interest by prohibiting journalists—but not a wide range of exempted groups—from using drones to create images.

- The law is not narrowly tailored. Both sets of provisions prohibit far more conduct than would be needed to advance the government's claimed interests, and they exempt drone operators who would implicate those interests just as much as journalists would.

Only one argument from the Defendants calls for additional comment: that the state can advance its interests through multiple laws at the same time. That turns on its head *O'Brien*'s requirement that the law "furthers" a governmental interest. *See United States v. O'Brien*, 391 U.S. 367, 377 (1968). If a law already exists to address the state's interest, a new law addressing the same thing does nothing to "further" that interest. The government's asserted interests are already addressed by other laws. Chapter 423 does not further them.

### D.  The Statute Is Unconstitutionally Vague and Overbroad

In addition to failing strict scrutiny, Chapter 423 should be struck down because it is unconstitutionally vague and overbroad. Plaintiffs explained in their motion and opposition briefs why First Amendment overbreadth doctrine requires the statute to be struck down, and why the law is unconstitutionally vague. Defendants do not advance any new arguments.

As Plaintiffs previously established, "a statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008); *see* Pls.' Opp. at 9-10. Chapter 423 is unconstitutionally overbroad for the same reason it is overinclusive and

not narrowly tailored: it prohibits a wide array of conduct that would not implicate the state's asserted interested. Pls.' Mot. at 23-25.

The statute is also unconstitutionally vague, since it "fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited." *Women's Med. Ctr. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001). As discussed above and in Plaintiffs' previous briefs, the Surveillance Provisions fail to define what they mean by "surveillance," leaving journalists unsure whether their newsgathering is prohibited. *Supra* § I.A.i; Pls.' Mot. at 30-32; Pls.' Opp. at 10-12. Dictionary definitions do not clarify the issue, and neither do Defendants: they have offered a string of cherry-picked but nevertheless contradictory definitions that still might or might not include newsgathering. The No-Fly Provisions do not define the phrase "commercial purpose," which is central to their exemptions. The term "commercial" carries one definition in the photography industry—a definition that does not include journalism—and a range of other dictionary definitions. Pls.' Mot. at 32-33. All that the Defendants offer is a cross-referenced definition that, if a reader follows their citations, does not actually exist. They say that because the No-Fly Provisions require commercial operators to comply with "each applicable Federal Aviation Administration rule, restriction, or exemption," TEX. GOV'T CODE § 423.0045(c)(1)(E), the FAA's definition of "commercial" is incorporated into the No-Fly Provisions, *see* Defs.' Opp. at 31. Apart from the fact that nothing in Chapter 423 suggests it is adopting an FAA definition, the FAA provisions that Defendants cite *do not even offer a* definition of "commercial." *See* Defs.' Opp. at 31; *see also* Pls.' Opp. at 12-13. Chapter 423 gives drone operators like Plaintiffs no way "to know what conduct is prohibited" and is therefore unconstitutionally vague.

## III.    THE COURT HAS JURISDICTION

### A.  Defendants Do Not Have Sovereign Immunity

Defendants are not immune from this lawsuit. They say the Plaintiffs have not addressed *Ex parte Young* and have not made the evidentiary showing required to demonstrate jurisdiction. Not so. This Court determined that the pleadings were sufficient for purposes of the motion to dismiss to show the Defendants were not immune, Order at 15-17; the undisputed facts now establish the same things the pleadings alleged.

As Plaintiffs have previously explained:

- Defendants do not contest that they have the duty to enforce Chapter 423. Indeed, peace officers in Texas have the power and duty to enforce laws, including misdemeanors. Tex. Code Crim. Proc. arts. 2.13, 14.01. Defendant Mathis is a peace officer, *see* Tex. Code Crim. Proc. art. 2.12(4); Tex. Gov't Code § 411.006(a)(5), and Defendant McCraw supervises the thousands of peace officers in the Department of Public Safety. Tex. Gov't Code § 411.006(a)(1). Defendant Mau admits he has "prosecution authority." Defs.' Mot. at 12.

