# EXHIBIT B

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, TEXAS PRESS ASSOCIATION, and JOSEPH PAPPALARDO, *Plaintiffs* <br><br> v. <br><br> STEVEN MCCRAW, in his official capacity as Director of Texas Department of Public Safety, RON JOY, in his official capacity as Chief of the Texas Highway Patrol, and WES MAU, in his official capacity as District Attorney of Hays County, Texas, *Defendants* | Civil Action No. 1:19-cv-00946 |

## AMICUS BRIEF OF THE TEXAS ASSOCIATION OF BROADCASTERS AND REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS

Amici the Texas Association of Broadcasters and Reporters Committee for Freedom of the Press, joined by over 40 additional Amici described below (collectively the "Amici") respectfully submit the following brief in support of the Motion for Summary Judgment, ECF No. 63 (the "Motion"), filed by Plaintiffs in this civil action.

### INTRODUCTION

The restrictions challenged in this lawsuit undercut foundational principles of press freedom, while failing to further any cognizable interest in safety or privacy. As aptly illustrated by the Plaintiffs, Chapter 423 of the Texas Government Code broadly prohibits use of Unmanned Aerial Vehicles by journalists in public airspace, yet arbitrarily exempts other members of the public from those proscriptions. The result is a statute that uniquely burdens the press, harming both press members and the news-consuming public they serve. Such a statute cannot withstand

constitutional scrutiny, and the undersigned respectfully submit that the challenged provisions should be invalidated as requested in the Motion.

## BACKGROUND

Amici represent local broadcasters and publishers across Texas, as well as others around the country committed to defending the newsgathering rights of journalists and the news-consuming public they serve.

TAB is an Austin-based trade association representing the interests of Texas' over 1,200 free, over-the-air radio and television stations. Formed in 1953, membership is open to commercial and non-commercial radio and television stations, companies doing business with the broadcast industry, current students and educators, and retired industry professionals.

The Reporters Committee for Freedom of the Press was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

Joining TAB and RCFP as Amici are 44 additional entities interested in the outcome of this dispute. These Amici represent a broad range of interests—from local news stations in El Paso to national associations in New York—who have come together to present their views on the important matters under review through this single amicus brief. A comprehensive list of these Amici, their specific statements of interest, and their corporate disclosures (as applicable) are included herewith as **Exhibit A**.

## ARGUMENT

**I.      Broadcasters and reporters use UAVs to provide a tangible public benefit.**

Frank discussion of Unmanned Aerial Vehicles ("UAVs") begins with an incontrovertible truth—they are valuable newsgathering tools. As Plaintiffs point out, similar to traditional implements like helicopters and fixed-wing aircraft, UAVs allow broadcasters and other journalists to reach the scene more quickly, follow events from an elevated perspective, and inform citizens in more engaging ways. *See* Motion at 2–6; *see also* David A. Fischer, DRON'T STOP ME NOW: PRIORITIZING DRONE JOURNALISM IN COMMERCIAL DRONE REGULATION, 43 Colum. J.L. & Arts 107, 108 (2019); *see also* David Goldberg, DRONALISM: JOURNALISM, REMOTELY PILOTED AIRCRAFT, LAW AND REGULATION, 10 FIU L. Rev. 405, 414 (2015).

This utility extends to newsgathering and reporting. Broadcasters in Texas alone have used UAVs to cover:

- Flooding, hurricanes, and other natural disasters in Houston and Central Texas;[1]

- Crane accidents in Dallas and Austin;[2]

- Fires, explosions, and other industrial accidents;[3]