- Mau's office has previously charged a person with violating Chapter 423, Defs.' Mot. at 11, which is more than enough to establish a willingness to enforce the law, *Texas Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) ("A scintilla of enforcement by the relevant state official with respect to the challenged law will do." (quotation marks omitted)).

- The Defendants make no assurances they will not enforce Chapter 423 in the future. They could have offered to enter into a non-enforcement consent decree, but they have not. *See KVUE, Inc. v. Moore*, 709 F.2d 922, 930 (5th Cir. 1983) ("That the statute has not been enforced and that there is no certainty that it will be does not establish the lack of a case or controversy. The state has not disavowed enforcement.").

The uncontested facts establish that the Defendants are not immune to suit.

### B.  Plaintiffs Have Standing

Defendants' argument against Plaintiffs' standing offers nothing new since their last brief, except a misreading of Plaintiffs' injuries. They ignore the self-censorship harms Plaintiffs have suffered due to fear of enforcement.

A recent Eighth Circuit decision supports what Plaintiffs established in their prior briefs: Direct threats of enforcement are not necessary to bring about a chilling effect. Where plaintiffs in that case alleged that a state law creating a civil cause of action for unauthorized access to property chilled them from sending undercover investigators to gather information about the procedures at a slaughterhouse and farm, the court held that the law's chilling effect gave plaintiffs standing. *Animal Legal Def. Fund v. Vaught*, No. 20-1538, 2021 WL 3482998, at *3 (8th Cir. Aug. 9, 2021). That was so even though the defendants—private businesses that could have brought suit under the law after plaintiffs sent in an investigator—had not brought suit against the plaintiffs and had not threatened to do so. *Id.* ("A formal threat, however, is not required to establish an injury in fact. The question is whether the plaintiffs have an objectively reasonable fear of legal action that chills their speech.").

Plaintiffs previously established that they have suffered injuries-in-fact—including, for NPPA and TPA, injuries to support both associational and organizational standing:

- Pappalardo has stopped using his drone for newsgathering in Texas altogether, giving up his First Amendment right "for fear of facing criminal or civil liability." Pappalardo Decl., Pls.' Ex. 5, ¶¶ 10, 16. His declaration listed many stories he did not use his drone to report because of the law, and additional stories he would report in the future but for the law. Pappalardo Decl., Pls.' Ex. 5, ¶¶ 14, 15.

- NPPA member Brandon Wade stated that Chapter 423 "has chilled my First Amendment news gathering efforts by preventing me from photographing important scenes related to news stories using my UAS." Wade Decl., Pls.' Ex. 7, ¶ 13. He lost a series of photo assignments due to fears that Chapter 423 would prohibit the photography.[3] Wade Decl., Pls.' Ex. 7, ¶ 15.

---

[3] Wade estimates that he lost thousands of dollars in income from drone newsgathering assignments he would have received from *The Dallas Morning News* if not for Chapter 423. Wade Decl., Pls.' Ex. 7, ¶ 15. Defendants question whether he would have received any additional assignments, Defs.' Opp. at 7, but they offer no contradictory evidence. Wade is "one of the main freelancers" that the newspaper relies on and is "the only freelancer with a Part 107 drone license and a drone." Wade Decl., Pls.' Ex. 7, ¶ 15. Defendants do not challenge Plaintiffs' evidence establishing that Wade's clients have refused to publish his newsworthy drone images because of Chapter 423.

- NPPA member Guillermo Calzada has limited his use of drones following his encounter with San Marcos police in 2018, when officers told him he was violating state law by flying his drone over a public street to photograph a deadly apartment fire. Calzada Decl., Pls.' Ex. 4, ¶¶ 8-12, 23.

- TPA member *The Dallas Morning News,* whose photographers include NPPA members, has similarly self-censored, adopting a policy against drone use and deciding against publishing photos that Wade captured by drone for fear of violating Chapter 423. Wade Decl., Pls.' Ex. 7, ¶¶ 14-17.

- NPPA's attorneys devoted hours to responding to Chapter 423, including by counseling members about the law's restrictions, researching First Amendment protections available to them, and meeting with lawmakers to try to revise the law. Ramsess Decl.,[4] Pls.' Ex. 6 ¶¶ 12, 16-17.