---

[1] *Birds-eye view of Houston floods from SkyDrone13*, KTRK-TV HOUSTON (Aug. 8, 2017), https://abc13.com/weather/birds-eye-view-of-houston-floods-from-skydrone13/2285865/; KHOU 11 NEWS, *Drone 11: Hurricane Laura aftermath in Orange, Tex.*, FACEBOOK (Aug. 27, 2020), https://www.facebook.com/KHOU11/videos/drone-11-hurricane-laura-aftermath-in-orange-texas/757296301756704/; *Drone video captures Hurricane Laura damage in Orange, Tex.*, KMBT 12 NEWS (Aug. 27, 2020), https://www.12newsnow.com/article/weather/hurricane/drone-video-captures-hurricane-laura-damage-in-orange-texas/502-8b8a02cc-18a5-47d7-b8f2-2527b3085437; *Aerial Video: Central Texas flooding devastation from above*, KXAN (Oct. 19, 2018), https://www.kxan.com/news/aerial-video-central-texas-flooding-devastation-from-above/; *3 killed, at least 20 injured after tornado rips through Onalaska in Polk County*, KSAT (Apr. 23, 2020), https://www.ksat.com/news/2020/04/23/3-killed-at-least-20-injured-after-tornado-rips-through-onalaska-in-polk-county/.
[2] *Crane collision injures 22, hospitalizes 16 in East Austin*, WFAA (Sept. 7, 2020), https://www.wfaa.com/article/news/local/east-austin-mueller-cranes-collide-collapse/269-7362cd13-326c-4bd7-a1c3-0b445e2800d6; *Vehicles to Be Removed From Elan City Lights Parking Garage on Monday*, NBCDFW (Oct. 5, 2019), https://www.nbcdfw.com/news/local/vehicles-to-be-removed-from-elan-city-lights-parking-garage-on-monday/273265/.
[3] *SkyDrone13 over the Crosby Square Apartment fire damage*, KRTK-TV HOUSTON (July 10, 2017), https://abc13.com/news/skydrone13-over-the-crosby-square-apartment-fire-damage/2203639/; *Amazing drone video over site of massive Houston explosion at Watson Grinding and Manufacturing*, KHOU 11 NEWS (Jan. 24 2020),

- Protests during the summer of 2020;[4]

- Structures of civic pride like a high school football stadium in Crosby;[5]

- Family events such as a sandcastle competition in Galveston[6] or the Houston Marathon;[7] and

- A simple sunrise in Seabrook.[8]

In San Antonio, as observed by the local paper, "[a] single photograph" taken via UAV "powerfully distilled the desperation felt by millions of Americans" during the early days of the COVID-19 pandemic.[9] The picture, which captured staggering lines at an area food bank, garnered national attention, and "helped trigger millions of dollars in individual and corporate donations to the Food Bank." *Id.* Regarding UAVs, the photographer specifically noted that:

> While drones won't replace traditional photography, they are a wonderful addition to our toolbox. A helicopter would have put me much higher; a ladder wouldn't have been high enough. But the drone, flying about 150 to 200 feet off the ground, allowed

---

https://www.khou.com/video/news/amazing-drone-video-over-site-of-massive-houston-explosion-at-watson-grinding-and-manufacturing/285-ff997f0c-b35c-47e3-a87b-7a852d1c5412; *Incredible drone video shows I-10 barge crash near Houston*, KHOU 11 NEWS (Sept. 20, 2019), https://www.khou.com/video/news/state/texas-news/drone-video-i-10-san-jacinto-barge-crash/502-b171672e-a336-4a4e-b12f-0d11143237cd.

[4] *Lawsuit: Protesto says he was running away when APD officer shot him in the face with 'less lethal round*, KXAN (Nov. 10, 2020), https://www.kxan.com/austin-george-floyd-mike-ramos-protests/lawsuit-protester-says-he-was-running-away-when-apd-officer-shot-him-in-the-face-with-less-lethal-round/.

[5] *FREEDOM FIELD: Step inside Alvin ISD's $41.5 million football stadium*, KTRK-TV HOUSTON (Sept. 21, 2018), https://abc13.com/sports/step-inside-alvin-isds-$415-million-football-stadium/4306682/; *SkyDrone 13: Crosby ISD's beautiful Cougar Stadium*, KTRK-TV HOUSTON (Sept. 25, 2019), https://abc13.com/sports/skydrone13-crosby-isds-beautiful-cougar-stadium/4422894/.

[6] *SkyDrone 13 sandcastle competition*, KTRK-HOUSTON (June 15, 2017), https://abc13.com/hobbies/skydrone13-sandcastle-competition-/2105142/.