- TPA has also had to divert resources to responding to Chapter 423 to try to help its members understand and avoid the law's restrictions. Baggett Decl., Pls.' Ex. 2, ¶ 5.

That is more than enough to establish injuries-in-fact for each Plaintiff.[5]

Defendants object that the injuries to NPPA and TPA are insufficient because neither organization has "identified a single specific project that it was prevented from undertaking" as a result of diverting resources to addressing Chapter 423. Defs.' Opp. at 14. But they cite no authority requiring a party to identify a "specific project" that went unaddressed. The organizations have shown they devoted extensive resources to ameliorating Chapter 423's unconstitutional effects that limit journalists' First Amendment rights. Ramsess Decl., Pls.' Ex. 6 ¶ 17; Baggett Decl., Pls.' Ex. 2, ¶ 5. "[A]n organization has standing to sue on its own behalf where it devotes resources to counteract a defendant's allegedly unlawful practices." *Ass'n of Cmty. Organizations*

---

[4] Although Defendants claim parts of the declarations of Akili-Casundria Ramsess, Executive Director of NPPA, and Donnis Baggett, Executive Vice President of TPA, are hearsay, Defs.' Opp. at 6, they do not identify specifically which statements they believe to be inadmissible and why, leaving Plaintiffs with little to respond to. Each statement in the declarations would be admissible at trial under a hearsay exception or because they are being offered to show the effect on the listener and not for the truth of the matter asserted.

[5] As the Court noted in its prior decision, only one Plaintiff needs to establish standing for the case to move forward. Order at 12 n.4 ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." (quoting *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006))).

*for Reform Now v. Fowler*, 178 F.3d 350, 360 (5th Cir. 1999) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Thus, courts have held, for example, that an organization had standing where one of its officers devoted time to register voters to counteract a state's allegedly unlawful voter registration practices. *Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014). And an immigration reform group that diverted resources to oppose President Trump's border wall had standing. *El Paso Cty. v. Trump*, 408 F. Supp. 3d 840, 854-55 (W.D. Tex. 2019). The same holds here. The organizational Plaintiffs have diverted resources from advancing their broader missions to instead counteract the unconstitutional harms imposed by Chapter 423, which gives them standing in this lawsuit.

As for the remainder of Defendants' sovereign immunity and standing arguments, Plaintiffs stand on their motion and opposition briefs. *See* Pls.' Mot. at 34-38; Pls.' Opp. at 13-18.

## CONCLUSION

For these reasons, and those set out in Plaintiffs' Motion and their Opposition to Defendants' Motion, the Court should grant Plaintiffs' motion for summary judgment.

Dated: August 23, 2021

Respectfully submitted,

By: /s/  James A. Hemphill
James A. Hemphill
Texas State Bar No. 00787674
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Ave., Suite 2700
Austin, Texas 78701
Tel: (512) 480-5762
Fax: (512) 536-9907
jhemphill@gdhm.com

Leah M. Nicholls (*pro hac vice*)
DC Bar No. 982730
Public Justice P.C.
1620 L Street NW, Suite 630

Washington, DC 20036
Tel: (202) 797-8600
lnicholls@publicjustice.net

David A. Schulz (*pro hac vice*)
NY State Bar No. 1514751
Media Freedom and Information
     Access Clinic
Yale Law School
127 Wall Street
New Haven, CT 06511
Tel: (212) 850-6103
Fax: (212) 223-1942
david.schulz@yale.edu

Mickey H. Osterreicher (*pro hac vice*)
New York State Bar No. 2938678
General Counsel
National Press Photographers
     Association
Finnerty Osterreicher & Abdulla
70 Niagara Street
Buffalo, NY 14202
Tel: (716) 983-7800
Fax: (716) 608-1509
lawyer@nppa.org

Alicia Wagner
Texas State Bar No. 24076296
Deputy General Counsel
National Press Photographers
     Association
Alicia Wagner Calzada, PLLC
12023 Radium, Suite B1
San Antonio, TX 78216
Tel: (210) 825-1449
Alicia@calzadalegal.com