[7] *SkyDrone 13 gets amazing views of Chevron Houston Marathon*, KTRK-HOUSTON (Jan. 5, 2021), https://abc13.com/sports/skydrone13-gets-amazing-views-of-the-chevron-houston-marathon/2943510/.

[8] *Skydrone13 captures a beautiful sunrise in Seabrook, Tex.*, KTRK-HOUSTON (Mar. 14, 2018) https://abc13.com/travel/skydrone13-captures-a-beautiful-sunrise-in-seabrook-texas/3215638/.

[9] Marc Duvoisin, *The story behind this viral photo of the San Antonio Food Bank during coronavirus shutdowns*, SAN ANTONIO EXPRESS-NEWS (May 14, 2020), https://www.expressnews.com/news/local/article/The-story-behind-the-viral-photo-of-cars-parked-15270219.php; *How San Antonio Food Bank became lifeline for South Texas during COVID-19 pandemic*, KSAT (July 6, 2020), https://www.ksat.com/news/local/2020/07/06/how-san-antonio-food-bank-became-lifeline-for-south-texas-during-covid-19-pandemic/.

>                    me to show the scale of the need while still allowing
>                    viewers to feel connected to the people in the cars.

*Id.*

More recently, UAVs played a pivotal role in coverage of the winter storm that wreaked havoc across the state. Texans searching for basic necessities leaned on local news outlets, who deployed drones to offer perspective and updates.[10] The storytelling power of UAVs in the hands of broadcasters and reporters is demonstrable and profound.

UAVs also enjoy certain advantages over other aerial newsgathering platforms. *See* Cynthia D. Love, Sean T. Lawson, Avery E. Holton, NEWS FROM ABOVE: FIRST AMENDMENT IMPLICATIONS OF THE F.A.A. BAN ON COMMERCIAL DRONES, 21 B.U.J. Sci. & Tech. L. 22, 28–34 (2015) (hereinafter "NEWS FROM ABOVE"). A high-quality consumer UAV with an HD camera can cost as little as $1,000, weigh just ten pounds, and operate at a fraction of the cost of traditional manned flights. *See* NATIONAL LEAGUE OF CITIES, CITIES AND DRONES: WHAT CITIES NEED TO KNOW ABOUT UNMANNED AERIAL VEHICLES 1 (2016) (hereinafter "CITIES AND DRONES"); NEWS FROM ABOVE at 33. UAVs are thus smaller, quieter, and less expensive to obtain and operate than traditional aircraft.

Generally speaking, they are safer too. While UAVs of course carry their own risks, reported incidents "represent a miniscule fraction of drone operations, the overwhelming majority of which help to augment and serve communities for the better." CITIES AND DRONES at 1. It goes without saying that "[w]hen a fuel-filled, 1,500 pound JetRanger [helicopter] becomes controlled solely by gravity, the risks, in terms of loss of life, injury and property damage are vastly worse

---

[10] Chris Sadeghi (@chrissadeghi), TWITTER (Feb. 11, 2021), https://twitter.com/chrissadeghi/status/1359897647931342855; Amanda McCoy, *Drone footage shows cleanup effort to remove dozens of vehicles involved in massive pile-up*, FT.-WORTH STAR-TELEGRAM (Feb. 11, 2021), https://www.star-telegram.com/news/local/fort-worth/article249187560.html; Diana Wray, *A Drone's-eye View of a Snowbound Houston*, HOUSTONIA (Feb. 15, 2021), https://www.houstoniamag.com/news-and-city-life/2021/02/a-drones-eye-view-of-snowbound-houston.

than if the same were to occur with a battery-powered, 3-pound model aircraft." NEWS FROM ABOVE at 33–34. In this way, UAVs have "oftentimes replaced more hazardous operations," as they operate more safely and less intrusively than other implements. CITIES AND DRONES AT 1.

## II. Chapter 423 is a speaker-based restriction that discriminates against the press and is therefore particularly corrosive to fundamental press freedoms.

Despite the numerous benefits offered by UAVs in the pursuit of local journalism, the specter of civil and criminal liability under Chapter 423 constrains their use in newsgathering. The experiences of the journalists identified by Plaintiffs who are wary of the potential legal exposure that accompanies every UAV operation under the current regulatory scheme, *see* Compl. ¶¶ 57–89, ECF No. 1, typify the concerns of the Amici in this regard. And the deficiencies in Chapter 423 are of constitutional moment. As a speaker-based regulation that discriminates against the press, Chapter 423 violates the First Amendment in a way that directly harms the free flow of newsworthy information to the public.

### A. Chapter 423 fails strict scrutiny.

To that point, Chapter 423 makes exceptions for certain speakers, but not for journalists, which is of particular concern to Amici.[11] As the Court has observed, "[c]ertain individuals are permitted to capture UAV images under the Surveillance Provisions, such as professors, students, professional engineers, and insurance company employees," but not the press. Order at 19, ECF No. 52. Likewise, with respect to the No-Fly provisions of the law, "inconsistent prohibition of UAVs indicates that [they] are restricting more speech than necessary to achieve the government's alleged interest." *Id.* at 24.

---

[11] Specifically, Texas Government Code Sections 423.002, 423.003, 423.004, and 423.006 (together "Surveillance Provisions"), and Sections 423.0045 and 423.0046 (together "No-Fly Provisions").

These provisions, as written, permit a favored few to engage in comparatively unrestricted UAV photography, but forbid broadcasters and reporters—the public's newsgathering arm—from doing the same. These provisions are, as such, speaker-based regulations, which are presumptively unconstitutional, as Plaintiffs argue. *See* Compl. ¶¶ 97-102; *see also Police Dept. of Chicago v. Mosley*, 408 U.S. 92 (1972) (invalidating a law that prohibited picketing within 150 feet of a public school during school hours except by labor unions); *Carey v. Brown*, 447 U.S. 455 (1980) (invalidating a statute that prohibited all residential picketing except by labor unions). Such regulations are subject to strict scrutiny, meaning they are valid only if the state can demonstrate a compelling need for the regulation and that the regulation is narrowly tailored to that need. *See Sorrell v. IMS Health*, 564 U.S. 552 (2011) (finding that a statute imposing speaker-based burdens on protected expression is subject to heightened scrutiny); *Boos v. Barry*, 485 U.S. 312 (1988) (finding that, even with a compelling government interest, a regulation failed because it was not narrowly tailored).

Speaker-based restrictions are subject to strict scrutiny because they operate to "burden[] disfavored speech by disfavored speakers," *Sorrell*, 564 U.S. at 564, and permit the government to target a form of "protected expression" that it finds "too persuasive" while leaving "unburdened those speakers whose messages are in accord with its own views," *id.* at 580. When speaker-based restrictions, such as discriminatory taxation schemes, burden members of the news media, they can serve "as a censor to check critical comment by the press, undercutting the basic assumption of our political system that the press will often serve as an important restraint on government." *Minn. Star and Tribune Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 585 (1983).

Here, the restrictions allow UAVs to be used by some operators in certain contexts but prohibit the press from using UAVs to collect the same information and report it in the public

interest. That is, professors, pipeline operators, surveyors, real estate brokers, and professional engineers can use UAVs for a variety of enumerated reasons, but the press cannot; similarly, certain speakers can use UAVs to photograph disaster areas, animal feedlots, energy facilities, and correctional institutions, but the press cannot. *See* Tex. Gov't Code §§ 423.002, 423.0045, and 423.0046. The restrictions therefore resemble the types of regulations that have been routinely invalidated as discriminating against the press (or among certain members of the press) because of the concern that such regulations can be used as tools of press censorship. *See, e.g., Minn. Star*, 460 U.S. at 575 (finding use tax on paper and ink singles out the press); *Ark. Writers Project, Inc. v. Ragland*, 481 U.S. 221, 234 (1987) (finding tax scheme that exempted certain journals but not general interest magazines unconstitutional); *Grosjean v. Am. Press Co.*, 297 U.S. 233, 251 (1936) (finding tax imposed on high-circulation publications unconstitutional).

### B. Chapter 423 also contravenes the purpose underlying the First Amendment's protections for newsgathering.

The challenged provisions fail not only the test of legal sufficiency articulated above and by the Plaintiffs, they fail the test of prudent public policy as well. The underpinnings of American press freedom are remarkably practical: "[I]n a society in which each individual has but limited time and resources with which to observe at first hand . . . he relies necessarily upon the press to bring him in convenient form the facts of those operations." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491 (1975). The press "serves as the information-gathering agent of the public," *Nixon v. Warner Comm'cns, Inc.*, 435 U.S. 589, 609 (1978), meaning "news gathering," as the Supreme Court has observed, must receive First Amendment protection. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated") (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681

(1972)). In short, we protect freedom of the press because many citizens lack the time and resources to personally observe a day's many newsworthy events.

These precepts typically facilitate press access to sources of information available to members of the public. *See Richmond Newspapers*, 448 U.S. at 573 ("media representatives enjoy the same right of access as the public . . ."); *Cox Broadcasting Corp.*, 420 U.S. at 495; *see also Health Sys. Agency of N. Virginia v. Virginia State Bd. of Med.*, 424 F. Supp. 267, 272 (E.D. Va. 1976) ("[T]he right of the press to gather news extends at a minimum to access to sources of information available to members of the general public."); *Times-Picayune Pub. Corp. v. Lee*, CIV.A. 88-1325, 1988 WL 36491, at *9 (E.D. La. Apr. 15, 1988) ("This right includes, at a minimum, a right of access to information made available to the public or made available generally to the press."). Were it otherwise, the information-gathering mission of the press would be thwarted, and the public left in the dark about matters of public concern. *See Richmond Newspapers*, 448 U.S. at 573 ("this validates the media claim of functioning as surrogates for the public").

### III. Chapter 423 does not effectively further any safety or privacy interests.

While Defendants may argue that the statute's intrusion on that newsgathering mission is motivated by benevolent intentions, Chapter 423 fails to effectively further any cognizable public interest. The Supreme Court long ago recognized that "airspace, apart from the immediate reaches above the land, is part of the public domain." *United States v. Causby*, 327 U.S. 256, 266 (1946). That is why the commonplace operation of traditional aircraft by commercial operators in the airspace above private property does not implicate traditional conceptions of privacy or seclusion.

In *Bevers v. Gaylord Broadcasting Co., L.P.*, No. 05-01-00895-CV, 2002 WL 1582286 (Tex. App.—Dallas July 18, 2002, pet. denied), for example, a Texas court of appeals affirmed dismissal of claims for negligence, trespass, and infliction of emotional distress asserted by a

homeowner against a news crew whose "helicopter hovered over the [plaintiff]'s residence" while "working on a story about the poor condition of rental properties." *Id.* at *1. As the court observed, "[l]andowners have no right to exclude overflights above their property, because airspace is part of the public domain." *Id.* at *6. Such operations therefore do not "as a matter of law, rise to the level of 'substantial interference' with the use and enjoyment of the underlying land." *Id.*

The Supreme Court recognized similar principles in *Florida v. Riley*, 488 U.S. 445 (1989), when it assessed whether a suspect had reasonable expectations of privacy in his "partially covered greenhouse in a residential backyard from the vantage point of a helicopter located 400 feet above the greenhouse." *Id.* at 447–48. While *Riley* involved government surveillance implicating Fourth Amendment concerns, the Court concluded that the homeowner "could not reasonably have expected that his greenhouse was protected from ***public or official*** observation from a helicopter had it been flying within the navigable airspace for fixed-wing aircraft." *Id.* at 450–51 (emphasis added).

Together, *Beyers* and *Florida* bring the potentially absurd implications of Chapter 423 into bold relief. A broadcaster operating a ten-pound electric drone over the properties in those cases may well have faced liability, while another operating a two-ton helicopter would not. This compounds Amici's concerns with the unjustifiable distinction between newsgathering and other commercial activities in the statute.

The State's filings in this case only exacerbate that concern. They suggest, for example, that because the Surveillance Provisions require specific intent, and because "[t]he question of specific intent to commit a crime is for the jury to decide," 7 Chapter 423 causes no issue. *See* Response at 4, 18–19, ECF No. 68. Put another way, the State argues that this Court need not worry about the Surveillance Provisions' actual prohibitions, because the statute saddles future

juries with the task of divining that imperceptible line where lawful "observation," *see Riley*, 488 U.S. at 450–51, strays into misdemeanor "surveillance." The State effectively concedes one of the primary flaws with the statute. *See* Motion at 28–34.

The State also strays into dangerous territory, asserting that Chapter 423 is permissible because it denies access to just one of many tools, and "journalists remain free to capture the same images using conventional aircraft or other means." Defs' MSJ at 18, ECF No. 65. But as Justice Black recognized long ago, "First Amendment freedoms can no more validly be taken away by degrees than by one fell swoop." *N.L.R.B. v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 80 (1964) (Black, J., concurring). That is why courts reject the artificial distinction between speech and the instruments that enable it invoked by the State.

In *Saia v. People of State of New York*, 334 U.S. 558 (1948), for example, the Supreme Court invalidated "a penal ordinance of the City of Lockport, New York, which forb[ade] the use of sound amplification devices except with permission of the Chief of Police." *Id.* at 558. As the Court observed, "[w]hen a city allows an official to ban [loud-speakers] in his uncontrolled discretion, it sanctions a device for suppression of free communication of ideas." *Id.* at 562. Courts should not blind themselves to the impact of such regulations on speech just because authorities targeted a particular instrumentality rather than the message it conveys. "Annoyance at ideas can be cloaked in annoyance at sound" or other contrivances. *Id.* "The power of censorship inherent in this type of ordinance," the Court observed, "reveals its vice." *Id.*

The State also cannot justify its regulation on the basis that it targets preliminary "conduct" inherent in the formation of speech, rather than the fully formed speech itself. In *Turner v. Lieutenant Driver*, 848 F.3d 678 (5th Cir. 2017), the Fifth Circuit recognized that "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit

government form limiting the stock of information form which members of the public may draw." *Id.* at 688 (quoting *F. Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978)). "Furthermore," the Court observed, "The Supreme Court has long recognized that the First Amendment protects film," and "[a] corollary to this principle is that the First Amendment protects the act of making film." *Id.* at 688–89.

In short, "the Supreme Court has never 'drawn a distinction between the process of creating a form of pure speech . . . and the product of these processes . . . in terms of the First Amendment protection afforded." *Id.* (quoting *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061–62 (9th Cir. 2010)); *see also ACLU of Illinois v. Alvarez*, 679 F.3d 583, 597 (7th Cir. 2012) (recognizing that "[a]udio and audiovisual recordings are communication technologies, and as such, they enable speech"). Condoning arbitrary regulation of those technologies would nonetheless allow "the State [t]o effectively control or suppress speech by the simple expedient of restricting an early step in the speech process rather than the end result." *Alvarez*, 679 F.3d at 597.

In sum, as currently formulated, Chapter 423 cuts off broadcasters' and other journalists' access to a traditionally public domain, in furtherance of purported privacy rights that do not exist, while incentivizing the use of less desirable alternatives. The statute's practical effects and the State's arguments in support fall woefully short of justifying those significant First Amendment intrusions.

## CONCLUSION

Chapter 423 sought to "strike a balance between the right to privacy and the rights to free speech and a free press." Texas Bill Analysis, H.B. 912, 5/7/2013. Despite its drafters' intent, that balance has not been achieved. For the reasons set forth above and in the Plaintiffs' Motion, the undersigned Amici respectfully submit that the Surveillance and No-Fly Provisions are unconstitutional, and should be invalidated.

Respectfully submitted,

*/s/ Paul C. Watler*
_____
Paul C. Watler
State Bar No. 20931600
pwatler@jw.com
Eric D. Wong
State Bar No. 24102659
ewong@jw.com
JACKSON WALKER L.L.P.
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
(214) 953-6000 – Telephone
(214) 953-5822 – Fax

**ATTORNEYS FOR AMICI**

## CERTIFICATE OF SERVICE

This certifies that on September 23, 2021, a true and correct copy of the foregoing document was served via the Court's ECF system upon all counsel of record who are registered ECF users in a manner authorized by Rule 5(b)(2) of the Federal Rules of Civil Procedure.

*/s/ Paul C. Watler*
_____
Paul C. Watler